IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| PERKINS DELAWARE, LLC, a Delaware limited liability company, | ) ) ) | CASE NO. _____ |
| Plaintiff, | ) ) | |
| vs. | ) ) | **NOTICE OF REMOVAL** |
| MF CORNHUSKER MEMBER LLC, a Delaware limited liability company, and MFP CORNHUSKER PROPERTIES LLC, a Delaware limited liability company, | ) ) ) ) ) | **PURSUANT TO 28 U.S.C. § 1441(b)** |
| Defendants. | ) | |

**TO THE CLERK OF THIS COURT AND TO THE PLAINTIFF AND ITS COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that pursuant to 28 U.S.C. § 1441(b) and 1332, Defendant, MF Cornhusker Member LLC ("PF Member"), hereby removes to this Court the State Court action described below.

**PLEASE TAKE FURTHER NOTICE** that a copy of this Notice of Removal is being served on all parties and is also attached to the Notice of Removal of Action to Federal Court being filed with the Clerk of the District Court of Douglas County, Nebraska.  A true and correct copy of the Notice of Removal of Action to Federal Court being filed with the Clerk of Douglas County, Nebraska is attached to this Notice as *Exhibit A.*

1.      On August 15, 2017, Plaintiff, Perkins Delaware, LLC ("Perkins Member"), commenced the above-entitled action in the District Court of Douglas County,

Nebraska, against Defendants, MF Cornhusker Member LLC ("PF Member") and MFP Cornhusker Properties LLC ("MFP Cornhusker"). This action bears Case No.: CI17-6964, in the records and files of that Court. Pursuant to 28 U.S.C. § 1446(a), a true and correct copy of all process, pleadings and orders received or otherwise known to have been filed in the state action pursuant to 28 U.S.C. § 1446(a) are attached to this Notice as *Exhibit B.*

2.     This Notice of Removal is filed within 30 days of the filing of this action in Douglas County District Court on August 15, 2017. The Complaint was served upon PF Member by registered mail after filing and received on August 18, 2017. Thus, this Notice of Removal is filed within 30 days of receipt of the Complaint and is therefore timely under 28 U.S.C. § 1446(b).

3.     Venue in this Court is proper pursuant to 28 U.S.C. § 1441(a).

4.     This Court has jurisdiction herein pursuant to 28 U.S.C. § 1332 because the state citizenship for diversity purposes of Perkins Member is different than the state citizenship for diversity purposes of PF Member, because the state citizenship for diversity purposes of Defendant MFP Cornhusker must be disregarded, and because the amount in controversy exceeds $75,000.

5.     Although the Complaint includes MFP Cornhusker as a Defendant, the allegations in the Complaint make clear that no relief is sought against MFP Cornhusker and that Perkins Member has joined MFP Cornhusker in the hope that MFP Cornhusker will consent to being a plaintiff in the action. (Complaint, ¶ 3.) Specifically, Perkins Member acknowledges that, "Plaintiff Perkins Member does not seek affirmative relief

against MFP Cornhusker, but joins MFP Cornhusker in that it has an interest in this litigation sufficient to have a right to intervene if it so sought. MFP Cornhusker may be united in interest with Perkins Member, but is joined as a defendant because in the urgency of filing this lawsuit Perkins Member had not obtained consent of MFP Cornhusker to be named as a plaintiff." (*Id.*) MFP Cornhusker is a nominal party to these proceedings against which no claim for relief is asserted. Accordingly, because no claim for relief against MFP Cornhusker exists and no liability to Perkins Member can be found, MFP Cornhusker must be disregarded for purposes of assessing diversity jurisdiction under fraudulent joinder principles. *Filla v. Norfolk S. Ry. Co.*, 336 F.3d 806, 811 (8th Cir. 2003).

6.      The state citizenship for diversity purposes of Perkins Member is the state of Nebraska. Perkins Member is a limited liability company. Its sole member is Perkins Centers Delaware, LLC. That entity's sole member, in turn, is Perkins, LLC. That entity's two members are: (1) Market Square, Inc., a corporation organized under the laws of the State of Nebraska with its principal place of business in Nebraska; and (2) Michael D. Perkins, as trustee of the Michael D. Perkins Funnel Trust dated June 6, 1996. Mr. Perkins is a citizen of Nebraska.

7.      The state citizenship for diversity purposes of PF Member is North Carolina. PF Member is a limited liability company. Its sole member is Mountain Funding, LLC. That entity's sole member, in turn, is The Mountain Real Estate Group, LLC. That entity, in turn, has two members: (1) Peter J. Fioretti, a citizen of North

Carolina; and (2) MFNC, Inc., a corporation organized under the laws of the State of North Carolina with its principal place of business in North Carolina.

8.     Accordingly—and because the state citizenship for diversity purposes of MFP Cornhusker must be disregarded—complete diversity exists between Perkins Member and PF Member.

9.     The amount in controversy in this case exceeds $75,000.  The Complaint pleads claims for declaratory and injunctive relief that seek to determine which entity will control MFP Cornhusker as its manager.  MFP Cornhusker is a substantial business that manages 11 commercial properties through another entity, MFP Mid-America Shopping Centers, LLC.  (Complaint, ¶ 9.)  The claims arise out of $47,500,000 in mortgage lending obtained by PF Member for MFP Mid-America and the recent decision by Perkins Member to refinance a very substantial portion of that indebtedness, reducing outstanding liability by over $2,125,000.  Defendant PF Member has taken the position that the refinancing was a Major Decision that required the consent of Member under the Operating Agreement and that because Member did not provide such consent, Perkins Member could be removed from its role as manager of MFP Cornhusker.  Perkins Member claims that this allegation is untrue and has been made to "wrongfully take control of MFP Cornhusker of which [PF Member] is only a 10% owner and wrongfully seize economic interests of Perkins Member."  The value of control of MFP Cornhusker through the Manager position and the "economic interests" and issues at stake in this litigation greatly exceed $75,000.

10.     If any question arises as to the propriety of the removal of this action, PF Member requests the opportunity to brief any disputed issues and to present oral argument in support of its position that this case is properly removable.

11.     Nothing in this Notice of Removal shall be interpreted as a waiver or relinquishment of PF Member's right to assert any defense or affirmative matter.

**WHEREFORE,** Defendant PF Member hereby removes the above-captioned action from the District Court of Douglas County, Nebraska, to the United States District Court for the District of Nebraska, and requests that further proceedings be conducted in this Court as provided by law.

Dated: September 13, 2017.

> MF CORNHUSKER MEMBER LLC,
> Defendant,
>
>
> By: _/s/David S. Houghton_
>      David S. Houghton, #15204
>      Keith A. Harvat, #21008
>      HOUGHTON BRADFORD WHITTED PC, LLO
>      6457 Frances Street, Suite 100
>      Omaha, NE  68106
>      Telephone:  (402) 344-4000
>      Facsimile:  (402) 930-1099
>      dhoughton@houghtonbradford.com
>      kharvat@houghtonbradford.com
>
>      *Attorneys for Defendant MF Cornhusker Member LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the foregoing Notice of Removal was deposited in the United States mail, regular postage prepaid, on this 13th day of September, 2017, addressed to the following parties:

Martin P. Pelster
David J. Skalka
Croker, Huck, Kasher, DeWitt,
   Anderson & Gonderinger, L.L.C.
2120 South 72nd Street, Suite 1200
Omaha, NE  68124

Bret A. Puls
Fox Rothschild, LLP
Campbell Mithun Tower, Suite 2000
222 South Ninth Street
Minneapolis, MN  55402-3338

*/s/David S. Houghton*

430025

# EXHIBIT A

IN THE DISTRICT COURT OF DOUGLAS COUNTY, NEBRASKA

| | | |
|---|---|---|
| PERKINS DELAWARE, LLC, a Delaware limited liability company, | ) ) ) | CASE NO. 17-6964 |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | **NOTICE OF REMOVAL OF** |
| | ) | **ACTION TO FEDERAL COURT** |
| MF CORNHUSKER MEMBER LLC, a Delaware limited liability company, and MFP CORNHUSKER PROPERTIES LLC, a Delaware limited liability company, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**TO:  PLAINTIFF, ITS COUNSEL OF RECORD, AND THE CLERK OF THE DISTRICT COURT OF DOUGLAS COUNTY, NEBRASKA**

**PLEASE TAKE NOTICE** that the Defendant, MF Cornhusker Member LLC, by and through its counsel of record, respectfully informs the Court that on September 13, 2017, Defendant has removed this action to the United States District Court for the District of Nebraska.  A true and correct copy of the Notice of Removal Pursuant to 28 U.S.C. § 1441(b) filed with the Clerk of the United States District Court for the District of Nebraska (without exhibits) is attached hereto as *Exhibit A.*

**PLEASE TAKE FURTHER NOTICE** that, pursuant to 28 U.S.C. § 1446, the filing of this Notice affects the removal of this action to Federal Court and this Court is directed to "proceed no further unless and until the case is remanded."  28 U.S.C. § 1446(d).  By filing this Notice, Defendant does not waive any otherwise valid defenses

and expressly reserves the right to assert the defense of lack of jurisdiction over the

parties and improper venue if this action for any reason is remanded to this Court.

Dated: September 13, 2017.

MF CORNHUSKER MEMBER LLC, and
MFP CORNHUSKER PROPERTIES LLC,
Defendants,

By: _____ /s/ David S. Houghton _____
David S. Houghton, #15204
Keith A. Harvat, #21008
HOUGHTON BRADFORD WHITTED PC, LLO
6457 Frances Street, Suite 100
Omaha, NE  68106
Telephone:  (402) 344-4000
Facsimile:  (402) 930-1099
dhoughton@houghtonbradford.com
kharvat@houghtonbradford.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing Notice of Removal was deposited in the United States mail, regular postage prepaid, on this 13th day of September, 2017, addressed to the following parties:

Martin P. Pelster
David J. Skalka
Croker, Huck, Kasher, DeWitt,
  Anderson & Gonderinger, L.L.C.
2120 South 72nd Street, Suite 1200
Omaha, NE  68124

Bret A. Puls
Fox Rothschild, LLP
Campbell Mithun Tower, Suite 2000
222 South Ninth Street
Minneapolis, MN  55402-3338

_____ /s/ David S. Houghton _____
David S. Houghton

429963

# EXHIBIT B

Filed in Douglas District Court
*** EFILED ***
Case Number: D01CI170006964
Transaction ID: 0005644452
Filing Date: 08/15/2017 09:41:37 AM CDT

IN THE DISTRICT COURT OF DOUGLAS COUNTY, NEBRASKA

| | | |
|---|---|---|
| PERKINS DELAWARE, LLC, a Delaware limited liability company, | ) ) ) | CASE NO.: _____ |
| | ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | **COMPLAINT** (Equity) |
| MF CORNHUSKER MEMBER LLC, a Delaware limited liability company, and MFP CORNHUSKER PROPERTIES LLC, a Delaware limited liability company, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

COMES NOW Plaintiff Perkins Delaware, LLC ("Perkins Member"), and for its claims

for relief against Defendant MF Cornhusker Member LLC ("PF Member"), states and alleges as

follows:

## COMMON FACTS

1.     Perkins Member is a Delaware limited liability company doing business in

Douglas County, Nebraska.  Through corporate entities and a revocable trust, Michael Perkins,

an individual, wholly owns and controls Perkins Member.

2.     Defendant MF Cornhusker Member LLC ("PF Member") is a Delaware limited

liability company with its headquarters in North Carolina. Its principals include Peter Fioretti.

3.     Defendant MFP Cornhusker Properties LLC ("MFP Cornhusker") is a Delaware

limited liability company and does business in Douglas County, Nebraska.  Plaintiff Perkins

Member does not seek affirmative relief against MFP Cornhusker, but joins MFP Cornhusker in

that it has an interest in this litigation sufficient to have a right to intervene if it so sought.  MFP

Cornhusker may be united in interest with Perkins Member, but is joined as a defendant because

in the urgency of filing this lawsuit Perkins Member had not obtained consent of MFP Cornhusker to be named a plaintiff.

4.     MFP Cornhusker was formed in August 2013 by Perkins Member and PF Member.

5.     In October 2013 Perkins Member and PF Member executed an operating agreement for MFP Cornhusker (the "Operating Agreement"). A true and complete copy of the Operating Agreement is attached to this Complaint as Exhibit "A". There have been no amendments to the Operating Agreement.

6.     The Operating Agreement provides that this Court is a proper venue for this action.

7.     Perkins Member is a 90% owner of MFP Cornhusker, and PF Member is a 10% owner. The Operating Agreement names Perkins Member as its LLC manager (the "Manager") and Perkins Member presently is MFP Cornhusker's Manager.

8.     MFP Cornhusker is the sole member of MFP Mid-America Shopping Centers LLC ("MFP Mid-America") which was formed in October 2013.

9.     MFP Cornhusker was organized and its Operating Agreement executed to, through MFP Mid-America, operate the 11 commercial retail properties in Nebraska and South Dakota identified on exhibit A to the Operating Agreement (the "Properties"). Perkins Member's initial capital contribution was transferring title to the Properties to MFP Mid-America.

10.     Section 4.1(a) of the Operating Agreement provides that the Manager "shall manage the affairs of the Company Entities [which include MFP Mid-America] and make all decisions with regard thereto in accordance with the Business Plan, except where PF Member's

2

approval is required under this Agreement." Capitalized terms are defined in the Operating Agreement.

11.     Section 4.1(b) of the Operating Agreement provides that certain acts defined as "Major Decisions" shall not be made "unless it has been approved by PF Member and either the Manager or Perkins Member; ...." These include, "Any sale, transfer, lease exchange, grant of option, mortgage, financing or other borrowings, hypothecation or encumbrance of all or any material portion of Company Entity assets; provided, however, the Manager may lease portions of the Properties in the ordinary course of business and in accordance with the Business Plan and the Approved Budget; ...."

12.     The Operating Agreement does not provide that a refinancing of existing debt is a Major Decision.

13.     Section 4.1(d) of the Operating Agreement provides that if Perkins Member and PF Member "are unable to agree on the resolution of any Major Decision", either member "may require the resolution of the Major Decision to be made by an independent arbitrator ...." "The determination of the selected arbitrator shall be final and binding on all parties." *Id.* "The Company shall commence acting on the arbitrator's determination as to the proper resolution of the Major Decision within three (3) days after such determination is communicated in writing by the arbitrator ...." *Id.*

14.     Section 4.5 of the Operating Agreement provides terms in which PF Member may seek to remove Perkins Member as Manager. These terms include if Perkins Member commits certain felonies, misappropriates funds, commits fraud, intentionally damages or destroys the Properties, or "... (6) commits any other material breach of this Agreement (including without limitation the occurrence of a violation under Sections 3.2 or 4.1) and fails to cure such other

3

material breach under this Section 4.5(a)(6) within fifteen (15) days of written notice of said breach from PF Member."

15.     Section 4.5 of the Operating Agreement purports to provide that upon the occurrence of a "Removal Event", PF Member "in its sole discretion may remove Perkins Member as the Manager ..." and in addition purports to provide that upon such removal Perkins Member "shall forfeit its right to participate in and approve Major Decisions" and forfeit certain economic and profit rights tied to Perkins Member's member interest in MFP Cornhusker.

16.     In October 2013 MFP Cornhusker obtained for MFP Mid-America a loan of $47,500,000 through Jefferies LoanCore LLC ("JLC"). JLC's loan was secured by a first priority lien in all of the Properties.

## COUNT I – DECLARATORY JUDGMENT

17.     Plaintiff Perkins Member incorporates the allegations in paragraphs 1 through 16 as if fully set forth herein.

18.     Over time, both Perkins Member and PF Member determined that the JLC loan was unreasonably onerous and burdensome. For example, one of its covenants provided that if a major tenant to one of the Properties left without a replacement, all Available Cash (as that term is defined in the JLC loan agreement) from all Properties shall be paid to JLC and maintained in an account as cash collateral. This occurred, and prevented MFP Mid-America from adequately operating the other Properties.

19.     The JLC loan's initial interest rate was 5.64%, and eventually became a variable rate.

20.     In 2015, MFP Cornhusker obtained for MFP Mid-America a refinancing of a portion of the JLC loan as it related to two of the Properties, the Bishop Heights Shopping Center

4

and The Meadows Shopping Center. In that refinancing, JLC agreed to release its lien as to those two properties. This refinancing was expressly approved by both Perkins Member and PF Member.

21.    Thereafter, Perkins Member as Manager continued to look for opportunities to refinance portions of the JLC loan.

22.    Over time, Michael Perkins had multiple conversations with Peter Fioretti regarding management of the Properties including refinancing the JLC loan.    From those conversations, Michael Perkins understood that PF Member approved refinancing the Herberger's (a/k/a Bon-Ton's, see exhibit A to Operating Agreement) property.

23.    In March 2017, Perkins Member as Manager caused MFP Mid-America to refinance a portion of the indebtedness related to the Herberger's property with Equitable Bank (the "Herberger's Refinancing"). As part of the Herberger's Refinancing, JLC agreed to release its lien as to the Herberger's property. The Herberger's Refinancing reduced the indebtedness to JLC by over $2,125,000.

24.    The Herberger's Refinancing substantially improved the business operations of MFP Mid-America and thus MFP Cornhusker. The Herberger's Refinancing provides for a fixed interest rate of 3.95% per annum. At the time of the Herberger's Refinancing, the JLC loan interest rate was 6.6875%, and it has increased further since then. The Herberger's Refinancing freed revenues from the Herberger's property from the onerous reserve covenants of the JLC loan. Based upon Equitable Bank's appraisal of the Herberger's property, $5,350,000, the Herberger's Refinancing freed up over $2.3 million of real estate from an encumbrance.

5

25.     On April 3, 2017, Peter Fioretti emailed Michael Perkins asking, "Pls call me-What's holdup on the refi ?" showing again that Fioretti wanted the Herberger's Refinancing to take place.

26.     On or about April 18, 2017, Perkins Member received a letter from PF Member attorney John Curry claiming that the Herberger's Refinancing was a Removal Event under the Operating Agreement and claimed it permitted PF Member to unilaterally remove Perkins Member as manager of MFP Cornhusker and change the Residual Sharing Ratio as defined in the Operating Agreement, among other claims (the "First Removal Letter"). A true and complete copy of the First Removal Letter is attached to this Affidavit as Exhibit "B".

27.     On or about June 21, 2017, Perkins Member received a letter from PF Member attorney John Curry, a true and complete copy of which is attached to this Affidavit as Exhibit "C" ("Second Removal Letter").

28.     Subsequent to both the First Removal Letter and Second Removal Letters, Michael Perkins had conversations with Peter Fioretti and PF Member regarding the operation of the Properties and the Herberger's Refinancing. In conversations, Peter Fioretti agreed to hold off on any action declared in the First Removal Letter and Second Removal Letter until at least August 1, 2017.

29.     On August 10, 2017, however, Peter Fioretti told Michael Perkins that he was going to pursue enforcing PF Member's claimed Removal Event including removing Perkins Member as Manager of MFP Cornhusker.

30.     In neither letter and in no conversation with Michael Perkins did PF Member claim that the Herberger's Refinancing financially harmed MFP Cornhusker. PF Member's

6

allegation of a Removal Event is to wrongfully take control of MFP Cornhusker of which it is only a 10% owner and wrongfully seize economic interests of Perkins Member.

31.     The Herberger's Refinancing was not a Major Decision defined in Section 4.1 of the Operating Agreement as it was not a new financing.

32.     Even assuming the Herberger's Refinancing was a Major Decision, PF Member approved it.

33.     Even assuming the Herberger's Refinancing was a Major Decision not approved in advance by PF Member, it was not a material breach of the Operating Agreement by Perkins Member and thus not a basis to remove Perkins Member as Manager.  Under governing Delaware law, for a breach to be material it must "go[] to the essence of the contract." *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 315 (3d Cir. 2001).

34.     Even assuming the Herberger's Refinancing was a Major Decision not approved in advance by PF Member and assuming it is grounds to declare a Removal Event, given that the Herberger's Refinancing on its face benefitted MFP Cornhusker, the terms of the Operating Agreement properly interpreted provide that before PF Member may unilaterally declare a Removal Event, the Herberger's Refinancing issue should be submitted to an arbitrator as provided in Section 4.1(d) of the Operating Agreement, and if the arbitrator determines that the Herberger's Refinancing was a reasonable action to take by the Manager in the best interests of MFP Cornhusker, there is no Removal Event.

35.     The terms of Section 4.5 of the Operating purporting to provide that upon a Removal Event, an act caused by Perkins Member as **Manager**, the 10% minority PF Member may unilaterally and without any due process or court order cause the forfeiture of rights of

7

Perkins Member's **member** interest in MFP Cornhusker (reducing the Residual Sharing Ratio in (iii)), are void and unenforceable pursuant to unconscionability or other basis under the law.

36.    There is a dispute between PF Member and Perkins Member as to the interpretation of the terms and rights set forth in the Operating Agreement.  Perkins Member is entitled to a declaratory judgment determining the rights and status and legal relations of Perkins Member and PF Member, specifically here to determine and declare the terms of the Operating Agreement as they relate to PF Member's allegation of a Removal Event purportedly caused by the Herberger's Refinancing.  Declaration of these rights and status between Perkins Member and PF Member will terminate an uncertainty of the parties' rights and obligations and prevent further litigation.

WHEREFORE, Plaintiff Perkins Member prays that this Court enter a declaratory judgment as between it and PF Member determining and declaring as follows:

(a)    The Herberger's Refinancing is not a Removal Event under the Operating Agreement, either because it was not a Major Decision defined in Section 4.1 of the Operating Agreement, PF Member approved the Herberger's Refinancing, or the Herberger's Refinancing was not a material breach of the Operating Agreement by Perkins Member;

(b)    The portion of Section 4.5 of the Operating Agreement providing that upon a Removal Event PF Member may cause the forfeiture of a portion of Perkins Member's Residual Sharing Ratio is void and unenforceable;

(c)    Alternative to (a), the terms of the Operating Agreement provide that before PF Member may unilaterally declare a Removal Event, the Herberger's Refinancing issue shall be submitted to an arbitrator as provided in Section 4.1(d) of the Operating Agreement, and if the arbitrator determines that the Herberger's Refinancing was a reasonable action to take by the Manager in the best interests of MFP Cornhusker, the dispute is resolved and there is no Removal Event;

8

Together with entering a judgment for Perkins Member and against PF Member for its costs and attorney's fees as provided by law and the Operating Agreement, and for all other relief this Court deems just and equitable.

## COUNT II – INJUNCTION

37.     Plaintiff Perkins Member incorporates the allegations in paragraphs 1 through 36 as if fully set forth herein.

38.     As shown above, no Removal Event has occurred as set forth in the Operating Agreement.

39.     PF Member's enforcement of its claimed Removal Event would produce irreparable harm to Perkins Member, including the loss of control over business operations that it is a 90% owner.  PF Member could substitute itself as Manager and take actions that could not be undone and could not be adequately compensated by a money judgment.

40.     The basis of PF Member's claimed Removal Event is not in any way based upon fraud, embezzlement, mismanagement, or other conduct that is in any way materially harming PF Member.

41.     PF Member should be temporarily and permanently enjoined from taking any action seeking to enforce its claimed Removal Event.

WHEREFORE, Plaintiff Perkins Member prays that this Court enter a temporary and permanent injunction enjoining PF Member from taking any action to enforce its claimed Removal Event including attempting to act as Manager of MFP Cornhusker, appointing another party as Manager, stating to any third party that Perkins Member is not the Manager of MFP Cornhusker, or interfering in any way with the responsibilities of the Manager set forth in

9

Section 4.1(a) of the Operating Agreement including the day to day operation of MFP Cornhusker, together with entering a judgment for Perkins Member and against PF Member for its costs and attorney's fees as provided by law and the Operating Agreement, and for all other relief this Court deems just and equitable.

DATED this 15th day of August, 2017.

PERKINS DELAWARE, LLC, a Delaware limited liability company

By: /s/ David J. Skalka
Martin P. Pelster, #19223
David J. Skalka, #21537
CROKER, HUCK, KASHER, DeWITT,
  ANDERSON & GONDERINGER, L.L.C.
2120 South 72nd Street, Suite 1200
Omaha, Nebraska 68124
(402) 391-6777
(402) 390-9221 (Fax)

Attorneys for Plaintiff

00707885.DOCX

10

LIMITED LIABILITY COMPANY

AGREEMENT OF

MFP CORNHUSKER PROPERTIES LLC

October ___, 2013

EXHIBIT

A

# TABLE OF CONTENTS

Page No.

I.  DEFINITIONS ............................................................................................. 1
   1.1.  Definitions ........................................................................................ 1
   1.2.  In addition to the terms defined in Section 1 .............................. 6

II.  ORGANIZATIONAL MATTERS; PURPOSE; TERM............................ 6
   2.1.  Formation of Company ................................................................... 6
   2.2.  Name.................................................................................................. 6
   2.3.  Registered Office; Registered Agent; Principal Office ............... 6
   2.4.  Foreign Qualification...................................................................... 7
   2.5.  Purpose and Scope .......................................................................... 7
   2.6.  Term................................................................................................... 7
   2.7.  Property Ownership and Management ......................................... 7
   2.8.  Limit of Liability ............................................................................. 7
   2.9.  Approvals and Consents ................................................................. 7
   2.10.  No State Law Partnership ............................................................ 7

III.  MEMBERSHIP; DISPOSITIONS OF INTERESTS............................ 8
   3.1.  Members ............................................................................................ 8
   3.2.  Dispositions of Membership Interests .......................................... 8
   3.3.  Creation of Additional Membership Interests............................. 8
   3.4.  Resignation ...................................................................................... 9
   3.5.  Information ....................................................................................... 9
   3.6.  Liability to Third Parties................................................................ 9

IV.  MANAGEMENT OF COMPANY .......................................................... 9
   4.1.  Management ...................................................................................... 9
   4.2.  Business Plan .................................................................................. 12
   4.3.  Budgets and Reserves ................................................................... 13
   4.4.  Meetings of Members .................................................................... 14
   4.5.  Removal of Manager ..................................................................... 14
   4.6.  Reimbursement of Expenses......................................................... 15
   4.7.  Compensation to Members or Manager...................................... 15
   4.8.  Transactions with Affiliates......................................................... 15
   4.9.  Insurance......................................................................................... 16
   4.10.  Conflicts of Interest ..................................................................... 16
   4.11.  Loan Obligations ......................................................................... 16
   4.12.  Buy-Sell Rights............................................................................ 16
   4.13.  Right to Market............................................................................ 18

V.  ACCOUNTING AND REPORTING ...................................................... 20
   5.1.  Fiscal Year, Accounts, Reports.................................................... 20
   5.2.  Bank Accounts................................................................................ 21

VI.  CAPITAL CONTRIBUTIONS .............................................................. 21
   6.1.  Initial Capital Contributions ...................................................... 21

6.2. Additional Capital Contributions ..................................................................... 22
6.3. Failure to Make Contributions ........................................................................ 22
6.4. Return of Contributions ................................................................................... 24
6.5. Member Loans .................................................................................................. 24
6.6. Balances ............................................................................................................ 24
6.7. Excess Committed Capital .............................................................................. 25

VII. SEPARATENESS FROM AFFILIATES; BANKRUPTCY ..................................... 25
7.1. Separateness from Affiliates ........................................................................... 25
7.2. Bankruptcy and Insolvency Proceedings ....................................................... 27

VIII. DISTRIBUTIONS ...................................................................................................... 27
8.1. Distributions in General .................................................................................. 27
8.2. Distribution of Net Distributable Cash .......................................................... 27

IX. CAPITAL ACCOUNTS, ALLOCATIONS, AND TAX MATTERS ......................... 28
9.1. Definitions ........................................................................................................ 28
9.2. Capital Accounts .............................................................................................. 30
9.3. Adjustment of Gross Asset Value ................................................................... 31
9.4. Profits, Losses and Distributive Share of Tax Items ..................................... 32
9.5. Tax Returns ....................................................................................................... 35
9.6. Tax Elections .................................................................................................... 36
9.7. Tax Matters Member ........................................................................................ 36
9.8. Allocations on Transfer of Interests ............................................................... 36

X. WITHDRAWAL, DISSOLUTION, LIQUIDATION, AND TERMINATION ........... 37
10.1. Dissolution, Liquidation, and Termination Generally ................................... 37
10.2. Liquidation and Termination ........................................................................... 37
10.3. Deficit Capital Accounts .................................................................................. 38
10.4. Cancellation of Certificate .............................................................................. 38

XI. MISCELLANEOUS PROVISIONS ............................................................................ 38
11.1. Notices .............................................................................................................. 38
11.2. Governing Law ................................................................................................. 39
11.3. Entirety; Amendments ..................................................................................... 39
11.4. Waiver ............................................................................................................... 39
11.5. Severability ....................................................................................................... 39
11.6. Ownership of Property and Right of Partition ............................................... 39
11.7. Captions, References ........................................................................................ 39
11.8. Involvement of Members in Certain Proceedings .......................................... 39
11.9. Interest .............................................................................................................. 39
11.10. Confidentiality .................................................................................................. 39
11.11. Counterparts; Electronic Signatures .............................................................. 40
11.12. Indemnification ................................................................................................ 40
11.13. Perkins Indemnity and Principal Certificates ............................................... 40
11.14. Disclosure and Waiver of Conflicts ............................................................... 40
11.15. Common Interest of Members ......................................................................... 40

XII. SPECIAL PURPOSE BANKRUPTCY REMOTE ENTITY ...................................... 41
12.1. Special Purpose Bankruptcy Remote Entity .................................................. 41
12.2. Special Member ................................................................................................ 41

ii

12.3.  Independent Manager ................................................................................... 41
12.4.  Limitations on the Company's Activities .......................................................... 42
12.5.  Defined Terms .............................................................................................. 42
12.6.  Lender as Third-Party Beneficiary ................................................................... 44

EXHIBITS AND SCHEDULES

**EXHIBITS**

A   LIST OF PROJECT PROPERTIES
B   LEGAL DESCRIPTION OF PROJECT
C   BUSINESS PLAN
D   INITIAL APPROVED BUDGET
E   PERKINS PRINCIPAL INDEMNITY
F   CERTIFICATE OF PRINCIPAL

**SCHEDULES**

1.1       EXAMPLE OF IRR CALCULATION
6.1(A)   CLOSING DELIVERIES
6.1(B)   PERKINS MEMBER
           REPRESENTATIONS

# LIST OF DEFINED TERMS

Page No.

AAA ............................................................................................ 12
Act ............................................................................................... 1
Additional Capital ........................................................................ 1
Additional Capital Contributions ................................................. 29
Adjusted Capital Account ............................................................. 29
Adjusted Capital Account Deficit ................................................. 1
Affiliate ........................................................................................ 1
Agreement .................................................................................... 1
Approved Additional Capital Contribution Balance ..................... 24
Approved Additional Capital Contributions ................................. 22
Approved Budget .......................................................................... 13
Asset Management Agreements .................................................... 1
Asset Manager .............................................................................. 1
Bankruptcy ................................................................................... 15
Bankruptcy Removal Event .......................................................... 2
Business Day ............................................................................. 2, 12
Business Plan ................................................................................ 18
Buy-Sell Event ........................................................................ 29, 30
Capital Account ........................................................................ 29, 30
Capital Contribution ..................................................................... 2
Capital Contribution Preferred Return Balance ........................... 25
Capital Proceeds ........................................................................... 2
Capital Sharing Ratios .................................................................. 2
Capital Transaction ...................................................................... 2
Cause ........................................................................................... 43
Certificate .................................................................................... 7
Certificate of Principal ................................................................. 41
Closing Date ................................................................................. 17
Co-Asset Manager ........................................................................ 2
Code ............................................................................................. 29
Company ....................................................................................... 2
Company Entity(ies) ..................................................................... 2
Control ......................................................................................... 1
Cost Overrun ................................................................................ 2
Default Capital ............................................................................. 23
Default Capital Contribution Balance .......................................... 25
Default Capital Contribution Preferred Return Balance ............... 25
Default Capital Contributions ...................................................... 25
Default Loan ................................................................................. 23
Default Preferred Return .............................................................. 3
Delinquent Member ...................................................................... 23
Depreciation ................................................................................. 29
Disposition ................................................................................... 3
Excess Committed Capital ........................................................... 25
Excess Committed Capital Milestone ........................................... 25
Governmental Authority(ies) ....................................................... 3
Governmental Regulations ........................................................... 3

Gross Asset Value................................................................29, 31
Improvements ................................................................3
Imputed Closing Costs................................................3, 19
Independent Manager................................................43
Initial Capital Contribution Balance................................25
Initial Capital Contributions................................3, 21
Initiating Member................................................17
Interest Rate ................................................3
Interim Sharing Ratio................................................3
Law Firm................................................41
Lender................................................41
Lending Members................................................23
Loan................................................41
Losses................................................30
Major Decisions................................................10
Management Fees................................................3
Manager................................................3
Material Action................................................44
Member Loan................................................24
Members ................................................4
Membership Interests................................................4
Mid-America Properties................................................4
Monument Mall Property................................................4
Nationally Recognized Service Company................................44
Net Distributable Cash................................................4
Net Operating Income................................................4
Net Project Income................................................4
Occupancy................................................4
Offer................................................19
Offered Project................................................19
Operating Budget................................................13
Partner Base Interest Ratio................................................4
Partner Nonrecourse Debt................................................29
Partner Nonrecourse Debt Minimum Gain................................29
Partner Nonrecourse Deductions................................29
Partnership Minimum Gain................................................30
Perkins Asset Management Agreements................................4
Perkins Member ................................................1
Perkins Note................................................21
Perkins Principal ................................................5
Perkins Principal Indemnity................................................41
Person................................................5
PF Asset Management Agreements................................5
PF Member................................................1
Pledge Agreement................................................41
Preferred Return................................................5
Primary Preferred Return................................................5
Profits................................................30
Project ................................................5
Project Expenses................................................5
Project Revenues................................................5

Promote Portion ......................................................................................................................................6
Properties ...............................................................................................................................................6
Property...................................................................................................................................................6
Property Operating Budget ...................................................................................................................13
Reduced Maximum Initial Investment..................................................................................................22
Regulations ...........................................................................................................................................30
Regulatory Allocations ....................................................................................................................30, 35
Removal Event.......................................................................................................................................14
Required Additional Capital Contributions ..........................................................................................22
Reserves ..........................................................................................................................................6, 14
Residual Sharing Ratios ..........................................................................................................................6
Responding Member..............................................................................................................................17
Response Period.....................................................................................................................................19
Sale Notice ............................................................................................................................................19
Secondary Preferred Return ....................................................................................................................6
Secured Obligations ..............................................................................................................................24
Secured Party ........................................................................................................................................24
Senior Loan Documents...........................................................................................................................6
Senior Mortgage Lender ..........................................................................................................................6
Senior Mortgage Loan .............................................................................................................................6
Special Member ....................................................................................................................................44
Subsidiary(ies) ........................................................................................................................................6
Tax matters partner ...............................................................................................................................37
Valuation Amount..................................................................................................................................17
Voluntary Transfer...................................................................................................................................6

## LIMITED LIABILITY COMPANY AGREEMENT OF
## MFP CORNHUSKER PROPERTIES LLC

THIS LIMITED LIABILITY COMPANY AGREEMENT (this "**Agreement**") is entered into as of the ___ day of October, 2013, between Perkins Delaware, LLC, a Delaware limited liability company, as a Member and the initial Manager (the "**Perkins Member**"), and MF Cornhusker Member LLC, a Delaware limited liability company, or its designate, as a Member (the "**PF Member**"), and Michael C. Doyle and Joan L. Yori, as the Independent Managers (as defined below).

## I.
## DEFINITIONS

1.1.     **Definitions**.  As used in this Agreement, the following terms shall have the following meanings:

"**Act**" means the Delaware Limited Liability Company Act, as it may be amended from time to time.

"**Additional Capital**" or "**Additional Capital Contributions**" means the Approved Additional Capital Contributions to the Company from the Members; and the Required Additional Capital Contributions from Perkins Member pursuant to Section 6.2 hereof.

"**Affiliate**" means, with respect to a Person, another Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Person in question.  The term "**control**" as used in the preceding sentence means, with respect to a Person that is a corporation, the right to exercise, directly or indirectly, more than 5% of the voting rights attributable to the shares of the controlled corporation, and, with respect to a Person that is not a corporation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Person.

"**Asset Management Agreements**" means, collectively, the Perkins Asset Management Agreements and the PF Asset Management Agreements.

"**Asset Manager**" means Perkins Properties, Inc., a Nebraska corporation, during the term of the Perkins Asset Management Agreements, or any successor or replacement manager.

"**Bankruptcy**" means, with respect to a Person, the occurrence of (1) an assignment by the Person for the benefit of creditors; (2) the filing by the Person of a voluntary petition in bankruptcy; (3) the entry of a judgment by any court that the Person is bankrupt or insolvent, or the entry against the Person of an order for relief in any bankruptcy or insolvency proceeding; (4) the filing of a petition or answer by the Person seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; (5) the filing by the Person of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding for reorganization or of a similar nature; (6) the consent or acquiescence of the Person to the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties; or (7) any other event which would cause the Person to cease to be a member of a limited liability company under Section 18-304 of the Act.

"**Business Day**" means any day other than Saturday, Sunday, or other day on which commercial banks in Omaha, Nebraska or Charlotte, North Carolina are authorized or required to close under the laws of the State of Nebraska or State of North Carolina, as applicable.

"**Business Plan**" shall have the meaning ascribed to such term in Section **4.2**.

"**Capital Contribution**" means, with respect to each Member, the amount of Initial Capital (which shall include any payments actually made by PF Member directly to Perkins Member under Section 6.1 or Section 6.7 as and when such payments are actually made), Additional Capital and Default Capital, each to the extent actually contributed to the Company by that Member pursuant to the terms hereof.

"**Capital Proceeds**" means funds of the Company arising from a Capital Transaction, net of the actual costs incurred by the Company, with third parties in consummating the Capital Transaction.

"**Capital Sharing Ratios**" means the percentages in which the Members participate in, and bear, certain Company items. The Capital Sharing Ratios of the Members are as follows:

| | |
|---|---|
| Perkins Member | 90.0% |
| PF Member | 10.0% |

"**Capital Transaction**" means the sale, financing, refinancing or similar transaction of or involving any portion of the Project (including condemnation awards, payment of title insurance proceeds or casualty loss insurance proceeds (other than business interruption or rental loss insurance proceeds), to the extent such awards and proceeds are not applied to mortgage indebtedness of the Company and not used to repair damage caused by a casualty or taking or in alleviation of any title defect).

"**Co-Asset Manager**" means Mountain Funding, L.L.C., a North Carolina limited liability company, during the term of the PF Asset Management Agreements, or any successor or replacement manager.

"**Company**" means MFP Cornhusker Properties LLC, a Delaware limited liability company.

"**Company Entity**" or "**Company Entities**" means, any of or collectively (as the context may require), the Company and the Subsidiaries.

"**Cost Overrun**" means, as of any date of determination, any excess of (A) Project Expenses in the aggregate incurred as of such date, over (B) the amount budgeted for said Project Expenses in the aggregate as of such date per the Business Plan and the applicable Approved Budget. Cost Overruns are separately determined on a net aggregate basis for hard costs and soft costs categories, such that aggregate hard cost expenditures in excess of the amount budgeted for aggregate hard costs per the Business Plan and Approved Budget and aggregate soft cost expenditures in excess of the amount budgeted for soft costs per the Business Plan and Approved Budget will be offset by (i) aggregate savings below the amount budgeted for hard costs or soft costs, as the case may be, and (ii) any applicable contingency amounts for hard costs or soft costs, as the case may be, as set forth in the Business Plan and Approved Budget.

"**Default Preferred Return**" shall mean, for each Member, the Primary Preferred Return of that Member on its Default Capital Contribution Balance, as defined in Section **6.3**.

MFP CORNHUSKER PROPERTIES LLC                    2

"**Disposition**" means and includes, but is not limited to, disposition by sale, delivery, assignment, gift, exchange, transfer, distribution by an executor, administrator, or personal representative, encumbrance or pledge, whether directly or indirectly.

"**Governmental Authority**" or "**Governmental Authorities**" means and includes any and all federal, state, county and municipal governmental bodies, courts, administrative commissions, agencies and authorities and any other political subdivisions in which the Project is located, or that exercise jurisdiction over the Project.

"**Governmental Regulations**" means any law, rule, regulation, ordinance, order, decree, statute, zoning ordinance, restrictive covenant, adjudication or other requirement of a Governmental Authority.

"**Improvements**" means all existing and future improvements to the Project per the Business Plan, including without limitation the Properties and the other horizontal and vertical improvements to the Project.

"**Imputed Closing Costs**" means a reasonable estimate of the amount equal to title insurance premiums, survey costs, brokerage commissions (not to exceed 1% of the purchase price), transfer tax and other commercially reasonable closing costs that would normally be incurred by the Company if the Project, or any portion thereof, as applicable, was sold for a given purchase price.

"**Initial Capital Contributions**" means the Capital Contributions of Perkins Member and PF Member described in Section **6.1** hereof.

"**Interest Rate**" means the lesser of the maximum lawful rate and 20% per annum, payable and compounded annually.

"**Interim Sharing Ratio**" means, initially as follows for the Members:

Perkins Member     75%
PF Member          25%

The initial Interim Sharing Ratios are subject to adjustment as provided in this Agreement, including without limitation Sections 4.5(b) and 6.3.

"**Management Fees**" means the fees paid to Asset Manager and Co-Asset Manager pursuant to the Asset Management Agreements.

"**Manager**" means the initial Manager (which is Perkins Member) and each Person hereafter designated as the Manager in accordance with this Agreement, until such Person ceases to be the Manager of the Company. Perkins Member, as the initial Manager, shall also perform day-to-day management and operation duties with respect to the Company Entities in accordance with the terms hereof to carry out the Approved Budget and as reasonably required, in coordination with Asset Manager and Co-Asset Manager, in accordance with the Business Plan, the Approved Budget and the Asset Management Agreements.

"**Members**" means PF Member and Perkins Member and each Person hereafter admitted as a Member in accordance with this Agreement, until such Person ceases to be a Member of the Company.

"**Membership Interests**" means all of the rights and interests of whatsoever nature of the Members in the Company, including without limitation the right to participate in management to the extent herein expressly provided, to receive distributions of funds, and to receive allocations of income, gain, loss, deduction, and credit.

"**Mid-America Properties**" means the Properties held by MFP Mid-America Shopping Centers LLC.

"**Monument Mall Property**" means the Property held by MFP Monument Mall LLC.

"**Net Distributable Cash**" means, for any period, Net Project Income for such period less (i) repayment of Member Loans in accordance with the terms thereof; and (ii) a working capital amount reasonably required for the operation of the Company consistent with the Approved Budget.

"**Net Operating Income**" shall have the definition given it in the Senior Loan Documents.

"**Net Project Income**" means, for any period, the amount by which Project Revenues exceed Project Expenses for such period.

"**Occupancy**" means the aggregate Occupied Square Footage of all Properties owned by the Company or any Subsidiary at the time of calculation, divided by the aggregate square footage of all Properties owned by the Company or any Subsidiary at the time of calculation. "Occupied Square Footage" means that portion of any Property that is subject to a lease agreement under which the tenant is (i) current on its rent, (ii) is occupying the portion of the Property subject to such lease agreement, and (iii) has not provided notice or other reasonable indication that it intends to terminate the lease agreement, vacate the leased space, or reduce the rent payable or square footage leased under the lease agreement.

"**Partner Base Interest Ratio**" means the percentages of base ownership interest allocated to the Members for purposes of determining the Promote Portion of distributions hereunder. The initial Partner Base Interest Ratios of the Members are as follows:

| | |
|---|---|
| Perkins Member | 51% |
| PF Member | 49% |

"**Perkins Asset Management Agreements**" means, collectively (i) that certain Asset Management Agreement between MFP Mid-America Shopping Centers LLC and Asset Manager of even date herewith, and (ii) that certain Asset Management Agreement between MFP Monument Mall LLC and Asset Manager of even date herewith, pursuant to each of which Asset Manager will manage and oversee the day-to-day management of the Project and proceed with the Project in accordance with the Business Plan and as set forth in the Perkins Asset Management Agreements.

"**Perkins Principal**" shall mean Michael D. Perkins.

"**Person**" means an individual or entity.

"**PF Asset Management Agreements**" means, collectively (i) that certain Asset Management Agreement between MFP Mid-America Shopping Centers LLC and Co-Asset Manager of even date herewith, and (ii) that certain Asset Management Agreement between MFP Monument Mall LLC and Co-Asset Manager of even date herewith, pursuant to each of which Co-Asset Manager will

assist the Asset Manager in the management and oversight of the day-to-day management of the as set forth in the PF Asset Management Agreements.

"**Preferred Return**" means, collectively, Primary Preferred Return and Secondary Preferred Return.

"**Primary Preferred Return**" means, for PF Member and, solely with respect to Default Capital Contributions, Perkins Member, an amount that accrues at the per annum rate specified below, compounded annually, upon the following types of Capital Contributions:

| | |
|---|---|
| Initial Capital Contributions | 10% |
| Approved Additional Capital Contributions | 10% |
| Required Additional Capital Contributions | 0% |
| Default Capital Contributions | 20% |

"**Project**" means, collectively, the eleven Properties commonly referred to as "Cornhusker Portfolio" listed on **Exhibit A**, and as more fully described on **Exhibit B**, which Properties are held by the Subsidiaries. The Project includes, without limitation, the Properties and the other vertical and horizontal Improvements within the Project pursuant to the Business Plan.

"**Project Expenses**" means, for any period, the current obligations of the Company, determined in accordance with sound accounting principles approved by PF Member and applicable to commercial real estate ownership and property management, consistently applied, for expenses of the Project and for capital expenditures not paid from the Members' Capital Contributions. Project Expenses shall include debt service on Company loans (including the Senior Mortgage Loan), any Reserves required by the Senior Mortgage Lender under the Senior Loan Documents, and a working capital amount reasonably required for the operation of the Company, consistent with the Approved Budget and Business Plan. Project Expenses shall not include non-cash expenses such as depreciation or amortization, but shall include (i) the Management Fees, (ii) the legal costs of the Members incurred in connection with the completion of this Agreement and the formation of the Company, and (iii) the Project due diligence and acquisition costs incurred by either Member. The Project Expenses shall be determined collectively across the Project and separately for each Property.

"**Project Revenues**" means, for any period, the gross revenues of the Company arising from the ownership and operation of the Project during such period, including Property rent, proceeds of any business interruption insurance maintained by the Company from time to time and amounts funded from Company reserves (including without limitation working capital reserves (including the Reserves) and Capital Proceeds, but specifically excluding Capital Contributions. The Project Revenues shall be determined collectively across the Project and separately for each Property.

"**Promote Portion**" means with respect to distributions to Perkins Member pursuant to Sections 8.2(g) and 8.2(h) and in accordance with the Interim Sharing Ratio and the Residual Sharing Ratio of Perkins Member, the portion of such distributions in excess of the Partner Base Interest Ratio of Perkins Member. For example, (A) if the Interim Sharing Ratio of Perkins Member is 75%, then the Promote Portion thereof is 24% (*i.e.*, 75% less 51%); and (B) if the Residual Sharing Ratio of Perkins Member is 90%, then the Promote Portion thereof is 39% (*i.e.*, 90% less 51%).

"**Property**" and collectively, the "**Properties**" means each of the eleven shopping centers set forth on **Exhibit A** hereto and comprising the Project.

"<u>Residual Sharing Ratios</u>" means the percentages in which Members participate in individual distributions arising from Net Distributable Cash under Section 8.2(h) after prior distributions under Section 8.2. The initial Residual Sharing Ratios of the Members are as follows:

| | |
|---|---|
| Perkins Member | 90% |
| PF Member | 10% |

The initial Residual Sharing Ratios are subject to adjustment as provided in this Agreement, including without limitation Sections 4.5 and 6.3(a)(ii).

"<u>Secondary Preferred Return</u>" means, for PF Member, an amount that accrues at the per annum rate specified below, compounded annually, upon the following types of Capital Contributions:

| | |
|---|---|
| Initial Capital Contributions | 8% |
| Approved Additional Capital Contributions | 8% |

"<u>Senior Loan Documents</u>" means any and all promissory notes, loan agreements, mortgages, deeds of trust, assignments, and other agreements and instruments evidencing, governing, or securing the Senior Mortgage Loan.

"<u>Senior Mortgage Lender</u>" means the lender who made the Senior Mortgage Loan, or its successor in interest.

"<u>Senior Mortgage Loan</u>" means the first priority mortgage loan obtained by a Company Entity which is secured by the Project or a portion thereof, including any and all refinancings thereof which may occur from time to time.

"<u>Subsidiary</u>" or "<u>Subsidiaries</u>" means, each of or collectively (as the context may require) MFP Mid-America Shopping Centers LLC, a Delaware limited liability company, MFP Monument Mall LLC, a Delaware limited liability company and any subsequent subsidiary of the Company formed upon the approval of the Members of the Company.

"<u>Voluntary Transfer</u>" means the voluntary Disposition by a Member of all or any portion of the Membership Interests of the Member pursuant to Section 3.2(d).

1.2.    In addition to the terms defined in Section 1.1 above, certain terms are defined elsewhere in this Agreement as set forth in the List of Defined Terms above.

## II.
## ORGANIZATIONAL MATTERS; PURPOSE; TERM

2.1.    <u>Formation of Company</u>. The Company has been organized as a Delaware limited liability company by filing a certificate of formation (the "<u>Certificate</u>") under the Act.

2.2.    <u>Name</u>. The name of the Company shall be MFP Cornhusker Properties LLC and all Company business must be conducted in that name or such other name as the Manager and PF Member approve.

2.3.    <u>Registered Office; Registered Agent; Principal Office</u>. The registered office and the registered agent of the Company in the State of Delaware shall be as specified in the Certificate or as designated by the Manager with PF Member's approval. The principal office of the Company shall be at

MFF CORNHUSKER PROPERTIES LLC                 6

c/o Perkins Properties, 608 North 114th Street, Omaha, Nebraska 68154, or at such other location as the Manager and PF Member approve.

2.4.     **Foreign Qualification.**  Before the Company conducts business in any jurisdiction other than Delaware, the Manager shall cause the Company to comply with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction.  At the request of the Manager, each Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, or terminate the Company as a foreign limited liability company in all jurisdictions in which the Company may conduct business or shall cease to conduct business, as the case may be.

2.5.     **Purpose and Scope.**  The purposes and scope of the Company's activities are strictly limited to (i) acquiring the Project pursuant to the Company's ownership of the Subsidiaries; (ii) as sole member and manager of the Subsidiaries, maintaining, owning and leasing the Properties within the Project, and (iii) performing all other activities reasonably necessary or incidental to the furtherance of such purposes.

2.6.     **Term.**  The Company shall commence on the effective date of the Certificate and shall continue to exist until dissolved as herein provided.

2.7.     **Property Ownership and Management.**  Pursuant to the Business Plan, the Company's operation and management of the Project and other related activities contemplated by the Business Plan will be completed by Asset Manager and Co-Asset Manager on behalf of the Company pursuant to the Asset Management Agreements.  Asset Manager shall be responsible for obtaining on behalf of the Company, all permits, licenses and other approvals required by Governmental Authorities in connection with the ownership and management of the Project by the Company.

2.8.     **Limit of Liability.**  Notwithstanding anything to the contrary set forth herein, no Member shall be liable for punitive or consequential damages arising from a claimed breach of this Agreement by any other Member.  Pursuant to Section 18-1101 of the Act, the Members shall not owe any fiduciary duties to the Company or to one another; provided, however, that this limitation shall not be construed to limit liability for the specific obligations of the Members set forth in this Agreement or limit the specific remedies for defaults set forth herein.  Except as provided in this Agreement, whenever in this Agreement a Member (in its non-managing capacity as a Member) is permitted or required to make a decision affecting or involving the Company, any Member, or any other Person, such Member shall be entitled to consider only such interests and factors as he, she or it desires, including a particular Member's interests, and shall, to the fullest extent permitted by applicable law, have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any Member.

2.9.     **Approvals and Consents.**  Items requiring the approval or consent of PF Member or Perkins Member hereunder have been provided solely to enable each said Member to protect itself and its investment in the Company.  Each Member acknowledges and agrees that in granting or withholding such approval or consent as a Member, said Member shall have no fiduciary or other obligations to the Company, the Manager, the other Member, any of the Company's creditors or any other Person and, unless otherwise expressly provided, may withhold such approval or consent in its sole and complete discretion.

2.10.     **No State Law Partnership.**  The Company shall not be a partnership or joint venture under any state or federal law except for tax purposes, and no Member or Manager shall be a partner or joint venturer of any other Member or Manager for any purposes, and this Agreement may not be construed otherwise.

MFP CORNHUSKER PROPERTIES LLC          7

III.

## MEMBERSHIP; DISPOSITIONS OF INTERESTS

3.1.   **Members**. The initial Members of the Company are PF Member and Perkins Member, each of which are admitted to the Company as a Member as of the date hereof.

3.2.   **Dispositions of Membership Interests**.

(a)   **General Prohibition**. Except as provided in Section **3.2(d)**, or as otherwise expressly provided or permitted by this Agreement, no Member may make a Disposition of any portion of the Membership Interest of the Member. Any Disposition which is not made pursuant to and in accordance with the terms and conditions of this Agreement shall be void and of no effect and shall vest no right, title or interest in the transferee. Each Member acknowledges that any Disposition of any portion of its Membership Interest may be subject to additional terms and restrictions imposed by the Company's lender(s), and each Member agrees to abide by all such terms and restrictions and to reimburse the Company for (or pay directly to the lender(s)) any costs or fees charged by such lender(s) in connection with a Disposition. In addition, no Member shall make any assignment, transfer, or other conveyance directly or indirectly of an interest in said Member without the prior written consent of the other Members, provided, however, that no such consent shall be required with respect to any such assignment, transfer or other conveyance of an interest in said Member to a wholly owned Affiliate of said Member.

(b)   **[Intentionally Omitted.]**

(c)   **[Intentionally Omitted.]**.

(d)   **Voluntary Transfer to Affiliate**. Notwithstanding the provisions of Section **3.2(a)** to the contrary, each of Perkins Member and PF Member may effect a Disposition of their respective Membership Interests to an Affiliate upon written notice to the other Members.

(e)   **Voluntary Transfer Documentation**. In connection with and as a condition to a Voluntary Transfer under Section **3.2(d)** hereof, the following shall be provided to the non-transferring Member:

(i)   a written agreement of the proposed transferee agreeing to be bound by this Agreement, and

(ii)   if reasonably requested by the non-transferring Member, an opinion of counsel, reasonably satisfactory in form and substance to the non-transferring Member, that the Voluntary Transfer will not terminate the Company or impair its ability to be taxed as a partnership for income tax purposes under the Internal Revenue Code and that the Voluntary Transfer constitutes an exempt transaction that does not require registration under applicable securities laws.

3.3.   **Creation of Additional Membership Interests**. Except as otherwise provided in Section 4.5 hereof, additional Membership Interests may be created and issued to existing Members or to

MFP CORNHUSKER PROPERTIES LLC                 8

other Persons, and such other Persons may be admitted to the Company as Members, (i) as provided in Section 4.5 upon the occurrence of a Removal Event, or (ii) with the approval of Perkins Member and PF Member, on such terms and conditions as the Manager and PF Member may determine at the time of admission. The Manager may reflect the admission of any new Members or the creation of any new class or group of Member in an amendment to this Agreement which shall be valid upon execution by the Manager.

      3.4.    **Resignation**. Except as otherwise provided in Section 3.2(d) hereof, a Member may not resign or withdraw from the Company without the consent of the other Members.

      3.5.    **Information**. In addition to the other rights specifically set forth in this Agreement, each Member is entitled to the following information under the circumstances and conditions set forth in the Act: (a) true and full information regarding the status of the business and financial condition of the Company; (b) promptly after becoming available, a copy of the Company's federal, state and local income tax returns for each year; (c) a current list of the name and last known business, residence or mailing address of each Member and Manager; (d) a copy of this Agreement, the Company's certificate of formation, and all amendments to such documents; (e) true and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each Member and which each Member has agreed to contribute in the future, and the date on which each became a Member; and (f) other information regarding the affairs of the Company to which that Member is entitled pursuant to Section 18-305 of the Act (including all Company books and records). Under no circumstances shall any information regarding the Company or its business be kept confidential from PF Member or Perkins Member.

      3.6.    **Liability to Third Parties**. No Member shall be liable for the debts, obligations or liabilities of the Company except to the extent expressly agreed to in writing by such Member.

<div align="center">

IV.

**MANAGEMENT OF COMPANY**

</div>

4.1.    **Management**.

    (a)    Subject to Section 4.5 hereof, The Manager shall manage the affairs of the Company Entities and make all decisions with regard thereto in accordance with the Business Plan, except where PF Member's approval is required under this Agreement. PF Member shall have sole authority on behalf of the Company Entities to enforce any agreement between a Company Entity and Perkins Member or its Affiliates or between a Company Entity and Asset Manager and its respective Affiliates, and to make all determinations on behalf of the Company Entities with respect thereto, including without limitation with respect to the Perkins Asset Management Agreements.

    (b)    No action shall be taken, sum expended, or obligation incurred by the Manager or the Company Entities regarding the matters described below (the "**Major Decisions**") unless it has been approved by PF Member and either the Manager or Perkins Member; provided, however, that from and after the occurrence of a Removal Event with respect to Perkins Member, Major Decisions shall be made by PF Member in its sole discretion:

        (i)    **Company Asset Conveyances or Financings**. Any sale, transfer, lease exchange, grant of option, mortgage, financing or other borrowings,

MFP CORNHUSKER PROPERTIES LLC        9

hypothecation or encumbrance of all or any material portion of Company Entity assets; provided, however, the Manager may lease portions of the Properties in the ordinary course of business and in accordance with the Business Plan and the Approved Budget;

(ii)     Acquisitions of Assets.  Authorizing, approving, executing or effecting the purchase of any material asset by the Company Entities except in accordance with the Business Plan and the Approved Budget;

(iii)    Financial Affairs of Company.  Making of any expenditure or incurrence of any obligation by or for the Company Entities in excess of $50,000 in any year over any line item set forth in an Approved Budget therefor, in excess of three percent (3%) of any line item or in excess of one percent (1%) of the aggregate amount of the Approved Budget (unless said expenditure in excess of 1% of the aggregate amount of the Approved Budget is expressly set forth in the Approved Budget); however, if emergency repairs to the Project are necessary to avoid imminent danger of injury to the Project or to an individual, the Manager may make such expenditures as may be necessary to alleviate such situation and shall promptly notify PF Member of the event giving rise to such repairs and the actions taken with respect thereto;

(iv)    Additional Capital Contributions.  Any request or call for Additional Capital Contributions, exclusive of the Required Additional Capital Contributions of Perkins Member;

(v)     Business Plan.  Except as expressly provided in Section 4.2, any amendment, modification or change to the Business Plan;

(vi)    Approved Budget.  Consenting to the Approved Budget or any amendment, modification or change thereto;

(vii)   Bankruptcy.  Filing of any petition or consenting to the filing of any petition that would subject the Company to a Bankruptcy;

(viii)  Affiliate Agreements.  Entering into any agreement with Perkins Member or an Affiliate of Perkins Member except on terms consistent with parties dealing at arm's length and consistent with the Business Plan and Approved Budget; provided, however, that the Perkins Asset Management Agreements are hereby approved by Perkins Member and PF Member;

(ix)    Distributions.  Any distributions of Net Distributable Cash by the Company except in accordance with Sections 8.1 and 8.2;

(x)     Confessions of Judgment.  Confessing any judgment against the Company;

(xi)    Authority.  Authorizing any merger, consolidation or reorganization of a Company Entity with any company or other Person or otherwise disposing of substantially all of a Company Entity's assets;

MFP CORNHUSKER PROPERTIES LLC                    10

(xii)   <u>New Members</u>.  Except as otherwise provided for in this Agreement, admitting a new Member or establishing the terms of such admission;

(xiii)  <u>Litigation</u>.  Instituting, settling or otherwise compromising any legal action or proceeding on behalf of a Company Entity (including submitting a claim to arbitration) that is not covered by insurance and which involves payment by or to a Company Entity of greater than $100,000;

(xiv)   <u>Material Agreements</u>.  Entering into, amending or extending, or waiving of any material default under or relating to, any material agreement between a Company Entity and any Person (including, without limitation, the Manager, Perkins Member and any lender to a Company Entity);

(xv)    <u>Tax Allocations</u>.  Making any elections or other decisions relating to the allocations of Company Entity items of profits, losses, deduction, credit or other tax or accounting matters except to the extent specifically called for in this Agreement;

(xvi)   <u>Dissolution</u>.  Determining whether a Company Entity shall be dissolved pursuant to Article X; and

(xvii)  <u>Other Matters</u>.  Any other action which, considered before the taking thereof, could be reasonably expected to (i) have a material and adverse effect on Company Entity business or affairs; (ii) have a cost or financial impact on a Company Entity in excess of $50,000 in excess of amounts approved pursuant to an Approved Budget; or (iii) cause a Company Entity to be unable to carry on its business in accordance with the Business Plan and/or in accordance with the terms and conditions hereof.

(c)   The Manager shall cause the Company Entities to operate the Project in accordance with the Business Plan and the Approved Budgets and, in coordination with Asset Manager, obtain all required approvals from Governmental Authorities in connection therewith.  The Manager, on behalf of the Entities, shall discharge its duties in a good and proper manner in accordance with industry standards and the terms and conditions of this Agreement.  The Manager shall oversee day-to-day operations of the Company Entities including monitoring the Properties in coordination with Asset Manager.  The Manager, on behalf of the Company Entities, shall in good faith use all commercially reasonable efforts to implement all Major Decisions approved by PF Member, enforce agreements entered into by the Company Entities, and conduct the ordinary business and affairs of the Company Entities in accordance with applicable Governmental Regulations, good industry practice and this Agreement.  Except as provided in the Asset Management Agreements, the Manager shall not delegate any of its rights or powers to manage and control the business and affairs of the Company Entities without the prior written consent of PF Member.

(d)   If Perkins Member and PF Member are unable to agree on the resolution of any Major Decision, either Member, by notice to the other Member, may require the

MFP CORNHUSKER PROPERTIES LLC.          11

resolution of the Major Decision to be made by an independent arbitrator specified in that notice. If either Member objects to the independent arbitrator designated therein within three (3) Business Days after it receives such notice and PF Member and Perkins Member fail to agree on an independent arbitrator, then either may request that the Omaha, Nebraska office of the American Arbitration Association (the "AAA") designate an independent arbitrator, in which case the selection of the arbitrator by the AAA shall be binding on the parties. The determination of the selected arbitrator shall be final and binding on all parties. The Company shall pay the cost of the arbitration proceeding. The decision of the arbitrator must be the resolution of the Major Decision proposed by either PF Member or by Perkins Member, and shall be rendered within thirty (30) days after the arbitrator's selection. The Company shall commence acting on the arbitrator's determination as to the proper resolution of the Major Decision within three (3) days after such determination is communicated in writing by the arbitrator; provided, however, that in no event shall any Member be required to increase its Capital Contribution as the result of the decision of the arbitrator other than with respect to Required Additional Capital Contributions. Any arbitrator designated in accordance with this Section 4.1(d) shall have at least ten years of experience in arbitrating disputes similar to those with respect to which the arbitrator is engaged hereunder.

(e)     Items requiring the approval or consent of PF Member or Perkins Member in their capacity as Members hereunder have been provided solely to enable each said Member to protect itself and its investment in the Company. Each Member acknowledges and agrees that in granting such approval or withholding such approval or consent, said Member shall have no fiduciary or other obligations to the Company Entities, the Manager, the other Member, any of the Company Entities' creditors or any other Person and, unless otherwise expressly provided, may withhold such approval or consent in its sole and complete discretion.

4.2.     **Business Plan.** The Members hereby adopt the business plan attached hereto as Exhibit C ("**Business Plan**"), which contains annual projections through 2024, with said projections to be updated each calendar year (subject to the consent of the Members hereinafter described). The Business Plan outlines the size, mix, projected rent prices and Occupancy of the Properties, and sets forth all estimated costs necessary to own and operate the Project. Timing of projected cash flow and projected net Member distributions are also included in the Business Plan. Any amendment, modification or change to the Business Plan must be approved by the written consent of both Members. Periodically, but not less than quarterly, the Manager, in conjunction with PF Member and in good faith, will review and, if necessary, update the Business Plan. Should the Business Plan require updating, the Manager shall prepare an updated proposed Business Plan and submit the same to PF Member for approval. In addition, following a materially adverse variance with respect to the Project, the Manager shall promptly give notice of the same to PF Member and shall, if PF Member so requests, present to PF Member for approval a revised Business Plan containing a description of the circumstances causing the materially adverse variance in the actual or likely performance of the Project from the provisions of the initial Business Plan delivered prior to the acquisition, the resulting impact on cash flow and other relevant financial and operational issues concerning the Project, a proposed remediation plan, if any, to bring the Project into compliance with the initial Business Plan and revised pro forma financial statements for the Project. The initial Business Plan includes projections for the Project and each Property, determined separately.

4.3.    **Budgets and Reserves.**

(a)    Property Operating Budgets. Each Property shall operate under annual operating budgets consistent with and incorporated into the Business Plan (each, a "**Property Operating Budget**"). Each Property Operating Budget and a consolidated annual operating budget for the entire project (the "**Operating Budget**") shall be prepared by the Manager and submitted to PF Member for approval in writing; provided, however, that so long as the Senior Loan Documents require that the Senior Mortgage Lender review and approve an annual budget for the Project, the approved budget required by the Senior Loan Documents shall take the place of, and shall be deemed to be, the Property Operating Budgets and the Operating Budget, and the Manager shall not be required to prepare any budgets other than the budgets approved annually by the Senior Mortgage Lender. After the annual Property Operating Budgets and the Operating Budget have been approved in writing by PF Member, the Manager shall implement them on behalf of the Company. The Property Operating Budgets and the Operating Budget approved pursuant to the provisions of this Section 4.3 and of Section 4.1(b)(vi) shall be hereinafter collectively referred to as an "**Approved Budget**". For the year ending December 31, 2014, the Approved Budget shall be deemed to be the 2014 portion of the Business Plan as described in Exhibit D. The Manager shall deliver to PF Member for approval a proposed Property Operating Budget for each Property, as well as a proposed Operating Budget for the entire Project (or in the alternative, the budget which the Manager proposes to submit to the Senior Mortgage Lender for approval, if applicable), by October 15 of the preceding calendar year. PF Member shall review the proposed budget and either approve the proposed budget or provide the Manager with written objections to any elements thereof. If PF Member does not provide any written objection to the proposed budget submitted by the Manager within thirty (30) days after delivery of the proposed budget, the Manager shall re-deliver such proposed budget to PF Member requesting PF Member's response within ten (10) days. If PF Member does not provide any written objection to the proposed budget within such ten (10) day period, the proposed budget shall be deemed approved by PF Member. If any objection is made by PF Member within the aggregate forty (40) day review period, PF Member, Perkins Member, and the Manager shall work in good faith to resolve any objections with reasonable promptness, and in any event so that a proposed budget may be submitted by the Company to the Senior Mortgage Lender before any deadline contained in the Senior Loan Documents, if applicable. If Manager fails to timely submit a proposed Property Operating Budget by the applicable due date, PF Member may elect to prepare such Property Operating Budget for the applicable calendar year and shall give notice to Asset Manager and to Perkins Member upon completion of the same by PF Member.

(b)    Reserves. The Company shall establish and fund such capital and tenant cost replacement reserves as Senior Mortgage Lender may require under the Senior Loan Documents ("the "**Reserves**"). The anticipated amount of such Reserves will be included in each Operating Budget. The Reserves shall be funded, and disbursements shall be made from the Reserves, as provided in the Senior Loan Documents.

4.4.    <u>Meetings of Members</u>.

    (a)    <u>Regular Meetings</u>.  The Members shall hold quarterly meetings to discuss the Project, and to discuss such other matters regarding Company business as the Members may elect.

    (b)    <u>Special Meetings</u>.  Special meetings of the Members may be called by the Manager or by either Member at any time by delivering at least ten (10) Business Days' prior notice thereof to the other Member to discuss such matters regarding Company business as the Members may elect.

    (c)    <u>Procedure</u>.  Each Company meeting shall be held at the principal place of business of the Company, unless the Members otherwise agree.  Attendance of a Person at a meeting shall constitute a waiver of notice of such meeting, unless such Person attends the meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. A Person may vote at such meeting by written proxy executed by that Person and delivered to a Manager or Member. A proxy shall be revocable unless it is stated to be irrevocable. Any action required or permitted to be taken at such meeting may be taken without a meeting, without prior notice, and without a vote if a consent or consents in writing, setting forth the action so taken, is signed by the Manager and the Members that would be necessary to take the action at a meeting at which all Members were present and voted. Any meeting may take place by means of telephone conference, video conference, or similar communication equipment by means of which all Persons participating therein can hear each other.

4.5.    <u>Removal of Manager</u>. The Manager may be removed by PF Member as provided herein under any of the following circumstances (a "<u>Removal Event</u>"):

    (a)    Perkins Member, Asset Manager or Perkins Principal (1) is convicted of, or enters a plea of no contest to, a felony or a criminal act relating to the Project; (2) misappropriates any funds derived from the Project, including insurance proceeds and condemnation awards, (3) commits fraud, material misrepresentation (including material misrepresentation under <u>Schedule 6.1(B)</u>), gross negligence or material misconduct; (4) fails to maintain insurance as required by this Agreement or to pay any taxes or assessments affecting the Project which are not in excess of the line item allocations therefor in the Approved Budget and fails to cure any such matter within fifteen (15) days of written notice of such failure from PF Member; (5) intentionally damages or destroys the Project, or any material part thereof; or (6) commits any other material breach of this Agreement (including without limitation the occurrence of a violation under Sections 3.2 or 4.1) and fails to cure such other material breach under this Section 4.5(a)(6) within fifteen (15) days of written notice of said breach from PF Member;

    (b)    failure of Perkins Member to timely make an Approved or Required Additional Capital Contribution (for purposes hereof any such Additional Capital Contribution made by a Default Loan to Perkins Member shall constitute a failure to make such Additional Capital Contribution by Perkins Member);

MFP CORNHUSKER PROPERTIES LLC          14

(c)     Bankruptcy of a Company Entity; provided, however, that if said bankruptcy is as a result of the filing of an involuntary petition in bankruptcy, said involuntary petition filing shall not be deemed a Removal Event hereunder if the same is dismissed within ninety (90) days of the filing thereof;

(d)     if Perkins Member takes any actions materially inconsistent with the provisions of Article VII;

(e)     the liquidation or dissolution of Perkins Member or Asset Manager;

(f)     in the event that Michael D. Perkins no longer (i) exercises management control of Perkins Member, or (ii) exercises day-to-day management control of the performance by Asset Manager of its obligations under the Perkins Asset Management Agreements;

(g)     Bankruptcy of Perkins Member, Asset Manager or Perkins Principal (a "**Bankruptcy Removal Event**"); provided, however, that if said bankruptcy is as a result of the filing of an involuntary petition of bankruptcy, said involuntary petition filing shall not be deemed a Removal Event hereunder if the same is dismissed within ninety (90) days of the filing thereof; or

(h)     in the event any of the representations or statements set forth in the Certificate of Principal delivered by Michael D. Perkins are untrue or incorrect in any material and adverse respect (which Certificates of Principal are being delivered on the date hereof in the form attached hereto as Exhibit G).

Upon the occurrence of a Removal Event, PF Member in its sole discretion may remove Perkins Member as the Manager upon written notice to Perkins Member, in which event PF Member may appoint itself, an Affiliate of PF Member, or a third party as Manager, each without the consent of Perkins Member notwithstanding anything contained herein to the contrary, and said replacement Manager shall be deemed admitted as a Member of the Company if PF Member so elects with such share of PF Member's capital and profits interest as PF Member shall determine; (ii) Perkins Member shall forfeit its right to participate in and approve Major Decisions; and (iii) the Residual Sharing Ratio of Perkins Member shall be reduced to the same percentage as its Partner Base Interest Ratio, with a corresponding increase to the Residual Sharing Ratio of PF Member/or replacement Manager appointed by PF Member.

4.6.     **Reimbursement of Expenses**. Except as otherwise expressly provided herein or in the Approved Budget, no Member shall be reimbursed for any out-of-pocket expenses or other costs incurred by it in conjunction with the business and affairs of the Company.

4.7.     **Compensation to Members or Manager**. Except as otherwise specifically provided herein or in the Approved Budget, no compensatory payment shall be made by the Company to Manager or to any Member for services to the Company of Manager, any such Member or any member or employee thereof.

4.8.     **Transactions with Affiliates**.

(a)     General.     When any service or activity to be performed on behalf of the Company is performed by an Affiliate of a Member, the fee payable for such service or activity shall not exceed the fee which would be generally payable by

MFP CORNHUSKER PROPERTIES LLC          15

the Company to an unaffiliated third party of comparable standing providing the same services.

(b)     <u>Termination of Agreements with Affiliates</u>. Upon the occurrence of a Removal Event, then the Company may terminate all agreements with Perkins Member's Affiliates, including without limitation the Perkins Asset Management Agreements, and all such agreements must contain a provision that allows for the exercise of the right of termination under this Section **4.8(b)**. PF Member may enforce this provision on behalf of the Company.

4.9.     **Insurance**. Perkins Member shall cause the Company Entities to maintain, at Company Entity expense as part of the Approved Budget, such insurance coverage as may be required from time to time by the Senior Mortgage Lender under the Senior Loan Documents. Perkins Member may cause its obligations under this Section **4.10** to be satisfied in whole or in part by causing Asset Manager to obtain said insurance on behalf of the Company Entities, including, without limitation, the insurance described in Section 15 of the Perkins Asset Management Agreements. To the extent Perkins Member fails to maintain the insurance required to be carried under this Agreement, then PF Member may, at its option and without obligation obtain or maintain such insurance in the name of the Company Entities and the Company Entities shall promptly reimburse PF Member for all out of pocket costs incurred in connection therewith; provided, however, that the retention of such coverage by PF Member shall not affect the classification of such omission by Perkins Member as a Removal Event pursuant to the provisions of Section **4.5**. Deductibles on insurance coverage may be obtained to the extent permitted by the Senior Loan Documents, and in the event of a claim under any such insurance coverage the amount of such deductible shall be treated as a Project Expense.

4.10.     **Conflicts of Interest**. Subject to the other express provisions of this Agreement, including without limitation Section **4.12**, each Member, Manager, and Officer or Affiliate thereof may engage in and possess interests in other business ventures of any and every type and description, independently or with others, with no obligation to offer to the Company or any other Member, Manager, Officer or Affiliate the right to participate therein or to account therefor. The Company may transact business with any Member, Manager, and Officer or Affiliate thereof, provided the terms of those transactions are no less favorable than those the Company could obtain from unrelated third parties.

4.11.     **Loan Obligations**. Perkins Member shall arrange any guarantees from an Affiliate of Perkins Member necessary to obtain any loan or other financing contemplated by the Business Plan and arrange any guarantees, credit enhancements, bonding or warranties from an Affiliate of Perkins Member in favor of or required by Governmental Authorities, lenders or other third parties in connection with the Business Plan and the ownership and operation of the Project; provided, however, that any such bonds or warranties duly approved in accordance with the terms of this Agreement shall constitute the obligations of the Company to the extent provided in the documents creating such obligations. Perkins Member and PF Member hereby agree that portions of the Project may be utilized as security in connection with any such obligations, and the Project, or portions thereof, will be used as security for the Senior Mortgage Loan.

4.12.     **Buy-Sell Rights**.

(a)     <u>Exercise</u>. Upon the occurrence of a Buy-Sell Event (as defined below), a Member (the "**Initiating Member**") may exercise the buy-sell rights under this Section **4.12** by giving notice to the other Member (the "**Responding Member**", stating therein the aggregate dollar amount (the "**Valuation Amount**") that the Initiating Member would be willing to pay for the assets of the Company as of the Closing Date (defined below) free and clear of all liabilities. After receipt of such notice

MFP CORNHUSKER PROPERTIES LLC     16

the Responding Member shall elect to either (1) sell its entire Membership Interest to the Initiating Member for an amount equal to the amount the Responding Member would have been entitled to receive if the Company had sold its assets for the Valuation Amount on the Closing Date (as hereinafter defined) and the Company had immediately paid all Company liabilities and Imputed Closing Costs and distributed the net proceeds of sale to the Members in satisfaction of their interests in the Company pursuant to Article 10, or (2) purchase the entire Membership Interest of the Initiating Member for an amount equal to the amount the Initiating Member would have been entitled to receive if the Company had sold all of its assets for the Valuation Amount on the Closing Date and the Company had immediately paid all Company liabilities and Imputed Closing Costs and distributed the net proceeds of the sale to the Members in satisfaction of their interests in the Company pursuant to Article 10. The Responding Member shall have thirty (30) days from the giving of the Initiating Member's notice in which to exercise either of its options by giving written notice to the Initiating Member. If the Responding Member does not elect to acquire the Initiating Member's Membership Interest within such time period, the Responding Member shall be deemed to have elected to sell its interest to the Initiating Member. Within three (3) Business Days after an election has been made or deemed made under this Section **4.12**, the acquiring Member shall deposit with the selling Member a non-refundable earnest money deposit in the amount of one percent (1%) of a reasonable estimate of the amount the selling Member is entitled to receive for its Membership Interest under this Section **4.12**, which amount shall be applied to the purchase price at closing; however, if the acquiring Member should thereafter fail to consummate the transaction, such amount shall be retained by the selling Member, free of all claims of the other Member, but shall not constitute a waiver of any rights and remedies otherwise available to the selling Member because of a default by the acquiring Member.

(b)     Closing. The closing of an acquisition pursuant to this Section **4.12** shall be held at the principal place of business of the Company on a mutually acceptable date (the "**Closing Date**") not later than one hundred eighty (180) days after Responding Member's election, deemed or otherwise. At the Closing of the disposition and acquisition of such interests the following shall occur:

(i)     The selling Member shall assign to the acquiring Member or its designee the selling Member's Membership Interest in accordance with the instructions of the acquiring Member, and shall execute and deliver to the acquiring Member all documents which may be required to give effect to the disposition and acquisition of such interests, in each case free and clear of all liens, claims, and encumbrances, with covenants of general warranty; and

(ii)    The acquiring Member shall pay to the selling Member the consideration therefor. Twenty percent (20%) of such consideration shall be paid in cash at closing, with the balance to be paid, with interest at a rate of 18% per annum, compounded annually, over a period equal to the lesser of (A) five (5) years, or (B) the period commencing on the Closing Date and ending on the date that is ten (10) years after the date hereof. Payments shall be in equal annual installments. Such obligations, which shall be fully pre-payable without penalty, shall be evidence by a

MFP CORNHUSKER PROPERTIES LLC          17

promissory note delivered at Closing and secured by the Membership Interest acquired.

(c) Enforcement. It is expressly agreed that the remedy at law for breach of the obligations of the Members set forth in this Section **4.12** is inadequate in view of (a) the complexities and uncertainties in measuring the actual damage to be sustained by reason of the failure of a Member to comply fully with such obligations, and (b) the uniqueness of the Company business and the Members' relationships. Accordingly, each of such obligations shall be, and is hereby expressly made, enforceable by a specific performance.

(d) Buy-Sell Events. A "**Buy-Sell Event**" shall mean the occurrence of any one or more of the following events:

   (i) the passing of ten (10) years from the date of this Agreement;

   (ii) a Removal Event arising under Section **4.5**, in which case the ability to initiate a Buy-Sell shall belong to PF Member;

   (iii) the termination of an Asset Management Agreement for "cause", in which case the ability to initiate a Buy-Sell shall belong to the Member that is not the Affiliate of the terminated Asset Manager or Co-Asset Manager, as applicable; and

   (iv) PF Member (A) is convicted of, or enters a plea of no contest to, a felony or a criminal act relating to the Project, (B) misappropriates any funds derived from the Project, including insurance proceeds and condemnation awards, (C) commits fraud, material misrepresentation, gross negligence or material misconduct; (D) intentionally damages or destroys the Project, or any material part thereof; or (E) commits any other material breach of this Agreement and fails to cure such other material breach within fifteen (15) days of written notice of said breach from Perkins Member, in which case the ability to initiate a Buy-Sell shall belong to Perkins Member.

4.13. **Right to Market**.

(a) Exercise. Upon the occurrence of a Removal Event arising under Section **4.5**, PF Member may elect to offer its Membership Interest or cause the Company to offer all or any portion of the Project for sale on specified terms or to accept from an unaffiliated purchaser a bona fide written cash offer (*i.e.*, not seller financed) for the purchase of the Project on terms which such PF Member desires for the Company to accept (such specified terms or bona fide offer being herein called the "**Offer**") by providing notice of the terms of such Offer (the "**Sale Notice**") to Perkins Member. The price in such Offer must be in an amount at least equal to the amount of any indebtedness secured by the Project or portion thereof subject to the Offer (the "**Offered Project**") plus the aggregate then-existing unreturned Capital Contributions and Default Preferred Return (if any) with respect to the Offered Project.

(b)   <u>Response.</u> Perkins Member shall have 20 days from the date of the Sale Notice (the "<u>Response Period</u>") to provide notice to PF Member of its willingness or unwillingness to make or accept the Offer. Failure to timely deliver such notice shall constitute a deemed election by Perkins Member not to exercise its right to accept the terms of the Offer.

   (i)   <u>Acceptance by Perkins Member of Offer.</u> If Perkins Member accepts the terms of the Offer, PF Member shall sell to Perkins Member, in which case Perkins Member must purchase PF Member's Membership Interest for an amount equal to the amount that would be distributable to PF Member if the Company had accepted the Offer and closed the sale pursuant to such Offer and wound up its affairs pursuant to Article 10. For purposes of the foregoing calculation, the purchase price for such sale shall be reduced by an amount equal to title insurance premiums, survey costs, brokerage commissions (not to exceed 1% of the purchase price), transfer tax and other commercially reasonable closing costs that would normally be incurred by the Company if the Offered Project was sold for such purchase price ("<u>Imputed Closing Costs</u>"). Perkins Member shall pay PF Member for its Membership Interest on the same terms set forth in Section 4.12(b)(ii) above. Closing shall take place within 180 days after the Sale Notice. If PF Member or Perkins Member defaults at closing, the non-defaulting party shall have the right to bring suit for damages, for specific performance, or exercise any other remedy available at law or in equity. Upon payment at closing, PF Member shall execute and deliver all documents reasonably required to transfer the interest being sold. A condition of the closing of such a sale by PF Member to Perkins Member shall be the receipt by PF Member of a full and complete release of PF Member from all liabilities of PF Member pertaining to the indebtedness of the Company related to the Offered Project. In the event that said release is not obtained on or before the closing date, then Perkins Member shall be deemed to have consented to sell the Offered Project upon the Specified Terms in accordance with the procedures set forth in Section 4.13(b)(ii) below.

   (ii)   <u>Non-Acceptance by Perkins Member of Offer.</u> If Perkins Member does not exercise its right to accept the terms of the Offer (or is deemed not to have exercised such right), then PF Member shall be allowed to offer and sell its Membership Interest or the Offered Project for cash on the terms of the Offer for a period of up to one (1) year following the expiration of the Response Period. If PF Member is unable to obtain a bona fide contract to sell the Offered Project on such terms within such one-year period, then PF Member must again submit an Offer to Perkins Member under the terms of this Section 4.13 before it may sell the Offered Project.

## V.
## ACCOUNTING AND REPORTING

5.1.    **Fiscal Year, Accounts, Reports.**

    (a)    The fiscal year-end of the Company shall be the calendar year.

    (b)    The books of account of the Company Entities, at Company expense, shall be kept and maintained by the Manager in accordance with the equity method of accounting based upon generally accepted accounting principles applied on a consistent basis applicable to commercial property ownership. The Manager shall prepare a reconciliation of such books and records to cash receipts and disbursements. The books of account shall be kept at the principal place of business of the Company, and shall at all times, upon reasonable notice, be available for inspection by PF Member.

    (c)    The Manager shall, at its expense, furnish to the Members (i) on or before thirty (30) days of each fiscal quarter (including each year-end fiscal quarter): (A) an unaudited statement setting forth and describing in reasonable detail the receipts and expenditures of the Company Entities during the preceding quarter and comparing the results of operations of the Company for such quarter and for the year to date to the appropriate Approved Budget together with a narrative summary of property operations for said preceding quarter, (B) if requested by PF Member, a projected cash flow analysis for the next four (4) calendar quarters; and (C) an internally prepared income statement and balance sheet of the Company Entities dated as of the end of such fiscal quarter reflecting the operating performance and financial condition of the Company in accordance with GAAP for and as of such quarter, and shall include a statement of the Members' Capital Accounts, Approved Additional Capital Contribution Balances, Capital Contribution Primary Preferred Return Balances, Capital Contribution Secondary Preferred Return Balances, Initial Capital Contribution Balances, Default Capital Contribution Balances, Default Capital Contribution Preferred Return Balances, a statement of Net Distributable Cash, a projected cash flow analysis for the remainder of the Project by fiscal year and a statement setting forth the Profits and Losses of the Company Entities for such fiscal quarter. In addition, on or before sixty (60) days after the end of each fiscal year, the Manager shall, at its expense, furnish to the Members an income statement and balance sheet of the Company Entities dated as of the end of such fiscal year and referencing all of the information mentioned above with respect to the Company Entities, such income statement and balance sheet reflecting the operating performance and financial condition of the Company Entities in accordance with GAAP for and as of such fiscal year, to be audited by an independent firm of certified public accountants as selected by PF Member if PF Member so requests (with any such audit requested by PF Member to be at PF Member expense). Further, from time to time, the Manager shall provide all other information relating to the Company Entities and its business and affairs reasonably requested by any Member.

    (d)    On at least a monthly basis, the Manager shall meet with the leasing agent(s) for the Properties and both of the Members to review status reports outlining leasing

MFP CORNHUSKER PROPERTIES LLC          20

progress and Occupancy for the Project, which meeting may be held by telephone conference.

    (e)    Each Member, at its expense, may at all reasonable times during usual business hours, audit the accounts, books and records of the Company Entities. Such right may be exercised by any Member, or by its designated agents or employees.

    5.2.    **Bank Accounts**. The Manager shall open and maintain bank accounts of the Company Entities in accordance with the cash management system required by the Senior Mortgage Lender under the Senior Loan Documents.

## VI.
## CAPITAL CONTRIBUTIONS

    6.1.    **Initial Capital Contributions**. Upon satisfaction of the conditions for contribution of the Initial Capital Contribution by PF Member set forth in Schedule 6.1(A) and upon PF Member's receipt of written confirmation from Perkins Member that the representations and warranties set forth in Schedule 6.1(B) are true and correct in all material respects on and as of the date of PF Members' Initial Capital Contribution (which confirmation shall be deemed given by Perkins Member upon execution hereof), the Members shall make Initial Capital Contributions ("**Initial Capital Contributions**") as follows:

    (a)    The Initial Capital Contributions of Perkins Member, consisting of the contribution of the Properties to the Subsidiaries by conveyance of title thereto, was contributed as of the date hereof.

    (b)    The Initial Capital Contribution of PF Member shall be contributed in the form of (i) the conversion of all amounts advanced under that certain Promissory Note issued to PF Member by Perkins, L.L.C. dated August 29, 2013 in the original principal amount of $650,000.00 (the "**Perkins Note**") and accrued interest thereunder as of the date of the admission of PF Member to the Company; and (ii) cash contributed concurrently with admission of PF Member to the Company. The initial capital funded by PF Member will be up to $5 million total investment, inclusive of deposits and costs. Upon admission of PF Member as Member of the Company, the Perkins Note shall be deemed paid in full and PF Member shall return the original Perkins Note to Perkins Principal marked "Paid in Full."

Notwithstanding the foregoing, the Members agree and acknowledge that PF Member's maximum Initial Capital Contribution shall equal the lower of (i) $5,000,000 or (ii) the Reduced Maximum PF Initial Investment (as defined below) and any capital required in excess of PF Member's maximum Initial Capital Contribution shall be contributed by the Members in the form of an Approved Additional Capital Contribution or a Required Capital Contribution, as applicable. If the Approved Budget agreed to by both Members reflects less than $5,000,000 of new capital (in the form of PF Member's Initial Capital Contribution) is required, then PF Member shall (A) contribute as its Initial Capital Contribution such lower amount (which shall not be less than $2,000,000 unless expressly agreed to in writing by the Members) (the "**Reduced Maximum Initial Investment**"); and (B) pay to Perkins Member an amount equal to 50% of the difference between $5,000,000 and the Reduced Maximum Initial Investment, provided that if both Members expressly agree in writing that the Reduced Maximum Initial Investment shall be less than $2,000,000, the amount payable under this clause (B) shall equal $1,500,000 (*i.e.*, 50%

of the difference between $5,000,000 and $2,000,000), plus 100% of the difference between $2,000,000 and the Reduced Maximum Initial Investment.

6.2.   **Additional Capital Contributions.**

(a)   Approved Additional Capital Contributions.  To the extent Additional Capital Contributions are expressly approved in the Business Plan by each of the Members pursuant to an Approved Budget or approved in writing in their respective sole discretion, the Members shall make said Approved Additional Capital Contributions to the Company in proportion with their respective Capital Sharing Ratios and in accordance with the requirements set forth in the Business Plan and Approved Budget ("**Approved Additional Capital Contributions**").

(b)   Required Additional Capital Contributions.  Perkins Member shall be unilaterally required to make Additional Capital Contributions to the Company to cover Cost Overruns that are not approved in advance in writing by the Members in their respective sole discretion ("**Required Additional Capital Contributions**"). Such Required Additional Capital Contributions shall be made by Perkins Member as and when required to cover said Cost Overruns, and if not so made by Perkins Member, PF Member may give notice to Perkins Member of the amount of Required Additional Capital Contributions so required and Perkins Member shall make such Required Additional Capital Contributions to the Company in the amount set forth in said notice within thirty (30) days after written notice is given, or as soon as reasonably practicable in the case of Cost Overruns incurred in an emergency.  Such capital calls by PF Member for Required Additional Capital Contributions shall be solely within the discretion of PF Member, and no third party shall have any right to compel any such call for Required Additional Capital Contributions. Perkins Member acknowledges its obligation to make Required Additional Capital Contributions as a primary obligation notwithstanding any obligations of the Asset Manager; provided, however, that in the event Asset Manager so covers the Cost Overruns pursuant to the Perkins Asset Management Agreements and if the Asset Manager is the same entity as or is a controlled Affiliate of Perkins Member at the time of such payment, such payment shall be deemed a Required Additional Capital Contribution.  PF Member shall have no obligation to make Required Additional Capital Contributions.

6.3.   **Failure to Make Contributions.**

(a)   Any Member which fails to timely contribute all or any portion of any Capital Contribution which said Member is required to contribute to the Company hereunder shall be considered a "**Delinquent Member**".  The Company may, upon notice to a Delinquent Member, exercise any one or more of the following rights or remedies:

(i)   permit the non-Delinquent Members which elect to do so, in proportion to their respective Capital Sharing Ratios or in such other percentages as they may agree (the "**Lending Members**", whether one or more), to advance that portion of the Capital Contribution that is in default, as a loan (a "**Default Loan**") with the following results:

MFP CORNHUSKER PROPERTIES LLC          22

(1)     the sum thus advanced shall constitute a loan to the Delinquent Member,

(2)     such loan and all accrued unpaid interest thereon shall be due six (6) months after such advance is made;

(3)     the loan shall bear interest at the Interest Rate from the date made until the date fully repaid;

(4)     all Company distributions and other payments that otherwise would be made to the Delinquent Member (whether before or after dissolution of the Company) under this Agreement shall be paid to the Lending Members until the loan and all interest accrued thereon is paid in full (with all such payments being applied first to accrued and unpaid interest and then to principal);

(5)     the payment of the loan shall be secured by security interest in the delinquent Member's Membership Interest as set forth in Section 6.3(b); and

(6)     the Lending Members may, in addition to the other rights granted herein, take such action as they may deem appropriate to obtain payment of the loan at the expense of the Delinquent Member;

(ii)    permit the non-Delinquent Member to elect (A) not to make its share (if any) of any Capital Contribution, in which case any portion of its share of any such Capital Contribution already contributed to the Company shall be returned to it, or (B) to contribute its share (if any) of any Capital Contribution and all, none or any portion of the Delinquent Member's Capital Contribution ("**Default Capital**"), in which case (i) all such Capital Contributions made by the non-Delinquent Member (including the non-Delinquent Member's Capital Contribution) shall constitute "**Default Capital Contributions**" by the non-Delinquent Member, which shall accrue Default Preferred Return in accordance with the terms hereof; and the Residual Sharing Ratio of the Delinquent Member shall be reduced by an amount equal to two (2) times a fraction, the numerator of which is the amount of the contribution which the Delinquent Member failed to make and the denominator of which is the sum of all Capital Contributions to the Company; and

(iii)   pursue all other available rights or remedies.

If any Member other than PF Member is a Delinquent Member, then exercise of the foregoing remedies shall be determined by PF Member in its sole discretion. If PF Member is a Delinquent Member, then exercise of the foregoing remedies shall be determined by Perkins Member in its sole discretion.

(b)     Each Member hereby grants to the other Member and the Company, equally and ratably, a security interest in its Membership Interest to secure performance of its obligation(s) under Sections 6.2(a) and 6.3 (collectively, the "**Secured**

MFP CORNHUSKER PROPERTIES LLC          23

Obligations"). Upon any default in the Secured Obligations, the Persons to whom such obligations are owed (each, a "**Secured Party**") shall have all the rights and remedies of a secured party under the Uniform Commercial Code with respect to the security interest granted herein, and the proceeds arising from any foreclosure of the security interest herein granted may be applied to attorneys' fees and expenses incurred by the Secured Party in exercising such rights and remedies. Each Member shall execute and deliver to the other Member and to the Company all such financing statements and other instruments as may be requested by the other Member to evidence the security interest provided for herein. This Agreement may serve as the necessary financing statement, or the Manager or the Lending Member may execute and file a financing statement on behalf of the other Member and the other Member hereby appoints the Manager and the Lending Member as its attorney-in-fact to execute such financing statements and other instruments as may be necessary to evidence or continue the perfection of the security interest herein granted. Such power of attorney is coupled with an interest and is irrevocable.

6.4.  **Return of Contributions**. Except as expressly provided herein, no Member shall be entitled to (a) the return of any part of its Capital Contributions, (b) any interest in respect of any Capital Contribution, or (c) the fair market value of its Membership Interest in connection with a withdrawal from the Company or otherwise. Unpaid Capital Contributions shall not be a liability of the Company or of any Member. No Member shall be required to contribute or lend any cash or property to the Company to enable the Company to return any Member's Capital Contribution to the Company.

6.5.  **Member Loans**. If the Company shall have insufficient cash to pay its obligations, any Member, with the written approval of the other Member and the Manager, may advance such funds for the Company on such terms and conditions as the lending Member and the other Member may determine ("**Member Loan**"). Each such advance shall constitute a loan from such Member to the Company and shall not constitute a Capital Contribution.

6.6.  **Balances**. The Company's books and records shall contain entries indicating the type and amount of Capital Contributions made to the Company and the Preferred Return thereon. When used herein, the following terms shall refer to the following balances:

"**Approved Additional Capital Contribution Balance**" means, for each Member, the cumulative Approved Additional Capital Contributions of that Member less the cumulative distributions to that Member in return thereof pursuant to Section **8.2**.

"**Capital Contribution Primary Preferred Return Balance**" means, for PF Member, the cumulative accrued Primary Preferred Return of PF Member on the balance of its Initial Capital Contribution Balance plus its Approved Additional Capital Contribution Balance, less all amounts distributed by the Company to PF Member in prior fiscal years in payment thereof pursuant to Section **8.2**.

"**Capital Contribution Secondary Preferred Return Balance**" means, for PF Member, the cumulative accrued Secondary Preferred Return of PF Member on the balance of its Initial Capital Contribution Balance plus the balance of its Approved Additional Capital Contribution Balance, less all amounts distributed by the Company to PF Member in prior fiscal years in payment thereof pursuant to Section **8.2**.

MFP CORNHUSKER PROPERTIES LLC            24

"**Default Capital Contribution Balance**" means, for each Member, the cumulative Default Capital Contributions of that Member, less the cumulative distributions to that Member in return thereof pursuant to Section **8.2.**

"**Default Capital Contribution Preferred Return Balance**" means, for each Member, the cumulative accrued Preferred Return of that Member on the balance of its Default Capital Contribution Balance less all amounts distributed by the Company to that Member in payment thereof pursuant to Section **8.2.**

"**Initial Capital Contribution Balance**" means, for each Member, the total Initial Capital Contributions of that Member, less the cumulative distributions to that Member in prior fiscal years in return thereof pursuant to Section **8.2.**

6.7. **Excess Committed Capital.** If the Members have established a Reduced Maximum Initial Investment for PF Member pursuant to the last paragraph of Section **6.1**, an amount equal to 50% of the difference between $5,000,000 and the Reduced Maximum Initial Investment (or, if the Reduced Maximum Initial Investment is agreed to be less than $2,000,000, an amount equal to $1,500,000) shall be deemed "Excess Committed Capital". If, on the date hereof or within two years of the date hereof, the "Excess Committed Capital Milestone" (as defined below) is achieved, then PF Member shall pay to Perkins Member an amount equal to the Excess Committed Capital. For purposes of this Section **6.7**, the "Excess Committed Capital Milestone" shall mean the achievement of each of the following: (a) the Monument Mall Property is sold or otherwise removed from the Project, or MFP Monument Mall LLC obtains refinancing of the loan currently secured by the Monument Mall Property on terms acceptable to PF Member; (b) the aggregate Occupancy of the Mid-America Properties equals 87% or more, and based on the Business Plan, Occupancy of the Mid-America Properties is not projected to decrease below 87% within the succeeding twelve (12) months; and (c) the aggregate Net Operating Income of the Mid-America Properties over the preceding twelve-month period is at least $5,631,000.

## VII.
## SEPARATENESS FROM AFFILIATES; BANKRUPTCY

7.1. **Separateness from Affiliates.** Notwithstanding anything in this Agreement to the contrary, unless otherwise provided pursuant to the written consent or written direction of PF Member, the Members and Manager shall endeavor to cause the Company to:

(a)     be and remain solvent and pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due, and maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(b)     correct any known misunderstanding regarding the separate identity of the Company, Perkins Member and PF Member;

(c)     maintain its accounts, books and records separate from any other Person and file its own tax returns, except to the extent that it is required to file consolidated tax returns by law;

(d)     maintain its own records, books, resolutions and agreements;

(e)    (i) not commingle its funds or assets with those of any other Person and (ii) not participate in any cash management system involving the commingling of funds with any other Person; provided, however, that the foregoing shall not be deemed to prohibit the cash management system required under the Senior Loan Documents;

(f)    hold its assets in its own name or in the name of a wholly owned subsidiary;

(g)    conduct its business in its name or in a name franchised or licensed to it by an entity other than an Affiliate of Company;

(h)    maintain its financial statements, accounting records and other entity documents separate from any other Person and not permit its assets to be listed as assets on the financial statement of any other entity except as required by GAAP; provided, however, that any consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(i)    pay its own liabilities and expenses, including the salaries of its own employees, out of its own funds and assets, and have maintained and maintain a sufficient number of employees in light of its contemplated business operations, all in accordance with the Business Plan;

(j)    observe all partnership, corporate or limited liability company formalities, as applicable;

(k)    have no indebtedness other than as expressly approved in the Business Plan and in no event in excess of $52,000,000.00, exclusive of funding for future reserves;

(l)    except as expressly set forth in the Business Plan, not assume or guarantee or become obligated for the debts of any other Person without the prior written approval of PF Member or hold out its credit as being available to satisfy the obligations of any other Person;

(m)    not acquire obligations or securities of its Members or of any Affiliate;

(n)    allocate fairly and reasonably any overhead expenses that are shared with any Affiliate, including, but not limited to, paying for shared office space and services performed by any employee of an Affiliate;

(o)    maintain and use separate stationery, invoices and checks bearing its name, with the stationery, invoices, and checks utilized by the Company and its Affiliates or utilized to collect their funds or pay their expenses to bear their own name and not bear the name of any other entity unless such entity is clearly designated as being the agent of the Company or its Affiliates, as applicable;

(p)    not pledge its assets for the benefit of any other Person;

(q)   hold itself out and identify itself as a separate and distinct entity under its own name or in a name franchised or licensed to it by an entity other than an Affiliate of Company and not as a division or part of any other Person;

(r)   maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(s)   not make loans to any Person or hold evidence of indebtedness issued by any other Person or entity (other than cash and investment grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity or other than as expressly set forth in the Business Plan);

(t)   not identify its partners or Members, or any Affiliate of any of them, as a division or part of it, and not identify itself as a division of any other Person;

(u)   not enter into or be a party to, any transaction with its Members or Affiliates except (i) in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and are no less favorable to it than would be obtained in a comparable arm's length transaction with an unrelated third party, and (ii) in connection with this Agreement; and

(v)   comply with all of the terms and provisions contained in its organizational documents.

7.2.   **Bankruptcy and Insolvency Proceedings.**  Without the written consent of PF Member, no Member, Manager, officer or employee (if any) of the Company shall cause any Company Entity to file or consent to the filing of any bankruptcy or insolvency petition or otherwise institute insolvency proceedings.

## VIII.
## DISTRIBUTIONS

8.1.   **Distributions in General.**  Subject to any restrictions contained in the Senior Loan Documents, the Manager shall distribute the Net Distributable Cash of the Company on an annual basis in the manner set forth in Section 8.2; provided, however, that PF Member may require the Company to make more frequent distributions of Net Distributable Cash (but in no event more than once per month) upon ten (10) days' written notice to the Manager.

8.2.   **Distribution of Net Distributable Cash.**  The Net Distributable Cash shall, subject to Section 6.3, be distributed to the Members in the following order of priority:

(a)   first, to the Members *pari passu* in payment of their Default Preferred Returns until their Default Capital Contribution Preferred Return Balances have been reduced to zero;

(b)   next, to the Members in proportion to and in return of their Default Capital Contributions until their Default Capital Contribution Balances have been reduced to zero;

MFP CORNHUSKER PROPERTIES LLC          27

(c)     next to PF Member in payment of amounts distributable to PF Member in previous years under subsections (d), (e) and (f) of this Section 8.2 but not previously distributed;

(d)     next, to PF Member in payment of its Primary Preferred Return on its Initial Capital Contribution and its Approved Additional Capital Contributions until its Capital Contribution Primary Preferred Return Balance has been reduced to zero;

(e)     next, to PF Member in return of its Initial Capital Contribution and its Approved Additional Capital Contribution in an amount of up to, but not exceeding, $1,000,000 per fiscal year (or such lesser amount as may be outstanding in PF Member's Initial Capital Contribution Balance and Approved Additional Capital Contribution Balance);

(f)     next, to PF Member in payment of its Secondary Preferred Return on its Initial Capital Contribution and its Approved Additional Capital Contributions until its Capital Contribution Secondary Preferred Return Balance has been reduced to zero;

(g)     next, to Perkins Member an amount equal to the distribution to PF Member under subsection (f) of this Section 8.2, multiplied by a ratio, the numerator of which equals Perkins Member's Interim Sharing Ratio and the denominator of which equals PF Member's Interim Sharing Ratio; and

(h)     thereafter, to the Members in accordance with their respective Residual Sharing Ratios (*i.e.*, 90% to Perkins Member and 10% to PF Member initially).

Distributions to Perkins Member under subsections (g) and (h) above shall first be in return of its Initial Capital Contribution Balance until its Initial Capital Contribution Balance has been reduced to zero, and then in return of its Approved Additional Capital Contribution Balance until its Approved Additional Capital, and then in return of its Required Additional Capital Contribution Balance until its Required Additional Capital Contribution Balance has been reduced to zero.

IX.
## CAPITAL ACCOUNTS, ALLOCATIONS, AND TAX MATTERS

9.1.    **Definitions.** The following terms shall have the following meanings:

(a)     **"Adjusted Capital Account"** means, with respect to a Member, such Member's Capital Account as of the end of each fiscal year, as the same is specially computed to reflect the adjustments required or permitted to be taken into account in applying Regulations Section 1.704-1(b)(2)(ii)(d) (including adjustments for Company Minimum Gain and Member Nonrecourse Debt Minimum Gain).

(b)     **"Adjusted Capital Account Deficit"** means, for each Member, the deficit balance, if any, in that Member's Adjusted Capital Account.

(c)     **"Capital Account"** shall have the meaning set forth in Section 9.2.

MFP CORNHUSKER PROPERTIES LLC            28

(d)  **"Code"** means the Internal Revenue Code of 1986, as amended from time to time, and any corresponding provisions of succeeding law.

(e)  **"Depreciation"** means, for each taxable year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for the year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of the year or other period, Depreciation will be an amount which bears the same ratio to the beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for the year or other period bears to the beginning adjusted tax basis, provided that if the federal income tax depreciation, amortization, or other cost recovery deduction for the year or other period is zero, Depreciation will be determined with reference to the beginning Gross Asset Value using any reasonable method selected by the Manager with the consent of PF Member.

(f)  **"Gross Asset Value"** has the meaning assigned to it in Section 9.3.

(g)  **"Partner Nonrecourse Debt"** has the meaning assigned to it in Regulations Sections 1.704-2(b)(4) and 1.752-2.

(h)  **"Partner Nonrecourse Debt Minimum Gain"** has the meaning assigned to it in Regulations Section 1.704-2(i)(2) and will be determined in accordance with Regulations Section 1.704-2(i)(3).

(i)  **"Partner Nonrecourse Deductions"** has the meaning assigned to it in Regulations Section 1.704-2(i)(2).

(j)  **"Partnership Minimum Gain"** has the meaning assigned to it in Regulations Section 1.704-2(d).

(k)  **"Profits"** and **"Losses"** mean, for each taxable year or other period, an amount equal to the Company's taxable income or loss for the year or other period, determined in accordance with Section 703(a) of the Code (including all items of income, gain, loss or deduction required to be stated separately under Section 703(a)(1) of the Code, with the following adjustments:

(i)  Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses will be added to taxable income or loss;

(ii)  Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Section 705(a)(2)(B) expenditures under Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses, will be subtracted from taxable income or loss;

(iii)  Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Gross Asset Value of the

property, notwithstanding that the adjusted tax basis of the property differs from its Gross Asset Value;

(iv) In lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there will be taken into account Depreciation for the taxable year or other period;

(v) Any items which are specially allocated under Sections 9.4(c) or 9.4(d) will not affect calculations of Profits or Losses; and

(vi) If the Gross Asset Value of any Company asset is adjusted under Section 9.3(b) or 9.3(c), the adjustment will be taken into account as gain or loss from disposition of the asset for purposes of computing Profits or Losses.

(l) "**Regulations**" means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code. All references herein to sections of the Regulations shall include any corresponding provisions of succeeding, similar, substitute proposed or final Regulations.

(m) "**Regulatory Allocations**" has the meaning assigned to it in Section 9.4(d).

9.2. **Capital Accounts**.

(a) Establishment and Maintenance. A separate capital account ("**Capital Account**") will be maintained for each Member. The Capital Account of each Member will be determined and adjusted as follows:

(i) Each Member's Capital Account will be credited with the Member's Capital Contributions (measured by the Gross Asset Value of any contributed property), the Member's distributive share of Profits, any items in the nature of income or gain that are specially allocated to the Member under Sections 9.4(b)(iii), 9.4(c) or 9.4(d), and the amount of any Company liabilities that are assumed by the Member or secured by any Company property distributed to the Member. PF Member tax basis shall include a minimum of $30 million relating to the allocated basis from outstanding senior debt of MFP Mid-America Shopping Centers LLC. Any tax basis for the debt of MFP Mid-America Shopping Centers LLC in excess of $50 million, and all other debt, shall be allocated 60% to PF Member and 40% to Perkins Member.

(ii) Each Member's Capital Account will be debited with the amount of cash and the Gross Asset Value of any Company property distributed to the Member under any provision of this Agreement, the Member's distributive share of Losses, any items in the nature of deduction or loss that are specially allocated to the Member under Sections 9.4(b)(iii), 9.4(c) or 9.4(d) and the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by the Member to the Company.

(iii)   If any interest in the Company is transferred in accordance with the terms of this Agreement, the transferee will succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(b)   <u>Modifications by Manager and PF Member</u>.  The provisions of this Section **9.2** and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Section 704(b) of the Code and the Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions.  The Manager may, with the prior written consent of PF Member, modify the manner in which the Capital Accounts are maintained under this Section **9.2** to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions; however, without the unanimous consent of all Members, the Manager may not make any modification to the way Capital Accounts are maintained if such modification would have the effect of changing the amount of distributions to which any Member would be entitled during the operation, or upon the liquidation, of the Company.

9.3.   <u>Adjustment of Gross Asset Value</u>.  "<u>Gross Asset Value</u>", with respect to any asset, is the adjusted basis of that asset for federal income tax purposes, except as follows:

(a)   The initial Gross Asset Value of any asset contributed (or deemed contributed under Code Sections 704(b) and 752 and the Regulations promulgated thereunder) by a Member to the Company will be the fair market value of the asset on the date of the contribution, as determined by the Manager with the consent of PF Member.

(b)   The Gross Asset Values of all Company assets will be adjusted to equal the respective fair market values of the assets, as reasonably determined by the Manager and PF Member, as of (1) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* capital contribution (exclusive of any contribution of Additional Capital pursuant to Section 6.2), (2) the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an interest in the Company if an adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company, (3) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); and (4) at such other times provided by the applicable Regulations.

(c)   The Gross Asset Value of any Company asset distributed to any Member will be the gross fair market value of the asset on the date of distribution.

(d)   The Gross Asset Values of Company assets will be increased or decreased to reflect any adjustment to the adjusted basis of the assets under Code Section 734(b) or 743(b), but only to the extent that the adjustment is taken into account in determining Capital Accounts under Regulations Section 1.704-1(b)(2)(iv)(m), provided that Gross Asset Values will not be adjusted under this Section **9.3(d)** to the extent that the Manager determines that an adjustment under Section **9.3(b)** is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment under this Section **9.3(d)**.

(e)    After the Gross Asset Value of any asset has been determined or adjusted under Sections 9.3(a), 9.3(b) or 9.3(d), Gross Asset Value will be adjusted by the Depreciation taken into account with respect to the asset for purposes of computing Profits or Losses.

9.4.    **Profits, Losses and Distributive Share of Tax Items**.

    (a)    Profits. After giving effect to any allocation provided for in Sections 9.4(b)(iii), 9.4(c) and 9.4(d), Profits of the Company for any taxable year shall be allocated to the Members in the following manner and priority:

        (i)    first, to the Members in an aggregate amount equal to the cumulative Losses that have previously been allocated pursuant to Section 9.4(b)(ii), such chargeback allocations to be made pro rata in accordance with the Members' respective share of such Losses;

        (ii)    next, to the Members in an amount equal to the sum of their respective distributed Default Preferred Returns for such taxable year and any portion of the distributed Default Preferred Return on their Default Capital Contributions for prior years that (a) has not been allocated a corresponding amount of Profits pursuant to this Section 9.4(a)(ii) or, (b) if so allocated, such allocation of Profits has been previously offset by a Loss chargeback allocation pursuant to Section 9.4(b)(i) with respect to Profits previously allocated pursuant to this Section 9.4(a)(ii);

        (iii)    next, to PF Member in an amount equal to the sum of its distributed Primary Preferred Return on its Initial Capital Contribution and Approved Additional Capital Contribution for such taxable year and any portion of the distributed Primary Preferred Return on its Initial Capital Contribution and Approved Additional Capital Contribution for prior years that (a) has not been allocated a corresponding amount of Profits pursuant to this Section 9.4(a)(iii) or, (b) if so allocated, such allocation of Profits has been previously offset by a Loss chargeback allocation pursuant to Section 9.4(b)(i) with respect to Profits previously allocated pursuant to this Section 9.4(a)(iii);

        (iv)    next, to PF Member in an amount equal to the sum of its distributed Secondary Preferred Return on its Initial Capital Contribution and Approved Additional Capital Contribution for such taxable year and any portion of the distributed Secondary Preferred Return on its Initial Capital Contribution and Approved Additional Capital Contribution for prior years that (a) has not been allocated a corresponding amount of Profits pursuant to this Section 9.4(a)(iv) or, (b) if so allocated, such allocation of Profits has been previously offset by a Loss chargeback allocation pursuant to Section 9.4(b)(i) with respect to Profits previously allocated pursuant to this Section 9.4(a)(iv);

        (v)    next, to the Members in an amount equal to the respective amounts distributed to the Members pursuant to Section 8.2(h) for such taxable year and all prior fiscal years to the extent (a) that the cumulative prior allocations of profits pursuant to this Section 9.4(a)(v) have not equaled

such cumulative amounts distributed to the Members pursuant to Section 8.2(h) for the current taxable and all prior taxable years, or (b) if so allocated, such allocation of profits has been previously offset by a Loss chargeback allocation pursuant to Section 9.4(b)(i) with respect to Profits previously allocated pursuant to this Section 9.4(a)(v);

(vi)    the balance, if any, to the Members in accordance with their respective Residual Sharing Ratios.

(b)    **Losses.** After giving effect to the allocations provided for in Sections 9.4(b)(iii), 9.4(c) and 9.4(d), Losses of the Company shall be allocated to the Members in the following manner and priority:

(i)    First, to the Members in an aggregate amount equal to the cumulative Profits that have previously been allocated pursuant to Sections 9.4(a)(ii), (iii), (iv), (v), (vi) and (vii), with such Loss chargeback allocations to be made: first, with respect to cumulative Profits allocated pursuant to Section 9.4(a)(vii); second, with respect to cumulative Profits allocated pursuant to Section 9.4(a)(vi); third, with respect to cumulative Profits allocated pursuant to Section 9.4(a)(v); fourth, with respect to cumulative Profits allocated pursuant to Section 9.4(a)(iv); fifth, with respect to the cumulative Profits allocated pursuant to Section 9.4(a)(iii); and sixth, with respect to the cumulative Profits allocated pursuant to Section 9.4(a)(ii).

(ii)    Thereafter, to the Members, pro rata in accordance with their Residual Sharing Ratios.

(iii)    Notwithstanding Section 9.4(b)(ii), the Losses allocated pursuant thereto shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any tax year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 9.4(b)(ii), the limitation set forth in this Section 9.4(b)(iii) will be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d). If each Member has an Adjusted Capital Account Deficit, Losses will be allocated to those Members having an adjusted tax basis in their Membership Interest pro rata in accordance with such adjusted tax basis. Prior to any allocation of Profits under Section 9.4(a), Profits will be first allocated to the Members who were allocated Losses as a result of this Section 9.4(b)(iii), until such prior allocations of Losses hereunder are fully offset.

(c)    **Special Allocations.** The following special allocations will be made in the following order and priority before allocations of Profits and Losses:

(i)    **Partnership Minimum Gain Chargeback.** If there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, before any other allocation under this

MFP CORNHUSKER PROPERTIES LLC    33

Agreement, each Member will be specially allocated items of Company income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to such Member's share of the net decrease in Partnership Minimum Gain during such year determined in accordance with Regulations Section 1.704-2(g)(2). The items to be allocated will be determined in accordance with Regulations Section 1.704-2(f) and (j). This Section 9.4(c)(i) is intended to comply with the Partnership Minimum Gain chargeback requirements of the Regulations, will be interpreted consistently with the Regulations and will be subject to all exceptions provided therein.

(ii)     Partner Nonrecourse Debt Minimum Gain Chargeback. Notwithstanding any other provision of this Section 9.4(c) (other than Section 9.4(c)(i) which shall be applied first), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Member with a share of such Partner Nonrecourse Debt Minimum Gain (determined under Regulations Section 1.704-2(i)(5)) as of the beginning of the year will be specially allocated items of Company income and gain for that period (and, if necessary, subsequent periods) in an amount equal to such Member's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during such year determined in accordance with Regulations Section 1.704-2(g)(2). The items to be so allocated will be determined in a manner consistent with Regulations Section 1.704-2(f), (g) and (j). This Section 9.4(c)(ii) is intended to comply with the Partner Nonrecourse Debt Minimum Gain chargeback requirements of the Regulations, will be interpreted consistently with the Regulations and will be subject to all exceptions provided therein.

(iii)    Qualified Income Offset. A Member who unexpectedly receives any adjustment, allocation or distribution described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) will be specially allocated items of Company income and gain in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible.

(iv)    Nonrecourse Deductions. Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated among the Members in the same manner as Losses pursuant to Section 9.4(b).

(v)     Partner Nonrecourse Deductions. Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i).

(vi)    Code Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset under Code Sections 734(b) or 743(b) is required to be taken into account in determining Capital

MFP CORNHUSKER PROPERTIES LLC          34

Accounts under Regulations Section 1.704-1(b)(2)(iv)(m), the amount of the adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis), and the gain or loss will be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted under Regulations Section 1.704-1(b)(2)(iv)(m).

(d)  Curative Allocations. The allocations set forth in Section 9.4(c) (the "Regulatory Allocations") are intended to comply with certain requirements of Regulations Sections 1.704-1(b) and 1.704-2. The Regulatory Allocations may effect results which would be inconsistent with the manner in which the Members intend to divide Company distributions. Accordingly, the Manager is authorized with the consent of PF Member to divide other allocations of Profits, Losses, and other items among the Members, to the extent that they exist, so that the net amount of the Regulatory Allocations and the special allocations to each Member is zero. The Manager will have discretion to accomplish this result in any reasonable manner that is consistent with Code Section 704 and the related Regulations and approved by PF Member.

(e)  Tax Allocations—Code Section 704(c). For federal, state and local income tax purposes, Company income, gain, loss, deduction or expense (or any item thereof) for each fiscal year shall be allocated to and among the Members to reflect the allocations made pursuant to the provisions of this Section 9.4 for such fiscal year; provided, however, that in accordance with Code Section 704(c) and the related Regulations, income, gain, loss and deduction with respect to any property contributed to the capital of the Company, solely for tax purposes, will be allocated among the Members so as to take account of any variation between the adjusted basis to the Company of the property for federal income tax purposes and the initial Gross Asset Value of the property (computed in accordance with Section 9.3). If the Gross Asset Value of any Company asset is adjusted under Section 9.3(b), subsequent allocations of income, gain, loss and deduction with respect to that asset will take account of any variation between the adjusted basis of the asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the related Regulations. Any elections or other decisions relating to allocations under this Section 9.4(e) will be made in any manner that the Manager determines reasonably reflects the purpose and intention of this Agreement, subject to the approval of such election by PF Member. Allocations under this Section 9.4(e) are solely for purposes of federal, state and local taxes and will not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses or other items or distributions under any provision of this Agreement.

(f)  Members shall be bound by the provisions of Section 9.4 in reporting their shares of Company income and loss for income tax purposes.

9.5.  **Tax Returns.** The Manager shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making the elections described in Section 9.6. On or before February 15 of each year, the Manager shall deliver to PF Member copies of the prepared federal and state income tax returns. PF Member shall review the prepared returns and either approve the prepared

returns or provide the Manager with written objections to any element thereof. If any objection is made by PF Member, the Members and the Manager shall work in good faith to resolve any objections with reasonable promptness and in any event so that such returns may be filed before the applicable filing deadline. Each Member shall furnish to the Manager all pertinent information in its possession relating to Company operations that is necessary to enable such income tax returns to be prepared and filed.

9.6.     **Tax Elections.**  The following elections shall be made on the appropriate returns of the Company:

      (a)     to adopt the calendar year as the Company's fiscal year;

      (b)     to adopt the accrual method of accounting and to keep the Company's books and records on the equity method;

      (c)     if there is a distribution of Company property as described in Section 734 of the Code or if there is a transfer of a Company interest as described in Section 743 of the Code, upon written request of any Member, to elect, pursuant to Section 754 of the Code, to adjust the basis of Company properties; and

      (d)     to elect to amortize the organizational expenses of the Company ratably over a period of sixty (60) months as permitted by Section 709(b) of the Code.

No election shall be made by the Company or any Member (i) to be excluded from the application of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar provisions of applicable state laws; or (ii) to classify the Company as other than a "partnership" for federal or state income tax purposes.

9.7.     **Tax Matters Member.**  Perkins Member shall be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code. As tax matters partner, such Member shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6231 of the Code. Such Member shall inform each other Member of all significant matters that may come to its attention in its capacity as tax matters partner by giving notice thereof within ten (10) days after becoming aware thereof and, within such time, shall forward to each other Member copies of all significant written communications it may receive in such capacity. Such Member shall not take any action contemplated by Sections 6222 through 6232 of the Code in such Member's capacity as tax matters partner without the consent of PF Member. This provision is not intended to authorize such Member, in its capacity as tax matters partner, to take any action left to the determination of an individual Member under Sections 6222 through 6232 of the Code.

9.8.     **Allocations on Transfer of Interests.**  All items of income, gain, loss, deduction, and credit allocable to any interest in the Company that may have been transferred shall be allocated between the transferor and the transferee based upon that portion of the calendar year during which each was recognized as owning such interest, without regard to the results of Company operations during any particular portion of such calendar year and without regard to whether cash distributions were made to the transferor or the transferee during such calendar year; however, such allocation shall be made in accordance with a method permissible under Section 706 of the Code and the Regulations thereunder.

MFP CORNHUSKER PROPERTIES LLC                    36

X.

## WITHDRAWAL, DISSOLUTION, LIQUIDATION, AND TERMINATION

10.1.   **Dissolution, Liquidation, and Termination Generally.**   The Company shall be dissolved upon the first to occur of any of the following:

(a)     The sale or disposition of all of the assets of the Company and the receipt, in cash, of all consideration therefor;

(b)     The determination of Perkins Member and PF Member to dissolve the Company; and

(c)     The occurrence of any event which, as a matter of law, requires that the Company be dissolved.

None of the events set forth in Section 18-801(a)(4) or (b) of the Act shall cause a dissolution of the Company, and the Members hereby agree and consent to continue the existing business of the Company upon the occurrence thereof.  Notwithstanding the foregoing, if the Company is dissolved because an event described in Section 18-801(a)(4) or (b) of the Act occurs with respect to a Member, then the other Member may elect to continue the Company business within ninety (90) days after the Members have actual notice of such event, and, at the option of the electing Member, may admit a new Member to the Company with a Residual Sharing Ratio and Capital Sharing Ratio determined by the electing Member. The Residual Sharing Ratio and Capital Sharing Ratio of the electing Member then shall be reduced by the Residual Sharing Ratio and Capital Sharing Ratio allocated to the new Member.

10.2.   **Liquidation and Termination.**  Upon dissolution of the Company, unless it is continued as provided above, the Manager shall act as liquidator or may appoint one or more other Persons as liquidator; however, if the Company is dissolved because of an event occurring with respect to the Manager, the liquidator shall be one or more Persons selected in writing by PF Member. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein.  The costs of liquidation shall be a Company expense.  Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Manager hereunder. The steps to be accomplished by the liquidator are as follows:

(a)     as promptly as possible after dissolution and again after final liquidation, the liquidator shall cause a proper accounting to be made by a firm of certified public accountants acceptable to PF Member of the Company's assets, liabilities, and operations through the last day of the calendar month in which the dissolution shall occur or the final liquidation shall be completed, as applicable;

(b)     the liquidator shall pay all of the debts and liabilities of the Company or otherwise make adequate provision therefor (including the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(c)     all remaining assets of the Company shall be distributed to the Members as follows:

(i)     the liquidator may sell any or all Company property and the sum of (A) any resulting gain or loss from each sale plus (B) the fair market value of such property that has not been sold shall be determined and

MFP CORNHUSKER PROPERTIES LLC               37

(notwithstanding the provisions of Article IX) income, gain, loss, and deduction inherent in such property (that has not been reflected in the Capital Accounts previously) shall be allocated among the Members to the extent possible to cause the Capital Account balance of each Member to equal the amount distributable to such Member under Section 10.2(c)(ii); and

(ii) Company property shall be distributed to the Members as provided in Section 8.2 and Profits or Losses arising from the liquidation shall be allocated pursuant to Section 9.4.

10.3. **Deficit Capital Accounts.** No Member shall be required to pay to the Company, to any other Member or to any third party any deficit balance which may exist from time to time in the Member's Capital Account.

10.4. **Cancellation of Certificate.** On completion of the distribution of Company assets, PF Member (or such other person as the Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to Section 2.4, and take such other actions as may be necessary to terminate the existence of the Company.

## XI.
## MISCELLANEOUS PROVISIONS

11.1. **Notices.** All notices, requests and demands to be made hereunder to the parties hereto must be in writing (at the addresses set forth on the signature pages hereto) and may be given by any of the following means:

(a) personal delivery;

(b) reputable, national overnight courier service;

(c) by telecopying (if concurrently transmitted the same day for next Business Day delivery by a reputable, national overnight courier service);

(d) registered or certified, first class mail, return receipt requested; or

(e) electronic mail (if concurrently transmitted the same day for next Business Day delivery by a reputable, national overnight courier service).

Any notice, demand or request sent pursuant to the terms of this Agreement will be deemed received (i) if sent pursuant to subsection (a), upon such personal delivery, (ii) if sent pursuant to subsection (b), on the next Business Day following the date of delivery to the courier service, (iii) if sent pursuant to subsection (c) or (e), upon dispatch if such dispatch occurs between the hours of 9:00 a.m. and 5:00 p.m. (recipient's time zone) on a Business Day, and if such dispatch occurs other than during such hours, on the next Business Day following dispatch, and (iv) if sent pursuant to subsection (d), 3 days following deposit in the mail.

By giving written notice thereof in accordance with the provisions of this Section 12.1, each Member shall have the right from time to time to change its notice address hereunder.

MFP CORNHUSKER PROPERTIES LLC          38

11.2.    **Governing Law.** This Agreement and the obligations of the Members hereunder shall be construed and enforced in accordance with the laws of the State of Delaware, excluding any conflicts of law rule or principle which might refer such construction to the laws of another state or country. Each Member submits to the jurisdiction of the state and federal courts in the States of North Carolina or Nebraska.

11.3.    **Entirety; Amendments.** This Agreement and its exhibits constitute the entire agreement between the Members relative to the formation of the Company and supersedes any prior agreements, written or oral, in regard thereto. Except as otherwise provided herein, no amendments to this Agreement shall be binding upon any Member unless set forth in a document duly executed by such Member.

11.4.    **Waiver.** No consent or waiver, express or implied, by any Member of any breach or default by any other Member in the performance by the other Member of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other Member of the same or any other obligation hereunder. Failure on the part of any Member to complain of any act or to declare any other Member in default, irrespective of how long such failure continues, shall not constitute a waiver of rights hereunder.

11.5.    **Severability.** If any provision of this Agreement or the application thereof to any Person or circumstances shall be invalid or unenforceable to any extent, and such invalidity or unenforceability does not destroy the basis of the bargain between the parties, then the remainder of this Agreement and the application of such provisions to other Persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

11.6.    **Ownership of Property and Right of Partition.** A Member's interest in the Company shall be personal property for all purposes. No Member shall have any right to partition the property owned by the Company.

11.7.    **Captions, References.** Pronouns, wherever used herein, and of whatever gender, shall include natural persons and corporations and associations of every kind and character, and the singular shall include the plural wherever and as often as may be appropriate. Article and section headings are for convenience of reference and shall not affect the construction or interpretation of this Agreement. Whenever the terms "hereof", "hereby", "herein", or words of similar import are used in this Agreement they shall be construed as referring to this Agreement in its entirety rather than to a particular section or provision, unless the context specifically indicates to the contrary. Whenever the word "including" is used herein, it shall be construed to mean including without limitation. Any reference to a particular "Article" or a "Section" shall be construed as referring to the indicated article or section of this Agreement unless the context indicates to the contrary.

11.8.    **Involvement of Members in Certain Proceedings.** Should any Member become involved in legal proceedings unrelated to the Company's business in which the Company is required to provide books, records, an accounting, or other information, then such Member shall indemnify the Company from all reasonable expenses and damages incurred in conjunction therewith.

11.9.    **Interest.** No amount charged as interest on loans hereunder shall exceed the maximum rate from time to time allowed by applicable law.

11.10.    **Confidentiality.** Each Member and their respective agents shall maintain the confidentiality of all documents, instruments and information obtained by such Member or such agents hereunder or otherwise in connection with the Company and the Projects (including but not limited to the terms of this Agreement) and shall not, without the other party's prior written consent, which consent shall not be unreasonably withheld or delayed, disclose any of such information to any other Person or use any of

such information for any purpose other than as contemplated herein. Notwithstanding the foregoing, (i) each Member may disclose any of such information (i) to its proposed investors and lenders and its officers, directors, employees, agents, attorneys, accountants, consultants and other professionals to whom such disclosure is reasonably necessary for the consummation of the transactions contemplated hereby, provided that each such Person agrees to maintain such information in a confidential manner; and (ii) each Member and the Asset Manager may disclose any of such information to transact the business of the Company in the ordinary course and as contemplated herein (including but not limited to the ownership and operation of the Project).

11.11.   **Counterparts; Electronic Signatures.**   This Agreement may be executed in counterparts, all of which taken together will constitute a single Agreement, or by execution of a separate agreement under the terms of which the Person executing such separate agreement specifically undertakes to be bound by the terms, provisions and agreements of this Agreement. Any signature to this Agreement transmitted electronically by facsimile or in portable document format shall be deemed a true and legally binding signature for all purposes and shall for all purposes be considered an original signature.

11.12.   **Indemnification.**   Perkins Member hereby agrees to indemnify, defend and hold harmless PF Member and Affiliates thereof from and against any and all loss, claims, damage or liability in connection with any brokerage commissions or finder's fees claimed by any broker or other party in connection with the investment by Perkins Member in the Company and any claim by any partner or member in Perkins Member or in Affiliates thereof (excluding, however, any of the foregoing to the extent caused solely by PF Member or Affiliates thereof). PF Member hereby agrees to indemnify, defend and hold harmless Perkins Member and Affiliates thereof from and against any and all loss, claims, damage or liability in connection with any brokerage commissions or finder's fees claimed by any broker or other party in connection with the investment by PF Member in the Company and any claim by any partner or member in any PF Member or Affiliate thereof (excluding, however, any of the foregoing to the extent caused solely by Perkins Member or Affiliates thereof).

11.13.   **Perkins Indemnity and Principal Certificates.**   On or before the contribution of the Initial Capital Contribution by PF Member and as a condition thereto, (i) the Perkins Principal shall execute and deliver to PF Member the Perkins Principal Indemnity Agreement ("**Perkins Principal Indemnity**") in substantially the form attached hereto as Exhibit F-2, and (ii) the Perkins Principal shall execute and deliver the Certificate of Principal ("**Certificate of Principal**") in the form attached hereto as Exhibit G. In the event of any breach by the Perkins Principal of the Perkins Principal Indemnity, the Promote Portion of any distributions to Perkins Member pursuant to Sections 8.2(g) and (h) shall be forfeited.

11.14.   **Disclosure and Waiver of Conflicts.**   In connection with the preparation of this Agreement, the Members acknowledge and agree that: (i) the law firm that prepared this Agreement (the "**Law Firm**") acted as legal counsel to PF Member and the Company; (ii) the other Members have been advised by the Law Firm that the interests of the Members are opposed to each other and, accordingly, the Law Firm's representation of the Company and PF Member may not be in the best interests of the Members; and (iii) each of the Members has been advised by the Law Firm to retain separate legal counsel.

11.15.   **Common Interest of Members.**   The Members acknowledge that they have a common interest in the Project and matters relating to the Project. Accordingly, the parties expect that during the course of this Agreement, (i) the parties will exchange information, including information relating to legal advice and legal work product, that would otherwise be protected from disclosure pursuant to the attorney-client privilege; (ii) the parties have an expectation that any such information exchanged should be protected from disclosure and should remain confidential; and (iii) such exchange of confidential information is necessary to advance the parties' shared interest in the Project and in securing legal advice in connection therewith. Accordingly, given the common interest of the parties described above, the Members

intend that (i) such disclosures among Members of such confidential information shall remain protected from disclosure pursuant to the attorney-client privilege, and (ii) neither Member is waiving the attorney-client privilege as a result of such exchange of information.

## XII.
## SPECIAL PURPOSE BANKRUPTCY REMOTE ENTITY

Notwithstanding any other provision of this Agreement to the contrary, so long as that certain loan (or any portion thereof) being made as of the date hereof by Jefferies LoanCore LLC, a Delaware limited liability company (together with its successors and/or assigns, "**Lender**") to MFP Monument Mall LLC (the "**Loan**") remains outstanding the following provisions shall remain in effect:

12.1.    **Special Purpose Bankruptcy Remote Entity.** The Members shall cause the Company to at all times be a Special Purpose Bankruptcy Remote Entity (as such term is defined in that certain Pledge and Security Agreement dated as of the date hereof by the Company for the benefit of Lender (the "**Pledge Agreement**")).

12.2.    **Special Member.** Upon the occurrence of any event that causes the last remaining Member to cease to be a member of the Company (other than upon continuation of the Company without dissolution upon (a) an assignment by the last remaining Member of all of its limited liability company interest in the Company and the admission of a transferee pursuant to this Agreement, or (b) the resignation of the last remaining Member and the admission of an additional member of the Company pursuant to this Agreement), each Person acting as an Independent Manager pursuant to this Agreement shall, without any action of any Person and simultaneously with the last remaining Member ceasing to be a member of the Company, automatically be admitted to the Company as a Special Member (defined below) and shall continue the Company without dissolution. No Special Member may resign from the Company or transfer its rights as Special Member unless (i) a successor Special Member has been admitted to the Company as Special Member by executing a counterpart to this Agreement, and (ii) such successor has also accepted its appointment as Independent Manager pursuant to this Agreement; provided, however, the Special Members shall automatically cease to be members of the Company upon the admission to the Company of a substitute Member. Each Special Member shall be a member of the Company that has no interest in the profits, losses and capital of the Company and has no right to receive any distributions of Company assets. Pursuant to Section 18-301 of the Act, a Special Member shall not be required to make any capital contributions to the Company and shall not receive a limited liability company interest in the Company. A Special Member, in its capacity as Special Member, may not bind the Company. Except as required by any mandatory provision of the Act, each Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, the Company, including, without limitation, the merger, consolidation or conversion of the Company. In order to implement the admission to the Company of each Special Member, each Person acting as an Independent Manager pursuant to this Agreement shall execute a counterpart to this Agreement. Prior to its admission to the Company as Special Member, each Person acting as an Independent Manager pursuant to this Agreement shall not be a member of the Company.

12.3.    **Independent Manager.**

(a)    As long as the Loan is outstanding, the Members shall cause the Company at all times to have at least two Independent Managers who will be appointed by the Members. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any duty otherwise existing at law or in equity, the Independent Managers shall consider only the interests of the Company, including its creditors, in acting or otherwise voting on Material Actions. No

resignation or removal of an Independent Manager, and no appointment of a successor Independent Manager, shall be effective until such successor (i) shall have accepted his or her appointment as an Independent Manager by a written instrument, and (ii) shall have executed a counterpart to this Agreement. In the event of a vacancy in the position of Independent Manager, the Members shall, as soon as practicable, appoint a successor Independent Manager. All right, power and authority of the Independent Managers shall be limited to the extent necessary to exercise those rights and perform those duties specifically set forth in this Agreement. Except for duties to the Company as set forth in the second sentence of this Section 12.3(a) (including duties to the Members and the Company's creditors solely to the extent of their respective economic interests in the Company but excluding (i) all other interests of the Members, (ii) the interests of other Affiliates of the Company, and (iii) the interests of any group of Affiliates of which the Company is a part), the Independent Managers shall not have any fiduciary duties to the Members or any other Person bound by this Agreement; provided, however, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing. To the fullest extent permitted by law, including Section 18-1101(e) of the Act, an Independent Manager shall not be liable to the Company, the Members or any other Person bound by this Agreement for breach of contract or breach of duties (including fiduciary duties), unless the Independent Manager acted in bad faith or engaged in willful misconduct. No Independent Manager shall at any time serve as trustee in bankruptcy for any Affiliate of the Company.

(b)     Subject to the other provisions of this Section 12.3, for so long as the Loan is outstanding, an Independent Manager may be removed by the Members only for Cause. Notwithstanding anything to the contrary contained in this Agreement, for so long as the Loan is outstanding, no Independent Manager shall be removed or replaced unless the Company provides the Lender with no less than three (3) Business Days' prior written notice of (i) any proposed removal of such Independent Manager and the reason for such removal, and (ii) the identity of the proposed replacement Independent Manager, together with a certification that such replacement satisfies the requirements for a Independent Manager set forth in this Agreement.

12.4.     **Limitations on the Company's Activities.** Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company, the Members or any other Person, so long as the Loan is outstanding, neither the Members nor any other Person shall be authorized or empowered, nor shall they permit the Company, without the prior unanimous written consent of the Members and all Independent Managers, to take any Material Action, provided, however, that, so long as the Loan is outstanding, the Members may not authorize the taking of any Material Action, unless there are at least two Independent Managers then serving in such capacity.

12.5.     **Defined Terms.** As used in this Article XII, the following terms shall have the following meanings:

(a)     "**Cause**" means, with respect to an Independent Manager, (i) acts or omissions by such Independent Manager that constitute willful disregard of such Independent Manager's duties under this Agreement, (ii) that such Independent Manager has engaged in or has been charged with, or has been convicted of, fraud or other acts constituting a crime under any law applicable to such Independent Manager, (iii)

MFP CORNHUSKER PROPERTIES LLC          42

such Independent Manager has breached its fiduciary duties of loyalty and care as and to the extent of such duties in accordance with the terms of the Company's organizational documents, (iv) there is a material increase in the fees charged by such Independent Manager or a material change to such Independent Manager's terms of service, (v) such Independent Manager is unable to perform his or her duties as Independent Manager due to death, disability or incapacity, or (vi) such Independent Manager no longer meets the definition of Independent Manager.

(b)    "**Independent Manager**" means a natural person selected by the Company (A) with prior experience as an independent director, independent manager or independent member, (B) with at least three (3) years of employment experience, (C) who is provided by a Nationally Recognized Service Company, (D) who is duly appointed as an Independent Manager and is not, will not be while serving as Independent Manager (except pursuant to the provisions of this Agreement providing for the appointment of such Independent Manager to become a "special member" upon the last remaining Member ceasing to be a member of the Company) and shall not have been at any time during the preceding five (5) years, any of the following:

(i)     a stockholder, director (other than as an Independent Manager), officer, employee, partner, attorney or counsel of the Company, any Affiliate of the Company or any direct or indirect parent of the Company;

(ii)    a customer, supplier or other Person who derives any of its purchases or revenues from its activities with the Company or any Affiliate of the Company;

(iii)   a Person or other entity Controlling or under Common Control with any such stockholder, partner, customer, supplier or other Person; or

(iv)    a member of the immediate family of any such stockholder, director, officer, employee, partner, customer, supplier or other Person.

(v)     A natural person who otherwise satisfies the foregoing definition and satisfies subparagraph (i) by reason of being the Independent Manager of a "special purpose entity" affiliated with the Company shall be qualified to serve as an Independent Manager of the Company, provided that the fees that such individual earns from serving as Independent Manager of affiliates of the Company in any given year constitute in the aggregate less than five percent (5%) of such individual's annual income for that year.

A natural person who satisfies the foregoing definition other than clause (ii) shall not be disqualified from serving as an Independent Manager of the Company if such individual is an independent director or special manager provided by an Nationally Recognized Service Company that provides professional independent directors and special managers and also provides other corporate services in the ordinary course of its business.

(c)   "Material Action" means to consolidate or merge the Company with or into any Person, or sell all or substantially all of the assets of the Company, or to institute proceedings to have the Company be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Company or file a petition seeking, or consent to, reorganization or relief with respect to the Company under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property, or make any assignment for the benefit of creditors of the Company, or admit in writing the Company's inability to pay its debts generally as they become due, or take action in furtherance of any such action, or, to the fullest extent permitted by law, dissolve or liquidate the Company.

(d)   "Nationally Recognized Service Company" shall mean any of CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company or such other nationally recognized company that provides independent director, independent manager or independent member services and that is reasonably satisfactory to Lender, in each case that is not an Affiliate of the Company and that provides professional independent directors and other corporate services in the ordinary course of its business.

(e)   "Special Member" means, upon such person's admission to the Company as a member of the Company pursuant to this Agreement, a person acting as Independent Manager, in such person's capacity as a member of the Company. A Special Member shall only have the rights and duties expressly set forth in this Agreement.

12.6.   **Lender as Third-Party Beneficiary.**  For so long as the Loan is outstanding, Lender is and shall be an intended third-party beneficiary the provisions of this Article XII.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

Executed effective as of the date above written.

**PF MEMBER:**                    **MF CORNHUSKER MEMBER LLC,**
                                  a Delaware limited liability company

                                  By: _____
                                  Name:   Kevin J. Mast
                                  Its:    Vice President

                                  Address:   c/o Mountain Funding LLC
                                             13860 Ballantyne Corp Place, Suite 130
                                             Charlotte, NC 28277
                                             Attention: Peter Fioretti
                                  Telephone:  (704) 930-7508
                                  Telecopier: (704) 540-7403
                                  Email Address: pfioretti@mrec.com

                                  Taxpayer Identification No. 46-3498625

**MANAGER AND**                   **PERKINS DELAWARE, LLC,**
**PERKINS MEMBER:**               a Delaware limited liability company

                                  By: Perkins Centers Delaware, LLC, a Delaware limited
                                  liability company, its Manager

                                       By: Perkins, L.L.C., a Nebraska limited liability
                                       company, its Manager

                                            _____
                                            Michael D. Perkins, Trustee of the Michael D.
                                            Perkins Funnel Trust created June 6, 1996, its
                                            Member

                                            Market Square, Inc., a Nebraska corporation, its
                                            Member

                                            By: _____
                                            Name:   Michael D. Perkins
                                            Its:    President

                                  Address:   608 N. 114th Street
                                             Omaha, Nebraska 68154
                                  Telephone No.:  (949) 496-2002
                                  Telecopier No.: (402) 495-9210
                                  Email Address: perkinsproperties@gmail.com

                                  Taxpayer Identification No. 20-4548329

MFP CORNHUSKER PROPERTIES LLC    Signature Page

*Executed effective as of the date above written.*

**PF MEMBER:**

**MF CORNHUSKER MEMBER LLC,**
a Delaware limited liability company

By:_____
Name:   Kevin J. Mast
Its:      Vice President

Address:  c/o Mountain Funding LLC
          13860 Ballantyne Corp Place, Suite 130
          Charlotte, NC  28277
          Attention: Peter Fioretti
Telephone: (704) 930-7508
Telecopier: (704) 540-7403
Email Address: pfioretti@mrec.com

Taxpayer Identification No. 46-3498625

**MANAGER AND**
**PERKINS MEMBER:**

**PERKINS DELAWARE, LLC,**
a Delaware limited liability company

By: Perkins Centers Delaware, LLC, a Delaware limited
liability company, its Manager

By: Perkins, L.L.C., a Nebraska limited liability
company, its Manager

Michael D. Perkins, Trustee of the Michael D.
Perkins Funnel Trust created June 6, 1996, its
Member

Market Square, Inc., a Nebraska corporation, its
Member

By:
Name:  Michael D. Perkins
Its:      President

Address:  608 N. 114th Street
          Omaha, Nebraska 68154
Telephone No.: (949) 496-2002
Telecopier No.: (402) 495-9210
Email Address: perkinsproperties@gmail.com

Taxpayer Identification No. 20-4548329

MFP CORNHUSKER PROPERTIES LLC   Signature Page

INDEPENDENT MANAGERS:

_____
Michael C. Doyle

_____
Joan L. Yori

MFP CORNHUSKER PROPERTIES LLC   Signature Page

## EXHIBIT A

### LIST OF PROJECT PROPERTIES

| Property | Location | Square Footage |
|---|---|---|
| | | |

MFP CORNHUSKER PROPERTIES LLC       Exhibit A

**EXHIBIT B**

**LEGAL DESCRIPTION OF PROJECT**

**Eastgate Plaza**

The land referred to is situated in the State of Nebraska, County of Dodge and is described as follows:

Parcel 1:

Lot 1, Block 1, Eastgate Plaza Second Addition to the City of Fremont, Dodge County, Nebraska of record in Plat Book 15 at Page 626;

TOGETHER with non-exclusive easement for ingress and egress appurtenant to subject property as established by Cross Easements and Restrictions dated July 12, 1984 and filed September 11, 1984 in Book 14 at Page 922 of the Miscellaneous Records of Dodge County, Nebraska.

Parcel 2:

Part of Lot 1, Block 1, Eastgate Plaza Addition to the City of Fremont, in the Southwest Quarter of Section 7, Township 17 North, Range 9 East of the 6th P.M., Dodge County, Nebraska, being described as follows: beginning at the Southeast corner of said Lot 1, and assuming the West line of said Lot 1 to have a bearing of N00°00'00"E; thence S89°59'42"W on the South line of said Lot 1, a distance of 275.15 feet; thence N00°01'22"E parallel with the East lien of said Lot 1, a distance of 233.00 feet; thence S89°59'42"W parallel with said South line, a distance of 200.00 feet to a point on the West line of said Lot 1, thence N00°00'00"E on said West line, a distance of 443.11 feet to the Northwest corner of said Lot 1; thence S89°57'56"E on the North line of said Lot 1; thence S00°02'23"W on the East line of said Lot 1, a distance of 320.64 feet; thence N89°58'14"E on said East line, a distance of 50.00 feet; thence S00°01'22"W on said East line, a distance of 355.20 feet to the point of beginning.

**Stockyards Plaza**

The land referred to is situated in the State of Nebraska, County of Douglas and is described as follows:

Parcel 1:

Intentionally Deleted.

Parcel 2:

Lots 3 and 4, Stockyards Plaza, a subdivision in SW 1/4 of Section 4, Township 14 North, Range 13 East of the 6th P.M., Douglas County, Nebraska, as shown on Dedication of Stockyards Plaza, filed May 16, 1998 in Book 1826 at Page 53, Deed Records, Douglas County, Nebraska, more particularly described as follows:

MFP CORNHUSKER PROPERTIES LLC          Exhibit B-1

Commencing at the point of intersection of the East right-of-way line of 36th Street and the South right-of-way line of "L" Street, said Point also being the Northwest corner of Lot 1, said Stockyards Plaza; thence S88°52'32"E (assumed bearing) along said South right-of-way line of "L" Street, said line also being the North line of said Lot 1, Stockyards Plaza, a distance of 175.34 feet to the Northeast corner of said Lot 1, Stockyards Plaza, said point also being the Northwest Corner of said Lot 3, Stockyards Plaza, said point also being the point of beginning; thence continuing S88°52'32"E, along said South right-of-way line of "L" Street, said line also being the North line of said Lot 3, Stockyards Plaza, and the North line of said Lot 4, Stockyards Plaza, a distance of 730.00 feet to the Northwest corner of Lot 5, said Stockyards Plaza; thence S01°07'28"W along the West, line of said Lot 5, Stockyards Plaza, a distance of 145.00 feet to the Southwest corner of said Lot 5, Stockyards Plaza; thence S88°52'32"E along the South line of said Lot 5, Stockyards Plaza, a distance of 224.90 feet to a point on the Westerly right-of-way line of 33rd Street, said point also being the Southeast corner of said Lot 5, Stockyards Plaza; thence along said Westerly right-of-way line of 33rd Street, said line also being the Easterly line of said Lot 3, Stockyards Plaza, on the following described courses; thence S01°07'28"W, a distance of 115.00 feet; thence S88°52'32"E, a distance of 18.16 feet; thence S07°00'14"W, a distance of 194.26 feet; thence S54°17'14'W, a distance of 21.71 feet to the point of intersection of said West right-of-way line eof 33rd Street and the Northerly right-of-way line of Edward Babe Gomez Avenue, said point also being the on the Southerly line of said Lot 3, Stockyards Plaza; thence along said Northerly right-of-way line of Edward Babe Gomez Avenue, said line also being said Southerly line of Lot 3, Stockyards Plaza, on the following described courses: thence N78°25'46"W, a distance of 33.84 feet; thence Southwesterly, on a curve to the left with a radius of 602.96 feet, a distance of 495.30 feet, said curve having a long chord which bears S77°53'09"W, a distance of 481.50 feet; thence S54°24'22"W, a distance of 29.86 feet; thence Westerly, on a curve to the right with a radius of 542.96 feet, a distance of 361.22 feet, said curve having a long chord which bears S73°27'54"W, a distance of 354.59 feet; thence N87°28'35"W, a distance of 114.66 feet to the Southeast corner of Lot 2, said Stockyards Plaza; thence N01°07'28"E along the East line of said Lot 2, Stockyards Plaza, a distance of 150.00 feet to the Northeast corner of said Lot 2 Stockyards Plaza; thence N88°52'32"W along the North line of said Lot 2, Stockyards Plaza, a distance of 150.00 feet to a point on said East right-of-way line of 33rd Street, said point also being the Northwest corner of said Lot 2, Stockyards Plaza, said point also being on the Westerly linen of said Lot 3; Stockyards Plaza; thence N02°56'59"E along said East right-of-way line of 33rd Street, said line also being said Westerly line of Lot 3, Stockyards Plaza, a distance of 278.51 feet to the Southwest corner of Lot 1, Stockyards Plaza; thence S88°52'32"E along the South line of said Lot 1, Stockyards Plaza, a distance of 183.79 feet to the Southeast corner of said Lot 1, Stockyards Plaza; thence N01°07'28"E along the East line of said Lot 1, Stockyards Plaza, a distance of 265.00 feet to the point of beginning

Parcel 3:

Non-exclusive easement for ingress/egress and parking contained in Cross Easement Agreement recorded May 1, 1989 in Book 884 at Page 633 of the Miscellaneous Records of Douglas County, Nebraska.

### Miracle Hills Park

The land referred to is situated in the State of Nebraska, County of Douglas and is described as follows:

Parcel 1:

Part of Lot 3, in West Dodge Plaza, an addition to the City of Omaha, Douglas County, Nebraska, more particularly described as follows:

Beginning at the Northwest corner of said Lot 3, West Dodge Plaza; thence South 66°28'49" East (assumed bearing), along the North line of said Lot 3, West Dodge Plaza, a distance of 770.34 feet; thence

MFP CORNHUSKER PROPERTIES LLC          Exhibit B-2

South 00°12'14" West, a distance of 202.61 feet; thence South 89°47'46" East along the South line of Lot 2, West Dodge Plaza and the Westerly extension thereof, a distance of 160.00 feet to a point on the West right-of-way line of 114th Street; thence South 00°12'14" West, along said West right-of-way line of 114th Street, a distance of 218.22 feet; thence S63°48'09"W (R) S63°45'32"W (A), a distance of 22.20 feet (R) 22.18 feet (A); thence

N89°50'29"W (R), N89°50'53"W (A), a distance of 9.90 feet; thence Southwesterly on a curve to the left with a radius of 151.00 feet, a distance of 101.74 feet, said curve having a long chord

which bears S70°51'21"W (R) S70°51'00"W (A), a distance of 99.83 feet; thence North 89°50'53" West, a distance of 482.29 feet to a point on the Westerly line of said Lot 3, West Dodge Plaza; thence along said Westerly line of Lot 3, West Dodge Plaza, on the following described courses; thence North 00°09'07" East, a distance of 324.88 feet; thence North 89°50'53' West, a distance of 73.00 feet; thence North 32°04'19" West, a distance of 248.24 feet; thence North 89°50'53" West, a distance of 55.00 feet; thence North 00°07'07" East, a distance of 234.51 feet to the point of beginning.

Parcel 2:

TOGETHER WITH THE APPURTENANT EASEMENTS SET OUT IN THE Easement, Cross Easement,

Covenant and Building Restriction Agreement dated March 3, 1986, filed March 5, 1986 in Book 766 at Page 628, Miscellaneous Records, Douglas County, Nebraska;

Addendum dated April 27, 1987, filed May 27, 1987 in Book 815 at Page 715, Miscellaneous Records, Douglas County, Nebraska;

Amendment dated June 28, 1988, filed September 7, 1988 in Book 861 at Page 146, Miscellaneous Records, Douglas County, Nebraska;

Second Declaration of Covenants, Conditions, and Restrictions by and between Randall Stores, Inc., a South Dakota corporation, Miracle Hills Partnership, a Nebraska general partnership and First National Bank Building General Partnership dated June 15, 1993 and recorded July 2, 1993 in Book 1082 at Page 140 of the Miscellaneous Records of Douglas County, Nebraska;

Third Amendment to Easement, Cross Easement, Covenant and Building Restriction Agreement dated April 29, 1993 and recorded July 9, 1993 in Book 1083 at Page 108 of the Miscellaneous Records of Douglas County, Nebraska;

Fourth Amendment to Easement, Cross Easement, Covenant, and Building Restriction Agreement dated April 21, 1994 and recorded April 22, 1994 in Book 1117 at Page 75 of the Miscellaneous Records of Douglas County, Nebraska;

Consent, Ratification and Subordination Agreement recorded April 22, 1994 in Book 1117 at Page 85, Miscellaneous Records, Douglas County, Nebraska;

Consent, Ratification and Subordination Agreement recorded April 22, 1994 in Book 1117 at Page 96, Miscellaneous Records, Douglas County, Nebraska;

Consent, Ratification and Subordination Agreement recorded April 22, 1994 in Book 1117 at Page 107, Miscellaneous Records, Douglas County, Nebraska.

MFP CORNHUSKER PROPERTIES LLC        Exhibit B-3

## Bishop Heights Shopping Center

The land referred to is situated in the State of Nebraska, County of Lancaster and is described as follows:

Parcel I:

Part Lot 7, Block 5, Bishop Heights, Lincoln, Lancaster County, Nebraska, more particularly described as follows: Commencing at the northwest corner of Section 7, Township 9 North, Range 7 East of the 6th P.M., Lincoln, Lancaster County, Nebraska, said point being on the centerline of said vacated Pioneers Boulevard thence northerly along westerly line Section 6, 33.0 feet to a point on the south line of said lot 7; thence easterly along south line said lot 7 on an assumed bearing of south 89°34'13" east, 85.7 feet; thence northerly on left deflection angle of 90° 12.0 feet to point of beginning; thence continuing northerly north 00°25'47" east, 100.0 feet; thence north 89°34'13" west, 110.0 feet; thence south 00°25'47" west, 100.0 feet; thence south 89°34'13" east, 110.0 feet to the point of beginning.

Parcel II:

Part Lot 7, Block 5, Bishop Heights, Lincoln, Lancaster County, Nebraska, more particularly described as follows: Beginning at the southeast corner of Platted Woods Boulevard lying east of South 27th Street; thence northerly along east line said street on an assumed bearing of north 00°00'00" east, 80.0 feet; thence north 90°00'00" east, 494.92 feet to a point on a curve, said point being on the northwesterly right of way line of the Chicago, Rock Island and Pacific Railroad; thence 545.09 feet along the arc of a curve to the right having a radius of 6435.43 feet and a chord which bears south 32°35'19" west 544.93 feet; thence north 53°49'13" west, 217.32 feet along northeasterly building line of ShopKo Store to a point on the most northerly corner of said building; thence north 73°53'13" west, 183.2 feet; thence north 00°00'00" east, 200.0 feet to a point on the south right of way line of said Woods Boulevard; thence north 90°00'00" east along South Street right of way line, 150.00 feet to point of beginning.

Parcel III:

Together with an easement for party wall delineated in the Party Wall Agreement dated June 21, 1985, recorded October 1, 1985 as Instrument No. 85-26237; and Easement for Public Access and Common Parking filed October 29, 1985 as Instrument No. 85-29165.

## Edgewood Shopping Center

The land referred to is situated in the State of Nebraska, County of Lancaster and is described as follows:

Parcel 1:

A tract of land composed Lot 2, Edgewood Center Fourth Addition, located in Section 9, Township 9 North, Range 7 East of the 6th P.M., Lancaster County, Nebraska and more particularly described as follows: Beginning at the Southwest corner of said Lot 2 thence North 03 degrees 56 minutes 27 seconds West (assumed bearing) along the west line of said Lot 2, a distance of 150.27 feet; thence North 00 degrees 00 minutes 52 seconds west continuing along the west line of said Lot 2 a distance of 549.65 feet; thence North 45 degrees 02 minutes 04 seconds east along the northwesterly line of said Lot 2 a distance of 35.36 feet; thence North 89 degrees 56 minutes 04 seconds east along the north line of said Lot 2 a distance of 411.47 feet; thence along a non-tangent curve to the right having a radius of 113.22 feet, an arc length of 97.39 feet, and a chord bearing South 41 degrees 53 minutes 18 seconds east a distance of 94.42 feet; thence South 00 degrees 02 minutes 02 seconds east along the east line of said Lot 2 a distance of 517.29 feet; thence South 44 degrees 58 minutes 52 seconds west along the southeasterly line of said

MFP CORNHUSKER PROPERTIES LLC        Exhibit B-4

Lot 2, a distance of 318.79 feet; thence South 89 degrees 56 minutes 37 seconds west along the south line of said Lot 2 a distance of 138.00 feet; thence North 55 degrees 04 minutes 56 seconds west along the southwesterly line of said Lot 2 a distance of 154.06 feet to the point of beginning.

Parcel 2:

A tract of land composed of Lot 2, Edgewood Center 5th Addition, located in Section 9, Township 9 North, Range 7 East of the 6th P.M., Lancaster County, Nebraska, and more particularly described as follows: Beginning at the Southeast corner of said Lot 2, thence North 89 degrees 55 minutes 01 seconds west (assumed bearing) along the south line of Lot 2 a distance of 585.15 feet; thence North 00 degrees 00 minutes 00 seconds east along the east line of Out Lot "A", Edgewood Center 4th Addition a distance of 78.12 feet; thence South 89 degrees 59 minutes 04 seconds west along the south line of said Lot 2 a distance of 478.59 feet; thence North 00 degrees 02 minutes 02 seconds west along the west line of said Lot 2 a distance of 325.09 feet; thence along a curve to the left having radius of 171.96 feet, an arc length of 193.70 feet, and a chord bearing North 32 degrees 16 minutes 26 seconds west a distance of 183.62 feet to a point on the westernmost line of said Lot 2; thence North 00 degrees 01 minutes 23 seconds east along said westernmost line a distance of 28.78 feet; thence along a curve to the right having a radius of 198.33 feet, an arc length of 194.96 feet, and a chord bearing South 39 degrees 57 minutes 33 seconds east a distance of 187.12 feet to a point on the north line of said Lot 2; thence North 89 degrees 54 minutes 47 seconds east along said north line a distance of 296.88 feet; thence North 00 degrees 00 minutes 14 seconds west along the west line of said Lot 2 a distance of 160.85 feet; thence 89 degrees 54 minutes 47 seconds east along the North line of said Lot 2 a distance of 63.00 feet; thence North 00 degrees 00 minutes 14 seconds west along the westerly line of said Lot 2 a distance of 189.04 feet; thence North 89 degrees 54 minutes 47 seconds east along the northernmost line of said Lot 2 a distance of 322.54 feet; thence south 00 degrees 00 minutes 14 seconds east along the east line of said Lot 2, a distance of 180.15 feet; thence North 89 degrees 55 minutes 06 seconds east along the north line of said Lot 2 a distance of 174.75 feet; thence South 23 degrees 41 minutes 44 seconds east along the northeasterly line of said Lot 2 a distance of 459.77 feet; thence South 00 degrees 03 minutes 29 seconds west along the east line of said Lot 2 a distance of 194.48 feet to the point of beginning.

Parcel 3:

Together with non-exclusive easements for the benefit of Parcels 1 and 2 as created by instruments recorded August 24, 1990 as Instrument No. 90-26219, recorded March 11, 1993 as Instrument No. 93-8501, recorded September 1, 1993 as Instrument No. 93-39150, recorded February 25, 1993 as Instrument No. 93-6800, and recorded January 15, 1993 as Instrument No. 93-1803, records of Lancaster County, Nebraska; for the purposes described in said instruments subject to the terms, provisions and conditions set forth herein.

### The Meadows Shopping Center

The land referred to is situated in the State of Nebraska, County of Lancaster and is described as follows:

Parcel 1:

A tract of land located in the Northwest Quarter Northwest Quarter of Section 3, Township 9 North, Range 7 East of the 6th P.M., Lancaster County, Nebraska, and more particularly described as follows: Commencing at the Northwest corner of said Section 3, thence Easterly along the North line of said Northwest Quarter Northwest Quarter a distance of 222.93 feet, thence Southerly on a line which is 222.93 feet East of and parallel to the West line of said Northwest Quarter Northwest Quarter a distance of 40.00 feet to the point of beginning, thence easterly on a line which is 40.00 feet South of and parallel

MFP CORNHUSKER PROPERTIES LLC          Exhibit B-5

to the north line of said Northwest Quarter Northwest Quarter on an assumed bearing of North 89 degrees 30 minutes 35 seconds East a distance of 339.06 feet, thence Southerly on a line which is 562.00 feet east of and parallel to the west line of said Northwest Quarter Northwest Quarter on a bearing of South 0 degrees 00 minutes 00 seconds west a distance of 667.00 feet, thence westerly on a line which is 707.00 feet south of and parallel to the north line of said Northwest Quarter Northwest Quarter on a bearing of South 89 degrees 30 minutes 35 seconds west a distance of 490.99 feet to a point which is 71.00 feet east of the west line of said Northwest Quarter Northwest Quarter, thence northerly on a line which is 71.00 feet east of and parallel to the west line of said Northwest Quarter Northwest Quarter on a bearing of North 0 degrees 00 minutes 00 seconds east a distance of 23.82 feet, said line also being the east right of way line of South 70th Street, thence North 90 degrees 00 minutes 00 seconds east along said right of way line a distance of 44.37 feet, thence North 0 degrees 00 minutes 00 seconds east along said right of way line a distance of 60.00 feet, thence North 90 degrees 00 minute 00 seconds west along said right of way line a distance of 45.00 feet, thence North 1 degree 00 minutes 00 seconds west, along said right of way line a distance of 426.18 feet; thence easterly on a line which is 197.00 feet south of and parallel to the north line of said Northwest Quarter Northwest Quarter on a bearing of North 89 degrees 30 minutes 35 seconds east a distance of 160.00 feet, thence northerly on a line which is 222.93 feet East of and parallel to the west line of said Northwest Quarter Northwest Quarter on a bearing of North 0 degrees 00 minutes 00 seconds west a distance 157.00 feet to the point of beginning; now known as Lot 45, irregular tracts in the Northwest Quarter of Section 3, Township 9 North, Range 7 East of the 6th P.M., Lincoln, Lancaster County, Nebraska;

Parcel 2:

Together with Cross-Easement and Agreement dated August 11, 1987 recorded November 3, 1987 as Instrument No. 87-36290, records of Lancaster County, Nebraska.

## Cornhusker Plaza

The land referred to is situated in the State of Nebraska, County of Dakota and is described as follows:

Lots 2 and 4, South Sioux City Plaza, an addition to the City of South Sioux City, as surveyed, platted and recorded in Plat Book 5 at Page 141, Office of the Register of Deeds of Dakota County, Nebraska.

## Market Square Shopping Center

The land referred to is situated in the State of Nebraska, County of Madison and is described as follows:

Parcel One:

Lots 1, 3 and 4, Market Square Subdivision in the City of Norfolk, Madison County, Nebraska, together with appurtenant easement found in the Party Wall Agreement of record in M93-4 at Page 621 and M85-8 at Page 535.

Parcel Two:

Lot 2-R, Commonwealth Park Fifth Addition, a Replat of Lot 1 of Commonwealth Park Third Addition to the City of Norfolk, Madison County, Nebraska, together with appurtenant easements found in the documents recorded as M85-8 at Page 535 and M2002-3 at Page 985-987, Records, Madison County, Nebraska.

MPP CORNHUSKER PROPERTIES LLC          Exhibit B-6

### Baken Park Center

Real property in the City of Rapid City, County of Pennington, State of South Dakota, described as follows:

Lots D, E, F and G of Lot 1 of the Northeast Quarter of the Northeast Quarter (NE1/4NE/1/4) of Section 3 in Township 1 North of Range 7 East of the Black Hills Meridian, in the City of Rapid City, Pennington County, South Dakota, as shown on the plats filed in Plat Book 2, Page 61, Plat Book 3, Page 47, Plat Book 3, Page 122, and Plat filed in the Steel File December 19, 1940, respectively; Excepting therefrom Lot H of Lot 1 of Baken Park Subdivision, as shown on the plat filed in Plat Book 13, Page 103, Excepting therefrom Lot H1 of said Lot D, as shown on the plat filed in Highway Plat Book 5, Page 197, and Excepting therefrom Lot H1 of said Lots E and G, as shown on the plat filed in Highway Plat Book 5, Page 192, and including Lot H2 of said Lot G, as shown on the plat filed in Highway Plat Book 10, Page 197, and including Lots U1, U2 and U3 from said Lot G, as shown on the plat filed in Highway Plat Book 10, Page 198, and including Lots H2 and H3 of said Lot E, as shown on the plat, filed in Highway Plat Book 10, Page 199, and including Lot U1 in said Lot E, as shown on the plat filed in Highway Plat Book 10, Page 200.

### Bon-Ton's (Herberger's)

The land referred to is situated in the State of Nebraska, County of Buffalo and is described as follows:

Parcel 1:

Lot 1, in Hilltop Mall Subdivision, a Subdivision to the City of Kearney, Buffalo County, Nebraska.

Parcel 2:

Non-exclusive appurtenant easements as set forth in Roll 83-7859 as Amended as Inst. No. 96-2172, Records, Buffalo County, Nebraska.

### Monument Mall

The land referred to is situated in the State of Nebraska, County of Scotts Bluff and is described as follows:

Parcel I:

Lot 3, Block 3, Third Replat of Lots 3 and 4, Block 3, Northeast Second Addition Replat No. 2, an Addition to the City of Scottsbluff, Scotts Bluff County, Nebraska.

Parcel Ia:

Lot 2, Block 3, Northeast Second Addition Replat No. 2, an Addition to the City of Scottsbluff, Scotts Bluff County, Nebraska.

Parcel II:

TOGETHER WITH the non-exclusive reciprocal easements set out in the Operating Agreement of record in Misc. Book 114 at Page 351, and First Amendment of record in Misc. Book 114 at Page 514;

MFP CORNHUSKER PROPERTIES LLC          Exhibit B-7

Parcel III:

TOGETHER WITH non-exclusive appurtenant Easements as set forth in Declaration of Restrictions recorded as Instrument No. 2004-02057, and that certain Mutual Easement dated March 27, 2006 and recorded April 21, 2006 as Instrument No. 2006-002364, Records, Scotts Bluff County, Nebraska.

MFP CORNHUSKER PROPERTIES LLC          Exhibit B-8

**EXHIBIT C**

BUSINESS PLAN

The Business Plan consists of the Excel File "Cornhusker Portfolio Business Plan 10-21-13 (FINAL).xlsx" as of October 21, 2013, 4:58 p.m. Central Time. The attached Investor Analysis is a tabbed portion thereof (Restructure tab).

Exhibit C-1 hereto, consisting of a pro forma business plan reflecting a 5% increase in Properties occupancy, is attached for informational purposes only.

MFP CORNHUSKER PROPERTIES LLC        Exhibit C

## Fiorreti Proforma Analysis 10-21-13 (Current Occupancy Levels)
### (Includes Ten Properties; Excludes Monument Mall)

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | | | |
| Rental Income | 6,561,382 | 6,712,979 | 6,914,368 | 7,121,799 | 7,336,453 | 7,556,517 | 7,782,193 | 8,015,648 | 8,256,117 | 8,503,801 | 8,758,915 |
| CAM Reimbursements | 954,279 | 973,381 | 1,002,861 | 1,032,638 | 1,063,617 | 1,095,526 | 1,128,392 | 1,162,243 | 1,197,111 | 1,233,024 | 1,270,015 |
| Other Reimbursements | 990,577 | 1,016,811 | 1,047,106 | 1,078,522 | 1,110,878 | 1,144,204 | 1,178,530 | 1,213,886 | 1,250,303 | 1,287,812 | 1,326,446 |
| Other Income | | | | | | | | | | | |
| **TOTAL INCOME** | 8,533,304 | 8,703,950 | 8,964,039 | 9,232,960 | 9,509,949 | 9,795,247 | 10,089,104 | 10,391,778 | 10,703,531 | 11,024,637 | 11,355,376 |
| | | | | | | | | | | | |
| **REIMBURSABLE OPERATING EXPENSES** | | | | | | | | | | | |
| Repairs and Maintenance | 220,520 | 232,825 | 235,153 | 237,505 | 239,880 | 242,279 | 244,702 | 247,149 | 249,620 | 252,116 | 254,637 |
| Sweet Costs | 94,243 | 95,185 | 96,137 | 97,099 | 98,070 | 99,050 | 100,041 | 101,041 | 102,052 | 103,072 | 104,103 |
| Repairs and Related Costs | 53,034 | 53,564 | 54,100 | 54,641 | 55,187 | 55,739 | 56,297 | 56,860 | 57,428 | 58,003 | 58,583 |
| Electric and Utilities | 95,674 | 96,630 | 97,495 | 98,470 | 99,455 | 100,449 | 101,454 | 102,468 | 103,493 | 104,528 | 105,573 |
| Landscaping | 110,773 | 111,881 | 113,000 | 114,130 | 115,271 | 116,424 | 117,588 | 118,764 | 119,951 | 121,151 | 122,362 |
| Insurance | 145,922 | 148,422 | 149,906 | 151,405 | 152,919 | 154,448 | 155,993 | 157,552 | 159,128 | 160,719 | 162,326 |
| Max Reimbursable Expenses | 9,221 | 9,313 | 9,406 | 9,500 | 9,595 | 9,691 | 9,788 | 9,886 | 9,985 | 10,085 | 10,186 |
| Security | 14,646 | 14,792 | 14,940 | 15,090 | 15,241 | 15,393 | 15,547 | 15,702 | 15,860 | 16,018 | 16,178 |
| Maintenance, Supervision, and Management | 366,123 | 369,784 | 373,082 | 385,811 | 380,177 | 383,779 | 387,417 | 371,091 | 374,802 | 378,550 | 382,335 |
| Management Office Expenses | 36,857 | 37,226 | 37,598 | 37,974 | 38,354 | 38,737 | 39,124 | 39,516 | 39,911 | 40,310 | 40,713 |
| Snow Removal | 108,621 | 110,717 | 111,824 | 112,943 | 114,072 | 115,213 | 116,365 | 117,529 | 118,704 | 119,891 | 121,090 |
| Other Reimbursable Expenses | 3,045 | 3,076 | 3,106 | 3,137 | 3,169 | 3,200 | 3,232 | 3,265 | 3,297 | 3,330 | 3,364 |
| Non-CAM Reimbursable Expenses | 93,404 | 94,338 | 95,281 | 96,234 | 97,197 | 98,169 | 99,150 | 100,142 | 101,143 | 102,155 | 103,176 |
| **TOTAL CAM EXPENSES** | 1,344,013 | 1,357,483 | 1,371,028 | 1,384,738 | 1,398,585 | 1,412,571 | 1,426,697 | 1,440,964 | 1,455,373 | 1,469,927 | 1,484,626 |
| | | | | | | | | | | | |
| **REAL ESTATE TAXES** | 1,135,894 | 1,147,253 | 1,158,725 | 1,170,313 | 1,182,016 | 1,193,836 | 1,205,774 | 1,217,832 | 1,230,010 | 1,242,311 | 1,254,734 |
| | | | | | | | | | | | |
| **TOTAL REIMBURSABLE OPERATING EXPENSES** | 2,479,907 | 2,504,736 | 2,529,753 | 2,555,051 | 2,580,601 | 2,606,407 | 2,632,471 | 2,658,796 | 2,685,384 | 2,712,238 | 2,739,360 |
| | | | | | | | | | | | |
| **NON-REIMBURSABLE OPERATING EXPENSES** | | | | | | | | | | | |
| Repairs and Maintenance - Owner | 7,647 | 7,723 | 7,801 | 7,879 | 7,957 | 8,037 | 8,117 | 8,199 | 8,281 | 8,363 | 8,447 |
| Utilities | 48,565 | 49,051 | 49,541 | 50,037 | 50,537 | 51,042 | 51,553 | 52,068 | 52,598 | 53,115 | 53,646 |
| Management Fees | 194,424 | 196,368 | 198,332 | 200,315 | 202,318 | 204,342 | 206,385 | 208,449 | 210,533 | 212,639 | 214,765 |
| Professional Fees | 353,292 | 379,082 | 378,782 | 379,362 | 383,388 | 409,810 | 415,544 | 427,671 | 440,141 | 452,995 | 466,215 |
| Maintenance and Tooling Expenses | 57,998 | 58,716 | 58,759 | 59,343 | 59,937 | 60,536 | 61,141 | 61,753 | 62,370 | 62,994 | 63,624 |
| Misc Owner Expenses | 14,724 | 14,871 | 15,020 | 15,170 | 15,322 | 15,475 | 15,630 | 15,786 | 15,944 | 16,103 | 16,264 |
| Other Non-Reimbursable Expenses | 12,013 | 12,133 | 12,254 | 12,377 | 12,501 | 12,626 | 12,752 | 12,880 | 13,008 | 13,138 | 13,270 |
| **TOTAL NON-REIMBURSABLE OPERATING EXPENSES** | 688,263 | 695,439 | 712,295 | 726,439 | 740,970 | 755,968 | 771,143 | 786,905 | 802,867 | 819,338 | 835,231 |
| | | | | | | | | | | | |
| **TOTAL PROPERTY EXPENSES** | 3,168,170 | 3,203,145 | 3,242,019 | 3,281,490 | 3,321,571 | 3,362,276 | 3,403,614 | 3,445,601 | 3,488,251 | 3,531,576 | 3,575,592 |
| | | | | | | | | | | | |
| **NET OPERATING INCOME (BEFORE DEBT SERVICE)** | 5,365,134 | 5,499,805 | 5,722,020 | 5,951,470 | 6,188,377 | 6,432,972 | 6,685,491 | 6,946,178 | 7,215,280 | 7,493,061 | 7,779,784 |
| | | | | | | | | | | | |
| **PAYMENT OF DEBT SERVICE** | 47,500,000 | | | | | | | | | | |
| New Senior Loan – 30yr. | 5.4000% | | | | | | | | | | |
| Annual Interest Rate | | | | | | | | | | | |
| Principle Reduction | 2,679,000 | 2,679,000 | 2,679,000 | 2,679,000 | 2,679,000 | 2,505,640 | 2,460,435 | 2,412,813 | 2,362,024 | 2,308,504 | 2,251,890 |
| | | | | | | 781,002 | 825,207 | 874,028 | 924,618 | 978,138 | 1,034,752 |
| **TOTAL PRINCIPLE AND INTEREST PAYMENTS** | 2,679,000 | 2,679,000 | 2,679,000 | 3,286,642 | 3,286,642 | 3,286,642 | 3,286,642 | 3,286,642 | 3,286,642 | 3,286,642 | 3,286,642 |

## Cornhusker Portfolio Business Plan Waterfall
### Flotehl Investor Analysis

Waterfall starts at Level One each Fiscal Year. Any prior year amounts not paid out from Level One through Level Three are distributed first, then distributions begin at Level One for the current year after that.

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10% Preferred Interest Distribution to Florehl | 500,000 | 400,000 | 300,000 | 200,000 | 100,000 | | | | | | |
| Member based on outstanding capital at beg of fiscal year plus any new capital added during the year | | | | | | | | | | | |
| Preferred Capital Repayment to Florehl Member  8,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | | | | | | |
| 6% Interest Distribution to Florehl Member to Achieve 18% | 400,000 | 320,000 | 240,000 | 180,000 | 80,000 | | | | | | |
| based on outstanding capital at beg of the fiscal year | 400,000 | 320,000 | 240,000 | 180,000 | 80,000 | | | | | | |
| Cash-up Distribution to Perkins Member for 7½% portion of Level Three | 785,134 | 990,000 | 720,000 | 490,000 | 240,000 | | | | | | |
| 10% Florehl Member | 2,606,330 | 14,091 | 78,302 | 92,483 | 148,174 | 314,633 | 339,885 | 365,953 | 392,864 | 420,642 | 448,314 |
| 90% Perkins Member | 23,456,972 | 126,725 | 704,718 | 742,345 | 1,333,562 | 2,831,697 | 3,058,964 | 3,293,581 | 3,535,775 | 3,785,777 | 4,043,828 |
| Total Level Five Distribution | 26,063,002 | 140,806 | 783,030 | 834,828 | 1,481,736 | 3,146,330 | 3,398,849 | 3,659,534 | 3,928,638 | 4,206,419 | 4,492,143 |
| Florehl Member  10,204,330 | 1,900,000 | 1,734,091 | 1,618,302 | 1,442,483 | 1,328,174 | 314,633 | 339,885 | 365,953 | 392,864 | 420,642 | 448,314 |
| Perkins Member  26,642,100 | 785,134 | 1,096,725 | 1,424,718 | 1,222,345 | 1,573,562 | 2,831,697 | 3,058,964 | 3,293,581 | 3,535,775 | 3,785,777 | 4,043,828 |

### Sale / Refinance Summary

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Estimated Portfolio Value at CAP Rate  8% | 67,091,673 | 68,747,566 | 71,521,250 | 74,390,572 | 77,354,716 | 80,412,151 | 83,568,931 | 86,827,203 | 90,191,001 | 93,663,259 | 97,247,304 |
| Sr Loan Payoff | (55,000,000) | (55,000,000) | (55,000,000) | (54,902,124) | (53,563,654) | (52,782,852) | (51,958,646) | (51,082,817) | (50,157,999) | (49,179,883) | (48,145,111) |
| Preferred Investor Payoff | (5,900,000) | (4,720,000) | (3,540,000) | (2,360,000) | (1,180,000) | | | | | | |
| Net Available Cash after Cash Distribution | 6,181,673 | 9,027,566 | 12,085,250 | 17,751,248 | 22,610,962 | 27,629,296 | 31,611,996 | 35,744,596 | 40,033,003 | 44,463,396 | 49,102,193 |

### Assumptions:

Income (in millions to previous year)

| Year | | Rate |
|---|---|---|
| 2014 | Income | 2.00% |
| 2015 | Income | 3.00% |
| 2016 | Income | 3.00% |
| 2017 | Income | 3.00% |
| 2018 | Income | 3.00% |
| 2019 | Income | 3.00% |
| 2020 | Income | 3.00% |
| 2021 | Income | 3.00% |
| 2022 | Income | 3.00% |
| 2023 | Income | 3.00% |

| 1.00% Expenses |
|---|
| 1.00% Expenses |
| 1.00% Expenses |
| 1.00% Expenses |
| 1.00% Expenses |
| 1.00% Expenses |
| 1.00% Expenses |
| 1.00% Expenses |
| 1.00% Expenses |
| 1.00% Expenses |

<u>**EXHIBIT C-1**</u>

**PRO FORMA BUSINESS PLAN**

**Florreil Proforma Analysis, 10-21-13 (5% Occupancy Increase)**
*(Includes Ten Properties; Excludes Monument Mall)*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | | | | |
| Rental Income | 6,899,348 | 6,999,835 | 7,206,431 | 7,422,624 | 7,645,303 | 7,874,663 | 8,110,902 | 8,354,229 | 8,604,855 | 8,863,001 | 9,128,891 | |
| CAM Reimbursements | 924,275 | 972,381 | 1,002,661 | 1,032,636 | 1,063,817 | 1,095,628 | 1,128,392 | 1,162,243 | 1,197,111 | 1,233,024 | 1,270,015 | |
| Other Reimbursements | 886,677 | 1,016,811 | 1,047,109 | 1,078,522 | 1,110,878 | 1,144,204 | 1,178,530 | 1,213,886 | 1,250,303 | 1,287,812 | 1,326,449 | |
| Other Income | | | | | | | | | | | | |
| **TOTAL INCOME** | 8,710,300 | 8,989,606 | 9,256,101 | 9,533,784 | 9,819,798 | 10,114,392 | 10,417,823 | 10,730,358 | 11,052,269 | 11,383,837 | 11,725,352 | |
| **REIMBURSABLE OPERATING EXPENSES** | | | | | | | | | | | | |
| Repairs and Maintenance | 230,620 | 232,925 | 235,193 | 237,505 | 239,880 | 242,279 | 244,702 | 247,149 | 249,620 | 252,116 | 254,637 | |
| Sewer Costs | 94,245 | 95,188 | 96,137 | 97,099 | 98,070 | 99,050 | 100,041 | 101,041 | 102,052 | 103,072 | 104,103 | |
| Cleaning and Related Costs | 63,094 | 63,664 | 64,100 | 64,641 | 55,187 | 55,739 | 56,297 | 56,860 | 57,428 | 58,003 | 58,583 | |
| Electric and Utilities | 95,674 | 96,530 | 97,495 | 98,470 | 99,455 | 100,449 | 101,454 | 102,469 | 103,493 | 104,528 | 105,573 | |
| Landscaping | 110,773 | 111,881 | 113,000 | 114,130 | 115,271 | 116,424 | 117,588 | 118,764 | 119,951 | 121,151 | 122,362 | |
| Insurance | 148,952 | 149,622 | 149,806 | 151,405 | 152,919 | 154,448 | 156,993 | 157,552 | 159,128 | 160,719 | 162,326 | |
| Misc Reimbursable Expense | 9,221 | 9,313 | 9,406 | 9,500 | 9,595 | 9,691 | 9,788 | 9,886 | 9,985 | 10,085 | 10,185 | |
| Security | 14,646 | 14,792 | 14,940 | 15,090 | 15,241 | 15,393 | 15,547 | 15,702 | 15,860 | 16,018 | 16,178 | |
| Maintenance, Supervision, and Management | 346,123 | 348,694 | 353,260 | 355,611 | 360,177 | 363,779 | 367,417 | 371,091 | 374,802 | 378,550 | 382,335 | |
| Management Office Expenses | 36,667 | 37,228 | 37,388 | 37,774 | 38,354 | 38,737 | 39,124 | 39,516 | 39,911 | 40,310 | 40,713 | |
| Snow Removal | 109,621 | 110,717 | 111,824 | 112,943 | 114,072 | 115,213 | 116,365 | 117,529 | 118,704 | 119,891 | 121,090 | |
| Other Reimbursable Expense | 3,045 | 3,075 | 3,106 | 3,137 | 3,169 | 3,200 | 3,233 | 3,265 | 3,297 | 3,330 | 3,364 | |
| Non-CAM Reimbursable Expenses | 63,404 | 64,338 | 65,281 | 66,234 | 97,197 | 98,169 | 99,150 | 100,142 | 101,143 | 102,155 | 103,176 | |
| **TOTAL CAM EXPENSES** | 1,344,016 | 1,357,483 | 1,371,028 | 1,384,738 | 1,398,585 | 1,412,571 | 1,426,697 | 1,440,964 | 1,455,373 | 1,469,927 | 1,484,626 | |
| **REAL ESTATE TAXES** | 1,135,894 | 1,147,253 | 1,158,725 | 1,170,313 | 1,182,016 | 1,193,836 | 1,205,774 | 1,217,832 | 1,230,010 | 1,242,311 | 1,254,734 | |
| **TOTAL REIMBURSABLE OPERATING EXPENSES** | 2,479,907 | 2,504,706 | 2,529,753 | 2,555,051 | 2,580,601 | 2,606,407 | 2,632,471 | 2,658,796 | 2,685,384 | 2,712,238 | 2,739,360 | |
| **NON-REIMBURSABLE OPERATING EXPENSES** | | | | | | | | | | | | |
| Repairs and Maintenance - Owner | 7,647 | 7,723 | 7,801 | 7,879 | 7,957 | 8,037 | 8,117 | 8,199 | 8,281 | 8,363 | 8,447 | |
| Utilities | 48,565 | 49,051 | 49,541 | 50,037 | 50,537 | 51,042 | 51,553 | 52,068 | 52,589 | 53,115 | 53,646 | |
| Professional Fees | 104,424 | 105,368 | 196,832 | 200,315 | 202,318 | 204,342 | 206,385 | 208,449 | 210,533 | 212,639 | 214,765 | |
| Management Fees | 364,412 | 371,490 | 382,044 | 393,351 | 404,782 | 416,076 | 428,713 | 441,214 | 454,091 | 467,333 | 481,014 | |
| Advertising and Renting Expense | 57,598 | 58,174 | 58,756 | 59,343 | 59,937 | 60,536 | 61,141 | 61,753 | 62,370 | 62,994 | 63,624 | |
| Misc Owner Expense | 14,724 | 14,871 | 15,020 | 15,170 | 15,322 | 15,475 | 15,630 | 15,786 | 15,944 | 16,103 | 16,264 | |
| Other Non-Reimbursable Expense | 12,013 | 12,133 | 12,254 | 12,377 | 12,501 | 12,626 | 12,752 | 12,880 | 13,008 | 13,138 | 13,270 | |
| **TOTAL NON-REIMBURSABLE OPERATING EXPENSES** | 699,383 | 708,761 | 723,848 | 738,472 | 753,354 | 768,634 | 784,291 | 800,348 | 816,816 | 833,706 | 851,030 | |
| **TOTAL PROPERTY EXPENSES** | 3,179,290 | 3,214,487 | 3,253,701 | 3,293,523 | 3,333,955 | 3,375,041 | 3,416,763 | 3,459,145 | 3,502,200 | 3,545,944 | 3,590,391 | |
| **NET OPERATING INCOME (BEFORE DEBT SERVICE)** | 5,631,010 | 5,772,019 | 6,002,400 | 6,240,261 | 6,485,832 | 6,739,351 | 7,001,061 | 7,271,214 | 7,550,068 | 7,837,893 | 8,134,961 | |
| **PAYMENT OF DEBT SERVICE** | | | | | | | | | | | | |
| New Senior Loan - 30yr ... 47,000,000  8.4400% | | | | | | | | | | | | |
| Annual Interest Rate | 2,678,000 | 2,678,000 | 2,678,000 | 2,588,796 | 2,548,572 | 2,505,640 | 2,480,435 | 2,412,613 | 2,382,024 | 2,308,508 | 2,251,890 | |
| Principal Reduction | | | | 697,878 | 738,270 | 781,002 | 826,207 | 874,029 | 924,618 | 978,139 | 1,034,752 | |
| **TOTAL PRINCIPAL AND INTEREST PAYMENTS** | 2,679,000 | 2,679,000 | 2,679,000 | 3,286,642 | 3,286,642 | 3,286,642 | 3,286,642 | 3,286,642 | 3,286,642 | 3,286,642 | 3,286,642 | |

## Cornhusker Portfolio Business Plan Waterfall
### Fioretti Investor Analysis

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Waterfall starts at Level One each Fiscal Year. Any prior year amounts not paid out from Level One through Level Three are distributed first, then distributions begin at Level One for the current year after that.* | | | | | | | | | | | |
| 10% Preferred Interest Distribution to Fioretti Member based on outstanding capital at beg of fiscal year plus any new capital added during the year. | 500,000 | 400,000 | 300,000 | 200,000 | 100,000 | - | - | - | - | - | - |
| Preferred Capital Repayment to Fioretti Member | 5,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | - | - | - | - | - | - |
| 6% Interest Distribution to Fioretti Member to Achieve 15% based on outstanding capital at beg of the fiscal year based on any new capital added during the year. | 400,000 | 320,000 | 240,000 | 160,000 | 80,000 | - | - | - | - | - | - |
| Catch-up Distribution to Perkins Member for 75% portion of Level Three | 1,052,010 | 960,000 | 720,000 | 480,000 | 240,000 | - | - | - | - | - | - |
| 10% Fioretti Member | | 41,302 | 108,340 | 111,382 | 177,919 | 345,271 | 371,442 | 398,457 | 426,343 | 455,125 | 484,832 |
| 90% Perkins Member | 2,848,343 | 371,717 | 957,060 | 1,002,268 | 1,601,272 | 3,107,438 | 3,342,977 | 3,585,115 | 3,837,084 | 4,096,126 | 4,363,488 |
| Total Level Five Distribution | 28,348,634 | 413,019 | 1,063,400 | 1,113,636 | 1,779,191 | 3,452,709 | 3,714,419 | 3,984,572 | 4,263,427 | 4,551,251 | 4,848,320 |
| Fioretti Member | 10,615,337 | 1,761,302 | 1,846,340 | 1,471,382 | 1,357,919 | 345,271 | 371,442 | 398,457 | 426,343 | 455,125 | 484,832 |
| Perkins Member | 29,177,944 | 231,717 | 1,577,060 | 1,462,268 | 1,441,272 | 3,107,438 | 3,342,977 | 3,585,115 | 3,837,064 | 4,096,126 | 4,363,488 |
| Estimated Portfolio Value at CAP Rate | 70,387,625 | 72,150,237 | 78,000,001 | 78,000,001 | 81,072,906 | 84,541,887 | 87,513,260 | 90,890,170 | 94,575,557 | 97,973,661 | 101,897,018 |
| Balloon Payment | (55,000,000) | (55,000,000) | (55,000,000) | (55,000,000) | (53,953,864) | (52,782,852) | (51,965,646) | (51,052,617) | (50,157,969) | (49,179,853) | (48,145,111) |
| Preferred Investor Payoff | (9,900,000) | (4,700,000) | (3,940,000) | (2,380,000) | (1,160,000) | - | - | - | - | - | - |
| Net Available Cash after Cash Distribution | 8,487,625 | 12,450,237 | 16,660,001 | 21,541,341 | 26,329,093 | 31,499,034 | 35,556,814 | 39,807,653 | 44,217,569 | 48,792,706 | 53,541,907 |

### Assumptions:

Income (in relation to previous year)

| | | |
|---|---|---|
| 2015 | Income | 2.00% |
| 2016 | Income | 3.00% |
| 2017 | Income | 3.00% |
| 2018 | Income | 3.00% |
| 2019 | Income | 3.00% |
| 2020 | Income | 3.00% |
| 2021 | Income | 3.00% |
| 2022 | Income | 3.00% |
| 2023 | Income | 3.00% |

| | |
|---|---|
| 1.00% | Expense |
| 1.00% | Expense |
| 1.00% | Expense |
| 1.00% | Expense |
| 1.00% | Expense |
| 1.00% | Expense |
| 1.00% | Expense |
| 1.00% | Expense |
| 1.00% | Expense |

2 of 2

## EXHIBIT D

### INITIAL APPROVED BUDGET

The Approved Budget for 2014 is evidenced by the 2014 portion of the Business Plan attached as Exhibit C.

MFP CORNHUSKER PROPERTIES LLC        Exhibit D

## EXHIBIT E

## FORM OF PERKINS PRINCIPAL INDEMNITY AGREEMENT

**FOR VALUE RECEIVED**, in consideration for, and as an inducement to **MF CORNHUSKER MEMBER LLC**, a Delaware limited liability company (hereinafter referred to as "**PF Member**") to enter into that certain Limited Liability Company Agreement of MFP Cornhusker Properties LLC of even date herewith (hereafter referred to as the "**LLC Agreement**") with **PERKINS DELAWARE, LLC**, a Delaware limited liability company (hereafter referred to as "**Perkins Member**"), the undersigned hereby absolutely, unconditionally and irrevocably agrees to indemnify, defend and hold harmless PF Member and its Affiliates (as such term is defined in the LLC Agreement) (hereinafter collectively referred to as the "**Indemnified Parties**") from and against any loss, cost or damage incurred by Indemnified Parties as a result of (A) the occurrence of Removal Events under the LLC Agreement; (B) the placement of any lien on the property of the Company Entities or the Project as a result of the direct action or inaction of Perkins Member or Asset Manager (as defined in the LLC Agreement) not otherwise approved in writing by PF Member, except where such action or inaction of Perkins Member or Asset Manager was due to the failure of PF Member to make an Approved Additional Capital Contribution; (C) breach or default by Asset Manager in performance of its obligations beyond any applicable cure period under the Perkins Asset Management Agreements of even date herewith; and (D) the inaccuracy of any representations given by Perkins Member under Schedule 6.1(B) of the LLC Agreement (collectively, "**Specified Events**"). The undersigned further represents to PF Member as an inducement for PF Member to enter into the LLC Agreement, that the execution and delivery of this Indemnity is not in contravention of any other agreement to which the undersigned is party. The undersigned acknowledges and covenants to the Indemnified Parties that the undersigned has a beneficial interest in Perkins Member and, accordingly, has a financial interest in the making of the LLC Agreement.

The undersigned does hereby waive all requirements of notice of the acceptance of this Indemnity. The undersigned's obligations hereunder shall remain fully binding although the Indemnified Parties may have waived one or more Specified Events, extended the time of performance by Perkins Member or Asset Manager, released Perkins Member from liability for any of the Removal Events and/or any other of Perkins Member's obligations under the LLC Agreement or released Asset Manager from any of Asset Manager's obligations under the Perkins Asset Management Agreements. The undersigned further agrees that the undersigned's liability under this Indemnity shall be primary, and that in any right of action which shall accrue to PF Member under the LLC Agreement, PF Member may, at PF Member's option, proceed simultaneously against the undersigned under this Indemnity, against Perkins Member under the LLC Agreement, or against Asset Manager under the Perkins Asset Management Agreements, or may proceed against the undersigned without having commenced any action against or having obtained any judgment against Perkins Member or Asset Manager. The undersigned's obligations hereunder shall remain fully binding, notwithstanding any course of dealings between PF Member and Perkins Member.

**IN WITNESS WHEREOF**, the undersigned has caused this Perkins Principal Indemnity Agreement to be executed as of the ___ day of _____, 2013.

**INDEMNITOR:**

_____
Michael D. Perkins

MFP CORNHUSKER PROPERTIES LLC          Exhibit E

## EXHIBIT F

### CERTIFICATE OF PRINCIPAL

Michael D. Perkins, an individual residing in the State of California, hereby represents and warrants to MF Cornhusker Member LLC, a Delaware limited liability company, that:

1. During the past ten (10) years there have been no (A) petitions under the federal bankruptcy laws or any state insolvency law filed by or against, or a receiver, fiscal agent or similar officer appointed by a court for the business or property of, or (B) unsatisfied judgments of record in excess of $10,000.00 against nor any actions pending in any courts against, or (C) tax liens filed against:

   i.     me;

   ii.    any partnership in which I was a general partner at or within two (2) years before the time of such filing; or

   iii.   any corporation or business association of which I was an executive officer at or within two (2) years before the time of such filing.

2. Any bankruptcy proceedings, judgments, or tax liens of record against individuals with the same or similar names, during the previous ten (10) years, are not against me.

3. During the past ten (10) years I have not been convicted of fraud in a civil or criminal proceeding.

4. During the past ten (10) years I have not been convicted in a criminal proceeding (excluding traffic violations and other minor offenses), nor am I a named subject of a criminal proceeding which is presently pending.

5. During the past ten (10) years I have not been the subject of any final court order, judgment, decree or consent agreement of any court or other federal or state authority, including administrative agencies, permanently or temporarily enjoining me from, or otherwise limiting me from engaging in or being associated with persons engaging in any type of business practice or activity.

6. I am not and have never been party or subject to an inquiry, investigation, lawsuit, litigation, arbitration, hearing or other legal or administrative proceeding (A) in which claims were asserted under federal and/or state securities, tax or bankruptcy laws or (B) in which claims were asserted otherwise alleging fraud, deceit or misrepresentation, except as set forth on Schedule 1 attached hereto.

Dated:  October __, 2013            By: _____
                                         Michael D. Perkins

## SCHEDULE 6.1(A)

### CLOSING DELIVERIES

Perkins Member shall have delivered to PF Member documents or other evidence of satisfaction of the following conditions in form and content reasonably satisfactory to PF Member:

1.  This Agreement and all requisite state and federal filings.

2.  All documents evidencing the formation, organization, valid existence, good standing, and due authorization of and for Perkins Member for the execution, delivery, and performance of the organizational documents.

3.  An ALTA (or equivalent) owner's policy of title insurance (or unconditional commitment therefor) in the amount of the value of the Project, in form and with endorsements satisfactory to PF Member, in the name of the Company.

4.  Evidence of insurance required by Section 4.10 of this Agreement. All such insurance policies and endorsements shall be fully paid for and contain such provisions and expiration dates and be in such form and issued by insurance companies licensed to do business in the state in which the Project is located.

5.  Evidence that water, sewer, electrical, natural gas and telephone utilities are available to the Project.

6.  No condemnation or adverse zoning or usage change proceeding shall have occurred or shall have been threatened against the Project; the Project shall not have suffered any significant damage by fire or other casualty which has not been repaired; no law, regulation, ordinance, moratorium, injunctive proceeding, restriction, litigation, action, citation or similar proceeding or matter shall have been enacted, adopted, or threatened by any third party or governmental authority, which would have, in PF Member's reasonable judgment, a material adverse effect on Perkins Member or the Project.

7.  Evidence that all fees and commissions payable to real estate brokers, mortgage brokers, or any other brokers or agents in connection with the Project have been paid.

8.  An environmental report pertaining to the environmental condition of the Project dated within sixty (60) days of the date hereof shall have been obtained by the Company and shall be in form satisfactory to PF Member.

9.  The Business Plan and the Approved Budget shall have been approved by PF Member (as set forth in Sections 4.2 and 4.3 of the Agreement and as attached to the Agreement as Exhibits C and D, respectively).

10. The Perkins Principal Indemnity, duly executed by Michael D. Perkins.

11. The Certificates of Principal duly executed by Michael D. Perkins.

12. The principals of Perkins Member shall have delivered to PF Member (i) financial statements reasonably satisfactory to PF Member and (ii) background report authorizations relating to

MFP CORNHUSKER PROPERTIES LLC          Schedule 6.1(A)
                                       Page 1

litigation, criminal and bankruptcy matters, with such background reports having been received by PF Member in form and content satisfactory to PF Member.

MFP CORNHUSKER PROPERTIES LLC          Schedule 6.1(A)
                                            Page 2

**SCHEDULE 6.1(B)**

**PERKINS MEMBER
REPRESENTATIONS**

Perkins Member, for itself and its Affiliates, hereby represents and warrants to PF Member and to the Company, that the following statements are true and correct as of the date of this Agreement:

1. <u>No Proceedings.</u> There are no legal or administrative proceedings (including without limitation condemnation or eminent domain proceedings by any Governmental Authority) pending, or, to the actual knowledge of Perkins Member, threatened with respect to the Project.

2. <u>Utility Availability.</u> Water and sewer line systems having adequate capacity for transmission of water, waste water and storm fluids are currently available to the Project.

3. <u>FIRPTA.</u> Such Member is not a "foreign person", "foreign partnership", "foreign trust" or "foreign estate" as those terms are defined in Section 1445 of the Internal Revenue Code of 1986, as amended.

4. <u>Use of Project.</u> The Project is useable for its intended use without violation of any federal, state, local or other governmental building, zoning, health, safety, platting, subdivision or other law, ordinance or regulation, or any applicable private restriction. Except as otherwise expressly set forth in the Phase I Environmental Site Assessments (as hereinafter defined) and to the actual knowledge of Perkins Member, no toxic or hazardous substances or wastes, pollutants, or contaminants have been generated, treated, stored, released or disposed of, or otherwise placed, deposited and/or located on the Project, nor have above-ground or underground storage tanks or been located in or about the Project and subsequently removed or filled. The term "Phase I Environmental Assessments" shall mean, collectively, the following reports prepared by Partner Engineering and Science, Inc.:

Eastgate Plaza
- Phase I Environmental Site Assessment Report of 2660-2850 East 23rd Street, Fremont, Nebraska 68025, dated August 7, 2013 (Project No. 13-106100.4)

Stockyards Plaza
- Phase I Environmental Site Assessment Report of Stockyards Plaza, 3201 L. Street and 3305-3505 L Street, Omaha, Nebraska 68107, dated September 30, 2013 (Project No. 13-106100.8)
- Phase II Subsurface Investigation Report of Stockyards Plaza, 3201 L. Street and 3305-3505 L Street, Omaha, Nebraska 68107, dated October 10, 2013 (Project No. 13-106100.12)

Miracle Hills Park
- Phase I Environmental Site Assessment Report of Miracle Hills Park, 606-720 North 114th Street, Omaha, Nebraska 68154, dated August 7, 2013 (Project No. 13-106100.6)

Bishop Heights Shopping Center
- Phase I Environmental Site Assessment Report of Bishop Heights Shopping Center, 4200 South 27th Street, Lincoln, Nebraska 60502, dated August 6, 2013 (Project No. 13-106100.2)

Edgewood Shopping Center
- Phase I Environmental Site Assessment Report of Edgewood I&II Shopping Center, 5400-5566 South 56th Street, Lincoln, Nebraska 68516, dated August 7, 2013 (Project No. 13-106100.5)

The Meadows Shopping Center
- Phase I Environmental Site Assessment Report of 2840 South 70th Street, Lincoln, Nebraska 68506, dated August 7, 2013 (Project No. 13-106100.9)

Cornhusker Plaza
- Phase I Environmental Site Assessment Report of 2601 Cornhusker Drive, South Sioux City, Nebraska 68776, dated August 6, 2013 (Project No. 13-106100.3)

Market Square Shopping Center
- Phase I Environmental Site Assessment Report of Market Square, 1900 Center Drive, Norfolk, Nebraska, 68701, dated August 7, 2013 (Project No. 13-106100.10)

Baken Park Center
- Phase I Environmental Site Assessment Report of Baken Park, 2001 West Main Street, Rapid City, South Dakota 57702, dated August 9, 2013 (Project No. 13-106100.1)
- Phase II Subsurface Investigation Report of Baken Park, 2001 West Main Street, Rapid City, South Dakota 57702, dated October 17, 2013 (Project No. 13-106100.13)

Bon-Ton's (Herberger's)
- Phase I Environmental Site Assessment Report of Herbergers, 4915 2nd Avenue, Kearney, Nebraska 68847, dated August 9, 2013 (Project No. 13-106100.11)

Monument Mall
- Phase I Environmental Site Assessment Report of Monument Mall, 2302 and 2410 Frontage Road, Scottsbluff, Nebraska 69361, dated August 6, 2013 (Project No. 13-106100.7)

5. **No Violation.** There is no violation of any Governmental Regulations with respect to the Project currently existing or which to the knowledge of Perkins Member would reasonably be expected to exist as a result of the contemplated operation of the Project, which if such violation existed would cause a material adverse effect on the Project.

6. **Compliance.** The use of the Project materially complies with all Governmental regulations, including all zoning ordinances, and comply with all private covenants (if any) affecting the Project.

7. **Approvals.** All approvals pursuant to Governmental Requirements (including all environmental permits, zoning approvals, approvals and impact statements) required in connection with the intended use of the Project, by all Governmental Authorities having jurisdiction thereof have been or Perkins Member reasonably expects will be obtained or completed and no actions relating to such approvals are pending, or, to the actual knowledge of Perkins Member, are threatened.

8. **No Condemnation.** No condemnation or adverse zoning or usage change proceeding has occurred or is pending, or, to the actual knowledge of Perkins Member, is threatened against the Project; the Project has not suffered any significant damage by fire or other casualty which has not been repaired; no law, regulation, ordinance, moratorium, injunctive proceeding, restriction, litigation, action, citation or similar proceeding or matter has been enacted, adopted, or, to the actual knowledge of Perkins Member, is threatened by any third party or governmental authority, which has been or would reasonably expected to have a material adverse effect on Perkins Member or the Project.

9. **Fees Paid.** All fees and commissions payable to real estate brokers, mortgage brokers, or any other brokers or agents in connection with the Project have been paid.

The representations shall survive the acquisition of the Project by the Company for the period that is (a) five (5) years from the date hereof, or (b) until one (1) year after the Project is completed by the Company, whichever is shorter.



April 18, 2017

Mr. Michael Perkins                                           <u>**VIA ELECTRONIC MAIL**</u>
Perkins Delaware, LLC
c/o Perkins Properties
608 North 114th Street
Omaha, Nebraska 68154

RE:   Notice of Removal Event under that certain Limited Liability Company Agreement (as same
      may be amended the "Operating Agreement") of MFP Cornhusker Properties LLC
      ("Company") by and between Perkins Delaware, LLC ("Perkins Member") and MF Cornhusker
      Member, LLC ("PF Member").

Dear Mr. Perkins,

I am writing to you as general counsel for PF Member. PF Member has determined that a Removal
Event has occurred under Section 4.5(a)(6) of the Operating Agreement. All capitalized terms used but
not defined herein shall have the meaning set forth in the Operating Agreement.

Section 4.1(b)(i) of the Operating Agreement requires PF Member consent for any "sale, transfer, lease
exchange, grant of option, mortgage, financing or other borrowings, hypothecation or encumbrance of
all or any material portion of Company assets". On March 22, 2017, I sent you a side letter outlining the
conditions for PF Member's consent to the refinance you were contemplating. The side letter was not
executed, and accordingly PF Member's consent was not given. Section 4.5(a)(6) provides that a
removal event has occurred if Perkins Member "commits any other material breach of [the Operating
Agreement] (including without limitation the occurrence of a violation under Sections 3.2 or 4.1)". Given
the set of circumstances, this is a removal event that cannot be cured.

Section 4.5 of the Operating Agreement sets forth the remedies afforded PF Member in the event of a
Removal Event. Without limiting any additional remedies PF Member may have, please note that as of
the date hereof:

1. Perkins Member shall no longer be the Manager of the Company or any affiliates of Company.
2. Control of all bank accounts and other financial obligations of the Company and its affiliates shall
   be controlled by PF Member.
3. As of the date hereof, all Major Decisions shall be made by PF Member in its sole discretion.
4. From the date hereof, the Residual Sharing Ratio of the Perkins Member shall be reduced to
   the same percentage as its Partner Base Interest Ratio, with a corresponding increase to the
   Residual Sharing Ratio of the PF Member.

PF Member fully reserves all rights and remedies it has under the Operating Agreement or otherwise
available by law, contract or equity. PF Member's failure to commence any rights or remedies resulting
from any Removal Event or any other defaults or events of default under the Operating Agreement now
or at any time in the future shall not be deemed a waiver of: (a) the Removal Event identified herein or
any and all other defaults or events of default that may exist under the Operating Agreement; or (b) any
and all remedies available to PF Member under the Operating Agreement or otherwise available to PF
Member by law, contract or equity.

> **EXHIBIT**
>
> **B**

Neither this notice, nor any discussions by PF Member with Perkins Member or any of its respective representatives, constitutes: (a) a waiver by PF Member of any default or Removal Event by such party under the Operating Agreement, whether or not referred to herein or in any prior communication; (b) an election of remedies with respect to any such default or Removal Event by PF Member which reserves all rights and remedies under law and equity or under the Operating Agreement; (c) a waiver, modification, relinquishment or forbearance by PF Member of any right or remedy under the Operating Agreement or under law or equity, all of which are reserved by PF Member; or (d) a modification of either or both of the Operating Agreement or any other document entered into with respect to either Project. No delay in the exercise of any remedies shall be deemed a waiver of the right to do so at any time hereafter.

Yours,

John F. Curry
General Counsel of PF Member

cc:     Peter Fioretti
        Kevin Mast
        John M Prososki, Esq.
        Martin P. Pelster, Esq.

2



**MOUNTAIN**
REAL ESTATE CAPITAL

June 21, 2017

Mr. Michael Perkins                                                    **VIA ELECTRONIC MAIL**
Perkins Delaware, LLC
c/o Perkins Properties
608 North 114th Street
Omaha, Nebraska 68154

RE:     Continuation of Removal Event under that certain Limited Liability Company Agreement (as
        same may be amended the "Operating Agreement") of MFP Cornhusker Properties LLC
        ("Company") by and between Perkins Delaware, LLC ("Perkins Member") and MF Cornhusker
        Member, LLC ("PF Member").

Dear Mr. Perkins,

I am writing to you as general counsel for PF Member. As you know, on April 19, 2017, PF Member
determined that a Removal Event occurred under Section 4.5(a)(6) of the Operating Agreement, and
duly sent notice of such removal event in accordance with the Operating Agreement. All capitalized
terms used but not defined herein shall have the meaning set forth in the Operating Agreement.

Notwithstanding any discussions between PF Member and Perkins Member with respect to the
Company, the Removal Event is still ongoing. This letter shall serve as notice that the conditions set
forth in the April 19, 2017 remain in effect, specifically that:

1. Perkins Member is no longer be the Manager of the Company or any affiliates of Company.
2. Control of all bank accounts and other financial obligations of the Company and its affiliates shall
   be controlled by PF Member.
3. As April 19, 2017, all Major Decisions shall be made by PF Member in its sole discretion.
4. As of April 19, 2017, the Residual Sharing Ratio of the Perkins Member was reduced to the
   same percentage as its Partner Base Interest Ratio, with a corresponding increase to the
   Residual Sharing Ratio of the PF Member.

PF Member expects cooperation from Perkins Member to ensure all bank accounts are in the sole
control of PF Member. Perkins Member shall also inform all lenders or other secured creditors, as well
as any property management company, tenants, and other stakeholders, of the Removal Event and
that PF Member (or an affiliate) shall be the new manager until further notice. Perkins Member shall
have until June 30, 2017, to comply fully with this demand.

PF Member fully reserves all rights and remedies it has under the Operating Agreement or otherwise
available by law, contract or equity. Neither this notice, nor any discussions by PF Member with Perkins
Member or any of its respective representatives, constitutes: (a) a waiver by PF Member of any default
or Removal Event by such party under the Operating Agreement, whether or not referred to herein or
in any prior communication; (b) an election of remedies with respect to any such default or Removal
Event by PF Member which reserves all rights and remedies under law and equity or under the
Operating Agreement; (c) a waiver, modification, relinquishment or forbearance by PF Member of any
right or remedy under the Operating Agreement or under law or equity, all of which are reserved by PF
Member; or (d) a modification of either or both of the Operating Agreement or any other document
entered into with respect to either Project.  No delay in the exercise of any remedies shall be deemed
a waiver of the right to do so at any time hereafter.

**EXHIBIT**

**C**

Yours,

John F. Curry
General Counsel of PF Member

cc:    Peter Fioretti
        Kevin Mast
        John M Prososki, Esq.
        Martin P. Pelster, Esq.

2

Image ID:
D00473070D01                    **SUMMONS**                    Doc. No.    473070

IN THE DISTRICT COURT OF Douglas COUNTY, NEBRASKA
1701 Farnam
Omaha              NE 68183

Perkins Delaware, LLC, v. MF Cornhusker Member LLC

Case ID: CI 17      6964

TO:  MF Cornhusker Member LLC

You have been sued by the following plaintiff(s):

Perkins Delaware, LLC,

Plaintiff's Attorney:    David J Skalka
Address:                 2120 S. 72nd St., #1200
                         Omaha, NE 68124-2356

Telephone:               (402) 391-6777

A copy of the complaint/petition is attached. To defend this lawsuit, an
appropriate response must be served on the parties and filed with the office of
the clerk of the court within 30 days of service of the complaint/petition. If
you fail to respond, the court may enter judgment for the relief demanded in the
complaint/petition.

Date:  AUGUST 16, 2017      BY THE COURT:  *John M. Friend*
                                                 Clerk

PLAINTIFF'S DIRECTIONS FOR SERVICE OF SUMMONS AND A COPY OF THE
COMPLAINT/PETITION ON:

        MF Cornhusker Member LLC
        c/o National Registered Agents, Inc
        160 Greentree Drive, Ste 101
        Dover, DE 19904

Method of service:  Certified Mail

You are directed to make such service within ten days after the date of issue,
and file with the court clerk proof of service within ten days after the signed
receipt is received or is available electronically, whichever occurs first.

| Image ID:<br>D00473087D01 | **SUMMONS** | Doc. No.    473087 |
| --- | --- | --- |

IN THE DISTRICT COURT OF Douglas COUNTY, NEBRASKA
1701 Farnam
Omaha                    NE 68183

Perkins Delaware, LLC, v. MF Cornhusker Member LLC

                                        Case ID: CI 17     6964

TO:  MFP Cornhusker Properties LLC

                                              **FILED BY**
                                      Clerk of the Douglas District Court
                                              08/16/2017

You have been sued by the following plaintiff(s):

     Perkins Delaware, LLC,

Plaintiff's Attorney:    David J Skalka
Address:                 2120 S. 72nd St., #1200
                         Omaha, NE 68124-2356

Telephone:               (402) 391-6777

A copy of the complaint/petition is attached. To defend this lawsuit, an
appropriate response must be served on the parties and filed with the office of
the clerk of the court within 30 days of service of the complaint/petition. If
you fail to respond, the court may enter judgment for the relief demanded in the
complaint/petition.

Date: AUGUST 16, 2017      BY THE COURT: _John M. Friend_
                                              Clerk

PLAINTIFF'S DIRECTIONS FOR SERVICE OF SUMMONS AND A COPY OF THE
COMPLAINT/PETITION ON:

          MFP Cornhusker Properties LLC
          1015 N 98th Street, Ste 100
          Omaha, NE 68114

Method of service:  Certified Mail

You are directed to make such service within ten days after the date of issue,
and file with the court clerk proof of service within ten days after the signed
receipt is received or is available electronically, whichever occurs first.

| SERVICE RETURN | Doc. No.    473087 |
|---|---|

```
              Douglas District Court
         1701 Farnam
         Omaha              NE 68183
```

To:
Case ID: CI 17    6964 Perkins Delaware,   v. MF Cornhusker Memb

Received this Summons on _____,_____. I hereby certify that on

_____, _____ at _____ o'clock __M. I served copies of the Summons
upon the party:

_____

by _____

_____

_____

as required by Nebraska state law.

Service and return      $ _____

Copy                          _____

Mileage _____miles          _____

  TOTAL               $ _____

Date: _____      BY: _____
                                       (Sheriff or authorized person)

# CERTIFIED MAIL
# PROOF OF SERVICE

Copies of the Summons were mailed by certified mail,
TO THE PARTY: _____

At the following address: _____

_____

_____

on the _____ day of _____ _____, as required by Nebraska state law.

                        _____

Postage $ _____      Attorney for: _____

The return receipt for mailing to the party was signed on _____, _____.

```
To: MFP Cornhusker Properties LLC      From: David J Skalka
    1015 N 98th Street, Ste 100             2120 S. 72nd St., #1200
                                            Omaha, NE 68124-2356
    Omaha, NE 68114
```

# ATTACH RETURN RECEIPT & RETURN TO COURT

IN THE DISTRICT COURT OF DOUGLAS COUNTY, NEBRASKA

PERKINS DELAWARE, LLC, a Delaware )
limited liability company, )
)
              Plaintiff, )
)
vs. )
)
MF CORNHUSKER MEMBER LLC, a )
Delaware limited liability company, and )
MFP CORNHUSKER PROPERTIES LLC, a )
Delaware limited liability company, )
)
              Defendants. )

CASE NO.: *CI 17-6964*

**APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION**

#6 **FILED**
IN DISTRICT COURT
DOUGLAS COUNTY NEBRASKA

AUG 1 6 2017

JOHN M. FRIEND
CLERK DISTRICT COURT

COMES NOW Plaintiff Perkins Delaware, LLC ("Plaintiff"), and through counsel applies for a Temporary Restraining Order and Temporary Injunction against Defendant MF Cornhusker Member LLC ("PF Member") as follows:

    1.    Contemporaneously herewith, Plaintiff filed its Complaint seeking a declaratory judgment and injunction against PF Member and submits the August 14, 2017 Affidavit of Michael Perkins in support of this Application for Temporary Restraining Order and Temporary Injunction attached hereto. The Complaint and Affidavit state that PF Member has threatened to remove Plaintiff as limited liability company manager ("Manager") of Defendant MFP Cornhusker Properties LLC ("MFP Cornhusker") and take other punitive actions against Plaintiff.

    2.    The Complaint seeks in part to declare PF Member's claims of a Removal Event (as described in the Complaint) invalid as inconsistent with the facts and MFP Cornhusker's Operating Agreement, and seeks to enjoin PF Member from taking any action to enforce its claimed Removal Event or interfering in any way with the responsibilities of the Manager set



forth in Section 4.1(a) of the Operating Agreement including the day to day operation of MFP Cornhusker and its subsidiaries.

3.     The basis for seeking injunctive relief as stated in the Complaint and Affidavit is that no Removal Event has occurred as set forth in the Operating Agreement, PF Member's enforcement of its claimed Removal Event would produce irreparable harm to Perkins Member, including the loss of control over business operations that it is a 90% owner, and that PF Member could substitute itself as Manager and take actions that could not be undone and could not be adequately compensated by a money judgment.

4.     Granting this Application for a Temporary Restraining Order and Temporary Injunction will maintain the status quo, to which PF Member will not be prejudiced and which will prevent irreparable harm to Plaintiff.  The basis of PF Member's claimed Removal Event is not in any way based upon fraud, embezzlement, mismanagement, or other conduct that is in any way materially harming MFP Cornhusker.

WHEREFORE, Plaintiff respectfully requests:

a.     that this Court immediately issue a Temporary Restraining Order restraining Defendant PF Member and anyone acting on its behalf from taking any action to enforce its claimed Removal Event including attempting to act as Manager of MFP Cornhusker, appointing another party as Manager, stating to any third party doing business with Plaintiff, MFP Cornhusker, or any of MFP Cornhusker's subsidiaries that Plaintiff is not the Manager of MFP Cornhusker, or interfering in any way with the responsibilities of the Manager set forth in Section 4.1(a) of the Operating Agreement including the day to day operation of MFP Cornhusker and its subsidiaries;

2

b.      that a hearing be ordered regarding Plaintiff's application for a temporary injunction;

c.      that reasonable notice be given to Defendant PF Member directing it to show why the Court should not issue a temporary injunction that restrains Defendant PF Member in this manner; and

d.      that the Court issue a temporary injunction enjoining Defendant PF Member in the same manner as the Temporary Restraining Order above.

DATED this 15th day of August, 2017.

PERKINS DELAWARE, LLC, a Delaware
limited liability company

By: /s/ David J. Skalka
    Martin P. Pelster, #19223
    David J. Skalka, #21537
    CROKER, HUCK, KASHER, DeWITT,
     ANDERSON & GONDERINGER, L.L.C.
    2120 South 72nd Street, Suite 1200
    Omaha, Nebraska 68124
    (402) 391-6777
    (402) 390-9221 (Fax)

    Attorneys for Plaintiff

00707973 DOCX

3

IN THE DISTRICT COURT OF DOUGLAS COUNTY, NEBRASKA

| | | |
|---|---|---|
| PERKINS DELAWARE, LLC, a Delaware limited liability company, | ) ) ) | CASE NO.: _____ |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | **AFFIDAVIT OF** |
| MF CORNHUSKER MEMBER LLC, a Delaware limited liability company, and MFP CORNHUSKER PROPERTIES LLC, a Delaware limited liability company, | ) ) ) ) ) | **MICHAEL PERKINS** |
| Defendants. | ) | |

STATE OF CALIFORNIA   )
                     ) ss.
COUNTY OF _____ )

    I, Michael Perkins, being first duly sworn, depose and state as follows:

    1.    I make the statements contained in this Affidavit based upon my own personal knowledge. If called as a witness, I would be competent to testify to the matters contained herein.

    2.    I am a Nebraska resident.

    3.    Plaintiff Perkins Delaware, LLC ("Perkins Member"), is a Delaware limited liability company. Perkins Centers Delaware, LLC is Perkins Member's LLC manager. Through corporate entities and a revocable trust, I am the sole owner of both such entities. I wholly control Perkins Member.

    4.    Defendant MFP Cornhusker Properties LLC ("MFP Cornhusker"), a Delaware limited liability company, was formed in August 2013.

    5.    Defendant MF Cornhusker Member LLC ("PF Member") is a Delaware limited liability company. Peter Fioretti ("Fioretti") has been at all relevant times a principal of PF

Member.  Upon information and belief, Kevin Mast ("Mast") is the Executive Vice President and CFO of PF Member.

6.     In October 2013 Perkins Member and PF Member executed an operating agreement for MFP Cornhusker (the "Operating Agreement").  A true and complete copy of the Operating Agreement is attached to this Affidavit as Exhibit "A".  There have been no amendments to the Operating Agreement.

7.     As stated in the Operating Agreement, Perkins Member is a 90% owner of MFP Cornhusker, and PF Member is a 10% owner.  The Operating Agreement names Perkins Member as its LLC manager, and Perkins Member is presently its LLC manager.

8.     MFP Cornhusker is the sole member of MFP Mid-America Shopping Centers LLC ("MFP Mid-America") which was formed in October 2013.

9.     MFP Cornhusker was organized and its Operating Agreement was executed to, through MFP Mid-America, operate the 11 commercial retail properties in Nebraska and South Dakota identified on exhibit A to the Operating Agreement (the "Properties").  Perkins Member's initial capital contribution was transferring title to the Properties to MFP Mid-America.

10.     In October 2013 MFP Cornhusker obtained for MFP Mid-America a loan of $47,500,000 through Jefferies LoanCore LLC ("JLC").  JLC's loan was secured by a first priority lien on all of the Properties.

11.     Over time, both Perkins Member and PF Member determined that the JLC loan was unreasonably onerous and burdensome.  For example, one of its covenants provided that if a major tenant to one of the Properties left without a replacement, all Available Cash (as that term is defined in the JLC loan agreement) from all Properties shall be paid to JLC and maintained in

an account as cash collateral. This occurred, and prevented MFP Mid-America from adequately operating the other Properties. The JLC loan's initial interest rate was 5.64%, and eventually became a variable rate.

12.     In 2015, MFP Cornhusker obtained for MFP Mid-America a refinancing of a portion of the JLC loan as it related to two of the Properties, the Bishop Heights Shopping Center and The Meadows Shopping Center. In that refinancing, JLC agreed to release its lien as to those two properties. This refinancing was expressly approved by both Perkins Member and PF Member by written resolution, a true and complete copy of which is attached to this Affidavit as Exhibit "B".

13.     Thereafter, I continued to look for opportunities to refinance portions of the JLC loan.

14.     Over time, I had multiple conversations with Fioretti regarding management of the Properties including refinancing the JLC loan. One particular conversation I recall was a face to face meeting on January 18, 2017 at a restaurant in Dana Point, California. We discussed among other things refinancing of the Herberger's (a/k/a Bon-Ton's) property. From that conversation and others, I understood that PF Member approved going forward to refinance the Herberger's property.

15.     In March 2017, as MFP Cornhusker's manager I caused MFP Mid-America to refinance a portion of the indebtedness related to the Herberger's property with Equitable Bank (the "Herberger's Refinancing"). A true and complete copy of the loan documents related to the Herberger's Refinancing are attached to this Affidavit as Exhibit "C". As part of the Herberger's Refinancing, JLC agreed to release its lien as to the Herberger's property.

3

16.     The Herberger's Refinancing substantially improved the business operations of MFP Mid-America and thus MFP Cornhusker. The Herberger's Refinancing provides for a fixed interest rate of 3.95% per annum. At the time of the Herberger's Refinancing, the JLC loan interest rate was 6.6875%, and it has increased further since then. The Herberger's Refinancing freed revenues from the Herberger's property from the onerous reserve covenants of the JLC loan I described above. Based upon Equitable Bank's appraisal of the Herberger's property, $5,350,000, the Herberger's Refinancing freed up over $2.3 million of real estate from an encumbrance.

17.     The cash received as part of the Herberger's Refinancing is still being held by MFP Mid-America, with the intent to use that cash to pay an indebtedness MFP Cornhusker owes PF Member for preferred distribution as provided in Article VIII in the Operating Agreement.

18.     On April 3, 2017, Fioretti emailed me asking, "Pls call me- What's holdup on the refi ?" which indicated again to me that Fioretti wanted the refinancing to take place.

19.     On or about April 18, 2017, I received a letter from PF Member attorney John Curry claiming that the Herberger's Refinancing was a Removal Event under the Operating Agreement and claimed it permitted PF Member to unilaterally remove Perkins Member as manager of MFP Cornhusker and change the Residual Sharing Ratio as defined in the Operating Agreement, among other claims (the "First Removal Letter"). A true and complete copy of the First Removal Letter is attached to this Affidavit as Exhibit "D". PF Member did not claim that the Herberger's Refinancing harmed MFP Cornhusker.

4

20.     Subsequent to that letter, I had several conversations and communications with Mast and Fioretti regarding the operation of the Properties and the Herberger's Refinancing. At no time did I concede that the Herberger's Refinancing was a Removal Event.

21.     On or about June 21, 2017, I received a letter from PF Member attorney John Curry, a true and complete copy of which is attached to this Affidavit as Exhibit "E".

22.     On July 3, 2017, I met Fioretti for breakfast in Dana Point, California regarding the June 21, 2017 letter. Fioretti agreed to hold off on any action until at least August 1, 2017. I continued to perform Perkins Member's responsibilities as MFP Cornhusker LLC manager.

23.     On August 4, 2017, I spoke with Fioretti. I expressly told him that the Herberger's Refinancing was not a Removal Event, in part because a refinancing is not financing provided by Section 4.1(b) of the Operating Agreement, that the Herberger's Refinancing was not a material breach of the Operating Agreement as it improved MFP Cornhusker's business position, and that in all events Fioretti for PF Member agreed to the refinancing.

24.     On August 10, 2017, I spoke again with Fioretti. Fioretti told me that he was going to pursue enforcing PF Member's claimed Removal Event including removing Perkins Member as LLC manager of MFP Cornhusker. In that conversation, I offered to use the cash MFP Mid-America received from the Herberger's Refinancing beyond what was paid to JLC to pay down the Equitable Bank loan. Fioretti said he did not want me to do that.

25.     In no conversation or written communication that I am aware of has PF Member ever alleged that MFP Cornhusker was financially harmed by the Herberger's Refinancing.

26.     Enforcing PF Member's claimed Removal Event would produce irreparable harm to Perkins Member, including the loss of control over business operations that it is a 90% owner.

27.     Perkins Member is asking this Court to enter a temporary restraining order restraining PF Member from removing Perkins Member as LLC manager of MFP Cornhusker or taking any action to enforce a claimed Removal Event, such as contacting third parties stating that Perkins Member is not the LLC manager of MFP Cornhusker or to interfere with the day to day operations of MFP Cornhusker.

FURTHER AFFIANT SAYETH NOT

Michael Perkins

SUBSCRIBED AND SWORN TO before me this _____ day of August, 2017.     *See Attached*

Notary Public

6



**WELLS FARGO**

# Jurat Certificate    California only

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Orange_

Subscribed and sworn to (or affirmed) before me on this _14th_

day of _August_, 20_17_, by _Michael Perkins_

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

*Place Seal Here*

Signature _Benjamin D. Kahn_

BENJAMIN D. KAHN
COMM. #2180373
NOTARY PUBLIC - CALIFORNIA
ORANGE COUNTY
My Commission Expires 01/20/2021
CSP1

## Description of Attached Document

Type or Title of Document
_Affidavit of Michael Perkins_

Document Date
_August 14th, 2017_

Number of Pages
_6_

Signer(s) Other Than Named Above

DSG 3018 CA (Rev 02 2/15)

LIMITED LIABILITY COMPANY

AGREEMENT OF

MFP CORNHUSKER PROPERTIES LLC

October \_\_\_, 2013

EXHIBIT

A

## TABLE OF CONTENTS

|  | Page No. |
|---|---|
| I. DEFINITIONS | 1 |
| 1.1. Definitions | 1 |
| 1.2. In addition to the terms defined in Section 1 | 6 |
| II. ORGANIZATIONAL MATTERS; PURPOSE; TERM | 6 |
| 2.1. Formation of Company | 6 |
| 2.2. Name | 6 |
| 2.3. Registered Office; Registered Agent; Principal Office | 6 |
| 2.4. Foreign Qualification | 7 |
| 2.5. Purpose and Scope | 7 |
| 2.6. Term | 7 |
| 2.7. Property Ownership and Management | 7 |
| 2.8. Limit of Liability | 7 |
| 2.9. Approvals and Consents | 7 |
| 2.10. No State Law Partnership | 7 |
| III. MEMBERSHIP; DISPOSITIONS OF INTERESTS | 8 |
| 3.1. Members | 8 |
| 3.2. Dispositions of Membership Interests | 8 |
| 3.3. Creation of Additional Membership Interests | 8 |
| 3.4. Resignation | 8 |
| 3.5. Information | 9 |
| 3.6. Liability to Third Parties | 9 |
| IV. MANAGEMENT OF COMPANY | 9 |
| 4.1. Management | 9 |
| 4.2. Business Plan | 9 |
| 4.3. Budgets and Reserves | 12 |
| 4.4. Meetings of Members | 13 |
| 4.5. Removal of Manager | 14 |
| 4.6. Reimbursement of Expenses | 14 |
| 4.7. Compensation to Members or Manager | 15 |
| 4.8. Transactions with Affiliates | 15 |
| 4.9. Insurance | 15 |
| 4.10. Conflicts of Interest | 16 |
| 4.11. Loan Obligations | 16 |
| 4.12. Buy-Sell Rights | 16 |
| 4.13. Right to Market | 18 |
| V. ACCOUNTING AND REPORTING | 20 |
| 5.1. Fiscal Year, Accounts, Reports | 20 |
| 5.2. Bank Accounts | 21 |
| VI. CAPITAL CONTRIBUTIONS | 21 |
| 6.1. Initial Capital Contributions | 21 |

6.2. Additional Capital Contributions.................................................................................22
6.3. Failure to Make Contributions..................................................................................22
6.4. Return of Contributions.............................................................................................24
6.5. Member Loans...........................................................................................................24
6.6. Balances.....................................................................................................................24
6.7. Excess Committed Capital.........................................................................................25

VII. SEPARATENESS FROM AFFILIATES; BANKRUPTCY ...................................25
7.1. Separateness from Affiliates.....................................................................................25
7.2. Bankruptcy and Insolvency Proceedings..................................................................27

VIII. DISTRIBUTIONS ...................................................................................................27
8.1. Distributions in General............................................................................................27
8.2. Distribution of Net Distributable Cash.....................................................................27

IX. CAPITAL ACCOUNTS, ALLOCATIONS. AND TAX MATTERS...........................28
9.1. Definitions.................................................................................................................28
9.2. Capital Accounts.......................................................................................................30
9.3. Adjustment of Gross Asset Value.............................................................................31
9.4. Profits, Losses and Distributive Share of Tax Items...............................................32
9.5. Tax Returns...............................................................................................................35
9.6. Tax Elections.............................................................................................................36
9.7. Tax Matters Member.................................................................................................36
9.8. Allocations on Transfer of Interests.........................................................................36

X. WITHDRAWAL, DISSOLUTION, LIQUIDATION, AND TERMINATION ...............37
10.1. Dissolution, Liquidation, and Termination Generally..............................................37
10.2. Liquidation and Termination ....................................................................................37
10.3. Deficit Capital Accounts...........................................................................................38
10.4. Cancellation of Certificate........................................................................................38

XI. MISCELLANEOUS PROVISIONS..............................................................................38
11.1. Notices.......................................................................................................................38
11.2. Governing Law..........................................................................................................39
11.3. Entirety; Amendments...............................................................................................39
11.4. Waiver.......................................................................................................................39
11.5. Severability................................................................................................................39
11.6. Ownership of Property and Right of Partition..........................................................39
11.7. Captions, References.................................................................................................39
11.8. Involvement of Members in Certain Proceedings ....................................................39
11.9. Interest.......................................................................................................................39
11.10. Confidentiality...........................................................................................................39
11.11. Counterparts; Electronic Signatures.........................................................................40
11.12. Indemnification..........................................................................................................40
11.13. Perkins Indemnity and Principal Certificates ..........................................................40
11.14. Disclosure and Waiver of Conflicts.........................................................................40
11.15. Common Interest of Members...................................................................................40

XII. SPECIAL PURPOSE BANKRUPTCY REMOTE ENTITY ....................................41
12.1. Special Purpose Bankruptcy Remote Entity.............................................................41
12.2. Special Member.........................................................................................................41

ii

12.3.   Independent Manager ........................................................................................ 41
12.4.   Limitations on the Company's Activities.......................................................... 42
12.5.   Defined Terms .................................................................................................. 42
12.6.   Lender as Third-Party Beneficiary ................................................................... 44

EXHIBITS AND SCHEDULES

| **EXHIBITS** | | **SCHEDULES** | |
|---|---|---|---|
| A | LIST OF PROJECT PROPERTIES | 1.1 | EXAMPLE OF IRR CALCULATION |
| B | LEGAL DESCRIPTION OF PROJECT | 6.1(A) | CLOSING DELIVERIES |
| C | BUSINESS PLAN | 6.1(B) | PERKINS MEMBER |
| D | INITIAL APPROVED BUDGET | | REPRESENTATIONS |
| E | PERKINS PRINCIPAL INDEMNITY | | |
| F | CERTIFICATE OF PRINCIPAL | | |

## LIST OF DEFINED TERMS

**Page No.**

AAA ........................................................................................................................... 12
Act ............................................................................................................................... 1
Additional Capital ....................................................................................................... 1
Additional Capital Contributions ............................................................................... 1
Adjusted Capital Account ............................................................................................ 29
Adjusted Capital Account Deficit ............................................................................... 29
Affiliate ....................................................................................................................... 1
Agreement .................................................................................................................... 1
Approved Additional Capital Contribution Balance ................................................... 24
Approved Additional Capital Contributions ............................................................... 22
Approved Budget ......................................................................................................... 22
Asset Management Agreements ................................................................................... 13
Asset Manager ............................................................................................................. 1
Bankruptcy ................................................................................................................... 1
Bankruptcy Removal Event ......................................................................................... 15
Business Day ................................................................................................................ 2
Business Plan ............................................................................................................... 2, 12
Buy-Sell Event ............................................................................................................ 18
Capital Account ........................................................................................................... 18
Capital Contribution .................................................................................................... 29, 30
Capital Contribution Preferred Return Balance .......................................................... 2
Capital Proceeds .......................................................................................................... 25
Capital Sharing Ratios ................................................................................................. 2
Capital Transaction ..................................................................................................... 2
Cause ........................................................................................................................... 2
Certificate .................................................................................................................... 43
Certificate of Principal ................................................................................................ 7
Closing Date ................................................................................................................ 41
Co-Asset Manager ....................................................................................................... 17
Code ............................................................................................................................. 2
Company ...................................................................................................................... 29
Company Entity(ies) .................................................................................................... 2
Control ......................................................................................................................... 1
Cost Overrun ............................................................................................................... 2
Default Capital ............................................................................................................ 23
Default Capital Contribution Balance ......................................................................... 25
Default Capital Contribution Preferred Return Balance ............................................. 25
Default Capital Contributions ..................................................................................... 23
Default Loan ................................................................................................................ 23
Default Preferred Return .............................................................................................. 23
Delinquent Member ..................................................................................................... 3
Depreciation ................................................................................................................ 29
Disposition ................................................................................................................... 3
Excess Committed Capital ........................................................................................... 25
Excess Committed Capital Milestone .......................................................................... 25
Governmental Authority(ies) ....................................................................................... 3
Governmental Regulations ........................................................................................... 3

v

Gross Asset Value.................................................................................................29, 31
Improvements .......................................................................................................3
Imputed Closing Costs.........................................................................................3
Independent Manager............................................................................................3, 19
Initial Capital Contribution Balance ...................................................................43
Initial Capital Contributions ...............................................................................25
Initiating Member ................................................................................................3, 21
Interest Rate .........................................................................................................17
Interim Sharing Ratio...........................................................................................3
Law Firm..............................................................................................................3
Lender...................................................................................................................41
Lending Members ................................................................................................41
Loan .....................................................................................................................23
Losses...................................................................................................................41
Major Decisions ..................................................................................................30
Management Fees .................................................................................................10
Manager ...............................................................................................................3
Material Action ....................................................................................................3
Member Loan.......................................................................................................44
Members ..............................................................................................................24
Membership Interests...........................................................................................4
Mid-America Properties.......................................................................................4
Monument Mall Property.....................................................................................4
Nationally Recognized Service Company ...........................................................4
Net Distributable Cash.........................................................................................44
Net Operating Income..........................................................................................4
Net Project Income ..............................................................................................4
Occupancy............................................................................................................4
Offer.....................................................................................................................4
Offered Project.....................................................................................................19
Operating Budget.................................................................................................19
Partner Base Interest Ratio...................................................................................13
Partner Nonrecourse Debt....................................................................................4
Partner Nonrecourse Debt Minimum Gain ..........................................................29
Partner Nonrecourse Deductions .........................................................................29
Partnership Minimum Gain..................................................................................30
Perkins Asset Management Agreements...............................................................4
Perkins Member ...................................................................................................4
Perkins Note.........................................................................................................1
Perkins Principal ..................................................................................................21
Perkins Principal Indemnity.................................................................................5
Person...................................................................................................................41
PF Asset Management Agreements ......................................................................5
PF Member...........................................................................................................1
Pledge Agreement................................................................................................5
Preferred Return...................................................................................................41
Primary Preferred Return .....................................................................................5
Profits...................................................................................................................5
Project...................................................................................................................30
Project Expenses ..................................................................................................5
Project Revenues..................................................................................................5

Promote Portion .................................................................................................... 6
Properties ............................................................................................................. 6
Property................................................................................................................ 6
Property Operating Budget ................................................................................... 6
Reduced Maximum Initial Investment.................................................................. 13
Regulations ......................................................................................................... 22
Regulatory Allocations ........................................................................................ 30
Removal Event .............................................................................................. 30, 35
Required Additional Capital Contributions .......................................................... 14
Reserves.............................................................................................................. 22
Residual Sharing Ratios ................................................................................... 6, 14
Responding Member............................................................................................. 6
Response Period.................................................................................................. 17
Sale Notice .......................................................................................................... 19
Secondary Preferred Return ................................................................................. 19
Secured Obligations .............................................................................................. 6
Secured Party ...................................................................................................... 24
Senior Loan Documents....................................................................................... 24
Senior Mortgage Lender ........................................................................................ 6
Senior Mortgage Loan ........................................................................................... 6
Special Member ..................................................................................................... 6
Subsidiary(ies) .................................................................................................... 44
Tax matters partner ............................................................................................... 6
Valuation Amount................................................................................................ 37
Voluntary Transfer .............................................................................................. 17
........................................................................................................................... 6

## LIMITED LIABILITY COMPANY AGREEMENT OF
## MFP CORNHUSKER PROPERTIES LLC

**THIS LIMITED LIABILITY COMPANY AGREEMENT** (this "**Agreement**") is entered into as of the ___ day of October, 2013, between Perkins Delaware, LLC, a Delaware limited liability company, as a Member and the initial Manager (the "**Perkins Member**"), and MF Cornhusker Member LLC, a Delaware limited liability company, or its designate, as a Member (the "**PF Member**"), and Michael C. Doyle and Joan L. Yori, as the Independent Managers (as defined below).

### I.
### DEFINITIONS

1.1.  **Definitions**.  As used in this Agreement, the following terms shall have the following meanings:

"**Act**" means the Delaware Limited Liability Company Act, as it may be amended from time to time.

"**Additional Capital**" or "**Additional Capital Contributions**" means the Approved Additional Capital Contributions to the Company from the Members; and the Required Additional Capital Contributions from Perkins Member pursuant to Section **6.2** hereof.

"**Affiliate**" means, with respect to a Person, another Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Person in question. The term "**control**" as used in the preceding sentence means, with respect to a Person that is a corporation, the right to exercise, directly or indirectly, more than 5% of the voting rights attributable to the shares of the controlled corporation, and, with respect to a Person that is not a corporation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Person.

"**Asset Management Agreements**" means, collectively, the Perkins Asset Management Agreements and the PF Asset Management Agreements.

"**Asset Manager**" means Perkins Properties, Inc., a Nebraska corporation, during the term of the Perkins Asset Management Agreements, or any successor or replacement manager.

"**Bankruptcy**" means, with respect to a Person, the occurrence of (1) an assignment by the Person for the benefit of creditors; (2) the filing by the Person of a voluntary petition in bankruptcy; (3) the entry of a judgment by any court that the Person is bankrupt or insolvent, or the entry against the Person of an order for relief in any bankruptcy or insolvency proceeding; (4) the filing of a petition or answer by the Person seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; (5) the filing by the Person of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding for reorganization or of a similar nature; (6) the consent or acquiescence of the Person to the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties; or (7) any other event which would cause the Person to cease to be a member of a limited liability company under Section 18-304 of the Act.

"**Business Day**" means any day other than Saturday, Sunday, or other day on which commercial banks in Omaha, Nebraska or Charlotte, North Carolina are authorized or required to close under the laws of the State of Nebraska or State of North Carolina, as applicable.

"**Business Plan**" shall have the meaning ascribed to such term in Section **4.2**.

"**Capital Contribution**" means, with respect to each Member, the amount of Initial Capital (which shall include any payments actually made by PF Member directly to Perkins Member under Section 6.1 or Section 6.7 as and when such payments are actually made), Additional Capital and Default Capital, each to the extent actually contributed to the Company by that Member pursuant to the terms hereof.

"**Capital Proceeds**" means funds of the Company arising from a Capital Transaction, net of the actual costs incurred by the Company, with third parties in consummating the Capital Transaction.

"**Capital Sharing Ratios**" means the percentages in which the Members participate in, and bear, certain Company items. The Capital Sharing Ratios of the Members are as follows:

| | |
|---|---|
| Perkins Member | 90.0% |
| PF Member | 10.0% |

"**Capital Transaction**" means the sale, financing, refinancing or similar transaction of or involving any portion of the Project (including condemnation awards, payment of title insurance proceeds or casualty loss insurance proceeds (other than business interruption or rental loss insurance proceeds), to the extent such awards and proceeds are not applied to mortgage indebtedness of the Company and not used to repair damage caused by a casualty or taking or in alleviation of any title defect).

"**Co-Asset Manager**" means Mountain Funding, L.L.C., a North Carolina limited liability company, during the term of the PF Asset Management Agreements, or any successor or replacement manager.

"**Company**" means MFP Cornhusker Properties LLC, a Delaware limited liability company.

"**Company Entity**" or "**Company Entities**" means, any of or collectively (as the context may require), the Company and the Subsidiaries.

"**Cost Overrun**" means, as of any date of determination, any excess of (A) Project Expenses in the aggregate incurred as of such date, over (B) the amount budgeted for said Project Expenses in the aggregate as of such date per the Business Plan and the applicable Approved Budget. Cost Overruns are separately determined on a net aggregate basis for hard costs and soft costs categories, such that aggregate hard cost expenditures in excess of the amount budgeted for aggregate hard costs per the Business Plan and Approved Budget and aggregate soft cost expenditures in excess of the amount budgeted for soft costs per the Business Plan and Approved Budget will be offset by (i) aggregate savings below the amount budgeted for hard costs or soft costs, as the case may be, and (ii) any applicable contingency amounts for hard costs or soft costs, as the case may be, as set forth in the Business Plan and Approved Budget.

"**Default Preferred Return**" shall mean, for each Member, the Primary Preferred Return of that Member on its Default Capital Contribution Balance, as defined in Section **6.3**.

"**Disposition**" means and includes, but is not limited to, disposition by sale, delivery, assignment, gift, exchange, transfer, distribution by an executor, administrator, or personal representative, encumbrance or pledge, whether directly or indirectly.

"**Governmental Authority**" or "**Governmental Authorities**" means and includes any and all federal, state, county and municipal governmental bodies, courts, administrative commissions, agencies and authorities and any other political subdivisions in which the Project is located, or that exercise jurisdiction over the Project.

"**Governmental Regulations**" means any law, rule, regulation, ordinance, order, decree, statute, zoning ordinance, restrictive covenant, adjudication or other requirement of a Governmental Authority.

"**Improvements**" means all existing and future improvements to the Project per the Business Plan, including without limitation the Properties and the other horizontal and vertical improvements to the Project.

"**Imputed Closing Costs**" means a reasonable estimate of the amount equal to title insurance premiums, survey costs, brokerage commissions (not to exceed 1% of the purchase price), transfer tax and other commercially reasonable closing costs that would normally be incurred by the Company if the Project, or any portion thereof, as applicable, was sold for a given purchase price.

"**Initial Capital Contributions**" means the Capital Contributions of Perkins Member and PF Member described in Section 6.1 hereof.

"**Interest Rate**" means the lesser of the maximum lawful rate and 20% per annum, payable and compounded annually.

"**Interim Sharing Ratio**" means, initially as follows for the Members:

| | |
|---|---|
| Perkins Member | 75% |
| PF Member | 25% |

The initial Interim Sharing Ratios are subject to adjustment as provided in this Agreement, including without limitation Sections **4.5(b)** and **6.3**.

"**Management Fees**" means the fees paid to Asset Manager and Co-Asset Manager pursuant to the Asset Management Agreements.

"**Manager**" means the initial Manager (which is Perkins Member) and each Person hereafter designated as the Manager in accordance with this Agreement, until such Person ceases to be the Manager of the Company. Perkins Member, as the initial Manager, shall also perform day-to-day management and operation duties with respect to the Company Entities in accordance with the terms hereof to carry out the Approved Budget and as reasonably required, in coordination with Asset Manager and Co-Asset Manager, in accordance with the Business Plan, the Approved Budget and the Asset Management Agreements.

"**Members**" means PF Member and Perkins Member and each Person hereafter admitted as a Member in accordance with this Agreement, until such Person ceases to be a Member of the Company.

MFP CORNHUSKER PROPERTIES LLC                3

"**Membership Interests**" means all of the rights and interests of whatsoever nature of the Members in the Company, including without limitation the right to participate in management to the extent herein expressly provided, to receive distributions of funds, and to receive allocations of income, gain, loss, deduction, and credit.

"**Mid-America Properties**" means the Properties held by MFP Mid-America Shopping Centers LLC.

"**Monument Mall Property**:" means the Property held by MFP Monument Mall LLC.

"**Net Distributable Cash**" means, for any period, Net Project Income for such period less (i) repayment of Member Loans in accordance with the terms thereof; and (ii) a working capital amount reasonably required for the operation of the Company consistent with the Approved Budget.

"**Net Operating Income**" shall have the definition given it in the Senior Loan Documents.

"**Net Project Income**" means, for any period, the amount by which Project Revenues exceed Project Expenses for such period.

"**Occupancy**" means the aggregate Occupied Square Footage of all Properties owned by the Company or any Subsidiary at the time of calculation, divided by the aggregate square footage of all Properties owned by the Company or any Subsidiary at the time of calculation. "Occupied Square Footage" means that portion of any Property that is subject to a lease agreement under which the tenant is (i) current on its rent, (ii) is occupying the portion of the Property subject to such lease agreement, and (iii) has not provided notice or other reasonable indication that it intends to terminate the lease agreement, vacate the leased space, or reduce the rent payable or square footage leased under the lease agreement.

"**Partner Base Interest Ratio**" means the percentages of base ownership interest allocated to the Members for purposes of determining the Promote Portion of distributions hereunder. The initial Partner Base Interest Ratios of the Members are as follows:

| | |
|---|---|
| Perkins Member | 51% |
| PF Member | 49% |

"**Perkins Asset Management Agreements**" means, collectively (i) that certain Asset Management Agreement between MFP Mid-America Shopping Centers LLC and Asset Manager of even date herewith, and (ii) that certain Asset Management Agreement between MFP Monument Mall LLC and Asset Manager of even date herewith, pursuant to each of which Asset Manager will manage and oversee the day-to-day management of the Project and proceed with the Project in accordance with the Business Plan and as set forth in the Perkins Asset Management Agreements.

"**Perkins Principal**" shall mean Michael D. Perkins.

"**Person**" means an individual or entity.

"**PF Asset Management Agreements**" means, collectively (i) that certain Asset Management Agreement between MFP Mid-America Shopping Centers LLC and Co-Asset Manager of even date herewith, and (ii) that certain Asset Management Agreement between MFP Monument Mall LLC and Co-Asset Manager of even date herewith, pursuant to each of which Co-Asset Manager will

assist the Asset Manager in the management and oversight of the day-to-day management of the as set forth in the PF Asset Management Agreements.

"**Preferred Return**" means, collectively, Primary Preferred Return and Secondary Preferred Return.

"**Primary Preferred Return**" means, for PF Member and, solely with respect to Default Capital Contributions, Perkins Member, an amount that accrues at the per annum rate specified below, compounded annually, upon the following types of Capital Contributions:

| | |
|---|---|
| Initial Capital Contributions | 10% |
| Approved Additional Capital Contributions | 10% |
| Required Additional Capital Contributions | 0% |
| Default Capital Contributions | 20% |

"**Project**" means, collectively, the eleven Properties commonly referred to as "Cornhusker Portfolio" listed on **Exhibit A**, and as more fully described on **Exhibit B**, which Properties are held by the Subsidiaries. The Project includes, without limitation, the Properties and the other vertical and horizontal Improvements within the Project pursuant to the Business Plan.

"**Project Expenses**" means, for any period, the current obligations of the Company, determined in accordance with sound accounting principles approved by PF Member and applicable to commercial real estate ownership and property management, consistently applied, for expenses of the Project and for capital expenditures not paid from the Members' Capital Contributions. Project Expenses shall include debt service on Company loans (including the Senior Mortgage Loan), any Reserves required by the Senior Mortgage Lender under the Senior Loan Documents, and a working capital amount reasonably required for the operation of the Company, consistent with the Approved Budget and Business Plan. Project Expenses shall not include non-cash expenses such as depreciation or amortization, but shall include (i) the Management Fees, (ii) the legal costs of the Members incurred in connection with the completion of this Agreement and the formation of the Company, and (iii) the Project due diligence and acquisition costs incurred by either Member. The Project Expenses shall be determined collectively across the Project and separately for each Property.

"**Project Revenues**" means, for any period, the gross revenues of the Company arising from the ownership and operation of the Project during such period, including Property rent, proceeds of any business interruption insurance maintained by the Company from time to time and amounts funded from Company reserves (including without limitation working capital reserves (including the Reserves) and Capital Proceeds, but specifically excluding Capital Contributions. The Project Revenues shall be determined collectively across the Project and separately for each Property.

"**Promote Portion**" means with respect to distributions to Perkins Member pursuant to Sections **8.2(g)** and **8.2(h)** and in accordance with the Interim Sharing Ratio and the Residual Sharing Ratio of Perkins Member, the portion of such distributions in excess of the Partner Base Interest Ratio of Perkins Member. For example, (A) if the Interim Sharing Ratio of Perkins Member is 75%, then the Promote Portion thereof is 24% (*i.e.,* 75% less 51%); and (B) if the Residual Sharing Ratio of Perkins Member is 90%, then the Promote Portion thereof is 39% (*i.e.,* 90% less 51%).

"**Property**" and collectively, the "**Properties**" means each of the eleven shopping centers set forth on **Exhibit A** hereto and comprising the Project.

"**Residual Sharing Ratios**" means the percentages in which Members participate in individual distributions arising from Net Distributable Cash under Section **8.2(h)** after prior distributions under Section **8.2**. The initial Residual Sharing Ratios of the Members are as follows:

| | |
|---|---|
| Perkins Member | 90% |
| PF Member | 10% |

The initial Residual Sharing Ratios are subject to adjustment as provided in this Agreement, including without limitation Sections **4.5** and **6.3(a)(ii)**.

"**Secondary Preferred Return**" means, for PF Member, an amount that accrues at the per annum rate specified below, compounded annually, upon the following types of Capital Contributions:

| | |
|---|---|
| Initial Capital Contributions | 8% |
| Approved Additional Capital Contributions | 8% |

"**Senior Loan Documents**" means any and all promissory notes, loan agreements, mortgages, deeds of trust, assignments, and other agreements and instruments evidencing, governing, or securing the Senior Mortgage Loan.

"**Senior Mortgage Lender**" means the lender who made the Senior Mortgage Loan, or its successor in interest.

"**Senior Mortgage Loan**" means the first priority mortgage loan obtained by a Company Entity which is secured by the Project or a portion thereof, including any and all refinancings thereof which may occur from time to time.

"**Subsidiary**" or "**Subsidiaries**" means, each of or collectively (as the context may require) MFP Mid-America Shopping Centers LLC, a Delaware limited liability company, MFP Monument Mall LLC, a Delaware limited liability company and any subsequent subsidiary of the Company formed upon the approval of the Members of the Company.

"**Voluntary Transfer**" means the voluntary Disposition by a Member of all or any portion of the Membership Interests of the Member pursuant to Section **3.2(d)**.

1.2.     In addition to the terms defined in Section **1.1** above, certain terms are defined elsewhere in this Agreement as set forth in the List of Defined Terms above.

## II.
## ORGANIZATIONAL MATTERS: PURPOSE: TERM

2.1.     **Formation of Company.**  The Company has been organized as a Delaware limited liability company by filing a certificate of formation (the "**Certificate**") under the Act.

2.2.     **Name**.  The name of the Company shall be MFP Cornhusker Properties LLC and all Company business must be conducted in that name or such other name as the Manager and PF Member approve.

2.3.     **Registered Office: Registered Agent: Principal Office**.  The registered office and the registered agent of the Company in the State of Delaware shall be as specified in the Certificate or as designated by the Manager with PF Member's approval. The principal office of the Company shall be at

c/o Perkins Properties, 608 North 114th Street, Omaha, Nebraska 68154, or at such other location as the Manager and PF Member approve.

2.4.   **Foreign Qualification**. Before the Company conducts business in any jurisdiction other than Delaware. the Manager shall cause the Company to comply with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Manager, each Member shall execute. acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, or terminate the Company as a foreign limited liability company in all jurisdictions in which the Company may conduct business or shall cease to conduct business, as the case may be.

2.5.   **Purpose and Scope**. The purposes and scope of the Company's activities are strictly limited to (i) acquiring the Project pursuant to the Company's ownership of the Subsidiaries; (ii) as sole member and manager of the Subsidiaries, maintaining, owning and leasing the Properties within the Project, and (iii) performing all other activities reasonably necessary or incidental to the furtherance of such purposes.

2.6.   **Term**. The Company shall commence on the effective date of the Certificate and shall continue to exist until dissolved as herein provided.

2.7.   **Property Ownership and Management**. Pursuant to the Business Plan, the Company's operation and management of the Project and other related activities contemplated by the Business Plan will be completed by Asset Manager and Co-Asset Manager on behalf of the Company pursuant to the Asset Management Agreements. Asset Manager shall be responsible for obtaining on behalf of the Company, all permits, licenses and other approvals required by Governmental Authorities in connection with the ownership and management of the Project by the Company.

2.8.   **Limit of Liability**. Notwithstanding anything to the contrary set forth herein, no Member shall be liable for punitive or consequential damages arising from a claimed breach of this Agreement by any other Member. Pursuant to Section 18-1101 of the Act, the Members shall not owe any fiduciary duties to the Company or to one another; provided, however, that this limitation shall not be construed to limit liability for the specific obligations of the Members set forth in this Agreement or limit the specific remedies for defaults set forth herein. Except as provided in this Agreement, whenever in this Agreement a Member (in its non-managing capacity as a Member) is permitted or required to make a decision affecting or involving the Company, any Member, or any other Person. such Member shall be entitled to consider only such interests and factors as he, she or it desires, including a particular Member's interests, and shall. to the fullest extent permitted by applicable law, have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any Member.

2.9.   **Approvals and Consents**. Items requiring the approval or consent of PF Member or Perkins Member hereunder have been provided solely to enable each said Member to protect itself and its investment in the Company. Each Member acknowledges and agrees that in granting or withholding such approval or consent as a Member, said Member shall have no fiduciary or other obligations to the Company, the Manager. the other Member. any of the Company's creditors or any other Person and, unless otherwise expressly provided, may withhold such approval or consent in its sole and complete discretion.

2.10.   **No State Law Partnership**. The Company shall not be a partnership or joint venture under any state or federal law except for tax purposes. and no Member or Manager shall be a partner or joint venturer of any other Member or Manager for any purposes, and this Agreement may not be construed otherwise.

MFP CORNHUSKER PROPERTIES LLC                    7

III.
## MEMBERSHIP; DISPOSITIONS OF INTERESTS

3.1.     **Members**.  The initial Members of the Company are PF Member and Perkins Member, each of which are admitted to the Company as a Member as of the date hereof.

3.2.     **Dispositions of Membership Interests**.

(a)     **General Prohibition**.  Except as provided in Section **3.2(d)**, or as otherwise expressly provided or permitted by this Agreement, no Member may make a Disposition of any portion of the Membership Interest of the Member.  Any Disposition which is not made pursuant to and in accordance with the terms and conditions of this Agreement shall be void and of no effect and shall vest no right, title or interest in the transferee.  Each Member acknowledges that any Disposition of any portion of its Membership Interest may be subject to additional terms and restrictions imposed by the Company's lender(s), and each Member agrees to abide by all such terms and restrictions and to reimburse the Company for (or pay directly to the lender(s)) any costs or fees charged by such lender(s) in connection with a Disposition.  In addition, no Member shall make any assignment, transfer, or other conveyance directly or indirectly of an interest in said Member without the prior written consent of the other Members, provided, however, that no such consent shall be required with respect to any such assignment, transfer or other conveyance of an interest in said Member to a wholly owned Affiliate of said Member.

(b)     **[Intentionally Omitted.]**

(c)     **[Intentionally Omitted.]**.

(d)     **Voluntary Transfer to Affiliate**.  Notwithstanding the provisions of Section 3.2(a) to the contrary, each of Perkins Member and PF Member may effect a Disposition of their respective Membership Interests to an Affiliate upon written notice to the other Members.

(e)     **Voluntary Transfer Documentation**.  In connection with and as a condition to a Voluntary Transfer under Section **3.2(d)** hereof, the following shall be provided to the non-transferring Member:

(i)     a written agreement of the proposed transferee agreeing to be bound by this Agreement, and

(ii)     if reasonably requested by the non-transferring Member, an opinion of counsel, reasonably satisfactory in form and substance to the non-transferring Member, that the Voluntary Transfer will not terminate the Company or impair its ability to be taxed as a partnership for income tax purposes under the Internal Revenue Code and that the Voluntary Transfer constitutes an exempt transaction that does not require registration under applicable securities laws.

3.3.     **Creation of Additional Membership Interests**.  Except as otherwise provided in Section 4.5 hereof, additional Membership Interests may be created and issued to existing Members or to

other Persons, and such other Persons may be admitted to the Company as Members, (i) as provided in Section 4.5 upon the occurrence of a Removal Event, or (ii) with the approval of Perkins Member and PF Member, on such terms and conditions as the Manager and PF Member may determine at the time of admission. The Manager may reflect the admission of any new Members or the creation of any new class or group of Member in an amendment to this Agreement which shall be valid upon execution by the Manager.

3.4.   **Resignation**. Except as otherwise provided in Section **3.2(d)** hereof, a Member may not resign or withdraw from the Company without the consent of the other Members.

3.5.   **Information**. In addition to the other rights specifically set forth in this Agreement, each Member is entitled to the following information under the circumstances and conditions set forth in the Act: (a) true and full information regarding the status of the business and financial condition of the Company; (b) promptly after becoming available, a copy of the Company's federal, state and local income tax returns for each year; (c) a current list of the name and last known business, residence or mailing address of each Member and Manager; (d) a copy of this Agreement, the Company's certificate of formation, and all amendments to such documents; (e) true and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each Member and which each Member has agreed to contribute in the future, and the date on which each became a Member; and (f) other information regarding the affairs of the Company to which that Member is entitled pursuant to Section 18-305 of the Act (including all Company books and records). Under no circumstances shall any information regarding the Company or its business be kept confidential from PF Member or Perkins Member.

3.6.   **Liability to Third Parties**. No Member shall be liable for the debts, obligations or liabilities of the Company except to the extent expressly agreed to in writing by such Member.

<div align="center">

IV.

**MANAGEMENT OF COMPANY**

</div>

4.1.   **Management**.

(a)   Subject to Section **4.5** hereof, The Manager shall manage the affairs of the Company Entities and make all decisions with regard thereto in accordance with the Business Plan, except where PF Member's approval is required under this Agreement. PF Member shall have sole authority on behalf of the Company Entities to enforce any agreement between a Company Entity and Perkins Member or its Affiliates or between a Company Entity and Asset Manager and its respective Affiliates, and to make all determinations on behalf of the Company Entities with respect thereto, including without limitation with respect to the Perkins Asset Management Agreements.

(b)   No action shall be taken, sum expended, or obligation incurred by the Manager or the Company Entities regarding the matters described below (the "**Major Decisions**") unless it has been approved by PF Member and either the Manager or Perkins Member; provided, however, that from and after the occurrence of a Removal Event with respect to Perkins Member, Major Decisions shall be made by PF Member in its sole discretion:

(i)   <u>Company Asset Conveyances or Financings</u>. Any sale, transfer, lease exchange, grant of option, mortgage, financing or other borrowings.

MFP CORNHUSKER PROPERTIES LLC                    9

hypothecation or encumbrance of all or any material portion of Company Entity assets; provided, however, the Manager may lease portions of the Properties in the ordinary course of business and in accordance with the Business Plan and the Approved Budget;

(ii)   Acquisitions of Assets.  Authorizing, approving, executing or effecting the purchase of any material asset by the Company Entities except in accordance with the Business Plan and the Approved Budget;

(iii)   Financial Affairs of Company.  Making of any expenditure or incurrence of any obligation by or for the Company Entities in excess of $50,000 in any year over any line item set forth in an Approved Budget therefor, in excess of three percent (3%) of any line item or in excess of one percent (1%) of the aggregate amount of the Approved Budget (unless said expenditure in excess of 1% of the aggregate amount of the Approved Budget is expressly set forth in the Approved Budget); however, if emergency repairs to the Project are necessary to avoid imminent danger of injury to the Project or to an individual, the Manager may make such expenditures as may be necessary to alleviate such situation and shall promptly notify PF Member of the event giving rise to such repairs and the actions taken with respect thereto;

(iv)   Additional Capital Contributions.  Any request or call for Additional Capital Contributions, exclusive of the Required Additional Capital Contributions of Perkins Member;

(v)   Business Plan.  Except as expressly provided in Section **4.2**, any amendment, modification or change to the Business Plan;

(vi)   Approved Budget.  Consenting to the Approved Budget or any amendment, modification or change thereto;

(vii)   Bankruptcy.  Filing of any petition or consenting to the filing of any petition that would subject the Company to a Bankruptcy;

(viii)   Affiliate Agreements.  Entering into any agreement with Perkins Member or an Affiliate of Perkins Member except on terms consistent with parties dealing at arm's length and consistent with the Business Plan and Approved Budget; provided, however, that the Perkins Asset Management Agreements are hereby approved by Perkins Member and PF Member;

(ix)   Distributions.  Any distributions of Net Distributable Cash by the Company except in accordance with Sections **8.1** and **8.2**;

(x)   Confessions of Judgment.  Confessing any judgment against the Company;

(xi)   Authority.  Authorizing any merger, consolidation or reorganization of a Company Entity with any company or other Person or otherwise disposing of substantially all of a Company Entity's assets;

MFP CORNHUSKER PROPERTIES LLC          10

(xii)   New Members.  Except as otherwise provided for in this Agreement, admitting a new Member or establishing the terms of such admission;

(xiii)  Litigation.  Instituting, settling or otherwise compromising any legal action or proceeding on behalf of a Company Entity (including submitting a claim to arbitration) that is not covered by insurance and which involves payment by or to a Company Entity of greater than $100,000;

(xiv)   Material Agreements.  Entering into, amending or extending, or waiving of any material default under or relating to, any material agreement between a Company Entity and any Person (including, without limitation, the Manager, Perkins Member and any lender to a Company Entity);

(xv)    Tax Allocations.  Making any elections or other decisions relating to the allocations of Company Entity items of profits, losses, deduction, credit or other tax or accounting matters except to the extent specifically called for in this Agreement;

(xvi)   Dissolution.  Determining whether a Company Entity shall be dissolved pursuant to Article X; and

(xvii)  Other Matters.  Any other action which, considered before the taking thereof, could be reasonably expected to (i) have a material and adverse effect on Company Entity business or affairs; (ii) have a cost or financial impact on a Company Entity in excess of $50,000 in excess of amounts approved pursuant to an Approved Budget; or (iii) cause a Company Entity to be unable to carry on its business in accordance with the Business Plan and/or in accordance with the terms and conditions hereof.

(c)   The Manager shall cause the Company Entities to operate the Project in accordance with the Business Plan and the Approved Budgets and, in coordination with Asset Manager, obtain all required approvals from Governmental Authorities in connection therewith.  The Manager, on behalf of the Entities, shall discharge its duties in a good and proper manner in accordance with industry standards and the terms and conditions of this Agreement.  The Manager shall oversee day-to-day operations of the Company Entities including monitoring the Properties in coordination with Asset Manager.  The Manager, on behalf of the Company Entities, shall in good faith use all commercially reasonable efforts to implement all Major Decisions approved by PF Member, enforce agreements entered into by the Company Entities, and conduct the ordinary business and affairs of the Company Entities in accordance with applicable Governmental Regulations, good industry practice and this Agreement.  Except as provided in the Asset Management Agreements, the Manager shall not delegate any of its rights or powers to manage and control the business and affairs of the Company Entities without the prior written consent of PF Member.

(d)   If Perkins Member and PF Member are unable to agree on the resolution of any Major Decision, either Member, by notice to the other Member, may require the

MFP CORNHUSKER PROPERTIES LLC          11

resolution of the Major Decision to be made by an independent arbitrator specified in that notice. If either Member objects to the independent arbitrator designated therein within three (3) Business Days after it receives such notice and PF Member and Perkins Member fail to agree on an independent arbitrator, then either may request that the Omaha, Nebraska office of the American Arbitration Association (the "**AAA**") designate an independent arbitrator, in which case the selection of the arbitrator by the AAA shall be binding on the parties. The determination of the selected arbitrator shall be final and binding on all parties. The Company shall pay the cost of the arbitration proceeding. The decision of the arbitrator must be the resolution of the Major Decision proposed by either PF Member or by Perkins Member, and shall be rendered within thirty (30) days after the arbitrator's selection. The Company shall commence acting on the arbitrator's determination as to the proper resolution of the Major Decision within three (3) days after such determination is communicated in writing by the arbitrator; provided, however, that in no event shall any Member be required to increase its Capital Contribution as the result of the decision of the arbitrator other than with respect to Required Additional Capital Contributions. Any arbitrator designated in accordance with this Section **4.1(d)** shall have at least ten years of experience in arbitrating disputes similar to those with respect to which the arbitrator is engaged hereunder.

(e)     Items requiring the approval or consent of PF Member or Perkins Member in their capacity as Members hereunder have been provided solely to enable each said Member to protect itself and its investment in the Company. Each Member acknowledges and agrees that in granting or withholding such approval or consent, said Member shall have no fiduciary or other obligations to the Company Entities, the Manager, the other Member, any of the Company Entities' creditors or any other Person and, unless otherwise expressly provided, may withhold such approval or consent in its sole and complete discretion.

4.2.     **Business Plan**.   The Members hereby adopt the business plan attached hereto as Exhibit C ("**Business Plan**"), which contains annual projections through 2024, with said projections to be updated each calendar year (subject to the consent of the Members hereinafter described). The Business Plan outlines the size, mix, projected rent prices and Occupancy of the Properties, and sets forth all estimated costs necessary to own and operate the Project. Timing of projected cash flow and projected net Member distributions are also included in the Business Plan. Any amendment, modification or change to the Business Plan must be approved by the written consent of both Members. Periodically, but not less than quarterly, the Manager, in conjunction with PF Member and in good faith, will review and, if necessary, update the Business Plan. Should the Business Plan require updating, the Manager shall prepare an updated proposed Business Plan and submit the same to PF Member for approval. In addition, following a materially adverse variance with respect to the Project, the Manager shall promptly give notice of the same to PF Member and shall, if PF Member so requests, present to PF Member for approval a revised Business Plan containing a description of the circumstances causing the materially adverse variance in the actual or likely performance of the Project from the provisions of the initial Business Plan delivered prior to the acquisition, the resulting impact on cash flow and other relevant financial and operational issues concerning the Project, a proposed remediation plan, if any, to bring the Project into compliance with the initial Business Plan and revised pro forma financial statements for the Project. The initial Business Plan includes projections for the Project and each Property, determined separately.

4.3.    **Budgets and Reserves**.

(a)    Property Operating Budgets. Each Property shall operate under annual operating budgets consistent with and incorporated into the Business Plan (each, a "**Property Operating Budget**"). Each Property Operating Budget and a consolidated annual operating budget for the entire project (the "**Operating Budget**") shall be prepared by the Manager and submitted to PF Member for approval in writing; provided, however, that so long as the Senior Loan Documents require that the Senior Mortgage Lender review and approve an annual budget for the Project, the approved budget required by the Senior Loan Documents shall take the place of, and shall be deemed to be, the Property Operating Budgets and the Operating Budget, and the Manager shall not be required to prepare any budgets other than the budgets approved annually by the Senior Mortgage Lender. After the annual Property Operating Budgets and the Operating Budget have been approved in writing by PF Member, the Manager shall implement them on behalf of the Company. The Property Operating Budgets and the Operating Budget approved pursuant to the provisions of this Section **4.3** and of Section **4.1(b)(vi)** shall be hereinafter collectively referred to as an "**Approved Budget**". For the year ending December 31, 2014, the Approved Budget shall be deemed to be the 2014 portion of the Business Plan as described in Exhibit D. The Manager shall deliver to PF Member for approval a proposed Property Operating Budget for each Property, as well as a proposed Operating Budget for the entire Project (or in the alternative, the budget which the Manager proposes to submit to the Senior Mortgage Lender for approval, if applicable), by October 15 of the preceding calendar year. PF Member shall review the proposed budget and either approve the proposed budget or provide the Manager with written objections to any elements thereof. If PF Member does not provide any written objection to the proposed budget submitted by the Manager within thirty (30) days after delivery of the proposed budget, the Manager shall re-deliver such proposed budget to PF Member requesting PF Member's response within ten (10) days. If PF Member does not provide any written objection to the proposed budget within such ten (10) day period, the proposed budget shall be deemed approved by PF Member. If any objection is made by PF Member within the aggregate forty (40) day review period, PF Member, Perkins Member, and the Manager shall work in good faith to resolve any objections with reasonable promptness, and in any event so that a proposed budget may be submitted by the Company to the Senior Mortgage Lender before any deadline contained in the Senior Loan Documents, if applicable. If Manager fails to timely submit a proposed Property Operating Budget by the applicable due date, PF Member may elect to prepare such Property Operating Budget for the applicable calendar year and shall give notice to Asset Manager and to Perkins Member upon completion of the same by PF Member.

(b)    Reserves. The Company shall establish and fund such capital and tenant cost replacement reserves as Senior Mortgage Lender may require under the Senior Loan Documents ("the "**Reserves**"). The anticipated amount of such Reserves will be included in each Operating Budget. The Reserves shall be funded, and disbursements shall be made from the Reserves, as provided in the Senior Loan Documents.

4.4.     **Meetings of Members**.

(a)     <u>Regular Meetings</u>.  The Members shall hold quarterly meetings to discuss the Project, and to discuss such other matters regarding Company business as the Members may elect.

(b)     <u>Special Meetings</u>.   Special meetings of the Members may be called by the Manager or by either Member at any time by delivering at least ten (10) Business Days' prior notice thereof to the other Member to discuss such matters regarding Company business as the Members may elect.

(c)     <u>Procedure</u>.  Each Company meeting shall be held at the principal place of business of the Company, unless the Members otherwise agree.  Attendance of a Person at a meeting shall constitute a waiver of notice of such meeting, unless such Person attends the meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. A Person may vote at such meeting by written proxy executed by that Person and delivered to a Manager or Member.  A proxy shall be revocable unless it is stated to be irrevocable.  Any action required or permitted to be taken at such meeting may be taken without a meeting, without prior notice, and without a vote if a consent or consents in writing, setting forth the action so taken, is signed by the Manager and the Members that would be necessary to take the action at a meeting at which all Members were present and voted.  Any meeting may take place by means of telephone conference, video conference, or similar communication equipment by means of which all Persons participating therein can hear each other.

4.5.     **Removal of Manager**.  The Manager may be removed by PF Member as provided herein under any of the following circumstances (a **"Removal Event"**):

(a)     Perkins Member, Asset Manager or Perkins Principal (1) is convicted of, or enters a plea of no contest to, a felony or a criminal act relating to the Project; (2) misappropriates any funds derived from the Project, including insurance proceeds and condemnation awards, (3) commits fraud, material misrepresentation (including material misrepresentation under <u>Schedule 6.1(B)</u>), gross negligence or material misconduct; (4) fails to maintain insurance as required by this Agreement or to pay any taxes or assessments affecting the Project which are not in excess of the line item allocations therefor in the Approved Budget and fails to cure any such matter within fifteen (15) days of written notice of such failure from PF Member; (5) intentionally damages or destroys the Project, or any material part thereof; or (6) commits any other material breach of this Agreement (including without limitation the occurrence of a violation under Sections **3.2** or **4.1**) and fails to cure such other material breach under this Section **4.5(a)(6)** within fifteen (15) days of written notice of said breach from PF Member;

(b)     failure of Perkins Member to timely make an Approved or Required Additional Capital Contribution (for purposes hereof any such Additional Capital Contribution made by a Default Loan to Perkins Member shall constitute a failure to make such Additional Capital Contribution by Perkins Member);

MFP CORNHUSKER PROPERTIES LLC              14

(c)     Bankruptcy of a Company Entity; provided, however, that if said bankruptcy is as a result of the filing of an involuntary petition of bankruptcy, said involuntary petition filing shall not be deemed a Removal Event hereunder if the same is dismissed within ninety (90) days of the filing thereof;

(d)     if Perkins Member takes any actions materially inconsistent with the provisions of Article VII;

(e)     the liquidation or dissolution of Perkins Member or Asset Manager;

(f)     in the event that Michael D. Perkins no longer (i) exercises management control of Perkins Member, or (ii) exercises day-to-day management control of the performance by Asset Manager of its obligations under the Perkins Asset Management Agreements;

(g)     Bankruptcy of Perkins Member, Asset Manager or Perkins Principal (a "**Bankruptcy Removal Event**"); provided, however, that if said bankruptcy is as a result of the filing of an involuntary petition of bankruptcy, said involuntary petition filing shall not be deemed a Removal Event hereunder if the same is dismissed within ninety (90) days of the filing thereof; or

(h)     in the event any of the representations or statements set forth in the Certificate of Principal delivered by Michael D. Perkins are untrue or incorrect in any material and adverse respect (which Certificates of Principal are being delivered on the date hereof in the form attached hereto as Exhibit G).

Upon the occurrence of a Removal Event, PF Member in its sole discretion may remove Perkins Member as the Manager upon written notice to Perkins Member, in which event PF Member may appoint itself, an Affiliate of PF Member, or a third party as Manager, each without the consent of Perkins Member notwithstanding anything contained herein to the contrary, and said replacement Manager shall be deemed admitted as a Member of the Company if PF Member so elects with such share of PF Member's capital and profits interest as PF Member shall determine; (ii) Perkins Member shall forfeit its right to participate in and approve Major Decisions; and (iii) the Residual Sharing Ratio of Perkins Member shall be reduced to the same percentage as its Partner Base Interest Ratio, with a corresponding increase to the Residual Sharing Ratio of PF Member/or replacement Manager appointed by PF Member.

4.6.     **Reimbursement of Expenses**.  Except as otherwise expressly provided herein or in the Approved Budget, no Member shall be reimbursed for any out-of-pocket expenses or other costs incurred by it in conjunction with the business and affairs of the Company.

4.7.     **Compensation to Members or Manager**.  Except as otherwise specifically provided herein or in the Approved Budget, no compensatory payment shall be made by the Company to Manager or to any Member for services to the Company of Manager, any such Member or any member or employee thereof.

4.8.     **Transactions with Affiliates**.

(a)     General.  When any service or activity to be performed on behalf of the Company is performed by an Affiliate of a Member, the fee payable for such service or activity shall not exceed the fee which would be generally payable by

the Company to an unaffiliated third party of comparable standing providing the same services.

(b) <u>Termination of Agreements with Affiliates</u>.  Upon the occurrence of a Removal Event, then the Company may terminate all agreements with Perkins Member's Affiliates, including without limitation the Perkins Asset Management Agreements, and all such agreements must contain a provision that allows for the exercise of the right of termination under this Section **4.8(b)**.  PF Member may enforce this provision on behalf of the Company.

4.9.     **Insurance**.  Perkins Member shall cause the Company Entities to maintain, at Company Entity expense as part of the Approved Budget, such insurance coverage as may be required from time to time by the Senior Mortgage Lender under the Senior Loan Documents.  Perkins Member may cause its obligations under this Section **4.10** to be satisfied in whole or in part by causing Asset Manager to obtain said insurance on behalf of the Company Entities, including, without limitation, the insurance described in Section 15 of the Perkins Asset Management Agreements.  To the extent Perkins Member fails to maintain the insurance required to be carried under this Agreement, then PF Member may, at its option and without obligation obtain or maintain such insurance in the name of the Company Entities and the Company Entities shall promptly reimburse PF Member for all out of pocket costs incurred in connection therewith; provided, however, that the retention of such coverage by PF Member shall not affect the classification of such omission by Perkins Member as a Removal Event pursuant to the provisions of Section 4.5.  Deductibles on insurance coverage may be obtained to the extent permitted by the Senior Loan Documents, and in the event of a claim under any such insurance coverage the amount of such deductible shall be treated as a Project Expense.

4.10.     **Conflicts of Interest**.  Subject to the other express provisions of this Agreement, including without limitation Section **4.12**, each Member, Manager, and Officer or Affiliate thereof may engage in and possess interests in other business ventures of any and every type and description, independently or with others, with no obligation to offer to the Company or any other Member, Manager, Officer or Affiliate the right to participate therein or to account therefor.  The Company may transact business with any Member, Manager, and Officer or Affiliate thereof, provided the terms of those transactions are no less favorable than those the Company could obtain from unrelated third parties.

4.11.     **Loan Obligations**.  Perkins Member shall arrange any guarantees from an Affiliate of Perkins Member necessary to obtain any loan or other financing contemplated by the Business Plan and arrange any guarantees, credit enhancements, bonding or warranties from an Affiliate of Perkins Member in favor of or required by Governmental Authorities, lenders or other third parties in connection with the Business Plan and the ownership and operation of the Project; provided, however, that any such bonds or warranties duly approved in accordance with the terms of this Agreement shall constitute the obligations of the Company to the extent provided in the documents creating such obligations.  Perkins Member and PF Member hereby agree that portions of the Project may be utilized as security in connection with any such obligations, and the Project, or portions thereof, will be used as security for the Senior Mortgage Loan.

4.12.     **Buy-Sell Rights**.

(a) <u>Exercise</u>. Upon the occurrence of a Buy-Sell Event (as defined below), a Member (the "**Initiating Member**" may exercise the buy-sell rights under this Section **4.12** by giving notice to the other Member (the "**Responding Member**", stating therein the aggregate dollar amount (the "**Valuation Amount**") that the Initiating Member would be willing to pay for the assets of the Company as of the Closing Date (defined below) free and clear of all liabilities. After receipt of such notice

the Responding Member shall elect to either (1) sell its entire Membership Interest to the Initiating Member for an amount equal to the amount the Responding Member would have been entitled to receive if the Company had sold its assets for the Valuation Amount on the Closing Date (as hereinafter defined) and the Company had immediately paid all Company liabilities and Imputed Closing Costs and distributed the net proceeds of sale to the Members in satisfaction of their interests in the Company pursuant to Article 10, or (2) purchase the entire Membership Interest of the Initiating Member for an amount equal to the amount the Initiating Member would have been entitled to receive if the Company had sold all of its assets for the Valuation Amount on the Closing Date and the Company had immediately paid all Company liabilities and Imputed Closing Costs and distributed the net proceeds of the sale to the Members in satisfaction of their interests in the Company pursuant to Article 10. The Responding Member shall have thirty (30) days from the giving of the Initiating Member's notice in which to exercise either of its options by giving written notice to the Initiating Member. If the Responding Member does not elect to acquire the Initiating Member's Membership Interest within such time period, the Responding Member shall be deemed to have elected to sell its interest to the Initiating Member. Within three (3) Business Days after an election has been made or deemed made under this Section **4.12**, the acquiring Member shall deposit with the selling Member a non-refundable earnest money deposit in the amount of one percent (1%) of a reasonable estimate of the amount the selling Member is entitled to receive for its Membership Interest under this Section **4.12**, which amount shall be applied to the purchase price at closing; however, if the acquiring Member should thereafter fail to consummate the transaction, such amount shall be retained by the selling Member, free of all claims of the other Member, but shall not constitute a waiver of any rights and remedies otherwise available to the selling Member because of a default by the acquiring Member.

(b)     Closing. The closing of an acquisition pursuant to this Section **4.12** shall be held at the principal place of business of the Company on a mutually acceptable date (the "**Closing Date**") not later than one hundred eighty (180) days after Responding Member's election, deemed or otherwise. At the Closing of the disposition and acquisition of such interests the following shall occur:

(i)      The selling Member shall assign to the acquiring Member or its designee the selling Member's Membership Interest in accordance with the instructions of the acquiring Member, and shall execute and deliver to the acquiring Member all documents which may be required to give effect to the disposition and acquisition of such interests, in each case free and clear of all liens, claims, and encumbrances, with covenants of general warranty; and

(ii)     The acquiring Member shall pay to the selling Member the consideration therefor. Twenty percent (20%) of such consideration shall be paid in cash at closing, with the balance to be paid, with interest at a rate of 18% per annum, compounded annually, over a period equal to the lesser of (A) five (5) years, or (B) the period commencing on the Closing Date and ending on the date that is ten (10) years after the date hereof. Payments shall be in equal annual installments. Such obligations, which shall be fully pre-payable without penalty, shall be evidence by a

promissory note delivered at Closing and secured by the Membership Interest acquired.

(c)     Enforcement. It is expressly agreed that the remedy at law for breach of the obligations of the Members set forth in this Section 4.12 is inadequate in view of (a) the complexities and uncertainties in measuring the actual damage to be sustained by reason of the failure of a Member to comply fully with such obligations, and (b) the uniqueness of the Company business and the Members' relationships. Accordingly, each of such obligations shall be, and is hereby expressly made, enforceable by a specific performance.

(d)     Buy-Sell Events. A "**Buy-Sell Event**" shall mean the occurrence of any one or more of the following events:

    (i)     the passing of ten (10) years from the date of this Agreement;

    (ii)    a Removal Event arising under Section 4.5, in which case the ability to initiate a Buy-Sell shall belong to PF Member;

    (iii)   the termination of an Asset Management Agreement for "cause", in which case the ability to initiate a Buy-Sell shall belong to the Member that is not the Affiliate of the terminated Asset Manager or Co-Asset Manager, as applicable; and

    (iv)    PF Member (A) is convicted of, or enters a plea of no contest to, a felony or a criminal act relating to the Project, (B) misappropriates any funds derived from the Project, including insurance proceeds and condemnation awards, (C) commits fraud, material misrepresentation, gross negligence or material misconduct; (D) intentionally damages or destroys the Project, or any material part thereof; or (E) commits any other material breach of this Agreement and fails to cure such other material breach within fifteen (15) days of written notice of said breach from Perkins Member, in which case the ability to initiate a Buy-Sell shall belong to Perkins Member.

4.13.   **Right to Market.**

(a)     Exercise. Upon the occurrence of a Removal Event arising under Section 4.5, PF Member may elect to offer its Membership Interest or cause the Company to offer all or any portion of the Project for sale on specified terms or to accept from an unaffiliated purchaser a bona fide written cash offer (*i.e.*, not seller financed) for the purchase of the Project on terms which such PF Member desires for the Company to accept (such specified terms or bona fide offer being herein called the "**Offer**") by providing notice of the terms of such Offer (the "**Sale Notice**") to Perkins Member. The price in such Offer must be in an amount at least equal to the amount of any indebtedness secured by the Project or portion thereof subject to the Offer (the "**Offered Project**") plus the aggregate then-existing unreturned Capital Contributions and Default Preferred Return (if any) with respect to the Offered Project.

(b)     <u>Response</u>. Perkins Member shall have 20 days from the date of the Sale Notice (the "**Response Period**") to provide notice to PF Member of its willingness or unwillingness to make or accept the Offer. Failure to timely deliver such notice shall constitute a deemed election by Perkins Member not to exercise its right to accept the terms of the Offer.

   (i)     <u>Acceptance by Perkins Member of Offer</u>. If Perkins Member accepts the terms of the Offer, PF Member shall sell to Perkins Member, in which case Perkins Member must purchase PF Member's Membership Interest for an amount equal to the amount that would be distributable to PF Member if the Company had accepted the Offer and closed the sale pursuant to such Offer and wound up its affairs pursuant to Article 10. For purposes of the foregoing calculation, the purchase price for such sale shall be reduced by an amount equal to title insurance premiums, survey costs, brokerage commissions (not to exceed 1% of the purchase price), transfer tax and other commercially reasonable closing costs that would normally be incurred by the Company if the Offered Project was sold for such purchase price ("**Imputed Closing Costs**"). Perkins Member shall pay PF Member for its Membership Interest on the same terms set forth in Section **4.12(b)(ii)** above.  Closing shall take place within 180 days after the Sale Notice. If PF Member or Perkins Member defaults at closing, the non-defaulting party shall have the right to bring suit for damages, for specific performance, or exercise any other remedy available at law or in equity. Upon payment at closing, PF Member shall execute and deliver all documents reasonably required to transfer the interest being sold.  A condition of the closing of such a sale by PF Member to Perkins Member shall be the receipt by PF Member of a full and complete release of PF Member from all liabilities of PF Member pertaining to the indebtedness of the Company related to the Offered Project.  In the event that said release is not obtained on or before the closing date, then Perkins Member shall be deemed to have consented to sell the Offered Project upon the Specified Terms in accordance with the procedures set forth in Section **4.13(b)(ii)** below.

   (ii)    <u>Non-Acceptance by Perkins Member of Offer</u>. If Perkins Member does not exercise its right to accept the terms of the Offer (or is deemed not to have exercised such right), then PF Member shall be allowed to offer and sell its Membership Interest or the Offered Project for cash on the terms of the Offer for a period of up to one (1) year following the expiration of the Response Period. If PF Member is unable to obtain a bona fide contract to sell the Offered Project on such terms within such one-year period, then PF Member must again submit an Offer to Perkins Member under the terms of this Section 4.13 before it may sell the Offered Project.

V.
## ACCOUNTING AND REPORTING

5.1.    **Fiscal Year, Accounts, Reports**.

(a)    The fiscal year-end of the Company shall be the calendar year.

(b)    The books of account of the Company Entities, at Company expense, shall be kept and maintained by the Manager in accordance with the equity method of accounting based upon generally accepted accounting principles applied on a consistent basis applicable to commercial property ownership. The Manager shall prepare a reconciliation of such books and records to cash receipts and disbursements. The books of account shall be kept at the principal place of business of the Company, and shall at all times, upon reasonable notice, be available for inspection by PF Member.

(c)    The Manager shall, at its expense, furnish to the Members (i) on or before thirty (30) days of each fiscal quarter (including each year-end fiscal quarter): (A) an unaudited statement setting forth and describing in reasonable detail the receipts and expenditures of the Company Entities during the preceding quarter and comparing the results of operations of the Company for such quarter and for the year to date to the appropriate Approved Budget together with a narrative summary of property operations for said preceding quarter, (B) if requested by PF Member, a projected cash flow analysis for the next four (4) calendar quarters; and (C) an internally prepared income statement and balance sheet of the Company Entities dated as of the end of such fiscal quarter reflecting the operating performance and financial condition of the Company in accordance with GAAP for and as of such quarter, and shall include a statement of the Members' Capital Accounts, Approved Additional Capital Contribution Balances, Capital Contribution Primary Preferred Return Balances, Capital Contribution Secondary Preferred Return Balances, Initial Capital Contribution Balances, Default Capital Contribution Balances, Default Capital Contribution Preferred Return Balances, a statement of Net Distributable Cash, a projected cash flow analysis for the remainder of the Project by fiscal year and a statement setting forth the Profits and Losses of the Company Entities for such fiscal quarter. In addition, on or before sixty (60) days after the end of each fiscal year, the Manager shall, at its expense, furnish to the Members an income statement and balance sheet of the Company Entities dated as of the end of such fiscal year and referencing all of the information mentioned above with respect to the Company Entities, such income statement and balance sheet reflecting the operating performance and financial condition of the Company Entities in accordance with GAAP for and as of such fiscal year, to be audited by an independent firm of certified public accountants as selected by PF Member if PF Member so requests (with any such audit requested by PF Member to be at PF Member expense). Further, from time to time, the Manager shall provide all other information relating to the Company Entities and its business and affairs reasonably requested by any Member.

(d)    On at least a monthly basis, the Manager shall meet with the leasing agent(s) for the Properties and both of the Members to review status reports outlining leasing

progress and Occupancy for the Project, which meeting may be held by telephone conference.

(e) Each Member, at its expense, may at all reasonable times during usual business hours, audit the accounts, books and records of the Company Entities. Such right may be exercised by any Member, or by its designated agents or employees.

5.2. **Bank Accounts**. The Manager shall open and maintain bank accounts of the Company Entities in accordance with the cash management system required by the Senior Mortgage Lender under the Senior Loan Documents.

## VI.
## CAPITAL CONTRIBUTIONS

6.1. **Initial Capital Contributions**. Upon satisfaction of the conditions for contribution of the Initial Capital Contribution by PF Member set forth in Schedule 6.1(A) and upon PF Member's receipt of written confirmation from Perkins Member that the representations and warranties set forth in Schedule 6.1(B) are true and correct in all material respects on and as of the date of PF Members' Initial Capital Contribution (which confirmation shall be deemed given by Perkins Member upon execution hereof), the Members shall make Initial Capital Contributions ("**Initial Capital Contributions**") as follows:

(a) The Initial Capital Contributions of Perkins Member, consisting of the contribution of the Properties to the Subsidiaries by conveyance of title thereto, was contributed as of the date hereof.

(b) The Initial Capital Contribution of PF Member shall be contributed in the form of (i) the conversion of all amounts advanced under that certain Promissory Note issued to PF Member by Perkins, L.L.C. dated August 29, 2013 in the original principal amount of $650,000.00 (the "**Perkins Note**") and accrued interest thereunder as of the date of the admission of PF Member to the Company; and (ii) cash contributed concurrently with admission of PF Member to the Company. The initial capital funded by PF Member will be up to $5 million total investment, inclusive of deposits and costs. Upon admission of PF Member as Member of the Company, the Perkins Note shall be deemed paid in full and PF Member shall return the original Perkins Note to Perkins Principal marked "Paid in Full."

Notwithstanding the foregoing, the Members agree and acknowledge that PF Member's maximum Initial Capital Contribution shall equal the lower of (i) $5,000,000 or (ii) the Reduced Maximum PF Initial Investment (as defined below) and any capital required in excess of PF Member's maximum Initial Capital Contribution shall be contributed by the Members in the form of an Approved Additional Capital Contribution or a Required Capital Contribution, as applicable. If the Approved Budget agreed to by both Members reflects less than $5,000,000 of new capital (in the form of PF Member's Initial Capital Contribution) is required, then PF Member shall (A) contribute as its Initial Capital Contribution such lower amount (which shall not be less than $2,000,000 unless expressly agreed to in writing by the Members) (the "**Reduced Maximum Initial Investment**"); and (B) pay to Perkins Member an amount equal to 50% of the difference between $5,000,000 and the Reduced Maximum Initial Investment, provided that if both Members expressly agree in writing that the Reduced Maximum Initial Investment shall be less than $2,000,000, the amount payable under this clause (B) shall equal $1,500,000 (i.e., 50%

of the difference between $5,000,000 and $2,000,000), plus 100% of the difference between $2,000,000 and the Reduced Maximum Initial Investment.

6.2. **Additional Capital Contributions**.

(a) _Approved Additional Capital Contributions_. To the extent Additional Capital Contributions are expressly approved in the Business Plan by each of the Members pursuant to an Approved Budget or approved in writing in their respective sole discretion, the Members shall make said Approved Additional Capital Contributions to the Company in proportion with their respective Capital Sharing Ratios and in accordance with the requirements set forth in the Business Plan and Approved Budget ("**Approved Additional Capital Contributions**").

(b) _Required Additional Capital Contributions_. Perkins Member shall be unilaterally required to make Additional Capital Contributions to the Company to cover Cost Overruns that are not approved in advance in writing by the Members in their respective sole discretion ("**Required Additional Capital Contributions**"). Such Required Additional Capital Contributions shall be made by Perkins Member as and when required to cover said Cost Overruns, and if not so made by Perkins Member, PF Member may give notice to Perkins Member of the amount of Required Additional Capital Contributions so required and Perkins Member shall make such Required Additional Capital Contributions to the Company in the amount set forth in said notice within thirty (30) days after written notice is given, or as soon as reasonably practicable in the case of Cost Overruns incurred in an emergency. Such capital calls by PF Member for Required Additional Capital Contributions shall be solely within the discretion of PF Member, and no third party shall have any right to compel any such call for Required Additional Capital Contributions. Perkins Member acknowledges its obligation to make Required Additional Capital Contributions as a primary obligation notwithstanding any obligations of the Asset Manager; provided, however, that in the event Asset Manager so covers the Cost Overruns pursuant to the Perkins Asset Management Agreements and if the Asset Manager is the same entity as or is a controlled Affiliate of Perkins Member at the time of such payment, such payment shall be deemed a Required Additional Capital Contribution. PF Member shall have no obligation to make Required Additional Capital Contributions.

6.3. **Failure to Make Contributions**.

(a) Any Member which fails to timely contribute all or any portion of any Capital Contribution which said Member is required to contribute to the Company hereunder shall be considered a "**Delinquent Member**". The Company may, upon notice to a Delinquent Member, exercise any one or more of the following rights or remedies:

(i) permit the non-Delinquent Members which elect to do so, in proportion to their respective Capital Sharing Ratios or in such other percentages as they may agree (the "**Lending Members**", whether one or more), to advance that portion of the Capital Contribution that is in default, as a loan (a "**Default Loan**") with the following results:

MFP CORNHUSKER PROPERTIES LLC          22

(1)    the sum thus advanced shall constitute a loan to the Delinquent Member;

(2)    such loan and all accrued unpaid interest thereon shall be due six (6) months after such advance is made;

(3)    the loan shall bear interest at the Interest Rate from the date made until the date fully repaid;

(4)    all Company distributions and other payments that otherwise would be made to the Delinquent Member (whether before or after dissolution of the Company) under this Agreement shall be paid to the Lending Members until the loan and all interest accrued thereon is paid in full (with all such payments being applied first to accrued and unpaid interest and then to principal);

(5)    the payment of the loan shall be secured by security interest in the delinquent Member's Membership Interest as set forth in Section **6.3(b)**; and

(6)    the Lending Members may, in addition to the other rights granted herein, take such action as they may deem appropriate to obtain payment of the loan at the expense of the Delinquent Member;

(ii)    permit the non-Delinquent Member to elect (A) not to make its share (if any) of any Capital Contribution, in which case any portion of its share of any such Capital Contribution already contributed to the Company shall be returned to it, or (B) to contribute its share (if any) of any Capital Contribution and all, none or any portion of the Delinquent Member's Capital Contribution ("**Default Capital**"), in which case (i) all such Capital Contributions made by the non-Delinquent Member (including the non-Delinquent Member's Capital Contribution) shall constitute "**Default Capital Contributions**" by the non-Delinquent Member, which shall accrue Default Preferred Return in accordance with the terms hereof; and the Residual Sharing Ratio of the Delinquent Member shall be reduced by an amount equal to two (2) times a fraction, the numerator of which is the amount of the contribution which the Delinquent Member failed to make and the denominator of which is the sum of all Capital Contributions to the Company; and

(iii)    pursue all other available rights or remedies.

If any Member other than PF Member is a Delinquent Member, then exercise of the foregoing remedies shall be determined by PF Member in its sole discretion. If PF Member is a Delinquent Member, then exercise of the foregoing remedies shall be determined by Perkins Member in its sole discretion.

(b)    Each Member hereby grants to the other Member and the Company, equally and ratably, a security interest in its Membership Interest to secure performance of its obligation(s) under Sections **6.2(a)** and **6.3** (collectively, the "**Secured**

MFP CORNHUSKER PROPERTIES LLC      23

**Obligations"**).  Upon any default in the Secured Obligations, the Persons to whom such obligations are owed (each, a **"Secured Party"**) shall have all the rights and remedies of a secured party under the Uniform Commercial Code with respect to the security interest granted herein, and the proceeds arising from any foreclosure of the security interest herein granted may be applied to attorneys' fees and expenses incurred by the Secured Party in exercising such rights and remedies.  Each Member shall execute and deliver to the other Member and to the Company all such financing statements and other instruments as may be requested by the other Member to evidence the security interest provided for herein.  This Agreement may serve as the necessary financing statement, or the Manager or the Lending Member may execute and file a financing statement on behalf of the other Member and the other Member hereby appoints the Manager and the Lending Member as its attorney-in-fact to execute such financing statements and other instruments as may be necessary to evidence or continue the perfection of the security interest herein granted.  Such power of attorney is coupled with an interest and is irrevocable.

6.4.     **Return of Contributions**.  Except as expressly provided herein, no Member shall be entitled to (a) the return of any part of its Capital Contributions, (b) any interest in respect of any Capital Contribution, or (c) the fair market value of its Membership Interest in connection with a withdrawal from the Company or otherwise.  Unrepaid Capital Contributions shall not be a liability of the Company or of any Member.  No Member shall be required to contribute or lend any cash or property to the Company to enable the Company to return any Member's Capital Contribution to the Company.

6.5.     **Member Loans**.  If the Company shall have insufficient cash to pay its obligations, any Member, with the written approval of the other Member and the Manager, may advance such funds for the Company on such terms and conditions as the lending Member and the other Member may determine (**"Member Loan"**).  Each such advance shall constitute a loan from such Member to the Company and shall not constitute a Capital Contribution.

6.6.     **Balances**.  The Company's books and records shall contain entries indicating the type and amount of Capital Contributions made to the Company and the Preferred Return thereon.  When used herein, the following terms shall refer to the following balances:

**"Approved Additional Capital Contribution Balance"** means, for each Member, the cumulative Approved Additional Capital Contributions of that Member less the cumulative distributions to that Member in return thereof pursuant to Section **8.2**.

**"Capital Contribution Primary Preferred Return Balance"** means, for PF Member, the cumulative accrued Primary Preferred Return of PF Member on the balance of its Initial Capital Contribution Balance plus its Approved Additional Capital Contribution Balance, less all amounts distributed by the Company to PF Member in prior fiscal years in payment thereof pursuant to Section **8.2**.

**"Capital Contribution Secondary Preferred Return Balance"** means, for PF Member, the cumulative accrued Secondary Preferred Return of PF Member on the balance of its Initial Capital Contribution Balance plus the balance of its Approved Additional Capital Contribution Balance, less all amounts distributed by the Company to PF Member in prior fiscal years in payment thereof pursuant to Section **8.2**.

"**Default Capital Contribution Balance**" means, for each Member, the cumulative Default Capital Contributions of that Member, less the cumulative distributions to that Member in return thereof pursuant to Section **8.2**.

"**Default Capital Contribution Preferred Return Balance**" means, for each Member, the cumulative accrued Preferred Return of that Member on the balance of its Default Capital Contribution Balance less all amounts distributed by the Company to that Member in payment thereof pursuant to Section **8.2**.

"**Initial Capital Contribution Balance**" means, for each Member, the total Initial Capital Contributions of that Member, less the cumulative distributions to that Member in prior fiscal years in return thereof pursuant to Section **8.2**.

6.7.    **Excess Committed Capital**.  If the Members have established a Reduced Maximum Initial Investment for PF Member pursuant to the last paragraph of Section **6.1**, an amount equal to 50% of the difference between $5,000,000 and the Reduced Maximum Initial Investment (or, if the Reduced Maximum Initial Investment is agreed to be less than $2,000,000, an amount equal to $1,500,000) shall be deemed "Excess Committed Capital". If, on the date hereof or within two years of the date hereof, the "Excess Committed Capital Milestone" (as defined below) is achieved, then PF Member shall pay to Perkins Member an amount equal to the Excess Committed Capital. For purposes of this Section 6.7, the "Excess Committed Capital Milestone" shall mean the achievement of each of the following: (a) the Monument Mall Property is sold or otherwise removed from the Project, or MFP Monument Mall LLC obtains refinancing of the loan currently secured by the Monument Mall Property on terms acceptable to PF Member; (b) the aggregate Occupancy of the Mid-America Properties equals 87% or more, and based on the Business Plan, Occupancy of the Mid-America Properties is not projected to decrease below 87% within the succeeding twelve (12) months; and (c) the aggregate Net Operating Income of the Mid-America Properties over the preceding twelve-month period is at least $5,631,000.

VII.
**SEPARATENESS FROM AFFILIATES; BANKRUPTCY**

7.1.    **Separateness from Affiliates**.  Notwithstanding anything in this Agreement to the contrary, unless otherwise provided pursuant to the written consent or written direction of PF Member, the Members and Manager shall endeavor to cause the Company to:

(a)     be and remain solvent and pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due, and maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(b)     correct any known misunderstanding regarding the separate identity of the Company, Perkins Member and PF Member;

(c)     maintain its accounts, books and records separate from any other Person and file its own tax returns, except to the extent that it is required to file consolidated tax returns by law;

(d)     maintain its own records, books, resolutions and agreements;

(e)     (i) not commingle its funds or assets with those of any other Person and (ii) not participate in any cash management system involving the commingling of funds with any other Person; provided, however, that the foregoing shall not be deemed to prohibit the cash management system required under the Senior Loan Documents;

(f)     hold its assets in its own name or in the name of a wholly owned subsidiary;

(g)     conduct its business in its name or in a name franchised or licensed to it by an entity other than an Affiliate of Company;

(h)     maintain its financial statements, accounting records and other entity documents separate from any other Person and not permit its assets to be listed as assets on the financial statement of any other entity except as required by GAAP; provided, however, that any consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(i)     pay its own liabilities and expenses, including the salaries of its own employees, out of its own funds and assets, and have maintained and maintain a sufficient number of employees in light of its contemplated business operations, all in accordance with the Business Plan;

(j)     observe all partnership, corporate or limited liability company formalities, as applicable;

(k)     have no indebtedness other than as expressly approved in the Business Plan and in no event in excess of $52,000,000.00, exclusive of funding for future reserves;

(l)     except as expressly set forth in the Business Plan, not assume or guarantee or become obligated for the debts of any other Person without the prior written approval of PF Member or hold out its credit as being available to satisfy the obligations of any other Person;

(m)     not acquire obligations or securities of its Members or of any Affiliate;

(n)     allocate fairly and reasonably any overhead expenses that are shared with any Affiliate, including, but not limited to, paying for shared office space and services performed by any employee of an Affiliate;

(o)     maintain and use separate stationery, invoices and checks bearing its name, with the stationery, invoices, and checks utilized by the Company and its Affiliates or utilized to collect their funds or pay their expenses to bear their own name and not bear the name of any other entity unless such entity is clearly designated as being the agent of the Company or its Affiliates, as applicable;

(p)     not pledge its assets for the benefit of any other Person;

*MFP CORNHUSKER PROPERTIES LLC*          26

(q)    hold itself out and identify itself as a separate and distinct entity under its own name or in a name franchised or licensed to it by an entity other than an Affiliate of Company and not as a division or part of any other Person;

(r)    maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(s)    not make loans to any Person or hold evidence of indebtedness issued by any other Person or entity (other than cash and investment grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity or other than as expressly set forth in the Business Plan);

(t)    not identify its partners or Members, or any Affiliate of any of them, as a division or part of it, and not identify itself as a division of any other Person;

(u)    not enter into or be a party to, any transaction with its Members or Affiliates except (i) in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and are no less favorable to it than would be obtained in a comparable arm's length transaction with an unrelated third party, and (ii) in connection with this Agreement; and

(v)    comply with all of the terms and provisions contained in its organizational documents.

7.2.    **Bankruptcy and Insolvency Proceedings**. Without the written consent of PF Member, no Member, Manager, officer or employee (if any) of the Company shall cause any Company Entity to file or consent to the filing of any bankruptcy or insolvency petition or otherwise institute insolvency proceedings.

VIII.
## DISTRIBUTIONS

8.1.    **Distributions in General**. Subject to any restrictions contained in the Senior Loan Documents, the Manager shall distribute the Net Distributable Cash of the Company on an annual basis in the manner set forth in Section **8.2**; provided, however, that PF Member may require the Company to make more frequent distributions of Net Distributable Cash (but in no event more than once per month) upon ten (10) days' written notice to the Manager.

8.2.    **Distribution of Net Distributable Cash**. The Net Distributable Cash shall, subject to Section **6.3**, be distributed to the Members in the following order of priority:

(a)    first, to the Members *pari passu* in payment of their Default Preferred Returns until their Default Capital Contribution Preferred Return Balances have been reduced to zero;

(b)    next, to the Members in proportion to and in return of their Default Capital Contributions until their Default Capital Contribution Balances have been reduced to zero;

MFP CORNHUSKER PROPERTIES LLC    27

(c)    next to PF Member in payment of amounts distributable to PF Member in previous years under subsections **(d)**, **(e)** and **(f)** of this Section **8.2** but not previously distributed;

(d)    next, to PF Member in payment of its Primary Preferred Return on its Initial Capital Contribution and its Approved Additional Capital Contributions until its Capital Contribution Primary Preferred Return Balance has been reduced to zero;

(e)    next, to PF Member in return of its Initial Capital Contribution and its Approved Additional Capital Contribution in an amount of up to, but not exceeding, $1,000,000 per fiscal year (or such lesser amount as may be outstanding in PF Member's Initial Capital Contribution Balance and Approved Additional Capital Contribution Balance);

(f)    next, to PF Member in payment of its Secondary Preferred Return on its Initial Capital Contribution and its Approved Additional Capital Contributions until its Capital Contribution Secondary Preferred Return Balance has been reduced to zero;

(g)    next, to Perkins Member an amount equal to the distribution to PF Member under subsection **(f)** of this Section **8.2**, multiplied by a ratio, the numerator of which equals Perkins Member's Interim Sharing Ratio and the denominator of which equals PF Member's Interim Sharing Ratio; and

(h)    thereafter, to the Members in accordance with their respective Residual Sharing Ratios (*i.e.,* 90% to Perkins Member and 10% to PF Member initially).

Distributions to Perkins Member under subsections **(g)** and **(h)** above shall first be in return of its Initial Capital Contribution Balance until its Initial Capital Contribution Balance has been reduced to zero, and then in return of its Approved Additional Capital Contribution Balance until its Approved Additional Capital, and then in return of its Required Additional Capital Contribution Balance until its Required Additional Capital Contribution Balance has been reduced to zero.

IX.
**CAPITAL ACCOUNTS, ALLOCATIONS, AND TAX MATTERS**

9.1.   **Definitions**.  The following terms shall have the following meanings:

(a)    "**Adjusted Capital Account**" means, with respect to a Member, such Member's Capital Account as of the end of each fiscal year, as the same is specially computed to reflect the adjustments required or permitted to be taken into account in applying Regulations Section 1.704-1(b)(2)(ii)(d) (including adjustments for Company Minimum Gain and Member Nonrecourse Debt Minimum Gain).

(b)    "**Adjusted Capital Account Deficit**" means, for each Member, the deficit balance, if any, in that Member's Adjusted Capital Account.

(c)    "**Capital Account**" shall have the meaning set forth in Section **9.2**.

MFP CORNHUSKER PROPERTIES LLC            28

(d)     "**Code**" means the Internal Revenue Code of 1986, as amended from time to time, and any corresponding provisions of succeeding law.

(e)     "**Depreciation**" means, for each taxable year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for the year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of the year or other period. Depreciation will be an amount which bears the same ratio to the beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for the year or other period bears to the beginning adjusted tax basis, provided that if the federal income tax depreciation, amortization, or other cost recovery deduction for the year or other period is zero. Depreciation will be determined with reference to the beginning Gross Asset Value using any reasonable method selected by the Manager with the consent of PF Member.

(f)     "**Gross Asset Value**" has the meaning assigned to it in Section 9.3.

(g)     "**Partner Nonrecourse Debt**" has the meaning assigned to it in Regulations Sections 1.704-2(b)(4) and 1.752-2.

(h)     "**Partner Nonrecourse Debt Minimum Gain**" has the meaning assigned to it in Regulations Section 1.704-2(i)(2) and will be determined in accordance with Regulations Section 1.704-2(i)(3).

(i)     "**Partner Nonrecourse Deductions**" has the meaning assigned to it in Regulations Section 1.704-2(i)(2).

(j)     "**Partnership Minimum Gain**" has the meaning assigned to it in Regulations Section 1.704-2(d).

(k)     "**Profits**" and "**Losses**" mean, for each taxable year or other period, an amount equal to the Company's taxable income or loss for the year or other period, determined in accordance with Section 703(a) of the Code (including all items of income, gain, loss or deduction required to be stated separately under Section 703(a)(1) of the Code), with the following adjustments:

    (i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses will be added to taxable income or loss;

    (ii)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Section 705(a)(2)(B) expenditures under Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses, will be subtracted from taxable income or loss;

    (iii)   Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Gross Asset Value of the

MFP CORNHUSKER PROPERTIES LLC          29

property, notwithstanding that the adjusted tax basis of the property differs from its Gross Asset Value;

(iv) In lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there will be taken into account Depreciation for the taxable year or other period;

(v) Any items which are specially allocated under Sections **9.4(c)** or **9.4(d)** will not affect calculations of Profits or Losses; and

(vi) If the Gross Asset Value of any Company asset is adjusted under Section **9.3(b)** or **9.3(c)**, the adjustment will be taken into account as gain or loss from disposition of the asset for purposes of computing Profits or Losses.

(l) "**Regulations**" means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code. All references herein to sections of the Regulations shall include any corresponding provisions of succeeding, similar, substitute proposed or final Regulations.

(m) "**Regulatory Allocations**" has the meaning assigned to it in Section **9.4(d)**.

9.2. **Capital Accounts**.

(a) Establishment and Maintenance.    A separate capital account ("**Capital Account**") will be maintained for each Member.  The Capital Account of each Member will be determined and adjusted as follows:

(i) Each Member's Capital Account will be credited with the Member's Capital Contributions (measured by the Gross Asset Value of any contributed property), the Member's distributive share of Profits, any items in the nature of income or gain that are specially allocated to the Member under Sections **9.4(b)(iii)**, **9.4(c)** or **9.4(d)**, and the amount of any Company liabilities that are assumed by the Member or secured by any Company property distributed to the Member.  PF Member tax basis shall include a minimum of $30 million relating to the allocated basis from outstanding senior debt of MFP Mid-America Shopping Centers LLC.  Any tax basis for the debt of MFP Mid-America Shopping Centers LLC in excess of $50 million, and all other debt, shall be allocated 60% to PF Member and 40% to Perkins Member.

(ii) Each Member's Capital Account will be debited with the amount of cash and the Gross Asset Value of any Company property distributed to the Member under any provision of this Agreement, the Member's distributive share of Losses, any items in the nature of deduction or loss that are specially allocated to the Member under Sections **9.4(b)(iii)**, **9.4(c)** or **9.4(d)** and the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by the Member to the Company.

(iii)    If any interest in the Company is transferred in accordance with the terms of this Agreement, the transferee will succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(b)    <u>Modifications by Manager and PF Member</u>.  The provisions of this Section **9.2** and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Section 704(b) of the Code and the Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions.  The Manager may, with the prior written consent of PF Member, modify the manner in which the Capital Accounts are maintained under this Section **9.2** to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions; however, without the unanimous consent of all Members, the Manager may not make any modification to the way Capital Accounts are maintained if such modification would have the effect of changing the amount of distributions to which any Member would be entitled during the operation, or upon the liquidation, of the Company.

9.3.    **Adjustment of Gross Asset Value**.  "**Gross Asset Value**", with respect to any asset, is the adjusted basis of that asset for federal income tax purposes, except as follows:

(a)    The initial Gross Asset Value of any asset contributed (or deemed contributed under Code Sections 704(b) and 752 and the Regulations promulgated thereunder) by a Member to the Company will be the fair market value of the asset on the date of the contribution, as determined by the Manager with the consent of PF Member.

(b)    The Gross Asset Values of all Company assets will be adjusted to equal the respective fair market values of the assets, as reasonably determined by the Manager and PF Member, as of (1) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* capital contribution (exclusive of any contribution of Additional Capital pursuant to Section **6.2**), (2) the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an interest in the Company if an adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company, (3) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); and (4) at such other times provided by the applicable Regulations.

(c)    The Gross Asset Value of any Company asset distributed to any Member will be the gross fair market value of the asset on the date of distribution.

(d)    The Gross Asset Values of Company assets will be increased or decreased to reflect any adjustment to the adjusted basis of the assets under Code Section 734(b) or 743(b), but only to the extent that the adjustment is taken into account in determining Capital Accounts under Regulations Section 1.704-1(b)(2)(iv)(m), provided that Gross Asset Values will not be adjusted under this Section **9.3(d)** to the extent that the Manager determines that an adjustment under Section **9.3(b)** is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment under this Section **9.3(d)**.

(e)     After the Gross Asset Value of any asset has been determined or adjusted under Sections **9.3(a)**, **9.3(b)** or **9.3(d)**, Gross Asset Value will be adjusted by the Depreciation taken into account with respect to the asset for purposes of computing Profits or Losses.

9.4.    <u>**Profits, Losses and Distributive Share of Tax Items**</u>.

(a)     <u>Profits</u>. After giving effect to any allocation provided for in Sections **9.4(b)(iii)**, **9.4(c)** and **9.4(d)**, Profits of the Company for any taxable year shall be allocated to the Members in the following manner and priority:

(i)     first, to the Members in an aggregate amount equal to the cumulative Losses that have previously been allocated pursuant to Section **9.4(b)(ii)**, such chargeback allocations to be made pro rata in accordance with the Members' respective share of such Losses;

(ii)    next, to the Members in an amount equal to the sum of their respective distributed Default Preferred Returns for such taxable year and any portion of the distributed Default Preferred Return on their Default Capital Contributions for prior years that (a) has not been allocated a corresponding amount of Profits pursuant to this Section **9.4(a)(ii)** or, (b) if so allocated, such allocation of Profits has been previously offset by a Loss chargeback allocation pursuant to Section **9.4(b)(i)** with respect to Profits previously allocated pursuant to this Section **9.4(a)(ii)**;

(iii)   next, to PF Member in an amount equal to the sum of its distributed Primary Preferred Return on its Initial Capital Contribution and Approved Additional Capital Contribution for such taxable year and any portion of the distributed Primary Preferred Return on its Initial Capital Contribution and Approved Additional Capital Contribution for prior years that (a) has not been allocated a corresponding amount of Profits pursuant to this Section **9.4(a)(iii)** or, (b) if so allocated, such allocation of Profits has been previously offset by a Loss chargeback allocation pursuant to Section **9.4(b)(i)** with respect to Profits previously allocated pursuant to this Section **9.4(a)(iii)**;

(iv)    next, to PF Member in an amount equal to the sum of its distributed Secondary Preferred Return on its Initial Capital Contribution and Approved Additional Capital Contribution for such taxable year and any portion of the distributed Secondary Preferred Return on its Initial Capital Contribution and Approved Additional Capital Contribution for prior years that (a) has not been allocated a corresponding amount of Profits pursuant to this Section **9.4(a)(iv)** or, (b) if so allocated, such allocation of Profits has been previously offset by a Loss chargeback allocation pursuant to Section **9.4(b)(i)** with respect to Profits previously allocated pursuant to this Section **9.4(a)(iv)**;

(v)     next, to the Members in an amount equal to the respective amounts distributed to the Members pursuant to Section **8.2(h)** for such taxable year and all prior fiscal years to the extent (a) that the cumulative prior allocations of profits pursuant to this Section **9.4(a)(v)** have not equaled

such cumulative amounts distributed to the Members pursuant to Section **8.2(h)** for the current taxable and all prior taxable years, or (b) if so allocated, such allocation of profits has been previously offset by a Loss chargeback allocation pursuant to Section **9.4(b)(i)** with respect to Profits previously allocated pursuant to this Section **9.4(a)(v)**;

(vi)    the balance, if any, to the Members in accordance with their respective Residual Sharing Ratios.

(b)    <u>Losses</u>.  After giving effect to the allocations provided for in Sections **9.4(b)(iii)**, **9.4(c)** and **9.4(d)**, Losses of the Company shall be allocated to the Members in the following manner and priority:

(i)    First, to the Members in an aggregate amount equal to the cumulative Profits that have previously been allocated pursuant to Sections **9.4(a)(ii)**, **(iii)**, **(iv)**, **(v)**, **(vi)** and **(vii)**, with such Loss chargeback allocations to be made:  first, with respect to cumulative Profits allocated pursuant to Section **9.4(a)(vii)**; second, with respect to cumulative Profits allocated pursuant to Section **9.4(a)(vi)**; third, with respect to cumulative Profits allocated pursuant to Section **9.4(a)(v)**; fourth, with respect to cumulative Profits allocated pursuant to Section **9.4(a)(iv)**; fifth, with respect to the cumulative Profits allocated pursuant to Section **9.4(a)(iii)**; and sixth, with respect to the cumulative Profits allocated pursuant to Section **9.4(a)(ii)**.

(ii)    Thereafter, to the Members, pro rata in accordance with their Residual Sharing Ratios.

(iii)    Notwithstanding Section **9.4(b)(ii)**, the Losses allocated pursuant thereto shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any tax year.  In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section **9.4(b)(ii)**, the limitation set forth in this Section **9.4(b)(iii)** will be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d). If each Member has an Adjusted Capital Account Deficit, Losses will be allocated to those Members having an adjusted tax basis in their Membership Interest pro rata in accordance with such adjusted tax basis. Prior to any allocation of Profits under Section **9.4(a)**, Profits will be first allocated to the Members who were allocated Losses as a result of this Section **9.4(b)(iii)**, until such prior allocations of Losses hereunder are fully offset.

(c)    <u>Special Allocations</u>.   The following special allocations will be made in the following order and priority before allocations of Profits and Losses:

(i)    <u>Partnership Minimum Gain Chargeback</u>.  If there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, before any other allocation under this

MFP CORNHUSKER PROPERTIES LLC       33

Agreement, each Member will be specially allocated items of Company income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to such Member's share of the net decrease in Partnership Minimum Gain during such year determined in accordance with Regulations Section 1.704-2(g)(2). The items to be allocated will be determined in accordance with Regulations Section 1.704-2(f) and (j). This Section **9.4(c)(i)** is intended to comply with the Partnership Minimum Gain chargeback requirements of the Regulations, will be interpreted consistently with the Regulations and will be subject to all exceptions provided therein.

(ii)   Partner Nonrecourse Debt Minimum Gain Chargeback. Notwithstanding any other provision of this Section **9.4(c)** (other than Section **9.4(c)(i)** which shall be applied first), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Member with a share of such Partner Nonrecourse Debt Minimum Gain (determined under Regulations Section 1.704-2(i)(5)) as of the beginning of the year will be specially allocated items of Company income and gain for that period (and, if necessary, subsequent periods) in an amount equal to such Member's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during such year determined in accordance with Regulations Section 1.704-2(g)(2). The items to be so allocated will be determined in a manner consistent with Regulations Section 1.704-2(f), (g) and (j). This Section **9.4(c)(ii)** is intended to comply with the Partner Nonrecourse Debt Minimum Gain chargeback requirements of the Regulations, will be interpreted consistently with the Regulations and will be subject to all exceptions provided therein.

(iii)   Qualified Income Offset. A Member who unexpectedly receives any adjustment, allocation or distribution described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) will be specially allocated items of Company income and gain in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible.

(iv)   Nonrecourse Deductions. Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated among the Members in the same manner as Losses pursuant to Section **9.4(b)**.

(v)   Partner Nonrecourse Deductions. Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i).

(vi)   Code Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset under Code Sections 734(b) or 743(b) is required to be taken into account in determining Capital

MFP CORNHUSKER PROPERTIES LLC          34

Accounts under Regulations Section 1.704-1(b)(2)(iv)(m), the amount of the adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis), and the gain or loss will be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted under Regulations Section 1.704-1(b)(2)(iv)(m).

(d)     <u>Curative Allocations</u>.    The allocations set forth in Section **9.4(c)** (the **"Regulatory Allocations"**) are intended to comply with certain requirements of Regulations Sections 1.704-1(b) and 1.704-2.  The Regulatory Allocations may effect results which would be inconsistent with the manner in which the Members intend to divide Company distributions.  Accordingly, the Manager is authorized with the consent of PF Member to divide other allocations of Profits, Losses, and other items among the Members, to the extent that they exist, so that the net amount of the Regulatory Allocations and the special allocations to each Member is zero.  The Manager will have discretion to accomplish this result in any reasonable manner that is consistent with Code Section 704 and the related Regulations and approved by PF Member.

(e)     <u>Tax Allocations—Code Section 704(c)</u>.  For federal, state and local income tax purposes, Company income, gain, loss, deduction or expense (or any item thereof) for each fiscal year shall be allocated to and among the Members to reflect the allocations made pursuant to the provisions of this Section **9.4** for such fiscal year; provided, however, that in accordance with Code Section 704(c) and the related Regulations, income, gain, loss and deduction with respect to any property contributed to the capital of the Company, solely for tax purposes, will be allocated among the Members so as to take account of any variation between the adjusted basis to the Company of the property for federal income tax purposes and the initial Gross Asset Value of the property (computed in accordance with Section **9.3**).  If the Gross Asset Value of any Company asset is adjusted under Section **9.3(b)**, subsequent allocations of income, gain, loss and deduction with respect to that asset will take account of any variation between the adjusted basis of the asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the related Regulations.  Any elections or other decisions relating to allocations under this Section **9.4(e)** will be made in any manner that the Manager determines reasonably reflects the purpose and intention of this Agreement, subject to the approval of such election by PF Member.  Allocations under this Section **9.4(e)** are solely for purposes of federal, state and local taxes and will not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses or other items or distributions under any provision of this Agreement.

(f)     Members shall be bound by the provisions of Section **9.4** in reporting their shares of Company income and loss for income tax purposes.

9.5.     **Tax Returns**.  The Manager shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making the elections described in Section **9.6**.  On or before February 15 of each year, the Manager shall deliver to PF Member copies of the prepared federal and state income tax returns.  PF Member shall review the prepared returns and either approve the prepared

returns or provide the Manager with written objections to any element thereof. If any objection is made by PF Member, the Members and the Manager shall work in good faith to resolve any objections with reasonable promptness and in any event so that such returns may be filed before the applicable filing deadline. Each Member shall furnish to the Manager all pertinent information in its possession relating to Company operations that is necessary to enable such income tax returns to be prepared and filed.

9.6.     **Tax Elections**. The following elections shall be made on the appropriate returns of the Company:

(a)     to adopt the calendar year as the Company's fiscal year;

(b)     to adopt the accrual method of accounting and to keep the Company's books and records on the equity method;

(c)     if there is a distribution of Company property as described in Section 734 of the Code or if there is a transfer of a Company interest as described in Section 743 of the Code, upon written request of any Member, to elect, pursuant to Section 754 of the Code, to adjust the basis of Company properties; and

(d)     to elect to amortize the organizational expenses of the Company ratably over a period of sixty (60) months as permitted by Section 709(b) of the Code.

No election shall be made by the Company or any Member (i) to be excluded from the application of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar provisions of applicable state laws; or (ii) to classify the Company as other than a "partnership" for federal or state income tax purposes.

9.7.     **Tax Matters Member**. Perkins Member shall be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code. As tax matters partner, such Member shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6231 of the Code. Such Member shall inform each other Member of all significant matters that may come to its attention in its capacity as tax matters partner by giving notice thereof within ten (10) days after becoming aware thereof and, within such time, shall forward to each other Member copies of all significant written communications it may receive in such capacity. Such Member shall not take any action contemplated by Sections 6222 through 6232 of the Code in such Member's capacity as tax matters partner without the consent of PF Member. This provision is not intended to authorize such Member, in its capacity as tax matters partner, to take any action left to the determination of an individual Member under Sections 6222 through 6232 of the Code.

9.8.     **Allocations on Transfer of Interests**. All items of income, gain, loss, deduction, and credit allocable to any interest in the Company that may have been transferred shall be allocated between the transferor and the transferee based upon that portion of the calendar year during which each was recognized as owning such interest, without regard to the results of Company operations during any particular portion of such calendar year and without regard to whether cash distributions were made to the transferor or the transferee during such calendar year; however, such allocation shall be made in accordance with a method permissible under Section 706 of the Code and the Regulations thereunder.

X.
## WITHDRAWAL, DISSOLUTION, LIQUIDATION, AND TERMINATION

10.1.     **Dissolution, Liquidation, and Termination Generally**.    The Company shall be dissolved upon the first to occur of any of the following:

(a)    The sale or disposition of all of the assets of the Company and the receipt, in cash, of all consideration therefor;

(b)    The determination of Perkins Member and PF Member to dissolve the Company; and

(c)    The occurrence of any event which, as a matter of law, requires that the Company be dissolved.

None of the events set forth in Section 18-801(a)(4) or (b) of the Act shall cause a dissolution of the Company, and the Members hereby agree and consent to continue the existing business of the Company upon the occurrence thereof. Notwithstanding the foregoing, if the Company is dissolved because an event described in Section 18-801(a)(4) or (b) of the Act occurs with respect to a Member, then the other Member may elect to continue the Company business within ninety (90) days after the Members have actual notice of such event, and, at the option of the electing Member, may admit a new Member to the Company with a Residual Sharing Ratio and Capital Sharing Ratio determined by the electing Member. The Residual Sharing Ratio and Capital Sharing Ratio of the electing Member then shall be reduced by the Residual Sharing Ratio and Capital Sharing Ratio allocated to the new Member.

10.2.     **Liquidation and Termination**.  Upon dissolution of the Company, unless it is continued as provided above, the Manager shall act as liquidator or may appoint one or more other Persons as liquidator; however, if the Company is dissolved because of an event occurring with respect to the Manager, the liquidator shall be one or more Persons selected in writing by PF Member. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein. The costs of liquidation shall be a Company expense. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Manager hereunder. The steps to be accomplished by the liquidator are as follows:

(a)    as promptly as possible after dissolution and again after final liquidation, the liquidator shall cause a proper accounting to be made by a firm of certified public accountants acceptable to PF Member of the Company's assets, liabilities, and operations through the last day of the calendar month in which the dissolution shall occur or the final liquidation shall be completed, as applicable;

(b)    the liquidator shall pay all of the debts and liabilities of the Company or otherwise make adequate provision therefor (including the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(c)    all remaining assets of the Company shall be distributed to the Members as follows:

(i)    the liquidator may sell any or all Company property and the sum of (A) any resulting gain or loss from each sale plus (B) the fair market value of such property that has not been sold shall be determined and

MFP CORNHUSKER PROPERTIES LLC          37

(notwithstanding the provisions of Article **IX**) income, gain, loss, and deduction inherent in such property (that has not been reflected in the Capital Accounts previously) shall be allocated among the Members to the extent possible to cause the Capital Account balance of each Member to equal the amount distributable to such Member under Section **10.2(c)(ii)**; and

(ii) Company property shall be distributed to the Members as provided in Section **8.2** and Profits or Losses arising from the liquidation shall be allocated pursuant to Section **9.4**.

10.3. **Deficit Capital Accounts**. No Member shall be required to pay to the Company, to any other Member or to any third party any deficit balance which may exist from time to time in the Member's Capital Account.

10.4. **Cancellation of Certificate**. On completion of the distribution of Company assets, PF Member (or such other person as the Act may require or permit) shall file a Certificate of Cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to Section **2.4**, and take such other actions as may be necessary to terminate the existence of the Company.

XI.
## MISCELLANEOUS PROVISIONS

11.1. **Notices**. All notices, requests and demands to be made hereunder to the parties hereto must be in writing (at the addresses set forth on the signature pages hereto) and may be given by any of the following means:

(a) personal delivery;

(b) reputable, national overnight courier service;

(c) by telecopying (if concurrently transmitted the same day for next Business Day delivery by a reputable, national overnight courier service);

(d) registered or certified, first class mail, return receipt requested; or

(e) electronic mail (if concurrently transmitted the same day for next Business Day delivery by a reputable, national overnight courier service).

Any notice, demand or request sent pursuant to the terms of this Agreement will be deemed received (i) if sent pursuant to subsection (a), upon such personal delivery, (ii) if sent pursuant to subsection (b), on the next Business Day following the date of delivery to the courier service, (iii) if sent pursuant to subsection (c) or (e), upon dispatch if such dispatch occurs between the hours of 9:00 a.m. and 5:00 p.m. (recipient's time zone) on a Business Day, and if such dispatch occurs other than during such hours, on the next Business Day following dispatch, and (iv) if sent pursuant to subsection (d), 3 days following deposit in the mail.

By giving written notice thereof in accordance with the provisions of this Section **12.1**, each Member shall have the right from time to time to change its notice address hereunder.

11.2.    **Governing Law**. This Agreement and the obligations of the Members hereunder shall be construed and enforced in accordance with the laws of the State of Delaware, excluding any conflicts of law rule or principle which might refer such construction to the laws of another state or country. Each Member submits to the jurisdiction of the state and federal courts in the States of North Carolina or Nebraska.

11.3.    **Entirety; Amendments**. This Agreement and its exhibits constitute the entire agreement between the Members relative to the formation of the Company and supersedes any prior agreements, written or oral, in regard thereto. Except as otherwise provided herein, no amendments to this Agreement shall be binding upon any Member unless set forth in a document duly executed by such Member.

11.4.    **Waiver**. No consent or waiver, express or implied, by any Member of any breach or default by any other Member in the performance by the other Member of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other Member of the same or any other obligation hereunder. Failure on the part of any Member to complain of any act or to declare any other Member in default, irrespective of how long such failure continues, shall not constitute a waiver of rights hereunder.

11.5.    **Severability**. If any provision of this Agreement or the application thereof to any Person or circumstances shall be invalid or unenforceable to any extent, and such invalidity or unenforceability does not destroy the basis of the bargain between the parties, then the remainder of this Agreement and the application of such provisions to other Persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

11.6.    **Ownership of Property and Right of Partition**. A Member's interest in the Company shall be personal property for all purposes. No Member shall have any right to partition the property owned by the Company.

11.7.    **Captions, References**. Pronouns, wherever used herein, and of whatever gender, shall include natural persons and corporations and associations of every kind and character, and the singular shall include the plural wherever and as often as may be appropriate. Article and section headings are for convenience of reference and shall not affect the construction or interpretation of this Agreement. Whenever the terms "hereof", "hereby", "herein", or words of similar import are used in this Agreement they shall be construed as referring to this Agreement in its entirety rather than to a particular section or provision, unless the context specifically indicates to the contrary. Whenever the word "including" is used herein, it shall be construed to mean including without limitation. Any reference to a particular "Article" or a "Section" shall be construed as referring to the indicated article or section of this Agreement unless the context indicates to the contrary.

11.8.    **Involvement of Members in Certain Proceedings**. Should any Member become involved in legal proceedings unrelated to the Company's business in which the Company is required to provide books, records, an accounting, or other information, then such Member shall indemnify the Company from all reasonable expenses and damages incurred in conjunction therewith.

11.9.    **Interest**. No amount charged as interest on loans hereunder shall exceed the maximum rate from time to time allowed by applicable law.

11.10.    **Confidentiality**. Each Member and their respective agents shall maintain the confidentiality of all documents, instruments and information obtained by such Member or such agents hereunder or otherwise in connection with the Company and the Projects (including but not limited to the terms of this Agreement) and shall not, without the other party's prior written consent, which consent shall not be unreasonably withheld or delayed, disclose any of such information to any other Person or use any of

MFP CORNHUSKER PROPERTIES LLC          39

such information for any purpose other than as contemplated herein. Notwithstanding the foregoing, (i) each Member may disclose any of such information (i) to its proposed investors and lenders and its officers, directors, employees, agents, attorneys, accountants, consultants and other professionals to whom such disclosure is reasonably necessary for the consummation of the transactions contemplated hereby, provided that each such Person agrees to maintain such information in a confidential manner; and (ii) each Member and the Asset Manager may disclose any of such information to transact the business of the Company in the ordinary course and as contemplated herein (including but not limited to the ownership and operation of the Project).

11.11.   **Counterparts; Electronic Signatures.**   This Agreement may be executed in counterparts, all of which taken together will constitute a single Agreement, or by execution of a separate agreement under the terms of which the Person executing such separate agreement specifically undertakes to be bound by the terms, provisions and agreements of this Agreement. Any signature to this Agreement transmitted electronically by facsimile or in portable document format shall be deemed a true and legally binding signature for all purposes and shall for all purposes be considered an original signature.

11.12.   **Indemnification.**   Perkins Member hereby agrees to indemnify, defend and hold harmless PF Member and Affiliates thereof from and against any and all loss, claims, damage or liability in connection with any brokerage commissions or finder's fees claimed by any broker or other party in connection with the investment by Perkins Member in the Company and any claim by any partner or member in Perkins Member or in Affiliates thereof (excluding, however, any of the foregoing to the extent caused solely by PF Member or Affiliates thereof). PF Member hereby agrees to indemnify, defend and hold harmless Perkins Member and Affiliates thereof from and against any and all loss, claims, damage or liability in connection with any brokerage commissions or finder's fees claimed by any broker or other party in connection with the investment by PF Member in the Company and any claim by any partner or member in any PF Member or Affiliate thereof (excluding, however, any of the foregoing to the extent caused solely by Perkins Member or Affiliates thereof).

11.13.   **Perkins Indemnity and Principal Certificates.**   On or before the contribution of the Initial Capital Contribution by PF Member and as a condition thereto, (i) the Perkins Principal shall execute and deliver to PF Member the Perkins Principal Indemnity Agreement ("**Perkins Principal Indemnity**") in substantially the form attached hereto as Exhibit F-2, and (ii) the Perkins Principal shall execute and deliver the Certificate of Principal ("**Certificate of Principal**") in the form attached hereto as Exhibit G. In the event of any breach by the Perkins Principal of the Perkins Principal Indemnity, the Promote Portion of any distributions to Perkins Member pursuant to Sections 8.2(g) and (h) shall be forfeited.

11.14.   **Disclosure and Waiver of Conflicts.**   In connection with the preparation of this Agreement, the Members acknowledge and agree that: (i) the law firm that prepared this Agreement (the "**Law Firm**") acted as legal counsel to PF Member and the Company; (ii) the other Members have been advised by the Law Firm that the interests of the Members are opposed to each other and, accordingly, the Law Firm's representation of the Company and PF Member may not be in the best interests of the Members; and (iii) each of the Members has been advised by the Law Firm to retain separate legal counsel.

11.15.   **Common Interest of Members.**   The Members acknowledge that they have a common interest in the Project and matters relating to the Project. Accordingly, the parties expect that during the course of this Agreement, (i) the parties will exchange information, including information relating to legal advice and legal work product, that would otherwise be protected from disclosure pursuant to the attorney-client privilege; (ii) the parties have an expectation that any such information exchanged should be protected from disclosure and should remain confidential; and (iii) such exchange of confidential information is necessary to advance the parties' shared interest in the Project and in securing legal advice in connection therewith. Accordingly, given the common interest of the parties described above, the Members

intend that (i) such disclosures among Members of such confidential information shall remain protected from disclosure pursuant to the attorney-client privilege, and (ii) neither Member is waiving the attorney-client privilege as a result of such exchange of information.

## XII.
## SPECIAL PURPOSE BANKRUPTCY REMOTE ENTITY

Notwithstanding any other provision of this Agreement to the contrary, so long as that certain loan (or any portion thereof) being made as of the date hereof by Jefferies LoanCore LLC, a Delaware limited liability company (together with its successors and/or assigns, "**Lender**") to MFP Monument Mall LLC (the "**Loan**") remains outstanding the following provisions shall remain in effect:

12.1.    **Special Purpose Bankruptcy Remote Entity**. The Members shall cause the Company to at all times be a Special Purpose Bankruptcy Remote Entity (as such term is defined in that certain Pledge and Security Agreement dated as of the date hereof by the Company for the benefit of Lender (the "**Pledge Agreement**")).

12.2.    **Special Member**. Upon the occurrence of any event that causes the last remaining Member to cease to be a member of the Company (other than upon continuation of the Company without dissolution upon (a) an assignment by the last remaining Member of all of its limited liability company interest in the Company and the admission of a transferee pursuant to this Agreement, or (b) the resignation of the last remaining Member and the admission of an additional member of the Company pursuant to this Agreement), each Person acting as an Independent Manager pursuant to this Agreement shall, without any action of any Person and simultaneously with the last remaining Member ceasing to be a member of the Company, automatically be admitted to the Company as a Special Member (defined below) and shall continue the Company without dissolution. No Special Member may resign from the Company or transfer its rights as Special Member unless (i) a successor Special Member has been admitted to the Company as Special Member by executing a counterpart to this Agreement, and (ii) such successor has also accepted its appointment as Independent Manager pursuant to this Agreement; provided, however, the Special Members shall automatically cease to be members of the Company upon the admission to the Company of a substitute Member. Each Special Member shall be a member of the Company that has no interest in the profits, losses and capital of the Company and has no right to receive any distributions of Company assets. Pursuant to Section 18-301 of the Act, a Special Member shall not be required to make any capital contributions to the Company and shall not receive a limited liability company interest in the Company. A Special Member, in its capacity as Special Member, may not bind the Company. Except as required by any mandatory provision of the Act, each Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, the Company, including, without limitation, the merger, consolidation or conversion of the Company. In order to implement the admission to the Company of each Special Member, each Person acting as an Independent Manager pursuant to this Agreement shall execute a counterpart to this Agreement. Prior to its admission to the Company as Special Member, each Person acting as an Independent Manager pursuant to this Agreement shall not be a member of the Company.

12.3.    **Independent Manager**.

(a)    As long as the Loan is outstanding, the Members shall cause the Company at all times to have at least two Independent Managers who will be appointed by the Members. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any duty otherwise existing at law or in equity, the Independent Managers shall consider only the interests of the Company, including its creditors, in acting or otherwise voting on Material Actions. No

resignation or removal of an Independent Manager, and no appointment of a successor Independent Manager, shall be effective until such successor (i) shall have accepted his or her appointment as an Independent Manager by a written instrument, and (ii) shall have executed a counterpart to this Agreement. In the event of a vacancy in the position of Independent Manager, the Members shall, as soon as practicable, appoint a successor Independent Manager. All right, power and authority of the Independent Managers shall be limited to the extent necessary to exercise those rights and perform those duties specifically set forth in this Agreement. Except for duties to the Company as set forth in the second sentence of this Section **12.3(a)** (including duties to the Members and the Company's creditors solely to the extent of their respective economic interests in the Company but excluding (i) all other interests of the Members, (ii) the interests of other Affiliates of the Company, and (iii) the interests of any group of Affiliates of which the Company is a part), the Independent Managers shall not have any fiduciary duties to the Members or any other Person bound by this Agreement; provided, however, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing. To the fullest extent permitted by law, including Section 18-1101(e) of the Act, an Independent Manager shall not be liable to the Company, the Members or any other Person bound by this Agreement for breach of contract or breach of duties (including fiduciary duties), unless the Independent Manager acted in bad faith or engaged in willful misconduct. No Independent Manager shall at any time serve as trustee in bankruptcy for any Affiliate of the Company.

(b)     Subject to the other provisions of this Section **12.3**, for so long as the Loan is outstanding, an Independent Manager may be removed by the Members only for Cause. Notwithstanding anything to the contrary contained in this Agreement, for so long as the Loan is outstanding, no Independent Manager shall be removed or replaced unless the Company provides the Lender with no less than three (3) Business Days' prior written notice of (i) any proposed removal of such Independent Manager and the reason for such removal, and (ii) the identity of the proposed replacement Independent Manager, together with a certification that such replacement satisfies the requirements for a Independent Manager set forth in this Agreement.

12.4.     **Limitations on the Company's Activities**. Notwithstanding any other provision of this Agreement and any provision of law that otherwise so empowers the Company, the Members or any other Person, so long as the Loan is outstanding, neither the Members nor any other Person shall be authorized or empowered, nor shall they permit the Company, without the prior unanimous written consent of the Members and all Independent Managers, to take any Material Action, provided, however, that, so long as the Loan is outstanding, the Members may not authorize the taking of any Material Action, unless there are at least two Independent Managers then serving in such capacity.

12.5.     **Defined Terms**. As used in this Article **XII**, the following terms shall have the following meanings:

(a)     "**Cause**" means, with respect to an Independent Manager, (i) acts or omissions by such Independent Manager that constitute willful disregard of such Independent Manager's duties under this Agreement, (ii) that such Independent Manager has engaged in or has been charged with, or has been convicted of, fraud or other acts constituting a crime under any law applicable to such Independent Manager, (iii)

MFP CORNHUSKER PROPERTIES LLC                42

such Independent Manager has breached its fiduciary duties of loyalty and care as and to the extent of such duties in accordance with the terms of the Company's organizational documents, (iv) there is a material increase in the fees charged by such Independent Manager or a material change to such Independent Manager's terms of service, (v) such Independent Manager is unable to perform his or her duties as Independent Manager due to death, disability or incapacity, or (vi) such Independent Manager no longer meets the definition of Independent Manager.

(b)     "**Independent Manager**" means a natural person selected by the Company (A) with prior experience as an independent director, independent manager or independent member, (B) with at least three (3) years of employment experience, (C) who is provided by a Nationally Recognized Service Company, (D) who is duly appointed as an Independent Manager and is not, will not be while serving as Independent Manager (except pursuant to the provisions of this Agreement providing for the appointment of such Independent Manager to become a "special member" upon the last remaining Member ceasing to be a member of the Company) and shall not have been at any time during the preceding five (5) years, any of the following:

(i)     a stockholder, director (other than as an Independent Manager), officer, employee, partner, attorney or counsel of the Company, any Affiliate of the Company or any direct or indirect parent of the Company;

(ii)    a customer, supplier or other Person who derives any of its purchases or revenues from its activities with the Company or any Affiliate of the Company;

(iii)   a Person or other entity Controlling or under Common Control with any such stockholder, partner, customer, supplier or other Person; or

(iv)    a member of the immediate family of any such stockholder, director, officer, employee, partner, customer, supplier or other Person.

(v)     A natural person who otherwise satisfies the foregoing definition and satisfies subparagraph (i) by reason of being the Independent Manager of a "special purpose entity" affiliated with the Company shall be qualified to serve as an Independent Manager of the Company, provided that the fees that such individual earns from serving as Independent Manager of affiliates of the Company in any given year constitute in the aggregate less than five percent (5%) of such individual's annual income for that year.

A natural person who satisfies the foregoing definition other than clause (ii) shall not be disqualified from serving as an Independent Manager of the Company if such individual is an independent director or special manager provided by an Nationally Recognized Service Company that provides professional independent directors and special managers and also provides other corporate services in the ordinary course of its business.

MFP CORNHUSKER PROPERTIES LLC          43

(c)  "**Material Action**" means to consolidate or merge the Company with or into any Person, or sell all or substantially all of the assets of the Company, or to institute proceedings to have the Company be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Company or file a petition seeking, or consent to, reorganization or relief with respect to the Company under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property, or make any assignment for the benefit of creditors of the Company, or admit in writing the Company's inability to pay its debts generally as they become due, or take action in furtherance of any such action, or, to the fullest extent permitted by law, dissolve or liquidate the Company.

(d)  "**Nationally Recognized Service Company**" shall mean any of CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company or such other nationally recognized company that provides independent director, independent manager or independent member services and that is reasonably satisfactory to Lender, in each case that is not an Affiliate of the Company and that provides professional independent directors and other corporate services in the ordinary course of its business.

(e)  "**Special Member**" means, upon such person's admission to the Company as a member of the Company pursuant to this Agreement, a person acting as Independent Manager, in such person's capacity as a member of the Company. A Special Member shall only have the rights and duties expressly set forth in this Agreement.

12.6.   **Lender as Third-Party Beneficiary**.  For so long as the Loan is outstanding, Lender is and shall be an intended third-party beneficiary the provisions of this Article **XII**.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

Executed effective as of the date above written.

PF MEMBER:

**MF CORNHUSKER MEMBER LLC,**
a Delaware limited liability company

By: _____
Name:   Kevin J. Mast
Its:       Vice President

Address:   c/o Mountain Funding LLC
                  13860 Ballantyne Corp Place, Suite 130
                  Charlotte, NC  28277
                  Attention:  Peter Fioretti
Telephone: (704) 930-7508
Telecopier: (704) 540-7403
Email Address:  pfioretti@mrec.com

Taxpayer Identification No. 46-3498625

MANAGER AND
PERKINS MEMBER:

**PERKINS DELAWARE, LLC,**
a Delaware limited liability company

By: Perkins Centers Delaware, LLC, a Delaware limited
liability company, its Manager

        By: Perkins, L.L.C., a Nebraska limited liability
        company, its Manager

                _____
                Michael D. Perkins, Trustee of the Michael D.
                Perkins Funnel Trust created June 6, 1996, its
                Member

                Market Square, Inc., a Nebraska corporation, its
                Member

                By: _____
                Name:   Michael D. Perkins
                Its:       President

Address:   608 N. 114th Street
                  Omaha, Nebraska 68154
Telephone No.:  (949) 496-2002
Telecopier No.:  (402) 495-9210
Email Address:  perkinsproperties@gmail.com

Taxpayer Identification No. 20-4548329

MFP CORNHUSKER PROPERTIES LLC   Signature Page

Executed effective as of the date above written.

PF MEMBER:

MF CORNHUSKER MEMBER LLC,
a Delaware limited liability company

By:_____
Name:   Kevin J. Mast
Its:       Vice President

Address:   c/o Mountain Funding LLC
                 13860 Ballantyne Corp Place, Suite 130
                 Charlotte, NC 28277
                 Attention: Peter Fioretti
Telephone: (704) 930-7508
Telecopier: (704) 540-7403
Email Address:  pfioretti@mrec.com

Taxpayer Identification No. 46-3498625

MANAGER AND
PERKINS MEMBER:

PERKINS DELAWARE, LLC,
a Delaware limited liability company

By: Perkins Centers Delaware, LLC, a Delaware limited
liability company, its Manager

By: Perkins, L.L.C., a Nebraska limited liability
company, its Manager

Michael D. Perkins, Trustee of the Michael D.
Perkins Funnel Trust created June 6, 1996, its
Member

Market Square, Inc., a Nebraska corporation, its
Member
By:
Name:  Michael D. Perkins
Its:       President

Address:  608 N. 114th Street
                Omaha, Nebraska 68154
Telephone No.: (949) 496-2002
Telecopier No.: (402) 495-9210
Email Address: perkinsproperties@gmail.com

Taxpayer Identification No. 20-4548329

MFP CORNHUSKER PROPERTIES LLC    Signature Page

INDEPENDENT MANAGERS:

_____
Michael C. Doyle

_____
Joan L. Yori

## EXHIBIT A

### LIST OF PROJECT PROPERTIES

| Property | Location | Square Footage |
|---|---|---|
| Eastgate Plaza | Fremont, NE | 133,456 |
| Stockyards Plaza | Omaha, NE | 103,649 |
| Miracle Hills Park | Omaha, NE | 71,532 |
| Bishop Heights Shopping Center | Lincoln, NE | 34,388 |
| Edgewood Shopping Center | Lincoln, NE | 174,632 |
| The Meadows Shopping Center | Lincoln, NE | 67,840 |
| Cornhusker Plaza | South Sioux City, NE | 83,085 |
| Market Square Shopping Center | Norfolk, NE | 159,515 |
| Baken Park Center | Rapid City, SD | 95,536 |
| Bon-Ton's (Herberger's) | Kearney, NE | 87,384 |
| Monument Mall | Scottsbluff, NE | 395,425 |
| Total | | 1,427,410 |

MFP CORNHUSKER PROPERTIES LLC          Exhibit A

**EXHIBIT B**

**LEGAL DESCRIPTION OF PROJECT**

**Eastgate Plaza**

The land referred to is situated in the State of Nebraska, County of Dodge and is described as follows:

Parcel 1:

Lot 1, Block 1, Eastgate Plaza Second Addition to the City of Fremont, Dodge County, Nebraska of record in Plat Book 15 at Page 626;

TOGETHER with non-exclusive easement for ingress and egress appurtenant to subject property as established by Cross Easements and Restrictions dated July 12, 1984 and filed September 11, 1984 in Book 14 at Page 922 of the Miscellaneous Records of Dodge County, Nebraska.

Parcel 2:

Part of Lot 1, Block 1, Eastgate Plaza Addition to the City of Fremont, in the Southwest Quarter of Section 7, Township 17 North, Range 9 East of the 6th P.M., Dodge County, Nebraska, being described as follows: beginning at the Southeast corner of said Lot 1, and assuming the West line of said Lot 1 to have a bearing of N00°00'00"E; thence S89°59'42"W on the South line of said Lot 1, a distance of 275.15 feet; thence N00°01'22"E parallel with the East lien of said Lot 1, a distance of 233.00 feet; thence S89°59'42"W parallel with said South line, a distance of 200.00 feet to a point on the West line of said Lot 1, thence N00°00'00"E on said West line, a distance of 443.11 feet to the Northwest corner of said Lot 1; thence S89°57'56"E on the North line of said Lot 1; thence S00°02'23"W on the East line of said Lot 1, a distance of 320.64 feet; thence N89°58'14"E on said East line, a distance of 50.00 feet; thence S00°01'22"W on said East line, a distance of 355.20 feet to the point of beginning.

**Stockyards Plaza**

The land referred to is situated in the State of Nebraska, County of Douglas and is described as follows:

Parcel 1:

Intentionally Deleted.

Parcel 2:

Lots 3 and 4, Stockyards Plaza, a subdivision in SW 1/4 of Section 4, Township 14 North, Range 13 East of the 6th P.M., Douglas County, Nebraska, as shown on Dedication of Stockyards Plaza, filed May 16, 1998 in Book 1826 at Page 53, Deed Records, Douglas County, Nebraska, more particularly described as follows:

Commencing at the point of intersection of the East right-of-way line of 36th Street and the South right-of-way line of "L" Street, said Point also being the Northwest corner of Lot 1, said Stockyards Plaza; thence S88°52'32"E (assumed bearing) along said South right-of-way line of "L" Street, said line also being the North line of said Lot 1, Stockyards Plaza, a distance of 175.34 feet to the Northeast corner of said Lot 1, Stockyards Plaza, said point also being the Northwest Corner of said Lot 3, Stockyards Plaza, said point also being the point of beginning; thence continuing S88°52'32"E, along said South right-of-way line of "L" Street, said line also being the North line of said Lot 3, Stockyards Plaza, and the North line of said Lot 4, Stockyards Plaza, a distance of 730.00 feet to the Northwest corner of Lot 5, said Stockyards Plaza; thence S01°07'28"W along the West, line of said Lot 5, Stockyards Plaza, a distance of 145.00 feet to the Southwest corner of said Lot 5, Stockyards Plaza; thence S88°52'32"E along the South line of said Lot 5, Stockyards Plaza, a distance of 224.90 feet to a point on the Westerly right-of-way line of 33rd Street, said point also being the Southeast corner of said Lot 5, Stockyards Plaza; thence along said Westerly right-of-way line of 33rd Street, said line also being the Easterly line of said Lot 3, Stockyards Plaza, on the following described courses; thence S01°07'28"W, a distance of 115.00 feet; thence S88°52'32"E, a distance of 18.16 feet; thence S07°00'14"W, a distance of 194.26 feet; thence S54°17'14'W, a distance of 21.71 feet to the point of intersection of said West right-of-way line eof 33rd Street and the Northerly right-of-way line of Edward Babe Gomez Avenue, said point also being the on the Southerly line of said Lot 3, Stockyards Plaza; thence along said Northerly right-of-way line of Edward Babe Gomez Avenue, said line also being said Southerly line of Lot 3, Stockyards Plaza, on the following described courses: thence N78°25'46"W, a distance of 33.84 feet; thence Southwesterly, on a curve to the left with a radius of 602.96 feet, a distance of 495.30 feet, said curve having a long chord which bears S77°53'09"W, a distance of 481.50 feet; thence S54°24'22"W, a distance of 29.86 feet; thence Westerly, on a curve to the right with a radius of 542.96 feet, a distance of 361.22 feet, said curve having a long chord which bears S73°27'54"W, a distance of 354.59 feet; thence N87°28'35"W, a distance of 114.66 feet to the Southeast corner of Lot 2, said Stockyards Plaza; thence N01°07'28"E along the East line of said Lot 2, Stockyards Plaza, a distance of 150.00 feet to the Northeast corner of said Lot 2 Stockyards Plaza; thence N88°52'32"W along the North line of said Lot 2, Stockyards Plaza, a distance of 150.00 feet to a point on said East right-of-way line of 33rd Street, said point also being the Northwest corner of said Lot 2, Stockyards Plaza, said point also being on the Westerly linen of said Lot 3, Stockyards Plaza; thence N02°56'59"E along said East right-of-way line of 33rd Street, said line also being said Westerly line of Lot 3, Stockyards Plaza, a distance of 278.51 feet to the Southwest corner of Lot 1, Stockyards Plaza; thence S88°52'32"E along the South line of said Lot 1, Stockyards Plaza, a distance of 183.79 feet to the Southeast corner of said Lot 1, Stockyards Plaza; thence N01°07'28"E along the East line of said Lot 1, Stockyards Plaza, a distance of 265.00 feet to the point of beginning

Parcel 3:

Non-exclusive easement for ingress/egress and parking contained in Cross Easement Agreement recorded May 1, 1989 in Book 884 at Page 633 of the Miscellaneous Records of Douglas County, Nebraska.

**Miracle Hills Park**

The land referred to is situated in the State of Nebraska, County of Douglas and is described as follows:

Parcel 1:

Part of Lot 3, in West Dodge Plaza, an addition to the City of Omaha, Douglas County, Nebraska, more particularly described as follows:

Beginning at the Northwest corner of said Lot 3, West Dodge Plaza; thence South 66°28'49" East (assumed bearing), along the North line of said Lot 3, West Dodge Plaza, a distance of 770.34 feet; thence

MFP CORNHUSKER PROPERTIES LLC          Exhibit B-2

South 00°12'14" West, a distance of 202.61 feet; thence South 89°47'46" East along the South line of Lot 2, West Dodge Plaza and the Westerly extension thereof, a distance of 160.00 feet to a point on the West right-of-way line of 114th Street; thence South 00°12'14" West, along said West right-of-way line of 114th Street, a distance of 218.22 feet; thence S63°48'09"W (R) S63°45'32"W (A), a distance of 22.20 feet (R) 22.18 feet (A); thence

N89°50'29"W (R), N89°50'53"W (A), a distance of 9.90 feet; thence Southwesterly on a curve to the left with a radius of 151.00 feet, a distance of 101.74 feet, said curve having a long chord

which bears S70°51'21"W (R) S70°51'00"W (A), a distance of 99.83 feet; thence North 89°50'53" West, a distance of 482.29 feet to a point on the Westerly line of said Lot 3, West Dodge Plaza; thence along said Westerly line of Lot 3, West Dodge Plaza, on the following described courses; thence North 00°09'07" East, a distance of 324.88 feet; thence North 89°50'53" West, a distance of 73.00 feet; thence North 32°04'19" West, a distance of 248.24 feet; thence North 89°50'53" West, a distance of 55.00 feet; thence North 00°07'07" East, a distance of 234.51 feet to the point of beginning.

Parcel 2:

TOGETHER WITH THE APPURTENANT EASEMENTS SET OUT IN THE Easement, Cross Easement,

Covenant and Building Restriction Agreement dated March 3, 1986, filed March 5, 1986 in Book 766 at Page 628, Miscellaneous Records, Douglas County, Nebraska;

Addendum dated April 27, 1987, filed May 27, 1987 in Book 815 at Page 715, Miscellaneous Records, Douglas County, Nebraska;

Amendment dated June 28, 1988, filed September 7, 1988 in Book 861 at Page 146, Miscellaneous Records, Douglas County, Nebraska;

Second Declaration of Covenants, Conditions, and Restrictions by and between Randall Stores, Inc., a South Dakota corporation, Miracle Hills Partnership, a Nebraska general partnership and First National Bank Building General Partnership dated June 15, 1993 and recorded July 2, 1993 in Book 1082 at Page 140 of the Miscellaneous Records of Douglas County, Nebraska;

Third Amendment to Easement, Cross Easement, Covenant and Building Restriction Agreement dated April 29, 1993 and recorded July 9, 1993 in Book 1083 at Page 108 of the Miscellaneous Records of Douglas County, Nebraska;

Fourth Amendment to Easement, Cross Easement, Covenant, and Building Restriction Agreement dated April 21, 1994 and recorded April 22, 1994 in Book 1117 at Page 75 of the Miscellaneous Records of Douglas County, Nebraska;

Consent, Ratification and Subordination Agreement recorded April 22, 1994 in Book 1117 at Page 85, Miscellaneous Records, Douglas County, Nebraska;

Consent, Ratification and Subordination Agreement recorded April 22, 1994 in Book 1117 at Page 96, Miscellaneous Records, Douglas County, Nebraska;

Consent, Ratification and Subordination Agreement recorded April 22, 1994 in Book 1117 at Page 107, Miscellaneous Records, Douglas County, Nebraska.

MFP CORNHUSKER PROPERTIES LLC          Exhibit B-3

**Bishop Heights Shopping Center**

The land referred to is situated in the State of Nebraska, County of Lancaster and is described as follows:

Parcel I:

Part Lot 7, Block 5, Bishop Heights, Lincoln, Lancaster County, Nebraska, more particularly described as follows: Commencing at the northwest corner of Section 7, Township 9 North, Range 7 East of the 6th P.M., Lincoln, Lancaster County, Nebraska, said point being on the centerline of said vacated Pioneers Boulevard thence northerly along westerly line Section 6, 33.0 feet to a point on the south line of said lot 7; thence easterly along south line said lot 7 on an assumed bearing of south 89°34'13" east, 85.7 feet; thence northerly on left deflection angle of 90° 12.0 feet to point of beginning; thence continuing northerly north 00°25'47" east, 100.0 feet; thence north 89°34'13" west, 110.0 feet; thence south 00°25'47" west, 100.0 feet; thence south 89°34'13" east, 110.0 feet to the point of beginning.

Parcel II:

Part Lot 7, Block 5, Bishop Heights, Lincoln, Lancaster County, Nebraska, more particularly described as follows: Beginning at the southeast corner of Platted Woods Boulevard lying east of South 27th Street; thence northerly along east line said street on an assumed bearing of north 00°00'00" east, 80.0 feet; thence north 90°00'00" east, 494.92 feet to a point on a curve, said point being on the northwesterly right of way line of the Chicago, Rock Island and Pacific Railroad; thence 545.09 feet along the arc of a curve to the right having a radius of 6435.43 feet and a chord which bears south 32°35'19" west 544.93 feet; thence north 53°49'13" west, 217.32 feet along northeasterly building line of ShopKo Store to a point on the most northerly corner of said building; thence north 73°53'13" west, 183.2 feet; thence north 00°00'00" east, 200.0 feet to a point on the south right of way line of said Woods Boulevard; thence north 90°00'00" east along South Street right of way line, 150.00 feet to point of beginning.

Parcel III:

Together with an easement for party wall delineated in the Party Wall Agreement dated June 21, 1985, recorded October 1, 1985 as Instrument No. 85-26237; and Easement for Public Access and Common Parking filed October 29, 1985 as Instrument No. 85-29165.

**Edgewood Shopping Center**

The land referred to is situated in the State of Nebraska, County of Lancaster and is described as follows:

Parcel 1:

A tract of land composed Lot 2, Edgewood Center Fourth Addition, located in Section 9, Township 9 North, Range 7 East of the 6th P.M., Lancaster County, Nebraska and more particularly described as follows: Beginning at the Southwest corner of said Lot 2 thence North 03 degrees 56 minutes 27 seconds West (assumed bearing) along the west line of said Lot 2, a distance of 150.27 feet; thence North 00 degrees 00 minutes 52 seconds west continuing along the west line of said Lot 2 a distance of 549.65 feet; thence North 45 degrees 02 minutes 04 seconds east along the northwesterly line of said Lot 2 a distance of 35.36 feet; thence North 89 degrees 56 minutes 04 seconds east along the north line of said Lot 2 a distance of 411.47 feet; thence along a non-tangent curve to the right having a radius of 113.22 feet, an arc length of 97.39 feet, and a chord bearing South 41 degrees 53 minutes 18 seconds east a distance of 94.42 feet; thence South 00 degrees 02 minutes 02 seconds east along the east line of said Lot 2 a distance of 517.29 feet; thence South 44 degrees 58 minutes 52 seconds west along the southeasterly line of said

Lot 2, a distance of 318.79 feet; thence South 89 degrees 56 minutes 37 seconds west along the south line of said Lot 2 a distance of 138.00 feet; thence North 55 degrees 04 minutes 56 seconds west along the southwesterly line of said Lot 2 a distance of 154.06 feet to the point of beginning.

Parcel 2:

A tract of land composed of Lot 2, Edgewood Center 5th Addition, located in Section 9, Township 9 North, Range 7 East of the 6th P.M., Lancaster County, Nebraska, and more particularly described as follows: Beginning at the Southeast corner of said Lot 2, thence North 89 degrees 55 minutes 01 seconds west (assumed bearing) along the south line of Lot 2 a distance of 585.15 feet; thence North 00 degrees 00 minutes 00 seconds east along the east line of Out Lot "A", Edgewood Center 4th Addition a distance of 78.12 feet; thence South 89 degrees 59 minutes 04 seconds west along the south line of said Lot 2 a distance of 478.59 feet; thence North 00 degrees 02 minutes 02 seconds west along the west line of said Lot 2 a distance of 325.09 feet; thence along a curve to the left having radius of 171.96 feet, an arc length of 193.70 feet, and a chord bearing North 32 degrees 16 minutes 26 seconds west a distance of 183.62 feet to a point on the westernmost line of said Lot 2; thence North 00 degrees 01 minutes 23 seconds east along said westernmost line a distance of 28.78 feet; thence along a curve to the right having a radius of 198.33 feet, an arc length of 194.96 feet, and a chord bearing South 39 degrees 57 minutes 33 seconds east a distance of 187.12 feet to a point on the north line of said Lot 2; thence North 89 degrees 54 minutes 47 seconds east along said north line a distance of 296.88 feet; thence North 00 degrees 00 minutes 14 seconds west along the west line of said Lot 2 a distance of 160.85 feet; thence 89 degrees 54 minutes 47 seconds east along the North line of said Lot 2 a distance of 63.00 feet; thence North 00 degrees 00 minutes 14 seconds west along the westerly line of said Lot 2 a distance of 189.04 feet; thence North 89 degrees 54 minutes 47 seconds east along the northernmost line of said Lot 2 a distance of 322.54 feet; thence south 00 degrees 00 minutes 14 seconds east along the east line of said Lot 2, a distance of 180.15 feet; thence North 89 degrees 55 minutes 06 seconds east along the north line of said Lot 2 a distance of 174.75 feet; thence South 23 degrees 41 minutes 44 seconds east along the northeasterly line of said Lot 2 a distance of 459.77 feet; thence South 00 degrees 03 minutes 29 seconds west along the east line of said Lot 2 a distance of 194.48 feet to the point of beginning.

Parcel 3:

Together with non-exclusive easements for the benefit of Parcels 1 and 2 as created by instruments recorded August 24, 1990 as Instrument No. 90-26219, recorded March 11, 1993 as Instrument No. 93-8501, recorded September 1, 1993 as Instrument No. 93-39150, recorded February 25, 1993 as Instrument No. 93-6800, and recorded January 15, 1993 as Instrument No. 93-1803, records of Lancaster County, Nebraska; for the purposes described in said instruments subject to the terms, provisions and conditions set forth herein.

### The Meadows Shopping Center

The land referred to is situated in the State of Nebraska, County of Lancaster and is described as follows:

Parcel 1:

A tract of land located in the Northwest Quarter Northwest Quarter of Section 3, Township 9 North, Range 7 East of the 6th P.M., Lancaster County, Nebraska, and more particularly described as follows: Commencing at the Northwest corner of said Section 3, thence Easterly along the North line of said Northwest Quarter Northwest Quarter a distance of 222.93 feet, thence Southerly on a line which is 222.93 feet East of and parallel to the West line of said Northwest Quarter Northwest Quarter a distance of 40.00 feet to the point of beginning, thence easterly on a line which is 40.00 feet South of and parallel

MFP CORNHUSKER PROPERTIES LLC        Exhibit B-5

to the north line of said Northwest Quarter Northwest Quarter on an assumed bearing of North 89 degrees 30 minutes 35 seconds East a distance of 339.06 feet, thence Southerly on a line which is 562.00 feet east of and parallel to the west line of said Northwest Quarter Northwest Quarter on a bearing of South 0 degrees 00 minutes 00 seconds west a distance of 667.00 feet, thence westerly on a line which is 707.00 feet south of and parallel to the north line of said Northwest Quarter Northwest Quarter on a bearing of South 89 degrees 30 minutes 35 seconds west a distance of 490.99 feet to a point which is 71.00 feet east of the west line of said Northwest Quarter Northwest Quarter, thence northerly on a line which is 71.00 feet east of and parallel to the west line of said Northwest Quarter Northwest Quarter on a bearing of North 0 degrees 00 minutes 00 seconds east a distance of 23.82 feet, said line also being the east right of way line of South 70th Street, thence North 90 degrees 00 minutes 00 seconds east along said right of way line a distance of 44.37 feet, thence North 0 degrees 00 minutes 00 seconds east along said right of way line a distance of 60.00 feet, thence North 90 degrees 00 minute 00 seconds east along said right of way line a distance of 45.00 feet, thence North 1 degree 00 minutes 00 seconds west, along said right of way line a distance of 426.18 feet; thence easterly on a line which is 197.00 feet south of and parallel to the north line of said Northwest Quarter Northwest Quarter on a bearing of North 89 degrees 30 minutes 35 seconds east a distance of 160.00 feet, thence northerly on a line which is 222.93 feet East of and parallel to the west line of said Northwest Quarter Northwest Quarter on a bearing of North 0 degrees 00 minutes 00 seconds west a distance 157.00 feet to the point of beginning; now known as Lot 45, irregular tracts in the Northwest Quarter of Section 3, Township 9 North, Range 7 East of the 6th P.M., Lincoln, Lancaster County, Nebraska;

Parcel 2:

Together with Cross-Easement and Agreement dated August 11, 1987 recorded November 3, 1987 as Instrument No. 87-36290, records of Lancaster County, Nebraska.

**Cornhusker Plaza**

The land referred to is situated in the State of Nebraska, County of Dakota and is described as follows:

Lots 2 and 4, South Sioux City Plaza, an addition to the City of South Sioux City, as surveyed, platted and recorded in Plat Book 5 at Page 141, Office of the Register of Deeds of Dakota County, Nebraska.

**Market Square Shopping Center**

The land referred to is situated in the State of Nebraska, County of Madison and is described as follows:

Parcel One:

Lots 1, 3 and 4, Market Square Subdivision in the City of Norfolk, Madison County, Nebraska, together with appurtenant easement found in the Party Wall Agreement of record in M93-4 at Page 621 and M85-8 at Page 535.

Parcel Two:

Lot 2-R, Commonwealth Park Fifth Addition, a Replat of Lot 1 of Commonwealth Park Third Addition to the City of Norfolk, Madison County, Nebraska, together with appurtenant easements found in the documents recorded as M85-8 at Page 535 and M2002-3 at Page 985-987, Records, Madison County, Nebraska.

MFP CORNHUSKER PROPERTIES LLC          Exhibit B-6

**Baken Park Center**

Real property in the City of Rapid City, County of Pennington, State of South Dakota, described as follows:

Lots D, E, F and G of Lot 1 of the Northeast Quarter of the Northeast Quarter (NE1/4NE1/4) of Section 3 in Township 1 North of Range 7 East of the Black Hills Meridian, in the City of Rapid City, Pennington County, South Dakota, as shown on the plats filed in Plat Book 2, Page 61, Plat Book 3, Page 47, Plat Book 3, Page 122, and Plat filed in the Steel File December 19, 1940, respectively; Excepting therefrom Lot H of Lot 1 of Baken Park Subdivision, as shown on the plat filed in Plat Book 13, Page 103, Excepting therefrom Lot H1 of said Lot D, as shown on the plat filed in Highway Plat Book 5, Page 197, and Excepting therefrom Lot H1 of said Lots E and G, as shown on the plat filed in Highway Plat Book 5, Page 192, and including Lot H2 of said Lot G, as shown on the plat filed in Highway Plat Book 10, Page 197, and including Lots U1, U2 and U3 from said Lot G, as shown on the plat filed in Highway Plat Book 10, Page 198, and including Lots H2 and H3 of said Lot E, as shown on the plat, filed in Highway Plat Book 10, Page 199, and including Lot U1 in said Lot E, as shown on the plat filed in Highway Plat Book 10, Page 200.

**Bon-Ton's (Herberger's)**

The land referred to is situated in the State of Nebraska, County of Buffalo and is described as follows:

Parcel 1:

Lot 1, in Hilltop Mall Subdivision, a Subdivision to the City of Kearney, Buffalo County, Nebraska.

Parcel 2:

Non-exclusive appurtenant easements as set forth in Roll 83-7859 as Amended as Inst. No. 96-2172, Records, Buffalo County, Nebraska.

**Monument Mall**

The land referred to is situated in the State of Nebraska, County of Scotts Bluff and is described as follows:

Parcel I:

Lot 3, Block 3, Third Replat of Lots 3 and 4, Block 3, Northeast Second Addition Replat No. 2, an Addition to the City of Scottsbluff, Scotts Bluff County, Nebraska.

Parcel Ia:

Lot 2, Block 3, Northeast Second Addition Replat No. 2, an Addition to the City of Scottsbluff, Scotts Bluff County, Nebraska.

Parcel II:

TOGETHER WITH the non-exclusive reciprocal easements set out in the Operating Agreement of record in Misc. Book 114 at Page 351, and First Amendment of record in Misc. Book 114 at Page 514;

Parcel III:

TOGETHER WITH non-exclusive appurtenant Easements as set forth in Declaration of Restrictions recorded as Instrument No. 2004-02057, and that certain Mutual Easement dated March 27, 2006 and recorded April 21, 2006 as Instrument No. 2006-002364, Records, Scotts Bluff County, Nebraska.

MFP CORNHUSKER PROPERTIES LLC          Exhibit B-8

## EXHIBIT C

### BUSINESS PLAN

The Business Plan consists of the Excel File "Cornhusker Portfolio Business Plan 10-21-13 (FINAL).xlsx" as of October 21, 2013, 4:58 p.m. Central Time.  The attached Investor Analysis is a tabbed portion thereof (Restructure tab).

Exhibit C-1 hereto, consisting of a pro forma business plan reflecting a 5% increase in Properties occupancy, is attached for informational purposes only.

MFP CORNHUSKER PROPERTIES LLC        Exhibit C

## Florrett Proforma Analysis 10-21-13 (Current Occupancy Levels)
### (Includes Ten Properties; Excludes Monument Mall)

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | | | |
| Rental Income | 6,591,352 | 6,712,879 | 6,914,368 | 7,121,799 | 7,335,453 | 7,555,517 | 7,782,183 | 8,015,648 | 8,256,117 | 8,503,801 | 8,758,915 |
| CAM Reimbursements | 954,275 | 973,361 | 1,002,561 | 1,032,638 | 1,063,617 | 1,095,526 | 1,128,392 | 1,162,243 | 1,197,111 | 1,233,024 | 1,270,015 |
| Other Reimbursements | 996,677 | 1,016,611 | 1,047,109 | 1,078,522 | 1,110,878 | 1,144,204 | 1,178,530 | 1,213,886 | 1,250,303 | 1,287,812 | 1,326,446 |
| Other Income | | | | | | | | | | | |
| **TOTAL INCOME** | 8,532,304 | 8,702,950 | 8,964,039 | 9,232,960 | 9,509,949 | 9,786,247 | 10,089,104 | 10,391,778 | 10,703,531 | 11,024,637 | 11,355,376 |
| **REIMBURSABLE OPERATING EXPENSES** | | | | | | | | | | | |
| Repairs and Maintenance | 230,520 | 232,825 | 235,153 | 237,505 | 239,880 | 242,279 | 244,702 | 247,149 | 249,620 | 252,116 | 254,637 |
| Sewer Costs | 94,243 | 95,185 | 96,137 | 97,099 | 98,070 | 99,050 | 100,041 | 101,041 | 102,052 | 103,072 | 104,103 |
| Cleaning and Related Costs | 53,034 | 53,564 | 54,100 | 54,641 | 55,187 | 55,739 | 56,297 | 56,860 | 57,428 | 58,003 | 58,583 |
| Electric and Utilities | 95,574 | 96,530 | 97,495 | 98,470 | 99,455 | 100,449 | 101,454 | 102,468 | 103,493 | 104,528 | 105,573 |
| Landscaping | 110,773 | 111,881 | 113,000 | 114,130 | 115,271 | 116,424 | 117,588 | 118,764 | 119,951 | 121,151 | 122,362 |
| Insurance | 146,952 | 148,422 | 149,906 | 151,405 | 152,919 | 154,448 | 155,993 | 157,552 | 159,128 | 160,719 | 162,326 |
| Misc Reimbursable Expenses | 9,221 | 9,313 | 9,406 | 9,500 | 9,595 | 9,691 | 9,788 | 9,886 | 9,985 | 10,085 | 10,186 |
| Security | 14,646 | 14,792 | 14,940 | 15,090 | 15,241 | 15,393 | 15,547 | 15,702 | 15,860 | 16,018 | 16,178 |
| Maintenance, Supervision, and Management | 346,123 | 349,584 | 353,080 | 356,611 | 360,177 | 363,770 | 367,417 | 371,091 | 374,802 | 378,550 | 382,335 |
| Management Office Expenses | 36,857 | 37,226 | 37,598 | 37,974 | 38,354 | 38,737 | 39,124 | 39,516 | 39,911 | 40,310 | 40,713 |
| Snow Removal | 108,821 | 110,717 | 111,824 | 112,943 | 114,072 | 115,213 | 116,365 | 117,529 | 118,704 | 119,891 | 121,090 |
| Other Reimbursable Expenses | 3,045 | 3,075 | 3,106 | 3,137 | 3,169 | 3,200 | 3,232 | 3,265 | 3,297 | 3,330 | 3,364 |
| Non CAM Reimbursable Expenses | 93,404 | 94,338 | 95,281 | 96,234 | 97,197 | 98,169 | 99,150 | 100,142 | 101,143 | 102,155 | 103,176 |
| **TOTAL CAM EXPENSES** | 1,344,013 | 1,357,453 | 1,371,028 | 1,384,738 | 1,398,585 | 1,412,571 | 1,426,697 | 1,440,964 | 1,455,373 | 1,469,927 | 1,484,626 |
| **REAL ESTATE TAXES** | 1,135,894 | 1,147,253 | 1,158,725 | 1,170,313 | 1,182,016 | 1,193,836 | 1,205,774 | 1,217,832 | 1,230,010 | 1,242,311 | 1,254,734 |
| **TOTAL REIMBURSABLE OPERATING EXPENSES** | 2,479,907 | 2,504,708 | 2,529,753 | 2,555,051 | 2,580,601 | 2,606,407 | 2,632,471 | 2,658,798 | 2,685,384 | 2,712,238 | 2,739,360 |
| **NON-REIMBURSABLE OPERATING EXPENSES** | | | | | | | | | | | |
| Repairs and Maintenance - Owner | 7,647 | 7,723 | 7,801 | 7,879 | 7,957 | 8,037 | 8,117 | 8,199 | 8,281 | 8,363 | 8,447 |
| Utilities | 48,565 | 49,051 | 49,541 | 50,037 | 50,537 | 51,042 | 51,553 | 52,068 | 52,589 | 53,115 | 53,646 |
| Professional Fees | 194,424 | 196,368 | 198,332 | 200,315 | 202,318 | 204,342 | 206,385 | 208,449 | 210,533 | 212,639 | 214,765 |
| Management Fees | 353,292 | 360,118 | 370,150 | 380,118 | 392,398 | 403,810 | 415,564 | 427,611 | 440,141 | 452,865 | 468,215 |
| Advertising and Posting Expense | 57,598 | 58,174 | 58,756 | 59,343 | 59,937 | 60,536 | 61,141 | 61,753 | 62,370 | 62,994 | 63,624 |
| Misc Owner Expenses | 14,724 | 14,871 | 15,020 | 15,170 | 15,322 | 15,475 | 15,630 | 15,786 | 15,944 | 16,103 | 16,264 |
| Other Non-Reimbursable Expenses | 12,013 | 12,133 | 12,254 | 12,377 | 12,501 | 12,626 | 12,752 | 12,880 | 13,008 | 13,138 | 13,270 |
| **TOTAL NON-REIMBURSABLE OPERATING EXPENSES** | 688,263 | 698,439 | 712,265 | 726,439 | 740,970 | 755,868 | 771,143 | 786,805 | 802,867 | 819,338 | 836,231 |
| **TOTAL PROPERTY EXPENSES** | 3,168,170 | 3,203,145 | 3,242,019 | 3,281,480 | 3,321,571 | 3,362,275 | 3,403,614 | 3,445,601 | 3,488,251 | 3,531,576 | 3,575,592 |
| **NET OPERATING INCOME (BEFORE DEBT SERVICE)** | 5,364,134 | 5,499,805 | 5,722,020 | 5,951,470 | 6,188,377 | 6,432,972 | 6,685,491 | 6,946,176 | 7,215,280 | 7,493,061 | 7,779,784 |
| **PAYMENT OF DEBT SERVICE** | | | | | | | | | | | |
| New Senior Loan - 30y | 47,500,000 | | | | | | | | | | |
| Annual Interest Rate | 5.6400% | | | | | | | | | | |
| Principle Restriction | | | | | | | | | | | |
| | | | | 2,588,766 | 2,548,372 | 2,505,640 | 2,460,435 | 2,412,613 | 2,362,024 | 2,308,506 | 2,251,890 |
| | | | | 697,876 | 738,270 | 781,002 | 826,207 | 874,029 | 924,618 | 978,136 | 1,034,752 |
| **TOTAL PRINCIPLE AND INTEREST PAYMENTS** | 2,679,000 | 2,679,000 | 2,679,000 | 2,679,000 | 2,679,000 | 3,286,642 | 3,286,642 | 3,286,642 | 3,286,642 | 3,286,642 | 3,286,642 |
| **NET OPERATING INCOME (AFTER DEBT SERVICE)** | 2,685,134 | 2,820,805 | 3,043,020 | 3,272,470 | 3,509,377 | 3,146,330 | 3,398,849 | 3,659,534 | 3,928,638 | 4,206,419 | 4,493,142 |

## Cornhusker Portfolio Business Plan Waterfall
### Fioretti Investor Analysis

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **NET OPERATING INCOME (AFTER DEBT SERVICE)** | 2,685,134 | 2,820,805 | 3,043,020 | 2,664,828 | 2,801,736 | 3,146,330 | 3,398,849 | 3,659,534 | 3,928,638 | 4,206,419 | 4,493,143 |
| Waterfall starts at Level One each Fiscal Year. Any prior year amounts paid out and paid out from Level One through Level Three are distributed first, then distributions begin at Level One for the current year after that | | | | | | | | | | | |
| **Level One Distribution - 10% Preferred Interest to Fioretti Member** | 2,685,134 | 2,820,805 | 3,043,020 | 2,664,828 | 2,801,736 | 3,146,330 | 3,398,849 | 3,659,534 | 3,928,638 | 4,206,419 | 4,493,143 |
| 10%  Preferred Interest Distribution to Fioretti | 500,000 | 400,000 | 300,000 | 200,000 | 100,000 | - | - | - | - | - | - |
| Member based on outstanding capital at beg of fiscal year | | | | | | | | | | | |
| plus any new capital added during the year. | | | | | | | | | | | |
| **Remaining Cash Flows After Level One** | 2,185,134 | 2,420,805 | 2,743,020 | 2,464,828 | 2,701,736 | 3,146,330 | 3,398,849 | 3,659,534 | 3,928,638 | 4,206,419 | 4,493,143 |
| **Level Two Distribution - Preferred Capital Payout to Fioretti Member** | | | | | | | | | | | |
| Preferred Capital Repayment to Fioretti Member | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | - | - | - | - | - | - |
| **Remaining Cash Flows After Level Two** | 1,185,134 | 1,420,805 | 1,743,020 | 1,464,828 | 1,801,736 | 3,146,330 | 3,398,849 | 3,659,534 | 3,928,638 | 4,206,419 | 4,493,143 |
| **Level Three Distribution - Cumulative 8% to Fioretti Member** | | | | | | | | | | | |
| 8%  Interest Distribution to Fioretti Member to Achieve 18% | 400,000 | 320,000 | 240,000 | 160,000 | 80,000 | - | - | - | - | - | - |
| based on outstanding capital at beg of the fiscal year | | | | | | | | | | | |
| plus any new capital added during the year. | | | | | | | | | | | |
| **Remaining Cash Flows After Level Three** | 785,134 | 1,100,805 | 1,503,020 | 1,304,828 | 1,721,736 | 3,146,330 | 3,398,849 | 3,659,534 | 3,928,638 | 4,206,419 | 4,493,143 |
| **Level Four Distribution - Perkins Member Catch-up to 25%/75% Split** | | | | | | | | | | | |
| Catch-up Distribution to Perkins Member for the 75% portion of Level Three | 785,134 | 960,000 | 720,000 | 480,000 | 240,000 | - | - | - | - | - | - |
| **Remaining Cash Flows After Level Four** | - | 140,805 | 783,020 | 824,828 | 1,481,736 | 3,146,330 | 3,398,849 | 3,659,534 | 3,928,638 | 4,206,419 | 4,493,143 |
| **Level Five Distribution - 10%/90% Split** | | | | | | | | | | | |
| 10%  Fioretti Member | 2,605,330 | 14,081 | 78,302 | 82,483 | 148,174 | 314,633 | 339,885 | 365,953 | 392,864 | 420,642 | 449,314 |
| 90%  Perkins Member | 23,456,972 | 126,725 | 704,718 | 742,345 | 1,333,562 | 2,831,697 | 3,058,964 | 3,293,581 | 3,535,775 | 3,785,777 | 4,043,828 |
| **Total Level Five Distribution** | 26,063,302 | 140,805 | 783,020 | 824,828 | 1,481,736 | 3,146,330 | 3,398,849 | 3,659,534 | 3,928,638 | 4,206,419 | 4,493,143 |
| **Total Distribution Split/Recap** | | | | | | | | | | | |
| Fioretti Member | 10,306,330 | 1,734,081 | 1,618,302 | 1,412,483 | 1,328,174 | 314,633 | 339,885 | 365,953 | 392,864 | 420,642 | 449,314 |
| Perkins Member | 26,642,706 | 1,086,725 | 1,424,718 | 1,222,345 | 1,373,562 | 2,831,697 | 3,058,964 | 3,293,581 | 3,535,775 | 3,785,777 | 4,043,828 |
| **Total Distribution** | 36,949,036 | 2,820,805 | 3,043,020 | 2,664,828 | 2,701,736 | 3,146,330 | 3,398,849 | 3,659,534 | 3,928,638 | 4,206,419 | 4,493,143 |

**Sale / Refinance Summary**

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Profit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Estimated Portfolio Value at CAP Rate | 8% | 67,051,873 | 68,747,566 | 71,525,250 | 74,393,372 | 77,354,716 | 80,412,151 | 83,568,631 | 86,827,203 | 90,191,001 | 93,663,259 | 97,247,204 | |
| Sr Loan Payoff | | (55,000,000) | (55,000,000) | (55,000,000) | (54,302,124) | (53,563,854) | (52,782,852) | (51,959,646) | (51,092,617) | (50,157,999) | (49,179,863) | (48,145,111) | |
| Preferred Investor Payoff | | (5,900,000) | (4,720,000) | (3,540,000) | (2,360,000) | (1,180,000) | - | - | - | - | - | - | |
| **Net Available Cash after Cash Distribution** | | 6,151,873 | 9,027,566 | 12,985,250 | 17,731,248 | 22,610,862 | 27,629,298 | 31,611,986 | 35,744,586 | 40,033,003 | 44,483,398 | 49,102,193 | 5,806,330 |

| | | |
|---|---|---|
| Fioretti Member IRR | 23.5% | |
| Fioretti Member Cash Flows | $(1,900,000) | 1,900,000 |
| Fioretti Member Multiple | 2.06 | |

**Assumptions:**

Income (in relation to previous year)

| | | |
|---|---|---|
| 2015 | Income | 2.00% |
| 2016 | Income | 3.00% |
| 2017 | Income | 3.00% |
| 2018 | Income | 3.00% |
| 2019 | Income | 3.00% |
| 2020 | Income | 3.00% |
| 2021 | Income | 3.00% |
| 2022 | Income | 3.00% |
| 2023 | Income | 3.00% |

| | |
|---|---|
| 1.00% Expenses | |
| 1.00% Expenses | |
| 1.00% Expenses | |
| 1.00% Expenses | |
| 1.00% Expenses | |
| 1.00% Expenses | |
| 1.00% Expenses | |
| 1.00% Expenses | |
| 1.00% Expenses | |

2 of 2

**EXHIBIT C-1**

**PRO FORMA BUSINESS PLAN**

**Florrell Proforma Analysis 10-21-13 (5% Occupancy Increase)**
(includes Ten Properties; Excludes Monument Mall)

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | | | |
| Rental Income | 6,853,348 | 6,996,835 | 7,295,431 | 7,422,024 | 7,645,303 | 7,874,652 | 8,110,902 | 8,354,229 | 8,604,855 | 8,853,001 | 9,128,891 |
| CAM Reimbursements | 954,275 | 973,381 | 1,002,561 | 1,032,638 | 1,063,617 | 1,095,526 | 1,128,392 | 1,162,243 | 1,197,111 | 1,233,024 | 1,270,015 |
| Other Reimbursements | 996,677 | 1,016,611 | 1,047,109 | 1,078,522 | 1,110,878 | 1,144,204 | 1,178,530 | 1,213,886 | 1,250,303 | 1,287,812 | 1,326,446 |
| **TOTAL INCOME** | 8,610,300 | 8,986,506 | 9,256,101 | 9,533,784 | 9,819,798 | 10,114,392 | 10,417,823 | 10,730,358 | 11,052,269 | 11,383,837 | 11,725,352 |
| **REIMBURSABLE OPERATING EXPENSES** | | | | | | | | | | | |
| Repairs and Maintenance | 230,520 | 232,825 | 235,153 | 237,505 | 239,880 | 242,279 | 244,702 | 247,149 | 249,620 | 252,116 | 254,637 |
| Sweep Costs | 94,243 | 95,185 | 96,137 | 97,099 | 98,070 | 99,050 | 100,041 | 101,041 | 102,052 | 103,072 | 104,103 |
| Cleaning and Related Costs | 53,034 | 53,564 | 54,100 | 54,641 | 55,187 | 55,739 | 56,297 | 56,860 | 57,428 | 59,003 | 59,583 |
| Electric and Utilities | 95,574 | 96,550 | 97,465 | 98,470 | 99,455 | 100,449 | 101,454 | 102,468 | 103,493 | 104,528 | 105,573 |
| Landscaping | 110,773 | 111,881 | 113,000 | 114,130 | 115,271 | 116,424 | 117,588 | 118,764 | 119,951 | 121,151 | 122,362 |
| Insurance | 148,952 | 148,422 | 149,906 | 151,405 | 152,919 | 154,448 | 155,993 | 157,552 | 159,128 | 160,719 | 162,326 |
| Security | 9,221 | 9,313 | 9,406 | 9,500 | 9,595 | 9,691 | 9,788 | 9,886 | 9,985 | 10,085 | 10,186 |
| Misc Reimbursable Expenses | 14,646 | 14,792 | 14,940 | 15,090 | 15,241 | 15,393 | 15,547 | 15,702 | 15,860 | 16,018 | 16,178 |
| Maintenance, Supervision, and Management | 346,123 | 349,584 | 353,080 | 356,611 | 360,177 | 363,779 | 367,417 | 371,091 | 374,802 | 378,550 | 382,335 |
| Management Office Expenses | 38,857 | 37,226 | 37,598 | 37,974 | 38,354 | 38,737 | 39,124 | 39,516 | 39,911 | 40,310 | 40,713 |
| Snow Removal | 109,621 | 110,717 | 111,824 | 112,943 | 114,072 | 115,213 | 116,365 | 117,529 | 118,704 | 119,891 | 121,090 |
| Other Reimbursable Expenses | 3,045 | 3,075 | 3,106 | 3,137 | 3,169 | 3,200 | 3,232 | 3,265 | 3,297 | 3,330 | 3,364 |
| Non-CAM Reimbursable Expenses | 93,404 | 94,338 | 95,281 | 96,234 | 97,197 | 98,168 | 99,150 | 100,142 | 101,143 | 102,155 | 103,176 |
| **TOTAL CAM EXPENSES** | 1,344,013 | 1,357,453 | 1,371,028 | 1,384,738 | 1,398,585 | 1,412,571 | 1,426,697 | 1,440,964 | 1,455,373 | 1,469,927 | 1,484,626 |
| **REAL ESTATE TAXES** | 1,135,994 | 1,147,253 | 1,158,725 | 1,170,313 | 1,182,016 | 1,193,836 | 1,205,774 | 1,217,832 | 1,230,010 | 1,242,311 | 1,254,734 |
| **TOTAL REIMBURSABLE OPERATING EXPENSES** | 2,479,997 | 2,504,706 | 2,529,753 | 2,555,051 | 2,580,601 | 2,606,407 | 2,632,471 | 2,658,796 | 2,685,384 | 2,712,238 | 2,739,360 |
| **NON-REIMBURSABLE OPERATING EXPENSES** | | | | | | | | | | | |
| Repairs and Maintenance - Owner | 7,647 | 7,723 | 7,801 | 7,879 | 7,957 | 8,037 | 8,117 | 8,199 | 8,281 | 8,363 | 8,447 |
| Utilities | 49,565 | 49,061 | 49,541 | 50,037 | 50,537 | 51,042 | 51,553 | 52,068 | 52,589 | 53,115 | 53,646 |
| Professional Fees | 184,424 | 198,368 | 198,332 | 206,315 | 202,318 | 204,342 | 206,385 | 208,449 | 210,533 | 212,639 | 214,765 |
| Management Fees | 364,412 | 371,460 | 382,244 | 393,351 | 404,792 | 416,576 | 428,713 | 441,214 | 454,602 | 467,353 | 481,014 |
| Advertising and Marketing Expenses | 57,598 | 58,174 | 58,756 | 59,343 | 59,937 | 60,536 | 61,141 | 61,753 | 62,370 | 62,994 | 63,624 |
| Misc Owner Expenses | 12,724 | 14,671 | 15,020 | 15,170 | 15,322 | 15,475 | 15,630 | 15,789 | 15,946 | 16,103 | 16,284 |
| Other Non-Reimbursable Expenses | 12,013 | 12,133 | 12,254 | 12,337 | 12,501 | 12,628 | 12,752 | 12,880 | 13,008 | 13,138 | 13,270 |
| **TOTAL NON-REIMBURSABLE OPERATING EXPENSES** | 699,363 | 709,781 | 723,948 | 738,472 | 753,364 | 768,634 | 784,281 | 800,349 | 816,816 | 833,706 | 851,030 |
| **TOTAL PROPERTY EXPENSES** | 3,179,290 | 3,214,487 | 3,253,701 | 3,293,523 | 3,333,965 | 3,375,041 | 3,416,763 | 3,459,145 | 3,502,200 | 3,545,944 | 3,590,391 |
| **NET OPERATING INCOME (BEFORE DEBT SERVICE)** | 5,631,010 | 5,772,019 | 6,002,400 | 6,240,261 | 6,485,832 | 6,739,351 | 7,001,061 | 7,271,214 | 7,550,069 | 7,837,893 | 8,134,961 |
| **PAYMENT OF DEBT SERVICE** | | | | | | | | | | | |
| New Seven Loan - 30yr. | 47,500,000 | | | | | | | | | | |
| Annual Interest Rate | 5.6400% | | | | | | | | | | |
| Principle Reduction | | | | | | | | | | | |
| **TOTAL PRINCIPLE AND INTEREST PAYMENTS** | 2,679,000 | 2,679,000 | 2,679,000 | 2,679,000 | 3,286,642 | 3,286,642 | 3,286,642 | 3,286,642 | 3,286,642 | 3,286,642 | 3,286,642 |
| **NET OPERATING INCOME (AFTER DEBT SERVICE)** | 2,952,010 | 3,093,019 | 3,323,400 | 3,561,261 | 3,199,190 | 3,452,709 | 3,714,419 | 3,984,572 | 4,263,427 | 4,551,251 | 4,848,320 |

## Cornhusker Portfolio Business Plan Waterfall
### Fioretti Investor Analysis

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **NET OPERATING INCOME AFTER DEBT SERVICE** | 2,912,010 | 3,053,019 | 3,323,400 | 2,953,620 | 3,199,191 | 3,452,709 | 3,714,419 | 3,984,572 | 4,263,427 | 4,551,251 | 4,848,320 |

*Waterfall starts at Level One each Fiscal Year. Any prior year amounts not paid out from Level One through Level Three are distributed first, then distributions begin at Level One for the current year after that.*

| **Level One Distribution – 10% Preferred Interest to Fioretti Member** | 1,500,000 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10% Preferred Interest Distribution to Fioretti Member based on outstanding capital at beg of fiscal year plus any new capital added during the year | 500,000 | 400,000 | 300,000 | 200,000 | 100,000 | | | | | | |
| Remaining Cash Flows After Level One | 2,452,010 | 2,653,019 | 3,023,400 | 2,753,620 | 3,099,191 | 3,452,709 | 3,714,419 | 3,984,572 | 4,263,427 | 4,551,251 | 4,848,320 |

| **Level Two Distribution – Preferred Capital Payoll to Fioretti Member** | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Preferred Capital Repayment to Fioretti Member | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | | | | | | |
| Remaining Cash Flows After Level Two | 1,452,010 | 1,693,019 | 2,023,400 | 1,753,620 | 2,099,191 | 3,452,709 | 3,714,419 | 3,984,572 | 4,263,427 | 4,551,251 | 4,848,320 |

| **Level Three Distribution – Cumulative 18% to Fioretti Member** | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8% Interest Distribution to Fioretti Member to Achieve 18% based on outstanding capital at beg of the fiscal year plus any new capital added during the year | 400,000 | 320,000 | 240,000 | 160,000 | 80,000 | | | | | | |
| Remaining Cash Flows After Level Three | 1,052,010 | 1,373,019 | 1,783,400 | 1,593,620 | 2,019,191 | 3,452,709 | 3,714,419 | 3,984,572 | 4,263,427 | 4,551,251 | 4,848,320 |

| **Level Four Distribution – Perkins Member Catch-up to 25%/75% Split** | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Catch-up Distribution to Perkins Member for 75% portion of Level Three | 1,052,010 | 960,000 | 720,000 | 480,000 | 240,000 | | | | | | |
| Remaining Cash Flows After Level Four | - | 413,019 | 1,063,400 | 1,113,620 | 1,779,191 | 3,452,709 | 3,714,419 | 3,984,572 | 4,263,427 | 4,551,251 | 4,848,320 |

| **Level Five Distribution – 10%/90% Split** | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10% Fioretti Member | | 41,302 | 106,340 | 111,362 | 177,919 | 345,271 | 371,442 | 399,457 | 426,343 | 455,125 | 484,832 |
| 90% Perkins Member | | 371,717 | 957,060 | 1,002,258 | 1,601,272 | 3,107,438 | 3,342,977 | 3,585,115 | 3,837,084 | 4,096,126 | 4,363,488 |
| Total Level Five Distribution | | 413,019 | 1,063,400 | 1,113,620 | 1,779,191 | 3,452,709 | 3,714,419 | 3,984,572 | 4,263,427 | 4,551,251 | 4,848,320 |

| **Total Distribution Split Recap** | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Fioretti Member | 1,900,000 | 1,761,302 | 1,646,340 | 1,471,362 | 1,357,919 | 345,271 | 371,442 | 399,457 | 426,343 | 455,125 | 484,832 |
| Perkins Member | 1,052,010 | 1,331,717 | 1,677,060 | 1,482,258 | 1,841,272 | 3,107,438 | 3,342,977 | 3,585,115 | 3,837,084 | 4,096,126 | 4,363,488 |
| **TOTAL Distribution** | 2,952,010 | 3,093,019 | 3,323,400 | 2,953,620 | 3,199,191 | 3,452,709 | 3,714,419 | 3,984,572 | 4,263,427 | 4,551,251 | 4,848,320 |

**Sale / Refinance Summary**

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Estimated Portfolio Value at CAP Rate (8%) | 70,987,025 | 72,150,237 | 75,020,001 | 78,000,285 | 81,072,906 | 84,241,987 | 87,513,260 | 90,890,170 | 94,375,897 | 97,973,691 | 101,667,018 |
| Sr Loan Payoff | (55,000,000) | (55,000,000) | (55,000,000) | (55,000,000) | (54,392,124) | (53,563,854) | (51,966,646) | (51,082,817) | (50,157,990) | (49,179,853) | (48,145,111) |
| Preferred Investor Payoff | (5,900,000) | (4,720,000) | (3,540,000) | (2,360,000) | (1,180,000) | | | | | | |
| **Net Available Cash after Cash Distribution** | 9,487,025 | 12,430,237 | 16,480,001 | 21,341,141 | 26,329,052 | 31,459,034 | 35,556,614 | 39,807,353 | 44,217,895 | 48,793,708 | 53,541,907 |

| | | | | | | | | | | | | Profit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fioretti Member IRR | 24.3% | | | | | | | | | | | $ 5,618,393 |
| Fioretti Member Cash Flows | $ (5,000,000) | 1,600,000 | 1,761,302 | 1,646,340 | 1,471,362 | 1,357,919 | 345,271 | 371,442 | 399,457 | 426,343 | 455,125 | 48,832 |
| Fioretti Member Multiple | 2.12 | | | | | | | | | | | |

**Assumptions:**

Income (no relation to previous year)

| | | |
|---|---|---|
| 2015 | Income | 1.00% Expenses | 2.00% |
| 2016 | Income | 1.00% Expenses | 3.00% |
| 2016 | Income | 1.00% Expenses | 3.00% |
| 2017 | Income | 1.00% Expenses | 3.00% |
| 2018 | Income | 1.00% Expenses | 3.00% |
| 2019 | Income | 1.00% Expenses | 3.00% |
| 2020 | Income | 1.00% Expenses | 3.00% |
| 2021 | Income | 1.00% Expenses | 3.00% |
| 2022 | Income | 1.00% Expenses | 3.00% |
| 2023 | Income | 1.00% Expenses | 3.00% |

**EXHIBIT D**

**INITIAL APPROVED BUDGET**

The Approved Budget for 2014 is evidenced by the 2014 portion of the Business Plan attached as Exhibit C.

## EXHIBIT E

## FORM OF PERKINS PRINCIPAL INDEMNITY AGREEMENT

**FOR VALUE RECEIVED**, in consideration for, and as an inducement to **MF CORNHUSKER MEMBER LLC**, a Delaware limited liability company (hereinafter referred to as "**PF Member**") to enter into that certain Limited Liability Company Agreement of MFP Cornhusker Properties LLC of even date herewith (hereafter referred to as the "**LLC Agreement**") with **PERKINS DELAWARE, LLC**, a Delaware limited liability company (hereafter referred to as "**Perkins Member**"), the undersigned hereby absolutely, unconditionally and irrevocably agrees to indemnify, defend and hold harmless PF Member and its Affiliates (as such term is defined in the LLC Agreement) (hereinafter collectively referred to as the "**Indemnified Parties**") from and against any loss, cost or damage incurred by Indemnified Parties as a result of (A) the occurrence of Removal Events under the LLC Agreement; (B) the placement of any lien on the property of the Company Entities or the Project as a result of the direct action or inaction of Perkins Member or Asset Manager (as defined in the LLC Agreement) not otherwise approved in writing by PF Member, except where such action or inaction of Perkins Member or Asset Manager was due to the failure of PF Member to make an Approved Additional Capital Contribution; (C) breach or default by Asset Manager in performance of its obligations beyond any applicable cure period under the Perkins Asset Management Agreements of even date herewith; and (D) the inaccuracy of any representations given by Perkins Member under Schedule 6.1(B) of the LLC Agreement (collectively, "**Specified Events**"). The undersigned further represents to PF Member as an inducement for PF Member to enter into the LLC Agreement, that the execution and delivery of this Indemnity is not in contravention of any other agreement to which the undersigned is party. The undersigned acknowledges and covenants to the Indemnified Parties that the undersigned has a beneficial interest in Perkins Member and, accordingly, has a financial interest in the making of the LLC Agreement.

The undersigned does hereby waive all requirements of notice of the acceptance of this Indemnity. The undersigned's obligations hereunder shall remain fully binding although the Indemnified Parties may have waived one or more Specified Events, extended the time of performance by Perkins Member or Asset Manager, released Perkins Member from liability for any of the Removal Events and/or any other of Perkins Member's obligations under the LLC Agreement or released Asset Manager from any of Asset Manager's obligations under the Perkins Asset Management Agreements. The undersigned further agrees that the undersigned's liability under this Indemnity shall be primary, and that in any right of action which shall accrue to PF Member under the LLC Agreement, PF Member may, at PF Member's option, proceed simultaneously against the undersigned under this Indemnity, against Perkins Member under the LLC Agreement, or against Asset Manager under the Perkins Asset Management Agreements, or may proceed against the undersigned without having commenced any action against or having obtained any judgment against Perkins Member or Asset Manager. The undersigned's obligations hereunder shall remain fully binding, notwithstanding any course of dealings between PF Member and Perkins Member.

**IN WITNESS WHEREOF**, the undersigned has caused this Perkins Principal Indemnity Agreement to be executed as of the ___ day of _____, 2013.

**INDEMNITOR:**

_____

Michael D. Perkins

MFP CORNHUSKER PROPERTIES LLC          Exhibit E

**EXHIBIT F**

**CERTIFICATE OF PRINCIPAL**

Michael D. Perkins, an individual residing in the State of California, hereby represents and warrants to MF Cornhusker Member LLC, a Delaware limited liability company, that:

1. During the past ten (10) years there have been no (A) petitions under the federal bankruptcy laws or any state insolvency law filed by or against, or a receiver, fiscal agent or similar officer appointed by a court for the business or property of, or (B) unsatisfied judgments of record in excess of $10,000.00 against nor any actions pending in any courts against, or (C) tax liens filed against:

       i.    me;

       ii.    any partnership in which I was a general partner at or within two (2) years before the time of such filing; or

       iii.    any corporation or business association of which I was an executive officer at or within two (2) years before the time of such filing.

2. Any bankruptcy proceedings, judgments, or tax liens of record against individuals with the same or similar names, during the previous ten (10) years, are not against me.

3. During the past ten (10) years I have not been convicted of fraud in a civil or criminal proceeding.

4. During the past ten (10) years I have not been convicted in a criminal proceeding (excluding traffic violations and other minor offenses), nor am I a named subject of a criminal proceeding which is presently pending.

5. During the past ten (10) years I have not been the subject of any final court order, judgment, decree or consent agreement of any court or other federal or state authority, including administrative agencies, permanently or temporarily enjoining me from, or otherwise limiting me from engaging in or being associated with persons engaging in any type of business practice or activity.

6. I am not and have never been party or subject to an inquiry, investigation, lawsuit, litigation, arbitration, hearing or other legal or administrative proceeding (A) in which claims were asserted under federal and/or state securities, tax or bankruptcy laws or (B) in which claims were asserted otherwise alleging fraud, deceit or misrepresentation, except as set forth on Schedule 1 attached hereto.

Dated: October __, 2013         By: _____
                                     Michael D. Perkins

MFP CORNHUSKER PROPERTIES LLC       Exhibit F

## SCHEDULE 6.1(A)

### CLOSING DELIVERIES

Perkins Member shall have delivered to PF Member documents or other evidence of satisfaction of the following conditions in form and content reasonably satisfactory to PF Member:

1. This Agreement and all requisite state and federal filings.

2. All documents evidencing the formation, organization, valid existence, good standing, and due authorization of and for Perkins Member for the execution, delivery, and performance of the organizational documents.

3. An ALTA (or equivalent) owner's policy of title insurance (or unconditional commitment therefor) in the amount of the value of the Project, in form and with endorsements satisfactory to PF Member, in the name of the Company.

4. Evidence of insurance required by Section **4.10** of this Agreement. All such insurance policies and endorsements shall be fully paid for and contain such provisions and expiration dates and be in such form and issued by insurance companies licensed to do business in the state in which the Project is located.

5. Evidence that water, sewer, electrical, natural gas and telephone utilities are available to the Project.

6. No condemnation or adverse zoning or usage change proceeding shall have occurred or shall have been threatened against the Project; the Project shall not have suffered any significant damage by fire or other casualty which has not been repaired; no law, regulation, ordinance, moratorium, injunctive proceeding, restriction, litigation, action, citation or similar proceeding or matter shall have been enacted, adopted, or threatened by any third party or governmental authority, which would have, in PF Member's reasonable judgment, a material adverse effect on Perkins Member or the Project.

7. Evidence that all fees and commissions payable to real estate brokers, mortgage brokers, or any other brokers or agents in connection with the Project have been paid.

8. An environmental report pertaining to the environmental condition of the Project dated within sixty (60) days of the date hereof shall have been obtained by the Company and shall be in form satisfactory to PF Member.

9. The Business Plan and the Approved Budget shall have been approved by PF Member (as set forth in Sections **4.2** and **4.3** of the Agreement and as attached to the Agreement as Exhibits C and D, respectively).

10. The Perkins Principal Indemnity, duly executed by Michael D. Perkins.

11. The Certificates of Principal duly executed by Michael D. Perkins.

12. The principals of Perkins Member shall have delivered to PF Member (i) financial statements reasonably satisfactory to PF Member and (ii) background report authorizations relating to

litigation, criminal and bankruptcy matters, with such background reports having been received by PF Member in form and content satisfactory to PF Member.

## SCHEDULE 6.1(B)

### PERKINS MEMBER
### REPRESENTATIONS

Perkins Member, for itself and its Affiliates, hereby represents and warrants to PF Member and to the Company, that the following statements are true and correct as of the date of this Agreement:

1.  <u>No Proceedings</u>. There are no legal or administrative proceedings (including without limitation condemnation or eminent domain proceedings by any Governmental Authority) pending, or, to the actual knowledge of Perkins Member, threatened with respect to the Project.

2.  <u>Utility Availability</u>. Water and sewer line systems having adequate capacity for transmission of water, waste water and storm fluids are currently available to the Project.

3.  <u>FIRPTA</u>. Such Member is not a "foreign person", "foreign partnership", "foreign trust" or "foreign estate" as those terms are defined in Section 1445 of the Internal Revenue Code of 1986, as amended.

4.  <u>Use of Project</u>. The Project is useable for its intended use without violation of any federal, state, local or other governmental building, zoning, health, safety, platting, subdivision or other law, ordinance or regulation, or any applicable private restriction. Except as otherwise expressly set forth in the Phase I Environmental Site Assessments (as hereinafter defined) and to the actual knowledge of Perkins Member, no toxic or hazardous substances or wastes, pollutants, or contaminants have been generated, treated, stored, released or disposed of, or otherwise placed, deposited and/or located on the Project, nor have above-ground or underground storage tanks or been located in or about the Project and subsequently removed or filled. The term "Phase I Environmental Assessments" shall mean, collectively, the following reports prepared by Partner Engineering and Science, Inc.:

Eastgate Plaza
*   Phase I Environmental Site Assessment Report of 2660-2850 East 23rd Street, Fremont, Nebraska 68025, dated August 7, 2013 (Project No. 13-106100.4)
Stockyards Plaza
*   Phase I Environmental Site Assessment Report of Stockyards Plaza, 3201 L. Street and 3305-3505 L Street, Omaha, Nebraska 68107, dated September 30, 2013 (Project No. 13-106100.8)
*   Phase II Subsurface Investigation Report of Stockyards Plaza, 3201 L. Street and 3305-3505 L Street, Omaha, Nebraska 68107, dated October 10, 2013 (Project No. 13-106100.12)
Miracle Hills Park
*   Phase I Environmental Site Assessment Report of Miracle Hills Park, 606-720 North 114th Street, Omaha, Nebraska 68154, dated August 7, 2013 (Project No. 13-106100.6)
Bishop Heights Shopping Center
*   Phase I Environmental Site Assessment Report of Bishop Heights Shopping Center, 4200 South 27th Street, Lincoln, Nebraska 60502, dated August 6, 2013 (Project No. 13-106100.2)
Edgewood Shopping Center
*   Phase I Environmental Site Assessment Report of Edgewood I&II Shopping Center, 5400-5566 South 56th Street, Lincoln, Nebraska 68516, dated August 7, 2013 (Project No. 13-106100.5)

The Meadows Shopping Center
- Phase I Environmental Site Assessment Report of 2840 South 70th Street, Lincoln, Nebraska 68506, dated August 7, 2013 (Project No. 13-106100.9)

Cornhusker Plaza
- Phase I Environmental Site Assessment Report of 2601 Cornhusker Drive, South Sioux City, Nebraska 68776, dated August 6, 2013 (Project No. 13-106100.3)

Market Square Shopping Center
- Phase I Environmental Site Assessment Report of Market Square, 1900 Center Drive, Norfolk, Nebraska, 68701, dated August 7, 2013 (Project No. 13-106100.10)

Baken Park Center
- Phase I Environmental Site Assessment Report of Baken Park, 2001 West Main Street, Rapid City, South Dakota 57702, dated August 9, 2013 (Project No. 13-106100.1)
- Phase II Subsurface Investigation Report of Baken Park, 2001 West Main Street, Rapid City, South Dakota 57702, dated October 17, 2013 (Project No. 13-106100.13)

Bon-Ton's (Herberger's)
- Phase I Environmental Site Assessment Report of Herbergers, 4915 2nd Avenue, Kearney, Nebraska 68847, dated August 9, 2013 (Project No. 13-106100.11)

Monument Mall
- Phase I Environmental Site Assessment Report of Monument Mall, 2302 and 2410 Frontage Road, Scottsbluff, Nebraska 69361, dated August 6, 2013 (Project No. 13-106100.7)

5. <u>No Violation</u>. There is no violation of any Governmental Regulations with respect to the Project currently existing or which to the knowledge of Perkins Member would reasonably be expected to exist as a result of the contemplated operation of the Project, which if such violation existed would cause a material adverse effect on the Project.

6. <u>Compliance</u>. The use of the Project materially complies with all Governmental regulations, including all zoning ordinances, and comply with all private covenants (if any) affecting the Project.

7. <u>Approvals</u>. All approvals pursuant to Governmental Requirements (including all environmental permits, zoning approvals, approvals and impact statements) required in connection with the intended use of the Project, by all Governmental Authorities having jurisdiction thereof have been or Perkins Member reasonably expects will be obtained or completed and no actions relating to such approvals are pending, or, to the actual knowledge of Perkins Member, are threatened.

8. <u>No Condemnation</u>. No condemnation or adverse zoning or usage change proceeding has occurred or is pending, or, to the actual knowledge of Perkins Member, is threatened against the Project; the Project has not suffered any significant damage by fire or other casualty which has not been repaired; no law, regulation, ordinance, moratorium, injunctive proceeding, restriction, litigation, action, citation or similar proceeding or matter has been enacted, adopted, or, to the actual knowledge of Perkins Member, is threatened by any third party or governmental authority, which has been or would reasonably expected to have a material adverse effect on Perkins Member or the Project.

9. <u>Fees Paid</u>. All fees and commissions payable to real estate brokers, mortgage brokers, or any other brokers or agents in connection with the Project have been paid.

The representations shall survive the acquisition of the Project by the Company for the period that is (a) five (5) years from the date hereof, or (b) until one (1) year after the Project is completed by the Company, whichever is shorter.

**COMPANY RESOLUTION**
**OF**
**MFP CORNHUSKER PROPERTIES LLC**

**July 10, 2015**

The undersigned, being all of the Members (the "Members") of MFP Cornhusker Properties, LLC, a Delaware limited liability company (the "Company"), do hereby adopt the following resolutions and approve the actions specified or contemplated herein:

WHEREAS, the Company is the sole member and manager of MFP Mid-America Shopping Centers LLC, a Delaware limited liability company ("Mid-America");

WHEREAS, Mid-America entered into that certain Loan Agreement dated as of October 22, 2013 between Mid-America and Jeffries LoanCore LLC, a Delaware limited liability company ("Lender") (the "Loan Agreement");

WHEREAS, Mid-America and Lender desire to enter into a Loan Modification Agreement to amend the Loan Agreement to accommodate a refinancing of the Bishop Heights and Meadows properties and accommodate the refinancing and future sales that may occur;

WHEREAS, the undersigned Members desire that the actions be taken and documents and agreements be executed as may be reasonably necessary to enter into the Loan Modification Agreement and refinance the Bishop Heights and/or Meadows properties;

NOW, THEREFORE, BE IT RESOLVED, that the undersigned Members hereby authorize, ratify, and approve in all respects: the form and substance of the Loan Modification Agreement; the execution, delivery, and performance by Mid-America of the Loan Modification Agreement; and the execution, delivery, and performance by Mid-America of such other documents as may be necessary or desirable in connection with or in furtherance of the transaction contemplated by the Loan Modification generally;

BE IT FURTHER RESOLVED, that the undersigned Members hereby authorize, ratify, and approve in all respects the refinancing of the Bishop Heights and Meadows properties and authorizes, ratifies, and approves the execution, delivery, and performance of any of the documents necessary to refinance these properties by Mid-America including, without limitation, the transfer of such properties to a new borrowing entity.

BE IT FURTHER RESOLVED that Perkins Delaware, LLC, a Delaware limited liability company, is authorized to consummate the transactions contemplated by the resolutions on behalf of the Company as the sole member and manager of Mid-America.

IN WITNESS WHEREOF, the undersigned Members have executed this Resolution as of the date first written above.

EXHIBIT
B

**MF CORNHUSKER MEMBER LLC,** a
Delaware limited liability company

By: _____
Name: _____
Its: _____

**PERKINS DELAWARE, LLC,** a Delaware
limited liability company

By:  Perkins Centers Delaware, LLC, a Delaware
limited liability company, its manager

By: Perkins, L.L.C., a Nebraska limited liability
company, its manager

_____
Michael D. Perkins, Trustee of the Michael D.
Perkins Funnel Trust created June 6, 1996, its
member

Market Square, Inc., a Nebraska corporation,
its member

By: _____
Michael D. Perkins, President

00604648.DOC



*First American Title Insurance Company*
*National Commercial Services*
13924 Gold Circle • Omaha, NE 68144

*Office Phone:*(402)697-4699 *Office Fax:*(877)483-0317

*Borrower's Final Settlement Statement*

| | |
|---|---|
| File No: | NCS-778137-OMHA |
| Escrow Officer: | Debra Saxton/ds |
| Settlement Date: | 03/17/2017 |
| Disbursement Date: | 03/17/2017 |

**Property:**
4915 2nd Avenue, Kearney, NE
Lot: 1

**Borrower:**
MFP Mid-America Shopping Centers LLC
4915 2nd Avenue, Kearney, NE

**Lender:**
Equitable Bank
619 North Diers Avenue, P.O. Box 160, Grand Island, NE
68802

| Description | Borrower Charge | Borrower Credit |
|---|---|---|
| **New Loan(s)** | | |
| **Lender: Equitable Bank** | | |
| Loan Amount | | 3,000,000.00 |
| Origination Fee | 7,500.00 | |
| Appraisal Fee | 3,500.00 | |
| Flood Certification | 12.00 | |
| Tax Service | 64.00 | |
| | | |
| **Payoff Loan(s)** | | |
| **Lender: Jefferies LoanCore LLC** | | |
| Principal Balance | 2,125,000.00 | |
| Interest on Payoff Loan | 12,237.20 | |
| Administrative Expenses & Misc Fees | 200.00 | |
| Legal Fees | 2,500.00 | |
| | | |
| **Title/Escrow Charges** | | |
| Closing Protection Letter NE to First American Title Insurance Company National Commercial Services | 25.00 | |
| Closing-Escrow Fee to First American Title Insurance Company National Commercial Services | 300.00 | |
| Policy-Extended ALTA 2006 Lender's to First American Title Insurance Company National Commercial Services | 2,040.00 | |
| Record Electronically | 25.00 | |
| Record DOT & AOR | 98.00 | |
| Record Release /Reconveyance to Buffalo County Register of Deeds | 16.00 | |
| Record Release /Reconveyance to Buffalo County Register of Deeds | 16.00 | |
| Record Release /Reconveyance to Buffalo County Register of Deeds | 16.00 | |
| **Cash ( From) (X To) Borrower** | 846,450.80 | |

EXHIBIT
C

Settlement Statement Page 1 of 2
Print Date: 03/17/2017, 8:08 AM

*Borrower's Final Settlement Statement*

| Settlement Date: | 03/17/2017 | | |
|---|---|---|---|
| Officer: | Debra Saxton/ds | **File No:** | NCS-778137-OMHA |

| Description | Borrower Charge | Borrower Credit |
|---|---|---|
| | | |
| Totals | 3,000,000.00 | 3,000,000.00 |

**BORROWER(S):**

MFP Mid-America Shopping Centers LLC

By: MFP Cornhusker Properties, LLC, its
Member; By: Perkins Centers Delaware, LLC,
its Manager; By: Perkins, L.L.C., its Manager

By: *Michael D. Perkins, Trustee*
Name: Michael D. Perkins, Trustee of
the
Title: Michael D. Perkins Funnel
Trust, Member

By: *Michael D. Perkins, President*
Name: Market Square, Inc., Member
Title: Michael D. Perkins, President

Exhibit "A"

The land referred to is situated in the State of Nebraska, County of Buffalo and is described as follows:

Parcel 1:
A tract of land being part of Lot One (1), Hilltop Mall Subdivision, a subdivision to the City of Kearney located in the Southwest Quarter of the Northwest Quarter (SW1/4 NW1/4) of Section Twenty-five (25), Township Nine (9) North, Range Sixteen (16) West of the Sixth (6th) Principal Meridian, all in Buffalo County, Nebraska and more particularly described as follows:
Referring to the Southwest corner of the Southwest Quarter of the Northwest Quarter of Section 25 and assuming the West line of said Southwest Quarter of the Northwest Quarter as bearing N 00°18'49" W and all bearings contained herein are relative thereto; thence N 00°18'49" W on said West line of the Southwest Quarter of the Northwest Quarter a distance of 216.55 feet; thence N 89°41'11" E perpendicular to said West line of the Southwest Quarter of the Northwest Quarter a distance of 50.00 feet to a 5/8 inch rebar at the Northwest corner of Lot 3, Hilltop Mall Subdivision, a subdivision to the City of Kearney, Buffalo County, Nebraska and the ACTUAL POINT OF BEGINNING; thence N 00°18'49" W on the East line of 2nd Avenue, as platted in said City of Kearney, a distance of 242.23 feet; thence N 89°41'15" E a distance of 229.50 feet; thence N 00°18'49" W a distance of 170.00 feet to a point on the South line of Lot 2 of said Hilltop Mall Subdivision; thence N 89°41'15" E on the South line of said Lot 2 a distance of 733.83 feet to a 5/8 inch rebar at the Southeast corner of said Lot 2, and the West line of Imperial Village Condominiums Second, a condominium laid out on Lots 1, 2, 3, 4 and 5, Block 7, of Imperial Village Addition, an addition to the City of Kearney, Buffalo County, Nebraska; thence S 44°25'12" W on the West line of said Imperial Village Condominiums Second a distance of 615.78 feet to a 1/2 inch rebar; thence S 00°56'55" E continuing on said West line a distance of 122.25 feet to a 2 inch iron pipe on the North line of 48th Street as platted in said Imperial Village Addition; thence S 89°25'43" W on said North line of 48th Street a distance of 271.30 feet; thence N 00°18'49" W a distance of 89.75 feet; thence N 19°42'54" E a distance of 64.24 feet; thence N 00°18'49" W a distance of 23.00 feet; thence S 89°25'43" W a distance of 132.00 feet; thence S 00°18'49" E a distance of 23.00 feet to a 5/8 inch rebar with cap at the Northeast corner of said Lot 3; thence S 89°22'26" W on the North line of said Lot 3 a distance of 150.00 feet to the Point of Beginning;

TO BE KNOWN AS: Lot 1, Hilltop Mall Second, an Addition to the City of Kearney, Buffalo County, Nebraska.

Parcel 2:
Non-exclusive appurtenant easements as set forth in Roll 83-7859 as Amended as Inst. No. 96-2172, Records, Buffalo County, Nebraska.

# Situs

Situs Asset Management LLC
5065 Westheimer Suite 700E
Houston, TX 77056
Phone: 713.328.4400
Fax: 713.355.5882

## UNSCHEDULED PRINCIPAL PAYDOWN NOTICE

Statement Date: 3/15/2017

MFP MID-America Shopping Centers LLC

608 North 114th Street

Omaha NE 68154

| | | |
|---|---|---|
| Situs Loan No. | 37095 | |
| Portfolio: | Jefferies LoanCore LLC | |
| Good for Payoff On: | 3/15/2017 | |
| Statement Expires On: | 3/31/2017 | |
| Current Interest Rate: | 6.68750% | |

| | | | | |
|---|---|---|---|---|
| PRINCIPAL PAYDOWN AMOUNT | | | $ | 2,125,000.00 |
| INTEREST DUE AT NOTE RATE | 3/9/2017 through 4/8/2017 | | | 12,237.20 |
| ADMINISTRATIVE EXPENSES & UNPAID MISC. FEES (if applicable) | | | | 200.00 |
| LEGAL FEES–Arnold Porter Kaye Scholer | | | | 2,500.00 |
| **TOTAL** | | | $ | 2,139,937.20 |

Collateral associated with this commercial loan:   Hilltop Mall (Herberger's)

Wire payments for the full amount shown above must be RECEIVED by Situs no later than 2:00 p.m. Central on
Wednesday, March 15, 2017   Payments received after 2:00 p.m. will not be credited until the next business day.

This Statement expires on   3/31/2017   after which a new and valid Statement must be obtained.

Escrow refunds are returned separately. This letter does NOT modify your loan documents nor negate your responsibility to pay installments timely.

**Please wire the total amount due as follows:**

Bank: Wells Fargo Bank, N.A.
Routing: 121-000-248
Beneficiary: Situs Asset Management LLC as Servicer
Account: 4121504211
Reference: Loan No. 37095

SITUS REQUIRES THE INCLUSION OF THE ABOVE REFERENCE LINE AS A CONDITION OF ACCEPTING YOUR PAYMENT.

THIS STATEMENT IS SUBJECT TO AUDIT AND LENDER APPROVAL

The Total amount due should be remitted in accordance with the above instructions in Immediately Available Funds. Alternative forms of payment (e.g., Certified Checks, Bank Drafts, and other mediums) must be arranged in advance through your Asset Manager. We assume no responsibility for late or misdirected wires, nor should this statement be used for a non-wire payment. No real estate tax or insurance payments will be disbursed for your account after payoff funds are received. The borrower is responsible for any payments due on or after the payoff date, including applicable interest or penalties.

IMPORTANT NOTICE: This statement does not modify, alter or amend the terms of the loan documents. The payoff quoted above is subject to final verification by the noteholder. Situs Asset Management LLC reserves the right to demand additional funds before or subsequent to the release of the noteholder's security interest in the property securing the loan, to correct any error or omission in these figures made in good faith, whether mathematical, clerical, typographical, or otherwise. The payoff figure is also subject to change to reflect any transactions that may occur on or after the date of this Statement.

© IIVALUE!
2017-0315

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,000,000.00 | 03-18-2017 | 03-15-2022 | 81010074 | 74 | | | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** MFP MID-AMERICA SHOPPING CENTERS LLC
1105 S 13TH ST STE 100
NORFOLK, NE 68701

**Lender:** Equitable Bank
Diers Avenue Branch
PO Box 160
Grand Island, NE 68802-0160
(308) 382-3136

---

**Principal Amount: $3,000,000.00**                                    **Date of Note: March 18, 2017**

**PROMISE TO PAY.** MFP MID-AMERICA SHOPPING CENTERS LLC ("Borrower") promises to pay to Equitable Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Three Million & 00/100 Dollars ($3,000,000.00), together with interest on the unpaid principal balance from March 18, 2017, calculated as described in the "INTEREST CALCULATION METHOD" paragraph using an interest rate of 3.950% per annum based on a year of 360 days, until paid in full. **The interest rate may change under the terms and conditions of the "INTEREST AFTER DEFAULT" section.**

**PAYMENT.** Borrower will pay this loan in 59 regular payments of $15,843.88 each and one irregular last payment estimated at $2,628,406.07. Borrower's first payment is due April 15, 2017, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on March 15, 2022, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied to escrow, interest, principal, and late charges. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Equitable Bank, Diers Avenue Branch, PO Box 160, Grand Island, NE 68802-0160.

**LATE CHARGE.** If a payment is 16 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment or $250.00, whichever is less.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by 4.000 percentage points. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Nebraska without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Nebraska.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Hall County, State of Nebraska.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein:

(A) a Deed of Trust dated March 18, 2017, to a trustee in favor of Lender on real property located in Buffalo County, State of Nebraska.

(B) an Assignment of All Rents to Lender on real property located in Buffalo County, State of Nebraska.

Loan No: 81010074

# PROMISSORY NOTE
## (Continued)

Page 2

**FINANCIAL INFORMATION.** Lender may, from time to time, request financial information from the Borrower. Borrower agrees to furnish any requested information upon the request of the Lender. All financial reports required to be provided under Lender's request shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

MFP MID-AMERICA SHOPPING CENTERS LLC

MFP CORNHUSKER PROPERTIES LLC, Member of MFP MID-AMERICA SHOPPING CENTERS LLC

PERKINS CENTERS DELAWARE, LLC, Manager of MFP CORNHUSKER PROPERTIES LLC

PERKINS, L.L.C., Manager of PERKINS CENTERS DELAWARE, LLC

MICHAEL D. PERKINS FUNNEL TRUST, Member of PERKINS, L.L.C.

By: _Michael D Perkins Trustee_
MICHAEL D PERKINS, Trustee of MICHAEL D.
PERKINS FUNNEL TRUST

MARKET SQUARE, INC., Member of PERKINS, L.L.C.

By: _Michael D Perkins President_
MICHAEL D PERKINS, President of MARKET
SQUARE, INC.

LaserPro, Ver. 17.1.0.023  Copr. D+H USA Corporation 1997, 2017  All Rights Reserved.  - NE  C:\CFI\PROFILE\D3E3\D TR 13787  PR-15

# LIMITED LIABILITY COMPANY RESOLUTION TO BORROW / GRANT COLLATERAL

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,000,000.00 | 03-18-2017 | 03-15-2022 | 81010074 | 74 | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Company:** MFP MID-AMERICA SHOPPING CENTERS LLC
1105 S 13TH ST STE 100
NORFOLK, NE 68701

**Lender:** Equitable Bank
Diers Avenue Branch
PO Box 160
Grand Island, NE 68802-0160
(308) 382-3136

---

I, THE UNDERSIGNED, DO HEREBY CERTIFY THAT:

**THE COMPANY'S EXISTENCE.** The complete and correct name of the Company is MFP MID-AMERICA SHOPPING CENTERS LLC ("Company"). The Company is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Delaware. The Company is duly authorized to transact business in the State of Nebraska and all other states in which the Company is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which the Company is doing business. Specifically, the Company is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. The Company has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. The Company maintains an office at 1105 S 13TH ST STE 100, NORFOLK, NE 68701. Unless the Company has designated otherwise in writing, the principal office is the office at which the Company keeps its books and records. The Company will notify Lender prior to any change in the location of the Company's state of organization or any change in the Company's name. The Company shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to the Company and the Company's business activities.

**RESOLUTIONS ADOPTED.** At a meeting of the members of the Company, duly called and held on **March 18, 2017**, at which a quorum was present and voting, or by other duly authorized action in lieu of a meeting, the resolutions set forth in this Resolution were adopted.

**MEMBER.** The following named entity is a member of MFP MID-AMERICA SHOPPING CENTERS LLC:

| NAMES | TITLES | AUTHORIZED | ACTUAL SIGNATURES |
|---|---|---|---|
| MFP CORNHUSKER PROPERTIES LLC | Member | Y | |

**ACTIONS AUTHORIZED.** The authorized entity listed above may enter into any agreements of any nature with Lender, and those agreements will bind the Company. Specifically, but without limitation, the authorized entity is authorized, empowered, and directed to do the following for and on behalf of the Company:

**Borrow Money.** To borrow, as a cosigner or otherwise, from time to time from Lender, on such terms as may be agreed upon between the Company and Lender, such sum or sums of money as in its judgment should be borrowed, without limitation.

**Execute Notes.** To execute and deliver to Lender the promissory note or notes, or other evidence of the Company's credit accommodations, on Lender's forms, at such rates of interest and on such terms as may be agreed upon, evidencing the sums of money so borrowed or any of the Company's indebtedness to Lender, and also to execute and deliver to Lender one or more renewals, extensions, modifications, refinancings, consolidations, or substitutions for one or more of the notes, any portion of the notes, or any other evidence of credit accommodations.

**Grant Security.** To mortgage, pledge, transfer, endorse, hypothecate, or otherwise encumber and deliver to Lender any property now or hereafter belonging to the Company or in which the Company now or hereafter may have an interest, including without limitation all of the Company's real property and all of the Company's personal property (tangible or intangible), as security for the payment of any loans or credit accommodations so obtained, any promissory notes so executed (including any amendments to or modifications, renewals, and extensions of such promissory notes), or any other or further indebtedness of the Company to Lender at any time owing, however the same may be evidenced. Such property may be mortgaged, pledged, transferred, endorsed, hypothecated or encumbered at the time such loans are obtained or such indebtedness is incurred, or at any other time or times, and may be either in addition to or in lieu of any property theretofore mortgaged, pledged, transferred, endorsed, hypothecated or encumbered.

**Execute Security Documents.** To execute and deliver to Lender the forms of mortgage, deed of trust, pledge agreement, hypothecation agreement, and other security agreements and financing statements which Lender may require and which shall evidence the terms and conditions under and pursuant to which such liens and encumbrances, or any of them, are given; and also to execute and deliver to Lender any other written instruments, any chattel paper, or any other collateral, of any kind or nature, which Lender may deem necessary or proper in connection with or pertaining to the giving of the liens and encumbrances.

**Negotiate Items.** To draw, endorse, and discount with Lender all drafts, trade acceptances, promissory notes, or other evidences of indebtedness payable to or belonging to the Company or in which the Company may have an interest, and either to receive cash for the same or to cause such proceeds to be credited to the Company's account with Lender, or to cause such other disposition of the proceeds derived therefrom as it may deem advisable.

**Further Acts.** In the case of lines of credit, to designate additional or alternate individuals as being authorized to request advances under such lines, and in all cases, to do and perform such other acts and things, to pay any and all fees and costs, and to execute and deliver such other documents and agreements, **including agreements waiving the right to a trial by jury**, as the member may in its discretion deem reasonably necessary or proper in order to carry into effect the provisions of this Resolution.

**ASSUMED BUSINESS NAMES.** The Company has filed or recorded all documents or filings required by law relating to all assumed business names used by the Company. Excluding the name of the Company, the following is a complete list of all assumed business names under which the Company does business: **None.**

**NOTICES TO LENDER.** The Company will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (A) change in the Company's name, (B) change in the Company's assumed business name(s), (C) change in the management or in the Members of the Company, (D) change in the authorized signer(s); (E) change in the Company's principal office address, (F) change in the Company's state of organization, (G) conversion of the Company to a new or different type of business entity; or (H) change in any other aspect of the Company that directly or indirectly relates to any agreements between the Company and Lender. No change in the Company's name or state of organization will take effect until after Lender has received notice.

**CERTIFICATION CONCERNING MEMBERS AND RESOLUTIONS.** The member named above is duly elected, appointed, or employed by or for the Company, as the case may be, and occupies the position set opposite its respective name. This Resolution now stands of record on the books of the Company, is in full force and effect, and has not been modified or revoked in any manner whatsoever.

**CONTINUING VALIDITY.** Any and all acts authorized pursuant to this Resolution and performed prior to the passage of this Resolution are hereby ratified and approved. This Resolution shall be continuing, shall remain in full force and effect and Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender at Lender's address shown above (or such addresses as Lender may designate from time to time). Any such notice shall not affect any of the Company's agreements or commitments in effect at the time notice is given.

**IN TESTIMONY WHEREOF,** I have hereunto set my hand and attest that the signature set opposite the name listed above is its genuine signature.

**I have read all the provisions of this Resolution, and I personally and on behalf of the Company certify that all statements and representations made in this Resolution are true and correct. This Limited Liability Company Resolution to Borrow / Grant Collateral is dated March 18, 2017.**

**THIS RESOLUTION IS DELIVERED UNDER SEAL AND IT IS INTENDED THAT THIS RESOLUTION IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.**

LIMITED LIABILITY COMPANY RESOLUTION TO BORROW / GRANT COLLATERAL

| Loan No: 81010074 | (Continued) | Page 2 |

CERTIFIED TO AND ATTESTED BY:

MFP CORNHUSKER PROPERTIES LLC, Member of MFP MID-AMERICA SHOPPING CENTERS LLC

PERKINS CENTERS DELAWARE, LLC, Manager of MFP CORNHUSKER PROPERTIES LLC

PERKINS, L.L.C., Manager of PERKINS CENTERS DELAWARE, LLC

MICHAEL D. PERKINS FUNNEL TRUST, Member of PERKINS, L.L.C.

By: _____(Seal)
MICHAEL D PERKINS, Trustee of MICHAEL D. PERKINS FUNNEL TRUST

MARKET SQUARE, INC., Member of PERKINS, L.L.C.

By: _____(Seal)
MICHAEL D PERKINS, President of MARKET SQUARE, INC.

NOTE. If the member signing this Resolution is designated by the foregoing document as one of the members authorized to act on the Company's behalf, it is advisable to have this Resolution signed by at least one non-authorized member of the Company

# CORPORATE RESOLUTION TO GUARANTEE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,000,000.00 | 03-18-2017 | 03-15-2022 | 81010074 | 74 | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** MFP MID-AMERICA SHOPPING CENTERS LLC
1105 S 13TH ST STE 100
NORFOLK, NE 68701

**Lender:** Equitable Bank
Diers Avenue Branch
PO Box 160
Grand Island, NE 68802-0160
(308) 382-3136

**Corporation:** MARKET SQUARE, INC.
1105 S 13TH ST
NORFOLK, NE 68701

I, THE UNDERSIGNED, DO HEREBY CERTIFY THAT:

THE CORPORATION'S EXISTENCE. The complete and correct name of the Corporation is MARKET SQUARE, INC. ("Corporation"). The Corporation is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Nebraska. The Corporation is duly authorized to transact business in all other states in which the Corporation is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which the Corporation is doing business. Specifically, the Corporation is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. The Corporation has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. The Corporation maintains an office at 1105 S 13TH ST, NORFOLK, NE 68701. Unless the Corporation has designated otherwise in writing, the principal office is the office at which the Corporation keeps its books and records. The Corporation will notify Lender prior to any change in the location of the Corporation's state of organization or any change in the Corporation's name. The Corporation shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to the Corporation and the Corporation's business activities.

RESOLUTIONS ADOPTED. At a meeting of the Directors of the Corporation, or if the Corporation is a close corporation having no Board of Directors then at a meeting of the Corporation's shareholders, duly called and held on March 16, 2017, at which a quorum was present and voting, or by other duly authorized action in lieu of a meeting, the resolutions set forth in this Resolution were adopted.

OFFICER. The following named person is an officer of MARKET SQUARE, INC.:

| NAMES | TITLES | AUTHORIZED | ACTUAL SIGNATURES |
|---|---|---|---|
| MICHAEL D PERKINS | President | Y | X [signature] |

ACTIONS AUTHORIZED. The authorized person listed above may enter into any agreements of any nature with Lender, and those agreements will bind the Corporation. Specifically, but without limitation, the authorized person is authorized, empowered, and directed to do the following for and on behalf of the Corporation:

**Guaranty.** To guarantee or act as surety for loans or other financial accommodations to Borrower from Lender on such guarantee or surety terms as may be agreed upon between the officer of the Corporation and Lender and in such sum or sums of money as in his or her judgment should be guaranteed or assured, without limit (the "Guaranty").

**Execute Security Documents.** To execute and deliver to Lender the forms of mortgage, deed of trust, pledge agreement, hypothecation agreement, and other security agreements and financing statements which Lender may require and which shall evidence the terms and conditions under and pursuant to which such liens and encumbrances, or any of them, are given; and also to execute and deliver to Lender any other written instruments, any chattel paper, or any other collateral, of any kind or nature, which Lender may deem necessary or proper in connection with or pertaining to the giving of the liens and encumbrances.

**Further Acts.** To do and perform such other acts and things and to execute and deliver such other documents and agreements, including agreements waiving the right to a trial by jury, as the officer may in his or her discretion deem reasonably necessary or proper in order to carry into effect the provisions of this Resolution.

ASSUMED BUSINESS NAMES. The Corporation has filed or recorded all documents or filings required by law relating to all assumed business names used by the Corporation. Excluding the name of the Corporation, the following is a complete list of all assumed business names under which the Corporation does business: None.

NOTICES TO LENDER. The Corporation will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (A) change in the Corporation's name; (B) change in the Corporation's assumed business name(s); (C) change in the management of the Corporation; (D) change in the authorized signer(s); (E) change in the Corporation's principal office address; (F) change in the Corporation's state of organization; (G) conversion of the Corporation to a new or different type of business entity; or (H) change in any other aspect of the Corporation that directly or indirectly relates to any agreements between the Corporation and Lender. No change in the Corporation's name or state of organization will take effect until after Lender has received notice.

CERTIFICATION CONCERNING OFFICERS AND RESOLUTIONS. The officer named above is duly elected, appointed, or employed by or for the Corporation, as the case may be, and occupies the position set opposite his or her respective name. This Resolution now stands of record on the books of the Corporation, is in full force and effect, and has not been modified or revoked in any manner whatsoever.

NO CORPORATE SEAL. The Corporation has no corporate seal, and therefore, no seal is affixed to this Resolution.

CONTINUING VALIDITY. Any and all acts authorized pursuant to this Resolution and performed prior to the passage of this Resolution are hereby ratified and approved. This Resolution shall be continuing, shall remain in full force and effect and Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender at Lender's address shown above (or such addresses as Lender may designate from time to time). Any such notice shall not affect any of the Corporation's agreements or commitments in effect at the time notice is given.

IN TESTIMONY WHEREOF, I have hereunto set my hand and attest that the signature set opposite the name listed above is his or her genuine signature.

I have read all the provisions of this Resolution, and I personally and on behalf of the Corporation certify that all statements and representations made in this Resolution are true and correct. This Corporate Resolution to Guarantee is dated March 18, 2017.

CERTIFIED TO AND ATTESTED BY:

X [signature]
MICHAEL D PERKINS, President of MARKET SQUARE, INC.

NOTE: If the officer signing this Resolution is designated by the foregoing document as one of the officers authorized to act on the Corporation's behalf, it is advisable to have this Resolution signed by at least one non-authorized officer of the Corporation.

LaserPro, Ver. 17.1.0.023 Copr. D+H USA Corporation 1997, 2017. All Rights Reserved. - NE C:\SHARED\APPS\CFI\LPL\C10.FC TR-13767 PR-15

# RESOLUTION OF CORPORATE LLC MEMBER

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,000,000.00 | 03-18-2017 | 03-15-2022 | 81010074 | 74 | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations

**Borrower:** MFP MID-AMERICA SHOPPING CENTERS LLC
1105 S 13TH ST STE 100
NORFOLK, NE 68701

**Lender:** Equitable Bank
Diers Avenue Branch
PO Box 160
Grand Island, NE 68802-0160
(308) 382-3136

**Corporation:** MARKET SQUARE, INC.
1105 S 13TH ST STE 100
NORFOLK, NE 68701

I, THE UNDERSIGNED, DO HEREBY CERTIFY THAT:

**ORGANIZATION.** The Corporation is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Nebraska The Corporation is duly authorized to transact business in all other states in which the Corporation is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which the Corporation is doing business. Specifically, the Corporation is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. The Corporation has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. The Corporation maintains an office at 1105 S 13TH ST STE 100, NORFOLK, NE 68701. Unless the Corporation has designated otherwise in writing, the principal office is the office at which the Corporation keeps its books and records including its records concerning the Collateral. The Corporation will notify Lender prior to any change in the location of the Corporation's state of organization or any change in the Corporation's name The Corporation shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to the Corporation and the Corporation's business activities.

**RELATIONSHIP TO BORROWER AND GRANTOR.** The Corporation is a Member in PERKINS, L.L.C.. PERKINS, L.L.C. is a Member in PERKINS CENTERS DELAWARE, LLC. PERKINS CENTERS DELAWARE, LLC is a Member in MFP CORNHUSKER PROPERTIES LLC. MFP CORNHUSKER PROPERTIES LLC is a Member in MFP MID-AMERICA SHOPPING CENTERS LLC. MFP MID-AMERICA SHOPPING CENTERS LLC has applied or will be applying to Equitable Bank ("Lender") for a loan or loans and other financial accommodations from Lender and has agreed to grant collateral for a loan or loans and other financial accommodations from Lender to MFP MID-AMERICA SHOPPING CENTERS LLC, including those which may be described on any exhibit or schedule attached to this Resolution The Corporation has considered the value of MFP MID-AMERICA SHOPPING CENTERS LLC obtaining the financial accommodations described above and granting the collateral.

**AUTHORIZATION TO BE A MEMBER.** The Corporation is authorized to be and become a Member in the Limited Liability Company named PERKINS, L.L.C., whose office is at 1105 S 13TH ST, NORFOLK, NE 68701.

**RESOLUTIONS ADOPTED.** At a meeting of the Directors of the Corporation, or if the Corporation is a close corporation having no Board of Directors then at a meeting of the Corporation's shareholders, duly called and held on March 18, 2017, at which a quorum was present and voting, or by other duly authorized action in lieu of a meeting, the resolutions set forth in this Resolution were adopted.

**OFFICER.** The following named person is an officer of MARKET SQUARE, INC.:

| NAMES | TITLES | AUTHORIZED | ACTUAL SIGNATURES |
|---|---|---|---|
| MICHAEL D PERKINS | President | Y | X ______________________ |

**ACTIONS AUTHORIZED.** The authorized person listed above may enter into any agreements of any nature with Lender, and those agreements will bind the Corporation. Specifically, but without limitation, the authorized person is authorized, empowered, and directed to do the following for and on behalf of the Corporation:

**Execute Documents.** As Member of PERKINS, L.L.C., to execute and deliver to Lender the form of Resolution of Limited Liability Company LLC Member and other loan documents submitted by Lender, confirming the nature and existence of PERKINS, L.L.C., including the Corporation's participation in PERKINS, L.L.C. as a Member.

**Authorize Officers.** To authorize other officers or employees of the Corporation, from time to time, to act in his or her stead or as his or her successors on behalf of the Corporation as Member in PERKINS, L.L.C..

**Further Acts.** To do and perform such other acts and things and to execute and deliver such other documents and agreements, including agreements waiving the right to a trial by jury, as the officer may in his or her discretion deem reasonably necessary or proper in order to carry into effect the provisions of this Resolution.

**NOTICES TO LENDER.** The Corporation will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (A) change in the Corporation's name, (B) change in the Corporation's assumed business name(s); (C) change in the management of the Corporation; (D) change in the authorized signer(s); (E) change in the Corporation's principal office address; (F) change in the Corporation's state of organization; (G) conversion of the Corporation to a new or different type of business entity; or (H) change in any other aspect of the Corporation that directly or indirectly relates to any agreements between the Corporation and Lender. No change in the Corporation's name or state of organization will take effect until after Lender has received notice.

**PARTICIPATION AUTHORIZED.** The Corporation's participation in PERKINS, L.L.C. as a Member and the execution, delivery, and performance of the documents described herein have been duly authorized by all necessary action by the Corporation and do not conflict with, result in a violation of, or constitute a default under (A) any provision of its articles of incorporation, bylaws, or any agreement or other instrument binding upon the Corporation or (B) any law, governmental regulation, court decree, or order applicable to the Corporation.

**CERTIFICATION CONCERNING OFFICERS AND RESOLUTIONS.** The officer named above is duly elected, appointed, or employed by or for the Corporation, as the case may be, and occupies the position set opposite his or her respective name. This Resolution now stands of record on the books of the Corporation, is in full force and effect, and has not been modified or revoked in any manner whatsoever.

**NO CORPORATE SEAL.** The Corporation has no corporate seal, and therefore, no seal is affixed to this Resolution.

**CONTINUING VALIDITY.** Any and all acts authorized pursuant to this Resolution and performed prior to the passage of this Resolution are hereby ratified and approved This Resolution shall be continuing, shall remain in full force and effect and Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender at Lender's address shown above (or such addresses as Lender may designate from time to time). Any such notice shall not affect any of the Corporation's agreements or commitments in effect at the time notice is given.

**IN TESTIMONY WHEREOF,** I have hereunto set my hand and attest that the signature set opposite the name listed above is his or her genuine signature.

I have read all the provisions of this Resolution, and I personally and on behalf of the Corporation certify that all statements and representations made in this Resolution are true and correct. This Resolution of Corporate LLC Member is dated March 18, 2017.

CERTIFIED TO AND ATTESTED BY:

X *Michael D Perkins President*
MICHAEL D PERKINS, President of MARKET SQUARE, INC.

LaserPro, Ver. 17.1.0.033 Copr. D+H USA Corporation 1997, 2017. All Rights Reserved. - NE C:\SHARE\CFI\LPL\C11.FC TR-13787 PR-1C

# RESOLUTION OF CORPORATE LLC MEMBER

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,000,000.00 | 03-18-2017 | 03-15-2022 | 81010074 | 74 | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

Borrower: MFP MID-AMERICA SHOPPING CENTERS LLC
1105 S 13TH ST STE 100
NORFOLK, NE 68701

Lender: Equitable Bank
Diers Avenue Branch
PO Box 160
Grand Island, NE 68802-0160
(308) 382-3136

Corporation: MARKET SQUARE, INC.
1105 S 13TH ST
NORFOLK, NE 68701

I, THE UNDERSIGNED, DO HEREBY CERTIFY THAT:

ORGANIZATION. The Corporation is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Nebraska. The Corporation is duly authorized to transact business in all other states in which the Corporation is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which the Corporation is doing business. Specifically, the Corporation is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. The Corporation has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. The Corporation maintains an office at 1105 S 13TH ST, NORFOLK, NE 68701. Unless the Corporation has designated otherwise in writing, the principal office is the office at which the Corporation keeps its books and records including its records concerning the Collateral. The Corporation will notify Lender prior to any change in the location of the Corporation's state of organization or any change in the Corporation's name. The Corporation shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to the Corporation and the Corporation's business activities.

RELATIONSHIP. The Corporation is a Member in PERKINS, L.L.C. PERKINS, L.L.C. has, including those which may be described on any exhibit or schedule attached to this Resolution. The Corporation has considered the value of PERKINS, L.L.C..

AUTHORIZATION TO BE A MEMBER. The Corporation is authorized to be and become a Member in the Limited Liability Company named PERKINS, L.L.C., whose office is at 1105 S 13TH ST STE 100, NORFOLK, NE 68701.

RESOLUTIONS ADOPTED. At a meeting of the Directors of the Corporation, or if the Corporation is a close corporation having no Board of Directors then at a meeting of the Corporation's shareholders, duly called and held on March 18, 2017, at which a quorum was present and voting, or by other duly authorized action in lieu of a meeting, the resolutions set forth in this Resolution were adopted.

OFFICER. The following named person is an officer of MARKET SQUARE, INC.:

| NAMES | TITLES | AUTHORIZED | ACTUAL SIGNATURES |
|---|---|---|---|
| MICHAEL D PERKINS | President | Y | X [signature] President |

ACTIONS AUTHORIZED. The authorized person listed above may enter into any agreements of any nature with Lender, and those agreements will bind the Corporation. Specifically, but without limitation, the authorized person is authorized, empowered, and directed to do the following for and on behalf of the Corporation:

Execute Documents. As Member of PERKINS, L.L.C., to execute and deliver to Lender the form of and other loan documents submitted by Lender, confirming the nature and existence of PERKINS, L.L.C., including the Corporation's participation in PERKINS, L.L.C. as a Member.

Authorize Officers. To authorize other officers or employees of the Corporation, from time to time, to act in his or her stead or as his or her successors on behalf of the Corporation as Member in PERKINS, L.L.C..

Further Acts. To do and perform such other acts and things and to execute and deliver such other documents and agreements, including agreements waiving the right to a trial by jury, as the officer may in his or her discretion deem reasonably necessary or proper in order to carry into effect the provisions of this Resolution.

NOTICES TO LENDER. The Corporation will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (A) change in the Corporation's name, (B) change in the Corporation's assumed business name(s), (C) change in the management of the Corporation; (D) change in the authorized signer(s), (E) change in the Corporation's principal office address; (F) change in the Corporation's state of organization; (G) conversion of the Corporation to a new or different type of business entity; or (H) change in any other aspect of the Corporation that directly or indirectly relates to any agreements between the Corporation and Lender. No change in the Corporation's name or state of organization will take effect until after Lender has received notice.

PARTICIPATION AUTHORIZED. The Corporation's participation in PERKINS, L.L.C. as a Member and the execution, delivery, and performance of the documents described herein have been duly authorized by all necessary action by the Corporation and do not conflict with, result in a violation of, or constitute a default under (A) any provision of its articles of incorporation, bylaws, or any agreement or other instrument binding upon the Corporation or (B) any law, governmental regulation, court decree, or order applicable to the Corporation.

CERTIFICATION CONCERNING OFFICERS AND RESOLUTIONS. The officer named above is duly elected, appointed, or employed by or for the Corporation, as the case may be, and occupies the position set opposite his or her respective name. This Resolution now stands of record on the books of the Corporation, is in full force and effect, and has not been modified or revoked in any manner whatsoever.

NO CORPORATE SEAL. The Corporation has no corporate seal, and therefore, no seal is affixed to this Resolution.

CONTINUING VALIDITY. Any and all acts authorized pursuant to this Resolution and performed prior to the passage of this Resolution are hereby ratified and approved. This Resolution shall be continuing, shall remain in full force and effect and Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender at Lender's address shown above (or such addresses as Lender may designate from time to time). Any such notice shall not affect any of the Corporation's agreements or commitments in effect at the time notice is given.

IN TESTIMONY WHEREOF, I have hereunto set my hand and attest that the signature set opposite the name listed above is his or her genuine signature.

I have read all the provisions of this Resolution, and I personally and on behalf of the Corporation certify that all statements and representations made in this Resolution are true and correct. This Resolution of Corporate LLC Member is dated March 18, 2017.

CERTIFIED TO AND ATTESTED BY:

X [signature] President

MICHAEL D PERKINS, President of MARKET SQUARE, INC.

LaserPro Ver. 17.1.0.023 Copr. D+H USA Corporation 1997, 2017. All Rights Reserved. - NE C:\HARLAND\CFI\LPL\C17.FC TR-1377 PR-16

## RESOLUTION OF LIMITED LIABILITY COMPANY MEMBER

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,000,000.00 | 03-18-2017 | 03-15-2022 | 81010074 | 574 | | | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** MFP MID-AMERICA SHOPPING CENTERS LLC
1105 S 13TH ST STE 100
NORFOLK, NE 68701

**Lender:** Equitable Bank
Diers Avenue Branch
PO Box 160
Grand Island, NE 68802-0160
(308) 382-3136

**Company:** PERKINS, L.L.C.
1105 S 13TH ST
NORFOLK, NE 68701

WE, THE UNDERSIGNED, DO HEREBY CERTIFY THAT:

**ORGANIZATION.** The Company is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Nebraska. The Company is duly authorized to transact business in all other states in which the Company is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which the Company is doing business. Specifically, the Company is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. The Company has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. The Company maintains an office at 1105 S 13TH ST, NORFOLK, NE 68701. Unless the Company has designated otherwise in writing, the principal office is the office at which the Company keeps its books and records including its records concerning the Collateral. The Company will notify Lender prior to any change in the location of the Company's state of organization or any change in the Company's name. The Company shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to the Company and the Company's business activities.

**RELATIONSHIP TO BORROWER AND GRANTOR.** The Company is a Member in PERKINS CENTERS DELAWARE, LLC. PERKINS CENTERS DELAWARE, LLC is a Member in MFP CORNHUSKER PROPERTIES LLC. MFP CORNHUSKER PROPERTIES LLC is a Member in MFP MID-AMERICA SHOPPING CENTERS LLC. MFP MID-AMERICA SHOPPING CENTERS LLC has applied or will be applying to Equitable Bank ("Lender") for a loan or loans and other financial accommodations from Lender and has agreed to grant collateral for a loan or loans and other financial accommodations from Lender to MFP MID-AMERICA SHOPPING CENTERS LLC, including those which may be described on any exhibit or schedule attached to this Resolution. The Company has considered the value of MFP MID-AMERICA SHOPPING CENTERS LLC obtaining the financial accommodations described above and granting the collateral.

**AUTHORIZATION TO BE A MEMBER.** The Company is authorized to and become a Member in the Limited Liability Company named PERKINS CENTERS DELAWARE, LLC, whose office is at 608 NORTH 114TH ST, OMAHA, NE 68154.

**RESOLUTIONS ADOPTED.** At a meeting of the members of the Company, duly called and held on March 18, 2017, at which a quorum was present and voting, or by other duly authorized action in lieu of a meeting, the resolutions set forth in this Resolution were adopted.

**MEMBERS.** The following named entities are members of PERKINS, L.L.C.:

| NAMES | TITLES | AUTHORIZED | ACTUAL SIGNATURES |
|---|---|---|---|
| MICHAEL D. PERKINS FUNNEL TRUST | | Y | |
| MARKET SQUARE, INC. | Member | Y | |

**ACTIONS AUTHORIZED.** Any one (1) of the authorized entities listed above may enter into any agreements of any nature with Lender, and those agreements will bind the Company. Specifically, but without limitation, any one (1) of such authorized entities are authorized, empowered, and directed to do the following for and on behalf of the Company:

**Execute Documents.** As Member of PERKINS CENTERS DELAWARE, LLC, to execute and deliver to Lender the form of Resolution of Limited Liability Company LLC Member and other loan documents submitted by Lender, confirming the nature and existence of PERKINS CENTERS DELAWARE, LLC, including the Company's participation in PERKINS CENTERS DELAWARE, LLC.

**Authorize Members.** To authorize other members or employees of the Company, from time to time, to act in their stead or as their successors on behalf of the Company as Member in PERKINS CENTERS DELAWARE, LLC.

**Further Acts.** To do and perform such other acts and things and to execute and deliver such other documents and agreements, including agreements waiving the right to a trial by jury, as the members may in their discretion deem reasonably necessary or proper in order to carry into effect the provisions of this Resolution.

**NOTICES TO LENDER.** The Company will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (A) change in the Company's name; (B) change in the Company's assumed business name(s); (C) change in the management or in the Members of the Company; (D) change in the authorized signer(s); (E) change in the Company's principal office address; (F) change in the Company's state of organization; (G) conversion of the Company to a new or different type of business entity; or (H) change in any other aspect of the Company that directly or indirectly relates to any agreements between the Company and Lender. No change in the Company's name or state of organization will take effect until after Lender has received notice.

**PARTICIPATION AUTHORIZED.** The Company's participation in PERKINS CENTERS DELAWARE, LLC as a Member and the execution, delivery, and performance of the documents described herein have been duly authorized by all necessary action by the Company and do not conflict with, result in a violation of, or constitute a default under (A) any provision of its articles of organization, or any agreement or other instrument binding upon the Company or (B) any law, governmental regulation, court decree, or order applicable to the Company.

**CERTIFICATION CONCERNING MEMBERS AND RESOLUTIONS.** The members named above are duly elected, appointed, or employed by or for the Company, as the case may be, and occupy the positions set opposite their respective names. This Resolution now stands of record on the books of the Company, is in full force and effect, and has not been modified or revoked in any manner whatsoever.

**CONTINUING VALIDITY.** Any and all acts authorized pursuant to this Resolution and performed prior to the passage of this Resolution are hereby ratified and approved. This Resolution shall be continuing, shall remain in full force and effect and Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender at Lender's address shown above (or such addresses as Lender may designate from time to time). Any such notice shall not affect any of the Company's agreements or commitments in effect at the time notice is given.

IN TESTIMONY WHEREOF, we have hereunto set our hand and attest that the signatures set opposite the names listed above are their genuine signatures.

We each have read all the provisions of this Resolution, and we each personally and on behalf of the Company certify that all statements and representations made in this Resolution are true and correct. This Resolution of Limited Liability Company Member is dated March 18, 2017.

**RESOLUTION OF LIMITED LIABILITY COMPANY MEMBER**
**(Continued)**

Loan No: 81010074                                                                    Page 2

CERTIFIED TO AND ATTESTED BY:

MICHAEL D. PERKINS FUNNEL TRUST, Member of PERKINS,
L.L.C.

By: _____
/MICHAEL D PERKINS, Trustee of MICHAEL D.
PERKINS FUNNEL TRUST

MARKET SQUARE, INC., Member of PERKINS, L.L.C.

By: _____
MICHAEL D PERKINS, President of MARKET
SQUARE, INC.

LaserPro Ver. 17.1.0.022 Copr. D+H USA Corporation 1997, 2017. All Rights Reserved. - NE C:\SHARE\SWPRO\CFI\LPL\C14.FC TR 43797 PR-11

# RESOLUTION OF LIMITED LIABILITY COMPANY MEMBER

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,000,000.00 | 03-18-2017 | 03-15-2022 | 81010074 | 74 | | | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "*****" has been omitted due to text length limitations.

**Borrower:** MFP MID-AMERICA SHOPPING CENTERS LLC
1105 S 13TH ST STE 100
NORFOLK, NE 68701

**Lender:** Equitable Bank
Diers Avenue Branch
PO Box 160
Grand Island, NE 68802-0160
(308) 382-3136

**Company:** MFP CORNHUSKER PROPERTIES LLC
1105 S 13TH ST STE 100
NORFOLK, NE 68701

**I, THE UNDERSIGNED, DO HEREBY CERTIFY THAT:**

**ORGANIZATION.** The Company is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Delaware. The Company is duly authorized to transact business in the State of Nebraska and all other states in which the Company is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which the Company is doing business. Specifically, the Company is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. The Company has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. The Company maintains an office at 1105 S 13TH ST STE 100, NORFOLK, NE 68701. Unless the Company has designated otherwise in writing, the principal office is the office at which the Company keeps its books and records including its records concerning the Collateral. The Company will notify Lender prior to any change in the location of the Company's state of organization or any change in the Company's name. The Company shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to the Company and the Company's business activities.

**RELATIONSHIP TO BORROWER AND GRANTOR.** The Company is a Member in MFP MID-AMERICA SHOPPING CENTERS LLC. MFP MID-AMERICA SHOPPING CENTERS LLC has applied or will be applying to Equitable Bank ("Lender") for a loan or loans and other financial accommodations from Lender and has agreed to grant collateral for a loan or loans and other financial accommodations from Lender to MFP MID-AMERICA SHOPPING CENTERS LLC, including those which may be described on any exhibit or schedule attached to this Resolution. The Company has considered the value of MFP MID-AMERICA SHOPPING CENTERS LLC obtaining the financial accommodations described above and granting the collateral.

**AUTHORIZATION TO BE A MEMBER.** The Company is authorized to be and become a Member in the Limited Liability Company named MFP MID-AMERICA SHOPPING CENTERS LLC, whose office is at 1105 S 13TH ST STE 100, NORFOLK, NE 68701.

**RESOLUTIONS ADOPTED.** At a meeting of the members of the Company, duly called and held on March 18, 2017, at which a quorum was present and voting, or by other duly authorized action in lieu of a meeting, the resolutions set forth in this Resolution were adopted.

**MANAGER.** The following named entity is a manager of MFP CORNHUSKER PROPERTIES LLC:

| NAMES | TITLES | AUTHORIZED | ACTUAL SIGNATURES |
|---|---|---|---|
| PERKINS CENTERS DELAWARE, LLC | Manager | Y | |

**ACTIONS AUTHORIZED.** The authorized entity listed above may enter into any agreements of any nature with Lender, and those agreements will bind the Company. Specifically, but without limitation, the authorized entity is authorized, empowered, and directed to do the following for and on behalf of the Company:

**Execute Documents.** As Member of MFP MID-AMERICA SHOPPING CENTERS LLC, to execute and deliver to Lender the form of Limited Liability Company Resolution and other loan documents submitted by Lender, confirming the nature and existence of MFP MID-AMERICA SHOPPING CENTERS LLC, including the Company's participation in MFP MID-AMERICA SHOPPING CENTERS LLC as a Member, and evidencing the terms of the loan from Lender to MFP MID-AMERICA SHOPPING CENTERS LLC.

**Authorize Managers.** To authorize other managers or employees of the Company, from time to time, to act in its stead or as its successors on behalf of the Company as Member in MFP MID-AMERICA SHOPPING CENTERS LLC.

**Further Acts.** In the case of lines of credit, to designate additional or alternate individuals as being authorized to request advances under such lines, and in all cases, to do and perform such other acts and things, to pay any and all fees and costs, and to execute and deliver such other documents and agreements, including agreements waiving the right to a trial by jury, as the manager may in its discretion deem reasonably necessary or proper in order to carry into effect the provisions of this Resolution.

**NOTICES TO LENDER.** The Company will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (A) change in the Company's name; (B) change in the Company's assumed business name(s); (C) change in the management or in the Managers of the Company; (D) change in the authorized signer(s), (E) change in the Company's principal office address; (F) change in the Company's state of organization, (G) conversion of the Company to a new or different type of business entity; or (H) change in any other aspect of the Company that directly or indirectly relates to any agreements between the Company and Lender. No change in the Company's name or state of organization will take effect until after Lender has received notice.

**PARTICIPATION AUTHORIZED.** The Company's participation in MFP MID-AMERICA SHOPPING CENTERS LLC as a Member and the execution, delivery, and performance of the documents described herein have been duly authorized by all necessary action by the Company and do not conflict with, result in a violation of, or constitute a default under (A) any provision of its articles of organization, or any agreement or other instrument binding upon the Company or (B) any law, governmental regulation, court decree, or order applicable to the Company.

**CERTIFICATION CONCERNING MANAGERS AND RESOLUTIONS.** The manager named above is duly elected, appointed, or employed by or for the Company, as the case may be, and occupies the position set opposite its respective name. This Resolution now stands of record on the books of the Company, is in full force and effect, and has not been modified or revoked in any manner whatsoever.

**CONTINUING VALIDITY.** Any and all acts authorized pursuant to this Resolution and performed prior to the passage of this Resolution are hereby ratified and approved. This Resolution shall be continuing, shall remain in full force and effect and Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender at Lender's address shown above (or such addresses as Lender may designate from time to time). Any such notice shall not affect any of the Company's agreements or commitments in effect at the time notice is given.

**IN TESTIMONY WHEREOF,** I have hereunto set my hand and attest that the signature set opposite the name listed above is its genuine signature.

I have read all the provisions of this Resolution, and I personally and on behalf of the Company certify that all statements and representations made in this Resolution are true and correct. This Resolution of Limited Liability Company Member is dated March 18, 2017.

**RESOLUTION OF LIMITED LIABILITY COMPANY MEMBER**
(Continued)

Loan No: 81010074                                                              Page 2

CERTIFIED TO AND ATTESTED BY:

PERKINS CENTERS DELAWARE, LLC, Manager of MFP
CORNHUSKER PROPERTIES LLC

PERKINS, L.L.C., Manager of PERKINS CENTERS DELAWARE. LLC

MICHAEL D. PERKINS FUNNEL TRUST, Member of PERKINS,
L.L.C.

By: _____
MICHAEL D PERKINS, Trustee of MICHAEL D.
PERKINS FUNNEL TRUST

MARKET SQUARE, INC., Member of PERKINS, L.L.C.

By: _____
MICHAEL D PERKINS, President of MARKET
SQUARE, INC.

## RESOLUTION OF LIMITED LIABILITY COMPANY MEMBER

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,000,000.00 | 03-18-2017 | 03-15-2022 | 81010074 | 74 | | | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** MFP MID-AMERICA SHOPPING CENTERS LLC
1105 S 13TH ST STE 100
NORFOLK, NE 68701

**Lender:** Equitable Bank
Diers Avenue Branch
PO Box 160
Grand Island, NE 68802-0160
(308) 382-3136

**Company:** PERKINS CENTERS DELAWARE, LLC
608 NORTH 114TH ST
OMAHA, NE 68154

**I, THE UNDERSIGNED, DO HEREBY CERTIFY THAT:**

**ORGANIZATION.** The Company is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Delaware. The Company is duly authorized to transact business in the State of Nebraska and all other states in which the Company is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which the Company is doing business. Specifically, the Company is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. The Company has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. The Company maintains an office at 608 NORTH 114TH ST, OMAHA, NE 68154. Unless the Company has designated otherwise in writing, the principal office is the office at which the Company keeps its books and records including its records concerning the Collateral. The Company will notify Lender prior to any change in the location of the Company's state of organization or any change in the Company's name. The Company shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to the Company and the Company's business activities.

**RELATIONSHIP TO BORROWER AND GRANTOR.** The Company is a Member in MFP CORNHUSKER PROPERTIES LLC. MFP CORNHUSKER PROPERTIES LLC is a Member in MFP MID-AMERICA SHOPPING CENTERS LLC. MFP MID-AMERICA SHOPPING CENTERS LLC has applied or will be applying to Equitable Bank ("Lender") for a loan or loans and other financial accommodations from Lender to MFP MID-AMERICA SHOPPING CENTERS LLC, including those collateral for a loan or loans and other financial accommodations from Lender to MFP MID-AMERICA SHOPPING CENTERS LLC, including those which may be described on any exhibit or schedule attached to this Resolution. The Company has considered the value of MFP MID-AMERICA SHOPPING CENTERS LLC obtaining the financial accommodations described above and granting the collateral.

**AUTHORIZATION TO BE A MEMBER.** The Company is authorized to be and become a Member in the Limited Liability Company named MFP CORNHUSKER PROPERTIES LLC, whose office is at 1105 S 13TH ST STE 100, NORFOLK, NE 68701.

**RESOLUTIONS ADOPTED.** At a meeting of the members of the Company, duly called and held on March 18, 2017, at which a quorum was present and voting, or by other duly authorized action in lieu of a meeting, the resolutions set forth in this Resolution were adopted.

**MANAGER.** The following named entity is a manager of PERKINS CENTERS DELAWARE, LLC:

| NAMES | TITLES | AUTHORIZED | ACTUAL SIGNATURES |
|---|---|---|---|
| PERKINS, L.L.C. | Manager | Y | |

**ACTIONS AUTHORIZED.** The authorized entity listed above may enter into any agreements of any nature with Lender, and those agreements will bind the Company. Specifically, but without limitation, the authorized entity is authorized, empowered, and directed to do the following for and on behalf of the Company:

**Execute Documents.** As Member of MFP CORNHUSKER PROPERTIES LLC, to execute and deliver to Lender the form of Resolution of Limited Liability Company LLC Member and other loan documents submitted by Lender, confirming the nature and existence of MFP CORNHUSKER PROPERTIES LLC, including the Company's participation in MFP CORNHUSKER PROPERTIES LLC as a Member.

**Authorize Managers.** To authorize other managers or employees of the Company, from time to time, to act in its stead or as its successors on behalf of the Company as Member in MFP CORNHUSKER PROPERTIES LLC.

**Further Acts.** To do and perform such other acts and things and to execute and deliver such other documents and agreements, including agreements waiving the right to a trial by jury, as the manager may in its discretion deem reasonably necessary or proper in order to carry into effect the provisions of this Resolution.

**NOTICES TO LENDER.** The Company will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (A) change in the Company's name; (B) change in the Company's assumed business name(s); (C) change in the management or in the Managers of the Company; (D) change in the authorized signer(s); (E) change in the Company's principal office address; (F) change in the Company's state of organization; (G) conversion of the Company to a new or different type of business entity; or (H) change in any other aspect of the Company that directly or indirectly relates to any agreements between the Company and Lender. No change in the Company's name or state of organization will take effect until after Lender has received notice.

**PARTICIPATION AUTHORIZED.** The Company's participation in MFP CORNHUSKER PROPERTIES LLC as a Member and the execution, delivery, and performance of the documents described herein have been duly authorized by all necessary action by the Company and do not conflict with, result in a violation of, or constitute a default under (A) any provision of its articles of organization, or any agreement or other instrument binding upon the Company or (B) any law, governmental regulation, court decree, or order applicable to the Company.

**CERTIFICATION CONCERNING MANAGERS AND RESOLUTIONS.** The manager named above is duly elected, appointed, or employed by or for the Company, as the case may be, and occupies the position set opposite its respective name. This Resolution now stands of record on the books of the Company, is in full force and effect, and has not been modified or revoked in any manner whatsoever.

**CONTINUING VALIDITY.** Any and all acts authorized pursuant to this Resolution and performed prior to the passage of this Resolution are hereby ratified and approved. This Resolution shall be continuing, shall remain in full force and effect and Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender at Lender's address shown above (or such addresses as Lender may designate from time to time). Any such notice shall not affect any of the Company's agreements or commitments in effect at the time notice is given.

**IN TESTIMONY WHEREOF,** I have hereunto set my hand and attest that the signature set opposite the name listed above is its genuine signature.

I have read all the provisions of this Resolution, and I personally and on behalf of the Company certify that all statements and representations made in this Resolution are true and correct. This Resolution of Limited Liability Company Member is dated March 18, 2017.

**RESOLUTION OF LIMITED LIABILITY COMPANY MEMBER**
**(Continued)**

Loan No: 81010074                                                                                    Page 2

CERTIFIED TO AND ATTESTED BY:

PERKINS, L.L.C., Manager of PERKINS CENTERS DELAWARE, LLC

MICHAEL D. PERKINS FUNNEL TRUST, Member of PERKINS,
L.L.C.

By: _____

MICHAEL D PERKINS, Trustee of MICHAEL D.
PERKINS FUNNEL TRUST

MARKET SQUARE, INC., Member of PERKINS, L.L.C.

By: _____

MICHAEL D PERKINS, President of MARKET
SQUARE, INC.

LaserPro, Ver 17.1.9.973 Copr. D+H USA Corporation 1997, 2017. All Rights Reserved. - NE C:\HARLAND\CFI\LPL\R\C18.FC  TR-25197  PR-13

# CERTIFICATE OF TRUST LLC MEMBER

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,000,000.00 | 03-18-2017 | 03-15-2022 | 81010074 | 74 | | *** | |
| References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations. | | | | | | | |

**Borrower:** MFP MID-AMERICA SHOPPING CENTERS LLC
1105 S 13TH ST STE 100
NORFOLK, NE 68701

**Lender:** Equitable Bank
Diers Avenue Branch
PO Box 160
Grand Island, NE 68802-0160
(308) 382-3136

**Trust:** MICHAEL D PERKINS FUNNEL TRUST
1619 KOENIGSTEIN
NORFOLK, NE 68701

I, THE UNDERSIGNED, DO HEREBY CERTIFY THAT:

**THE TRUST.** MICHAEL D PERKINS FUNNEL TRUST ("Trust") was created pursuant to a trust agreement.

**RELATIONSHIP.** Trust is a Member in PERKINS, L.L.C.. PERKINS, L.L.C. has, including those which may be described on any exhibit or schedule attached to this Certificate. Trust has considered the value of PERKINS, L.L.C.

**AUTHORIZATION TO BE A MEMBER.** Trust is authorized to be and become a Member in the Limited Liability Company named PERKINS, L.L.C., whose office is at 1105 S 13TH ST STE 100, NORFOLK, NE 68701.

**TRUSTEES.** The following named person has been duly appointed as Trustee of MICHAEL D PERKINS FUNNEL TRUST:

| NAMES | TITLES | AUTHORIZED | ACTUAL SIGNATURES |
|---|---|---|---|
| MICHAEL D PERKINS | Trustee of MICHAEL D PERKINS FUNNEL TRUST | Y | X Michael D Perkins Trustee |

**ACCEPTANCE AS TRUSTEE.** The person named above has accepted his or her appointment as Trustee and is duly acting as Trustees of Trust.

**ACTIONS AUTHORIZED.** The authorized person listed above may enter into any agreements of any nature with Lender, and those agreements will bind Trust. Specifically, but without limitation, the authorized person is authorized, empowered, and directed to do the following for and on behalf of Trust:

**Execute Documents.** As Member of PERKINS, L.L.C., to execute and deliver to Lender the form of and other loan documents submitted by Lender, confirming the nature and existence of PERKINS, L.L.C., including Trust's participation in PERKINS, L.L.C. as a Member.

**Authorize Trustees.** To authorize other Trustees or employees of Trust, from time to time, to act in his or her stead or as his or her successors on behalf of Trust as Member in PERKINS, L.L.C.

**Further Acts.** To do and perform such other acts and things and to execute and deliver such other documents and agreements, including agreements waiving the right to a trial by jury, as the Trustee may in his or her discretion deem reasonably necessary or proper in order to carry into effect the provisions of this Certificate.

**NOTICES TO LENDER.** The Trustee will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (A) change in Trust's name; (B) change in Trust's assumed business name(s); (C) change in the Trustees of the Trust; (D) change in the authorized signer(s); (E) change in Trust's state of organization; (F) conversion of Trust to a new or different type of business entity; or (G) change in any other aspect of Trust that directly or indirectly relates to any agreements between Trust and Lender. No change in Trust's name or state of organization will take effect until after Lender has received notice.

**PARTICIPATION AUTHORIZED.** Trust's participation in PERKINS, L.L.C. as a Member and the execution, delivery, and performance of the documents described herein have been duly authorized by all necessary action by Trust and do not conflict with, result in a violation of, or constitute a default under (A) any provision of its, or any agreement or other instrument binding upon Trust or (B) any law, governmental regulation, court decree, or order applicable to Trust.

**CERTIFICATION CONCERNING TRUSTEES AND CERTIFICATES.** The Trustee named above is duly elected, appointed, or employed by or for Trust, as the case may be, and occupies the position set opposite his or her respective name. This Certificate now stands of record on the books of Trust, is in full force and effect, and has not been modified or revoked in any manner whatsoever.

**CONTINUING VALIDITY.** Any and all acts authorized pursuant to this Certificate and performed prior to the passage of this Certificate are hereby ratified and approved. This Certificate shall be continuing, shall remain in full force and effect and Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender at Lender's address shown above (or such addresses as Lender may designate from time to time). Any such notice shall not affect any of Trust's agreements or commitments in effect at the time notice is given.

**IN TESTIMONY WHEREOF, I have hereunto set my hand and attest that the signature set opposite the name listed above is his or her genuine signature.**

**I have read all the provisions of this Certificate, and I personally and on behalf of Trust certify that all statements and representations made in this Certificate are true and correct. This Certificate of Trust LLC Member is dated March 18, 2017.**

TRUST:

X Michael D Perkins Trustee
MICHAEL D PERKINS, Trustee of MICHAEL D PERKINS FUNNEL TRUST

LaserPro, Ver. 17.1.0.023 Copr. D+H USA Corporation 1997, 2017. All Rights Reserved. - NE [illegible]

# CERTIFICATE OF TRUST LLC MEMBER

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,000,000.00 | 03-18-2017 | 03-15-2022 | 8101/0074 | 74 | | | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** MFP MID-AMERICA SHOPPING CENTERS LLC
1105 S 13TH ST STE 100
NORFOLK, NE 68701

**Lender:** Equitable Bank
Diers Avenue Branch
PO Box 160
Grand Island, NE 68802-0160
(308) 382-3136

**Trust:** MICHAEL D. PERKINS FUNNEL TRUST
1619 KOENIGSTEIN
NORFOLK, NE 68701

I, THE UNDERSIGNED, DO HEREBY CERTIFY THAT:

THE TRUST. MICHAEL D. PERKINS FUNNEL TRUST ("Trust") was created pursuant to a trust agreement.

RELATIONSHIP TO BORROWER AND GRANTOR. Trust is a Member in PERKINS, L.L.C. PERKINS, L.L.C. is a Member in PERKINS CENTERS DELAWARE, LLC. PERKINS CENTERS DELAWARE, LLC is a Member in MFP CORNHUSKER PROPERTIES LLC. MFP CORNHUSKER PROPERTIES LLC is a Member in MFP MID-AMERICA SHOPPING CENTERS LLC. MFP MID-AMERICA SHOPPING CENTERS LLC has applied or will be applying to Equitable Bank ("Lender") for a loan or loans and other financial accommodations from Lender and has agreed to grant collateral for a loan or loans and other financial accommodations from Lender to MFP MID-AMERICA SHOPPING CENTERS LLC, including those which may be described on any exhibit or schedule attached to this Certificate. Trust has considered the value of MFP MID-AMERICA SHOPPING CENTERS LLC obtaining the financial accommodations described above and granting the collateral.

AUTHORIZATION TO BE A MEMBER. Trust is authorized to be and become a Member in the Limited Liability Company named PERKINS, L.L.C., whose office is at 1105 S 13TH ST, NORFOLK, NE 68701.

TRUSTEES. The following named person has been duly appointed as Trustee of MICHAEL D. PERKINS FUNNEL TRUST:

| NAMES | TITLES | AUTHORIZED | ACTUAL SIGNATURES |
|---|---|---|---|
| MICHAEL D PERKINS | Trustee of MICHAEL D. PERKINS FUNNEL TRUST | Y | x _(signature)_ Michael D. Perkins, Trustee |

ACCEPTANCE AS TRUSTEE. The person named above has accepted his or her appointment as Trustee and is duly acting as Trustee of Trust.

ACTIONS AUTHORIZED. The authorized person listed above may enter into any agreements of any nature with Lender, and those agreements will bind Trust. Specifically, but without limitation, the authorized person is authorized, empowered, and directed to do the following for and on behalf of Trust:

Execute Documents. As Member of PERKINS, L.L.C., to execute and deliver to Lender the form of Resolution of Limited Liability Company LLC Member and other loan documents submitted by Lender, confirming the nature and existence of PERKINS, L.L.C., including Trust's participation in PERKINS, L.L.C. as a Member.

Authorize Trustees. To authorize other Trustees or employees of Trust, from time to time, to act in his or her stead or as his or her successors on behalf of Trust as Member in PERKINS, L.L.C.

Further Acts. To do and perform such other acts and things and to execute and deliver such other documents and agreements, including agreements waiving the right to a trial by jury, as the Trustee may in his or her discretion deem reasonably necessary or proper in order to carry into effect the provisions of this Certificate

NOTICES TO LENDER. The Trustee will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (A) change in Trust's name; (B) change in Trust's assumed business name(s); (C) change in the Trustees of the Trust; (D) change in the authorized signer(s); (E) change in Trust's state of organization; (F) conversion of Trust to a new or different type of business entity; or (G) change in any other aspect of Trust that directly or indirectly relates to any agreements between Trust and Lender. No change in Trust's name or state of organization will take effect until after Lender has received notice.

PARTICIPATION AUTHORIZED. Trust's participation in PERKINS, L.L.C. as a Member and the execution, delivery, and performance of the documents described herein have been duly authorized by all necessary action by Trust and do not conflict with, result in a violation of, or constitute a default under (A) any provision of its, or any agreement or other instrument binding upon Trust or (B) any law, governmental regulation, court decree, or order applicable to Trust

CERTIFICATION CONCERNING TRUSTEES AND CERTIFICATES. The Trustee named above is duly elected, appointed, or employed by or for Trust, as the case may be, and occupies the position set opposite his or her respective name. This Certificate now stands of record on the books of Trust, is in full force and effect, and has not been modified or revoked in any manner whatsoever.

CONTINUING VALIDITY. Any and all acts authorized pursuant to this Certificate and performed prior to the passage of this Certificate are hereby ratified and approved. This Certificate shall be continuing, shall remain in full force and effect until Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender at Lender's address shown above (or such addresses as Lender may designate from time to time). Any such notice shall not affect any of Trust's agreements or commitments in effect at the time notice is given.

IN TESTIMONY WHEREOF, I have hereunto set my hand and attest that the signature set opposite the name listed above is his or her genuine signature.

I have read all the provisions of this Certificate, and I personally and on behalf of Trust certify that all statements and representations made in this Certificate are true and correct. This Certificate of Trust LLC Member is dated March 18, 2017.

TRUST:

x _(signature)_ Michael D. Perkins, Trustee
MICHAEL D PERKINS, Trustee of MICHAEL D.
PERKINS FUNNEL TRUST

LaserPro, Ver. 17.1.0.023 Copr. D+H USA Corporation 1997, 2017  All Rights Reserved  - NE  C:\HARLAND\APPS\CFI\LPL\C9.FC  TR-13757  PR-3

# TRUST CERTIFICATE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,000,000.00 | 03-18-2017 | 03-15-2022 | 81010074 | | | www | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item
Any item above containing "***" has been omitted due to text length limitations

Borrower:  MFP MID-AMERICA SHOPPING CENTERS LLC
           1105 S 13TH ST STE 100
           NORFOLK, NE  68701

Lender:    Equitable Bank
           Diers Avenue Branch
           PO Box 160
           Grand Island, NE  68802-0160
           (308) 382-3136

Trust:     MICHAEL D PERKINS FUNNEL TRUST
           1619 KOENIGSTEIN
           NORFOLK, NE  68701

I, THE UNDERSIGNED, DO HEREBY CERTIFY THAT:

THE TRUST.  MICHAEL D PERKINS FUNNEL TRUST ("Trust") was created pursuant to a trust agreement.

TRUSTEES.  The following named person has been duly appointed as Trustee of MICHAEL D PERKINS FUNNEL TRUST:

| NAMES | TITLES | AUTHORIZED | ACTUAL SIGNATURES |
|---|---|---|---|
| MICHAEL D PERKINS | Trustee of MICHAEL D PERKINS FUNNEL TRUST | Y | x _Michael D Perkins, Trustee_ |

ACCEPTANCE AS TRUSTEE.  The person named above has accepted his or her appointment as Trustee and is duly acting as Trustees of Trust.

ACTIONS AUTHORIZED.  The authorized person listed above may enter into any agreements of any nature with Lender, and those agreements will bind Trust.  Specifically, but without limitation, the authorized person is authorized, empowered, and directed to do the following for and on behalf of Trust:

    **Guaranty.**  To guarantee or act as surety for loans or other financial accommodations to Borrower from Lender on such guarantee or surety terms as may be agreed upon between the Trustee of Trust and Lender and in such sum or sums of money as in his or her judgment should be guaranteed or assured, without limit (the "Guaranty").

    **Execute Security Documents.**  To execute and deliver to Lender the forms of mortgage, deed of trust, pledge agreement, hypothecation agreement, and other security agreements and financing statements which Lender may require and which shall evidence the terms and conditions under and pursuant to which such liens and encumbrances, or any of them, are given; and also to execute and deliver to Lender any other written instruments, any chattel paper, or any other collateral, of any kind or nature, which Lender may deem necessary or proper in connection with or pertaining to the giving of the liens and encumbrances.

    **Negotiate Items.**  To draw, endorse, and discount with Lender all drafts, trade acceptances, promissory notes, or other evidences of indebtedness payable to or belonging to Trust or in which Trust may have an interest, and either to receive cash for the same or to cause such proceeds to be credited to Trust's account with Lender, or to cause such other disposition of the proceeds derived therefrom as he or she may deem advisable.

    **Further Acts.**  To do and perform such other acts and things and to execute and deliver such other documents and agreements, including agreements waiving the right to a trial by jury, as the Trustee may in his or her discretion deem reasonably necessary or proper in order to carry into effect the provisions of this Certificate.

NOTICES TO LENDER.  The Trustee will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any  (A)  change in Trust's name;  (B)  change in Trust's assumed business name(s);  (C)  change in the Trustees of the Trust;  (D)  change in the authorized signer(s);  (E)  change in Trust's state of organization;  (F)  conversion of Trust to a new or different type of business entity; or  (G)  change in any other aspect of Trust that directly or indirectly relates to any agreements between Trust and Lender.  No change in Trust's name or state of organization will take effect until after Lender has received notice.

FURTHER TRUST CERTIFICATIONS.  The person named above is duly appointed and acting Trustee of Trust and is duly authorized to act on behalf of Trust in the manner described above; I am familiar with the purpose of the indebtedness; the indebtedness proceeds are to be used for a legitimate trust purpose and for the benefit of the Trust and its beneficiaries.

CONTINUING VALIDITY.  This Certificate shall be continuing, shall remain in full force and effect and Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender at Lender's address shown above (or such addresses as Lender may designate from time to time).  Any such notice shall not affect any of Trust's agreements or commitments in effect at the time notice is given.

IN TESTIMONY WHEREOF, I have hereunto set my hand and attest that the signature set opposite the name listed above is his or her genuine signature.

I have read all the provisions of this Certificate, and I personally and on behalf of Trust certify that all statements and representations made in this Certificate are true and correct.  This Trust Certificate is dated March 18, 2017.

CERTIFIED TO AND ATTESTED BY:

x _Michael D Perkins, Trustee_
MICHAEL D PERKINS, Trustee of MICHAEL D PERKINS FUNNEL TRUST

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,000,000.00 | 03-18-2017 | 03-15-2022 | 81010074 | 74 | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** MFP MID-AMERICA SHOPPING CENTERS LLC
1105 S 13TH ST STE 100
NORFOLK, NE 68701

**Lender:** Equitable Bank
Diers Avenue Branch
PO Box 160
Grand Island, NE 68802-0160
(308) 382-3136

THIS BUSINESS LOAN AGREEMENT dated March 18, 2017, is made and executed between MFP MID-AMERICA SHOPPING CENTERS LLC ("Borrower") and Equitable Bank ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of March 18, 2017, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Delaware. Borrower is duly authorized to transact business in the State of Nebraska and all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 1105 S 13TH ST STE 100, NORFOLK, NE 68701. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of organization or membership agreements, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral, and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes)

# BUSINESS LOAN AGREEMENT
## (Continued)

Loan No: 81010074      Page 3

assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement.

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Nebraska without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Nebraska.

**BUSINESS LOAN AGREEMENT**
**(Continued)**

Loan No: 81010074                            Page 5

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED MARCH 18, 2017.

BORROWER:

MFP MID-AMERICA SHOPPING CENTERS LLC

MFP CORNHUSKER PROPERTIES LLC, Member of MFP MID-AMERICA SHOPPING CENTERS LLC

PERKINS CENTERS DELAWARE, LLC, Manager of MFP CORNHUSKER PROPERTIES LLC

PERKINS, L.L.C., Manager of PERKINS CENTERS DELAWARE, LLC

MICHAEL D. PERKINS FUNNEL TRUST, Member of PERKINS, L.L.C.

By: _____
MICHAEL D PERKINS, Trustee of MICHAEL D. PERKINS FUNNEL TRUST

MARKET SQUARE, INC., Member of PERKINS, L.L.C.

By: _____
MICHAEL D PERKINS, President of MARKET SQUARE, INC.

LENDER:

EQUITABLE BANK

By: _____
Authorized Signer

# COMMERCIAL GUARANTY

| Borrower: | MFP MID-AMERICA SHOPPING CENTERS LLC<br>1105 S 13TH ST STE 100<br>NORFOLK, NE 68701 | Lender: | Equitable Bank<br>Diers Avenue Branch<br>PO Box 160<br>Grand Island, NE 68802-0160<br>(308) 382-3136 |
| --- | --- | --- | --- |
| Guarantor: | MICHAEL D PERKINS<br>608 NORTH 114TH ST<br>OMAHA, NE 68154 | | |

**GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations that Borrower individually or collectively or interchangeably with others, owes or will owe Lender under the Note and Related Documents and any renewals, extensions, modifications, refinancings, consolidations and substitutions of the Note and Related Documents.

If Lender presently holds one or more guarantees, or hereafter receives additional guarantees from Guarantor, Lender's rights under all guarantees shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty.

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S FINANCIAL STATEMENTS.** Guarantor agrees to furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than ninety (90) days after the end of each fiscal year, Guarantor's balance sheet and income statement for the year ended, prepared by Guarantor in form satisfactory to Lender.

**Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Guarantor's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

All financial reports required to be provided under this Guaranty shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Guarantor as being true and correct.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**COMMERCIAL GUARANTY**
(Continued)

| Loan No: 81010074 | Page 2 |
|---|---|

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates its claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law.** This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Nebraska without regard to its conflicts of law provisions.

**Choice of Venue.** If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of Hall County, State of Nebraska.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code.

**Borrower.** The word "Borrower" means MID-AMERICA SHOPPING CENTERS LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation MICHAEL D PERKINS, and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means Equitable Bank, its successors and assigns.

**Note.** The word "Note" means the promissory note dated March 18, 2017, in the original principal amount of $3,000,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

Loan No: 81010074

**COMMERCIAL GUARANTY**
**(Continued)**

Page 3

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE  THIS GUARANTY IS DATED MARCH 18, 2017.

GUARANTOR:

X _____
MICHAEL D PERKINS

LaserPro Ver. 17.1.0.023  Copr. D+H USA Corporation 1997, 2017.  All Rights Reserved.  - FL  C:\SHARED\APPS\CFI\PLR\E20.FC  TR-10767  PR-15

# COMMERCIAL GUARANTY

| Borrower: | MFP MID-AMERICA SHOPPING CENTERS LLC<br>1105 S 13TH ST STE 100<br>NORFOLK, NE 68701 | Lender: | Equitable Bank<br>Diers Avenue Branch<br>PO Box 160<br>Grand Island, NE 68802-0160<br>(308) 382-3136 |
|---|---|---|---|
| Guarantor: | MARKET SQUARE, INC.<br>1105 S 13TH ST<br>NORFOLK, NE 68701 | | |

**GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations that Borrower individually or collectively or interchangeably with others, owes or will owe Lender under the Note and Related Documents and any renewals, extensions, modifications, refinancings, consolidations and substitutions of the Note and Related Documents.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty.

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor, (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and permits Lender to apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any

Loan No: 81010074

## COMMERCIAL GUARANTY
### (Continued)

Page 3

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS.  IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY".  NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE.  THIS GUARANTY IS DATED MARCH 18, 2017.

GUARANTOR:

MARKET SQUARE, INC.

By: _____

MICHAEL  D  PERKINS, President  of  MARKET
SQUARE, INC.

LaserPro, Ver. 17.1.6.033 Copr. D-+H USA Corporation 1997, 2017  All Rights Reserved. - NT  C:\SHARED\LPPROFIL\E29.FC  TR-12287  PR-15

# COMMERCIAL GUARANTY

| Borrower: | MFP MID-AMERICA SHOPPING CENTERS LLC<br>1105 S 13TH ST STE 100<br>NORFOLK, NE 68701 | Lender: | Equitable Bank<br>Diers Avenue Branch<br>PO Box 160<br>Grand Island, NE 68802-0160<br>(308) 382-3136 |
|---|---|---|---|
| Guarantor: | MICHAEL D PERKINS FUNNEL TRUST<br>1619 KOENIGSTEIN<br>NORFOLK, NE 68701 | | |

**GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations that Borrower individually or collectively or interchangeably with others, owes or will owe Lender under the Note and Related Documents and any renewals, extensions, modifications, refinancings, consolidations and substitutions of the Note and Related Documents.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty.

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any

# COMMERCIAL GUARANTY
## (Continued)

| Loan No: 81010074 | | Page 2 |

claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness, Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Guaranty:

Amendments. This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Attorneys' Fees; Expenses. Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

Caption Headings. Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

Governing Law. This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Nebraska without regard to its conflicts of law provisions.

Choice of Venue. If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of Hall County, State of Nebraska.

Integration. Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

Interpretation. In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

Notices. Any notice required to be given under this Guaranty shall be given in writing, and shall be effective when actually delivered when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

No Waiver by Lender. Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

Successors and Assigns. Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

Waive Jury. Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

DEFINITIONS. The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

Borrower. The word "Borrower" means MFP MID-AMERICA SHOPPING CENTERS LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

Guarantor. The word "Guarantor" means everyone signing this Guaranty, including without limitation MICHAEL D PERKINS FUNNEL TRUST, and in each case, any signer's successors and assigns.

Guaranty. The word "Guaranty" means this guaranty from Guarantor to Lender.

Indebtedness. The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

Lender. The word "Lender" means Equitable Bank, its successors and assigns.

Note. The word "Note" means the promissory note dated March 18, 2017, in the original principal amount of $3,000,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of consolidations of, and substitutions for the promissory note or agreement.

Related Documents. The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

Loan No: 81010074

**COMMERCIAL GUARANTY**
(Continued)

Page 3

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED MARCH 18, 2017.

GUARANTOR:

MICHAEL D PERKINS FUNNEL TRUST

By: _____
MICHAEL D PERKINS, Trustee of MICHAEL D
PERKINS FUNNEL TRUST

LaserPro, Ver. 17.1.0.023, Copr. D+H USA Corporation 1997, 2017. All Rights Reserved. - NE  C:\CFI\LPL\E20.FC  TR-15787  PR-32

## AGREEMENT TO PROVIDE INSURANCE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,000,000.00 | 03-18-2017 | 03-15-2022 | 81010074 | 741 | | | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Grantor:** MFP MID-AMERICA SHOPPING CENTERS LLC
1105 S 13TH ST STE 100
NORFOLK, NE 68701

**Lender:** Equitable Bank
Diers Avenue Branch
PO Box 160
Grand Island, NE 68802-0160
(308) 382-3136

**INSURANCE REQUIREMENTS.** Grantor, MFP MID-AMERICA SHOPPING CENTERS LLC ("Grantor"), understands that insurance coverage is required in connection with the extending of a loan or the providing of other financial accommodations to Grantor by Lender. These requirements are set forth in the security documents for the loan. The following minimum insurance coverages must be provided on the following described collateral (the "Collateral"):

Collateral: 4915 2nd Ave, Kearney, NE 68847.
Type: Fire and extended coverage.
Amount: Full Insurable Value.
Basis: Replacement value.
Endorsements: Standard mortgagee's clause with stipulation that coverage will not be cancelled or diminished without a minimum of 10 days prior written notice to Lender, and without disclaimer of the insurer's liability for failure to give such notice.
Latest Delivery Date: By 10 days after the loan closing date.

**INSURANCE COMPANY.** Grantor may obtain insurance from any insurance company Grantor may choose that is reasonably acceptable to Lender. Grantor understands that credit may not be denied solely because insurance was not purchased through Lender.

**FLOOD INSURANCE.** Flood Insurance for the Collateral securing this loan is described as follows:

Real Estate at 4915 2nd Ave, Kearney, NE 68847.
Should the Collateral at any time be deemed to be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area Grantor agrees to obtain and maintain Federal Flood Insurance, if available, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan. Flood insurance may be purchased under the National Flood Insurance Program or from private insurers.

**FAILURE TO PROVIDE INSURANCE.** Grantor agrees to deliver to Lender, on the latest delivery date stated above, evidence of the required insurance as provided above, with an effective date of March 18, 2017, or earlier. Grantor acknowledges and agrees that if Grantor fails to provide any required insurance or fails to continue such insurance in force, Lender may do so at Grantor's expense as provided in the applicable security document. The cost of any such insurance, at the option of Lender, shall be added to the indebtedness as provided in the security document. GRANTOR ACKNOWLEDGES THAT IF LENDER SO PURCHASES ANY SUCH INSURANCE, THE INSURANCE WILL PROVIDE LIMITED PROTECTION AGAINST PHYSICAL DAMAGE TO THE COLLATERAL, UP TO AN AMOUNT EQUAL TO THE LESSER OF (1) THE UNPAID BALANCE OF THE DEBT, EXCLUDING ANY UNEARNED FINANCE CHARGES, OR (2) THE VALUE OF THE COLLATERAL; HOWEVER, GRANTOR'S EQUITY IN THE COLLATERAL MAY NOT BE INSURED. IN ADDITION, THE INSURANCE MAY NOT PROVIDE ANY PUBLIC LIABILITY OR PROPERTY DAMAGE INDEMNIFICATION AND MAY NOT MEET THE REQUIREMENTS OF ANY FINANCIAL RESPONSIBILITY LAWS.

**AUTHORIZATION.** For purposes of insurance coverage on the Collateral, Grantor authorizes Lender to provide to any person (including any insurance agent or company) all information Lender deems appropriate, whether regarding the Collateral, the loan or other financial accommodations, or both.

**GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS AGREEMENT TO PROVIDE INSURANCE AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED MARCH 18, 2017.**

GRANTOR:

MFP MID-AMERICA SHOPPING CENTERS LLC

MFP CORNHUSKER PROPERTIES LLC, Member of MFP MID-AMERICA SHOPPING CENTERS LLC

PERKINS CENTERS DELAWARE, LLC, Manager of MFP CORNHUSKER PROPERTIES LLC

PERKINS, L.L.C., Manager of PERKINS CENTERS DELAWARE, LLC

MICHAEL D. PERKINS FUNNEL TRUST, Member of PERKINS, L.L.C.

By: _____
MICHAEL D PERKINS, Trustee of MICHAEL D.
PERKINS FUNNEL TRUST

MARKET SQUARE, INC., Member of PERKINS, L.L.C.

By: _____
MICHAEL D PERKINS, President of MARKET
SQUARE, INC.

Loan No: 81010074

## AGREEMENT TO PROVIDE INSURANCE
### (Continued)

Page 2

---

**FOR LENDER USE ONLY**
**INSURANCE VERIFICATION**

DATE: _____

PHONE _____

AGENT'S NAME: _____

AGENCY: _____

ADDRESS: _____

INSURANCE COMPANY: _____

POLICY NUMBER: _____

EFFECTIVE DATES: _____

COMMENTS _____

# NOTICE OF INSURANCE REQUIREMENTS

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| | 03-18-2017 | | 81010074 | 74 | | ***** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "*****" has been omitted due to text length limitations.

**Grantor:** MFP MID-AMERICA SHOPPING CENTERS LLC
1105 S 13TH ST STE 100
NORFOLK, NE 68701

**Lender:** Equitable Bank
Diers Avenue Branch
PO Box 160
Grand Island, NE 68802-0160
(308) 382-3136

TO: ATTN: Insurance Agent

DATE: March 18, 2017

RE: Policy Number(s):

Insurance Companies/Company:

Dear Insurance Agent:

Grantor, MFP MID-AMERICA SHOPPING CENTERS LLC ("Grantor") is obtaining a loan from Equitable Bank. Please send appropriate evidence of insurance to Equitable Bank, together with the requested endorsements, on the following property, which Grantor is giving as security for the loan.

**Collateral:** 4915 2nd Ave, Kearney, NE 68847.
**Type:** Fire and extended coverage.
**Amount:** Full Insurable Value.
**Basis:** Replacement value.
**Endorsements:** Standard mortgagee's clause with stipulation that coverage will not be cancelled or diminished without a minimum of 10 days prior written notice to Lender, and without disclaimer of the insurer's liability for failure to give such notice.
**Latest Delivery Date:** By 10 days after the loan closing date.

RETURN TO:

Equitable Bank
Diers Avenue Branch
PO Box 160
Grand Island, NE 68802-0160

LaserPro, Ver. 17.1.0.023 Copr. D+H USA Corporation 1997, 2017. All Rights Reserved. - NE C:\HARLAND\CFI\LPL\I11.FC TR-13787 PR-15

Loan No: 81010074

## NOTICE OF INSURANCE REQUIREMENTS
### (Continued)

Page 2

GRANTOR:

MFP MID-AMERICA SHOPPING CENTERS LLC

MFP CORNHUSKER PROPERTIES LLC, Member of MFP MID-AMERICA SHOPPING CENTERS LLC

PERKINS CENTERS DELAWARE, LLC, Manager of MFP CORNHUSKER PROPERTIES LLC

PERKINS, L.L.C., Manager of PERKINS CENTERS DELAWARE, LLC

MICHAEL D. PERKINS FUNNEL TRUST, Member of PERKINS, L.L.C.

By: _____
MICHAEL D PERKINS, Trustee of MICHAEL D.
PERKINS FUNNEL TRUST

MARKET SQUARE, INC., Member of PERKINS, L.L.C.

By: _____
MICHAEL D PERKINS, President of MARKET
SQUARE, INC.

## DISBURSEMENT REQUEST AND AUTHORIZATION

| Principal | Loan Date | Maturity | Loan No. | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,000,000.00 | 03-18-2017 | 03-15-2022 | 81010074 | 74 | | | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** MFP MID-AMERICA SHOPPING CENTERS LLC
1105 S 13TH ST STE 100
NORFOLK, NE 68701

**Lender:** Equitable Bank
Diers Avenue Branch
PO Box 160
Grand Island, NE 68802-0160
(308) 382-3136

**LOAN TYPE.** This is a Fixed Rate (3.950%) Nondisclosable Loan to a Limited Liability Company for $3,000,000.00 due on March 15, 2022.

**PRIMARY PURPOSE OF LOAN.** The primary purpose of this loan is for:

☐ Personal, Family, or Household Purposes or Personal Investment.

☒ Business (Including Real Estate Investment).

**SPECIFIC PURPOSE.** The specific purpose of this loan is: Cash out refinance for other investment opportunities.

**DISBURSEMENT INSTRUCTIONS.** Borrower understands that no loan proceeds will be disbursed until all of Lender's conditions for making the loan have been satisfied. Please disburse the loan proceeds of $3,000,000.00 as follows:

| | |
|---|---|
| **Amount paid to Borrower directly:** | $846,523.80 |
| $846,523.80 Deposited to Checking Account # 383061276 | |
| **Amount paid to others on Borrower's behalf:** | $2,139,937.20 |
| $2,139,937.20 to Wire to Situs Asset Management | |
| **Other Charges Financed:** | $6,027.00 |
| $3,500.00 Appraisal | |
| $98.00 Recording | |
| $2,365.00 Title Insurance | |
| $64.00 Tax Monitoring Fee | |
| **Total Financed Prepaid Finance Charges:** | $7,512.00 |
| $7,500.00 Loan Origination Fee | |
| $12.00 Flood Determination | |
| **Note Principal:** | $3,000,000.00 |

**LIEN RELEASE FEES.** In addition to all other charges, Borrower agrees, to the extent not prohibited by law, to pay all governmental fees for release of Lender's security interests in collateral securing this loan. Borrower will pay these fees at the time the lien or liens are released. The estimated amount of these future lien release fees is $10.00.

**NOTICE - WRITTEN AGREEMENTS.** A credit agreement must be in writing to be enforceable under Nebraska law. To protect Borrower and Lender from any misunderstandings or disappointments, any contract, promise, undertaking or offer to forbear repayment of money or to make any other financial accommodation in connection with this loan of money or grant or extension of credit, or any amendment of, cancellation of, waiver of, or substitution for any or all of the terms or provisions of any instrument or document executed in connection with this loan of money or grant or extension of credit must be reduced to writing.

**FINANCIAL CONDITION.** BY SIGNING THIS AUTHORIZATION, BORROWER REPRESENTS AND WARRANTS TO LENDER THAT THE INFORMATION PROVIDED ABOVE IS TRUE AND CORRECT AND THAT THERE HAS BEEN NO MATERIAL ADVERSE CHANGE IN BORROWER'S FINANCIAL CONDITION AS DISCLOSED IN BORROWER'S MOST RECENT FINANCIAL STATEMENT TO LENDER. THIS AUTHORIZATION IS DATED MARCH 18, 2017.

**BORROWER:**

MFP MID-AMERICA SHOPPING CENTERS LLC

MFP CORNHUSKER PROPERTIES LLC, Member of MFP MID-AMERICA SHOPPING CENTERS LLC

PERKINS CENTERS DELAWARE, LLC, Manager of MFP CORNHUSKER PROPERTIES LLC

PERKINS, L.L.C., Manager of PERKINS CENTERS DELAWARE, LLC

MICHAEL D. PERKINS FUNNEL TRUST, Member of PERKINS, L.L.C.

By: _Michael D Perkins, Trustee_
MICHAEL D. PERKINS, Trustee of MICHAEL D.
PERKINS FUNNEL TRUST

MARKET SQUARE, INC., Member of PERKINS, L.L.C.

By: _Michael D Perkins, President_
MICHAEL D. PERKINS, President of MARKET
SQUARE, INC.

LaserPro, Ver. 17.1.0.023  Copr. D+H USA Corporation 1997, 2017.  All Rights Reserved.  - NE  C:\SHARE\DAPPED\CFI\LPL\PLG07.FC  TR-13797  PR-15



001541233D01

IN ⎯                                      ⎯AS COUNTY, NEBRASKA

PERKINS DELAWARE, LLC, a Delaware )          CASE NO.: CI 17-6964
limited liability company,                      )
                                                )
                                                )
                    Plaintiff,                  )
                                                )          **ORDER SETTING TEMPORARY**
vs.                                             )          **INJUNCTION HEARING**
                                                )
MF CORNHUSKER MEMBER LLC, a )
Delaware limited liability company, and )
MFP CORNHUSKER PROPERTIES LLC, a )
Delaware limited liability company,     )
                                                )
                    Defendants.                 )

#6   FILED
IN DISTRICT COURT
DOUGLAS COUNTY NEBRASKA

AUG 1 6 2017

JOHN M. FRIEND
CLERK DISTRICT COURT

THIS MATTER comes before the Court on Plaintiff Perkins Delaware, LLC's

("Plaintiff") Application for Temporary Restraining Order and Temporary Injunction against

Defendant MF Cornhusker Member LLC ("PF Member").  Plaintiff has filed its Complaint and

submitted the August 14, 2017 Affidavit of Michael Perkins.   Being duly advised in the

premises, the Court finds that the requested hearing on Plaintiff's Application for a Temporary

Injunction should be scheduled, but Plaintiff's Application for Temporary Restraining Order

should be denied as the Court finds the relief requested is inappropriate to be granted *ex parte*.

IT IS, THEREFORE, ORDERED that Plaintiff's Application for Temporary Injunction is

set for hearing on **August 25, 2017, at 9:30 a.m.**, in the District Court of Douglas County,

Nebraska, Courtroom No. 504, at which time Defendant PF Member is required to appear and

show cause why a temporary injunction should not be issued pending a final determination by

this Court.  Plaintiff is required forthwith to notify Defendants PF Member and MFP Cornhusker

Properties LLC of the time and place of said hearing.

IT IS FURTHER ORDERED that Plaintiff's Application for Temporary Restraining

Order is denied, without prejudice to Plaintiff's Application for Temporary Injunction.

Issued at _____ ____.m. this _____ day of August, 2017.

BY THE COURT:

_____
Honorable W. Russell Bowie, District Court Judge

Prepared and submitted by:

David J. Skalka, #21537
Croker, Huck, Kasher, DeWitt, Anderson &
    Gonderinger, L.L.C.
2120 South 72nd Street, Suite 1250
Omaha, Nebraska 68124
(402) 391-6777
(402) 390-9221 (Fax)

Attorneys for Plaintiffs

00707982.DOCX

2

Filed in Douglas District Court
*** EFILED ***
Case Number: D01CI170006964
Transaction ID: 0005678768
Filing Date: 08/23/2017 10:53:50 AM CDT

IN THE DISTRICT COURT OF DOUGLAS COUNTY, NEBRASKA

| | | |
|---|---|---|
| PERKINS DELAWARE, LLC, a Delaware limited liability company, | ) ) ) | CASE NO.: CI 17-6964 |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | **MOTION TO CONTINUE HEARING ON TEMPORARY INJUNCTION APPLICATION** |
| MF CORNHUSKER MEMBER LLC, a Delaware limited liability company, and MFP CORNHUSKER PROPERTIES LLC, a Delaware limited liability company, | ) ) ) ) ) | |
| Defendants. | ) ) | |

COMES NOW Plaintiff Perkins Delaware, LLC ("Plaintiff"), and through counsel moves this Court to continue the hearing on Plaintiff's Application for a Temporary Injunction currently scheduled for August 25, 2017 at 9:30 a.m., to a date and time on September 21, 2017 or as soon thereafter as this Court has time available for the parties to be heard on the Application.  In support of this Motion, Plaintiff states that Defendant MF Cornhusker Member LLC ("Defendant") has been served summons and notice of the upcoming hearing and has retained counsel, and that Plaintiff and Defendant have entered into a written agreement temporarily resolving certain matters and a term of that agreement is that the Temporary Injunction hearing shall be postponed to a date on or after September 21, 2017.

WHEREFORE, Plaintiff prays that this Motion be granted and the hearing on Plaintiff's Application Temporary Injunction currently scheduled for August 25, 2017 at 9:30 a.m. be continued to a date and time on September 21, 2017 or as soon thereafter as this Court has time available for the parties to be heard on the Application.

DATED this 23rd day of August, 2017.

PERKINS DELAWARE, LLC, a Delaware limited liability company

By: /s/ David J. Skalka
    Martin P. Pelster, #19223
    David J. Skalka, #21537
    CROKER, HUCK, KASHER, DeWITT,
      ANDERSON & GONDERINGER, L.L.C.
    2120 South 72nd Street, Suite 1200
    Omaha, Nebraska  68124
    (402) 391-6777
    (402) 390-9221 (Fax)

    Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 23rd day of August, 2017, a true and correct copy of the above and foregoing was sent via email to the following:

Bret Puls                                   bpuls@foxrothschild.com
Fox Rothschild LLP
Campbell Mithun Tower, Suite 2000
222 South Ninth Street
Minneapolis, MN 55402-3338

    /s/ David J. Skalka
    David J. Skalka, #21537

00709195.DOCX

2

# Certificate of Service

I hereby certify that on Wednesday, August 23, 2017 I provided a true and correct copy of the Motion-Continuance to the following:

MFP Cornhusker Properties LLC service method: No Service

MF Cornhusker Member LLC service method: No Service

Perkins Delaware, LLC, represented by Pelster,Martin,Paul (Bar Number: 19223) service method: Electronic Service to mpelster@crokerlaw.com

Signature: /s/ Skalka,David, (Bar Number: 21537)

IN THE DISTRICT COURT OF DOUGLAS COUNTY, NEBRASKA

| | |
|---|---|
| PERKINS DELAWARE, LLC, a Delaware limited liability company, | CASE NO.: CI 17-6964 |
| Plaintiff, | |
| vs. | **ORDER** |
| MF CORNHUSKER MEMBER LLC, a Delaware limited liability company, and MFP CORNHUSKER PROPERTIES LLC, a Delaware limited liability company, | |
| Defendants. | |

#6 FILED
IN DISTRICT COURT
DOUGLAS COUNTY NEBRASKA

AUG 2 5 2017

JOHN M. FRIEND
CLERK DISTRICT COURT

THIS MATTER comes before the Court on Plaintiff Perkins Delaware, LLC's ("Plaintiff") Motion to Continue the August 25, 2017 hearing on its Application for Temporary Injunction. Based upon the representations by Plaintiff's counsel and being duly advised in the premises, the Court finds that the Motion should be granted.

IT IS THEREFORE ORDERED that the hearing on Plaintiff's Application for Temporary Injunction that is currently set for August 25, 2017, at 9:30 a.m. is continued and shall now be heard on ___October 2___, 2017 at __1:30__ _p_ m. in the District Court of Douglas County, Nebraska, Courtroom No. 504. Plaintiff shall give notice of this Order to the Defendants.

Dated: August _24_, 2017

BY THE COURT:

Honorable W. Russell Bowie, District Court Judge

001549368D01

Prepared and submitted by:

David J. Skalka, #21537
Croker, Huck, Kasher, DeWitt, Anderson &
   Gonderinger, L.L.C.
2120 South 72nd Street, Suite 1250
Omaha, Nebraska 68124
(402) 391-6777
(402) 390-9221 (Fax)

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I, the undersigned, certify that on August 28, 2017    , I served a copy of the foregoing document upon the following persons at the addresses given, by mailing by United States Mail, postage prepaid, or via E-mail:

MF Cornhusker Member LLC                MFP Cornhusker Properties LLC
c/o National Registered Agents, Inc     1015 N 98th Street, Ste 100
160 Greentree Drive, Ste 101            Omaha, NE 68114
Dover, DE 19904

David J Skalka
dskalka@crokerlaw.com

Date:  August 28, 2017        BY THE COURT:  *John M. Friend*
                                             CLERK